**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:20-CV-973 |
| THE UNIVERSITY OF NORTH TEXAS, THE | § | |
| UNIVERSITY OF NORTH TEXAS SYSTEM, | § | JUDGE SEAN D. JORDAN |
| NEAL SMATRESK, PRESIDENT OF THE | § | |
| UNIVERSITY OF NORTH TEXAS and | § | |
| SHANNON GOODMAN, VICE PRESIDENT | § | |
| FOR ENROLLMENT OF THE UNIVERSITY | § | |
| OF NORTH TEXAS; | § | |
| *Defendants*. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
JOSEPH AARON BARNES, SR.
Texas Bar No. 24099014
abarnes@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

STATEMENT OF ISSUES ...................................................................................................1

INTRODUCTION ..................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................3

I.      STATUTORY HISTORY .............................................................................................3

II.     YOUNG CONSERVATIVES OF TEXAS .....................................................................3

STANDARD OF REVIEW ...................................................................................................5

SUMMARY OF THE ARGUMENT ....................................................................................6

ARGUMENT AND AUTHORITIES ....................................................................................7

I.      TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS
        EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A) ....................................................7

II.     EVEN IF TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES
        CITIZENS, IS NOT EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A), IT IS STILL
        INVALID UNDER THE PRINCIPLES OF CONFLICT PREEMPTION .................................10

        A.  Compliance with both Tex. Educ. Code § 54.051(d) and 8 U.S.C. §
            1623(a) is impossible ............................................................................12

        B.  Tex. Educ. Code § 54.051(d) stands as an obstacle to the
            accomplishment and execution of the full purposes and objectives of
            Congress ..................................................................................................14

CONCLUSION ......................................................................................................................20

CERTIFICATE OF SERVICE ..............................................................................................21

# TABLE OF AUTHORITIES

**Cases:**                                                                                       **Page(s):**

*Alden v. Maine*,
    527 U.S. 706 (1999)............................................................................................2

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008)..............................................................................................8

*Arizona v. United States*,
    567 U.S. 387 (2012)......................................................... 11, 15, 16, 17, *passim*

*Baker v. Farmers Elec. Co-op*,
    34 F.3d 274 (5th Cir. 1994) ..............................................................................5

*Barton v. Barr*,
    140 S. Ct. 1442 (2020).....................................................................................16

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988).........................................................................................14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................5

*Chadha v. Immigration & Naturalization Serv.*,
    634 F.2d 408 (9th Cir. 1980),
    *aff'd*, 462 U.S. 919 (1983) ........................................................................14, 15

*Chamber of Commerce of the United States v. Whiting*,
    563 U.S. 582 (2011)...........................................................................................8

*Cipollone v. Liggett Grp.*,
    505 U.S. 504 (1992)......................................................................................8, 11

*Coventry Health Care of Mo., Inc. v. Nevils*,
    137 S. Ct. 1190 (2017).......................................................................................8

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000).........................................................................2, 10, 11, 14

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993).......................................................................................6, 8

*Elkins v. Moreno*,
    435 U.S. 647 (1978).........................................................................................16

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990).............................................................................................6, 7

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)..............................................................................................12

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893)..............................................................................................15

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)............................................................ 6, 11, 14, 17, *passim*

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)..............................................................................................10

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824).............................................................................11, 15

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..........................................................................................14, 15, 16

*International Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)..............................................................................................17

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977)..........................................................................................11, 12

*Kansas v. Garcia*,
    140 S. Ct. 791 (2020)..........................................................................................2, 6

*Knauer v. United States*,
    328 U.S. 654 (1946)..............................................................................................15

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
    892 F.2d 1238 (5th Cir. 1990) ..............................................................................5

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)................................................................................................2

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819)............................................................................2, 14

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)............................................................................................7, 8

iv

*Merck Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019) ...............................................................................13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ....................................................................................19

*Motor Coach Employees v. Lockridge*,
    403 U.S. 274 (1971) ..................................................................................17

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) ..................................................................................13

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ..........................................................................7, 10, 11

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) .............................................................................17, 18

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) .........................................................................11, 12, 13

*Rosas v. U.S. Small Bus. Admin.*,
    964 F.2d 351 (5th Cir. 1992) .......................................................................5

*Toll v. Moreno*,
    458 U.S. 1 (1982) .....................................................................................15

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) ..................................................................................16

## Constitution, Statutes & Rules:

U.S. Const., art. I, § 8, cl. 4 ...............................................................................14
U.S. Const., art. VI, cl. 2 ...........................................................................1, 2, 16

8 U.S.C.
    § 1325 .................................................................................................16
    § 1326 .................................................................................................16
    § 1601 .................................................................................................17
    § 1601(2)(B) .........................................................................................17
    § 1601(6) .............................................................................................17
    § 1621(a) ...............................................................................................8
    § 1621(c)(1)(B) ......................................................................................8
    § 1621(d) ...............................................................................................9
    § 1622 .............................................................................................16, 17

§ 1623...........................................................................................................................3, 5, 6

§ 1623(a) ................................................................................................. 1, 2, 9, 10, *passim*

§ 1643(a)(2) ...............................................................................................................18

Tex. Educ. Code

§ 54.051(b)..................................................................................................................13

§ 54.051(d)........................................................................................... 1, 2, 3, 5, *passim*

§ 54.051(m)....................................................................................................................9

§ 54.052(a)(3) ................................................................................................2, 9, 10, 12

§ 54.053(3)(B)...................................................................................................10, 12, 16

Fed. R. Civ. P.

§ 1...................................................................................................................................5

§ 56.................................................................................................................................1

§ 56(a) ...........................................................................................................................5

## Other Authorities:

Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403,

Sec. 2, effective June 16, 2001 .............................................................................3, 10

Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528,

Sec. 3, effective September 1, 2005.......................................................................3, 10

Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208,

Div. C, Title V, Subtitle A, § 505, 110 Stat. 3009-672 (1996)...........................................3

TO THE HONORABLE SEAN D. JORDAN:

Plaintiff Young Conservatives of Texas Foundation ("Plaintiff" or "YCT") files this motion for summary judgment seeking declaratory and injunctive relief. Fed. R. Civ. P. 56. Specifically, Plaintiff seeks a declaration that Section 54.051(d) of the Texas Education Code, as applied to United States citizens, is preempted by 8 U.S.C. § 1623(a). This state statute is preempted because it establishes an unconstitutional tuition rate for nonresident citizens in violation of federal law. Accordingly, Plaintiff further seeks a declaration that the legal determinations and resulting actions taken by Defendant Neal Smatresk and Defendant Shannon Goodman in charging nonresident tuition to United States citizens were incompatible with federal law and thus without legal authority, invalid, and of no force or effect. Finally, Plaintiff requests that this Court enter an order permanently enjoining Defendants, as well as any and all agents, administrators, employees, and other persons acting on behalf of Defendants, from applying Section 54.051(d) of the Texas Education Code to United States citizens. Plaintiff seeks summary judgment because no genuine issue of material fact exists, and Plaintiff is entitled to judgment as a matter of law as to its preemption claim.

## STATEMENT OF ISSUES

1. Whether the state statute that charges nonresident tuition to United States citizens is preempted by Section 1623 of the federal Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

## INTRODUCTION

The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the United States Constitution are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl.

2. The Supremacy Clause "provides a rule of decision for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). It is a "basic" and long settled principle that state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819)). Thus, Congress's power to preempt state law is a "fundamental principle of the Constitution," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and when such preemption occurs, "[t]he States . . . are bound by obligations imposed by . . . federal statutes that comport with the constitutional design," *Alden v. Maine*, 527 U.S. 706, 755 (1999).

At its core, this case presents a straightforward instance of federal preemption. Federal law only allows "an alien who is not lawfully present in the United States" to qualify for resident tuition based on residence within the state if that same tuition rate is made available to United States citizens without regard to whether they are state residents. 8 U.S.C. § 1623(a). Texas law specifically allows such aliens to qualify for resident tuition based on residence within the state. Tex. Educ. Code § 54.052(a)(3). Accordingly, federal law mandates that resident tuition be made available to any United States citizen attending a Texas public university, regardless of whether that citizen is a state resident. 8 U.S.C. § 1623(a). However, Section 54.051(d) of the Texas Education Code denies resident tuition rates to United States citizens that do not qualify as Texas residents and is therefore preempted.

There are three routes this Court can travel in addressing the federal government's preemption of state law in this case. The first and most direct route is "express preemption," which only requires this Court to read the explicit, unambiguous language of Section 1623 and decide whether the state provision falls within the scope of preemption that Congress intended. The second, slightly more complex route is one type of "conflict preemption" that looks to whether

2

compliance with both state and federal law is impossible. The third and most intricate route is the other type of "conflict preemption" that requires a determination of whether the state law obstructs Congress's purposes and objectives. In order to completely and thoroughly apprise this Court, all three paths are mapped out below. However, no matter which route this Court elects to take, the destination remains the same—Section 54.051(d) of the Texas Education Code, as applied to United States citizens, has been preempted by federal law and is unconstitutional.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   STATUTORY HISTORY

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (hereinafter "IIRIRA") was enacted by the 104th United States Congress on September 30, 1996. Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, Div. C, Title V, Subtitle A, § 505, 110 Stat. 3009-672 (1996). One of IIRIRA's provisions, codified as 8 U.S.C. § 1623, preempts any state law that denies United States citizens a "postsecondary education benefit" of the same "amount, duration, and scope" as the benefits available to "an alien who is not lawfully present in the United States" if the alien is eligible for those benefits "on the basis of residence." Afterwards, the Texas legislature adopted statutory criteria that allows such aliens to qualify for "resident tuition." *See* Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2, effective June 16, 2001; *see also* Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528, Sec. 3, effective September 1, 2005. The moment that criteria was adopted into law, the state statute that charges "nonresident tuition"—Tex. Educ. Code § 54.051(d)—was immediately preempted with regard to United States citizens.

### II.   YOUNG CONSERVATIVES OF TEXAS

YCT is a non-partisan youth organization whose core organizational purpose is to promote conservative values. Declaration of William C. Dominguez, ¶ 2 ("Dominguez Decl."). In

advancing this core objective, YCT seeks to educate students and the public, advocate for conservative public policies, engage in campus activism, and hold elected representatives accountable by publishing ratings of those in the Texas Legislature. Dominguez Decl., ¶ 7. YCT has student chapters at colleges and universities across the state of Texas, including a chapter at the University of North Texas. Dominguez Decl., ¶¶ 3, 4. Many of YCT's members are United States citizens that do not qualify as Texas residents and are not otherwise exempt from the requirement to pay nonresident tuition. Dominguez Decl., ¶ 5. While these members could theoretically bring individual suits themselves, college students often lack the resources to effectively advance such legal claims. However, neither the claim asserted, nor the relief requested, is of the nature that would require their individual participation in this lawsuit.

As an on-campus group comprised of college students, advocacy for higher education reform is germane to YCT's core purpose of advancing conservative values. Dominguez Decl., ¶ 8. Accordingly, YCT's advocacy for higher education reform extends to both statewide issues and campus specific policies. Dominguez Decl., ¶ 8. In bringing conservative solutions to the many problems of higher education, YCT has promoted increased competition, transparency, and accountability in higher education. Dominguez Decl., ¶ 9. YCT has also advocated for the elimination of wasteful spending and opposed tuition deregulation as ways of lowering tuition. Dominguez Decl., ¶¶ 10, 11. Perhaps most relevant to the instant case, YCT has repeatedly opposed allowing those in the country illegally to pay resident tuition while United States citizens from other states must pay a higher rate. Dominguez Decl., ¶ 12. This unequal treatment of American citizens directly conflicts with the core tenets of YCT as an organization and injures many of its members. Dominguez Decl., ¶¶ 5, 8. And YCT's opposition to this practice has perceptibly impaired its ability to advocate in other policy areas by draining its organizational

4

resources. Dominguez Decl., ¶ 13. This Court should thus redress the injuries inflicted upon YCT and its members by the application of nonresident rates of tuition to United States citizens.

<strong>STANDARD OF REVIEW</strong>

Plaintiff challenges the validity and constitutionality of applying Tex. Educ. Code § 54.051(d) to United States citizens, specifically alleging that this state provision has been preempted by 8 U.S.C. § 1623. Whether a state statute is federally preempted is a pure question of law. *Baker v. Farmers Elec. Co-op.*, 34 F.3d 274, 278 (5th Cir. 1994). While discovery in this case has yet to commence, a grant of summary judgment at this early stage is not unusual in cases involving purely legal questions. *See Rosas v. U.S. Small Bus. Admin*., 964 F.2d 351, 359 (5th Cir. 1992) ("As the issues to be decided by the district court were purely legal in nature, the court did not abuse its discretion in deciding the summary judgment motion prior to completion of discovery."); *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1269 (5th Cir. 1990) (affirming summary judgment granted prior to discovery because "many of the issues raised by the summary judgment motions were purely legal and . . . discovery would therefore not aid their resolution.").

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). To prevail on a motion for summary judgment, a movant must show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Given that the sole issue before this Court is strictly legal in nature, and that the controlling law on that sole issue is abundantly clear, Plaintiff has already met that burden in the instant case. Accordingly, in a case such as this, which

5

involves only the application of a rule of decision for determining whether federal or state law applies, summary judgment is the proper means of addressing Plaintiff's constitutional claim.

## SUMMARY OF THE ARGUMENT

Generally speaking, "state law is pre-empted under the Supremacy Clause . . . in three circumstances": 1) express preemption; 2) conflict preemption; and 3) field preemption.[1] *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). These categories are not "rigidly distinct," *id*. at 79 n.5, and field and conflict preemption are often grouped together into the larger category of "implied preemption," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). However, regardless of which species of preemption is being invoked, "all preemption arguments[] must be grounded 'in the text and structure of the statute at issue.'" *Garcia*, 140 S. Ct. at 804 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U. S. 658, 664 (1993)).

In this case, the application of Section 54.051(d) of the Texas Education Code to United States citizens on the basis of residency is clearly and manifestly preempted by 8 U.S.C. § 1623. First, Section 54.051(d) is expressly preempted because it unambiguously falls within the substance and scope of the preemption provision contained in Section 1623. The explicit statutory language of Section 1623 clearly demonstrates that Congress intended to preempt certain kinds of state laws. And Section 54.051(d) of the Texas Education Code falls well within the scope of that preemptive intent.

However, even if this Court determines that express preemption does not apply, Section 54.051(d) of the Texas Education Code would still be invalid under either test for conflict preemption. First, Section 54.051(d) directly conflicts with the federal statute's structure and

---

[1]     The category of field preemption is inapplicable to the instant case. Therefore, this Motion addresses only express preemption and the two distinct tests for conflict preemption.

purpose, making compliance with both impossible. Indeed, private citizens from out of state cannot pay both the nonresident tuition required under state law and the resident tuition they are entitled to under federal law. Nor can this facial conflict be harmonized by school administrators or judges. Therefore, Section 54.051(d) must yield to federal law under the "impossibility" test for conflict preemption.

Finally, even if it were somehow possible to comply with both provisions, Section 54.051(d) of the Texas Education Code must still fall since it impermissibly obstructs Congress's overall purposes and objectives. The federal government's power to regulate immigration is both broad and well established. In exercising that power, Congress has created an extensive and complex statutory scheme of interrelated provisions that balances multiple competing interests. Section 1623, which seeks both to disincentivize illegal immigration and ensure equal treatment of American citizens, is essential to that broader regulation of immigration. Given that immigration constitutes a uniquely federal interest, the State's pursuit of policies that undermine federal immigration law is implicitly preempted.

## ARGUMENT AND AUTHORITIES

I.    **Tex. Educ. Code § 54.051(d), as applied to United States citizens, is expressly preempted by 8 U.S.C. § 1623(a).**

Congress possesses the power to employ "express language" to "pre-empt, i.e., invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Although the Supreme Court has recognized that even express preemption "fundamentally is a question of congressional intent," it remains true that "when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English*, 496 U.S. at 78-79. Indeed, where the language of "a statutory provision . . . expressly pre-empts state law," a court "need not go beyond that language to determine" Congress's intent. *See Medtronic, Inc. v. Lohr*,

518 U.S. 470, 484 (1996). Courts instead "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp.*, 507 U.S. at 664). In doing so, courts do not require Congress "to employ a particular linguistic formulation when preempting state law." *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1199 (2017); *see also Gade*, 505 U.S. at 112 (Kennedy, J., concurring in part and concurring in the judgment) (observing that the Court has "never required any particular magic words in our express preemption cases").

Where a federal law contains an express preemption clause, the only question that remains is "the substance and scope of Congress' displacement of state law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). In other words, where "the pre-emptive scope of [a federal statute] is governed entirely by the express language" of one of its provisions, a court then "need only identify the domain expressly pre-empted" by that provision. *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992). Much like the threshold question of whether a provision constitutes an express preemption, a court's "understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose*." *Medtronic*, 518 U.S. at 485-86 (internal quotation marks omitted). And again, congressional intent regarding scope "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Id*. at 486.

While the language of both the federal statute and state statute in the instant case is straightforward, how the texts of those statutes function requires a brief explanation of the statutory framework of each. Federal law provides that "an alien" that does not fall within one of three named categories "is not eligible for any State or local public benefit," 8 U.S.C. § 1621(a), including any "postsecondary education" benefit, 8 U.S.C. § 1621(c)(1)(B). However, one of the

8

statute's two exceptions to this general rule is that "[a] State may provide that an alien who is not lawfully present in the United States is eligible" for such benefits, but "only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d). Section 1623 then imposes an additional condition for cases where a state has passed a statute that provides eligibility for a postsecondary education benefit on the basis of residency:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a). Section 1623 is central to the instant case because it is the provision that expressly invalidates state statutes that fall within its scope.

For its part, Texas's statutory scheme provides that "[u]nless the student establishes residency or is entitled or permitted to pay resident tuition as provided by this subchapter, tuition for a student who is a citizen of any country other than the United States of America is the same as the tuition required of other nonresident students." Tex. Educ. Code § 54.051(m). However, any person—including an alien not lawfully present in the United States—is considered a state resident if he has "graduated from a public or private high school . . . or received the equivalent of a high school diploma" in Texas as well as "maintained a residence continuously" in Texas for both "the three years preceding the date of graduation or receipt of the diploma equivalent" and "the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education." Tex. Educ. Code § 54.052(a)(3). If the person attempting to qualify under this provision "is not a citizen or permanent resident of the United States, an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply" is required to be submitted to the institution of higher education. Tex.

Educ. Code § 54.053(3)(B). When these criteria are met, the individual then becomes eligible to pay resident tuition under Section 54.051(c) rather than the higher rate of nonresident tuition as calculated pursuant to Section 54.051(d).

When these two statutory regimes are considered in tandem, Section 1623's preemptive effect upon Section 54.051(d) becomes clear and manifest. Texas has extended a "postsecondary education benefit"—resident tuition—to aliens who are not lawfully present in the United States but that qualify as Texas residents under Section 54.052(a)(3) of the Texas Education Code. Further, Texas enacted that statutory criteria for determining residency after August 22, 1996. *See* Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2, effective June 16, 2001; *see also* Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528, Sec. 3, effective September 1, 2005. As the text of Section 1623 makes clear, any such extension of postsecondary education benefits to aliens who are not lawfully present in the United States invalidates the state statute that denies those same benefits to United States citizens. Accordingly, Section 54.051(d) of the Texas Education Code, as applied to United States citizens, falls well within the scope of Congress's displacement of state law and is thus expressly preempted.

## II.    EVEN IF TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS NOT EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A), IT IS STILL INVALID UNDER THE PRINCIPLES OF CONFLICT PREEMPTION.

Express preemption is not the only way a federal statute may invalidate a state statute. When "a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok*, 575 U.S. at 376-77. In distinguishing "between 'express' and 'implied' pre-emptive intent," the Supreme Court has traditionally "treat[ed] 'conflict' pre-emption as an instance of the latter." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884, (2000). Thus, "the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict," *Crosby*, 530 U.S. at

388, but instead is often "implicitly contained in [the federal statute's] structure and purpose," *Cipollone*, 505 U.S. at 516 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

It has long been recognized that "acts of the State Legislatures" that "interfere with, or are contrary to the laws of Congress" are invalid, even if they are "enacted in the execution of acknowledged State powers." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210-11 (1824); *see also Gade*, 505 U.S. at 108 (stating that "under the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield" (internal quotation marks omitted)). And while courts have traditionally gone to "great lengths attempting to harmonize conflicting statutes" when applying other legal principles, the text of the Supremacy Clause "suggests that courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011). Further, finding that a state statute falls outside the scope of an express preemptive provision "does not bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the pre-emption of laws falling outside the clause." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (internal quotation marks omitted).

Under the principles of conflict preemption, a "state law is pre-empted if that law *actually* conflicts with federal law." *Cipollone*, 505 U.S. at 516 (emphasis added). This can occur under either of two circumstances: 1) "where compliance with both state and federal law is impossible"; or 2) "where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (internal quotation marks omitted). As explained below, both varieties of conflict preemption are present in the instant case.

11

### A.  Compliance with both Tex. Educ. Code § 54.051(d) and 8 U.S.C. § 1623(a) is impossible.

Where state and federal law "directly conflict" such that it is impossible to comply with both, the "state law must give way" to its federal counterpart. *PLIVA*, 564 U.S. at 617-18 (internal quotation marks omitted). In fact, impossibility it the prototypical—and perhaps only—circumstance of a "direct conflict." *Id.* at 618 n.4 (declining to "address whether state and federal law 'directly conflict' in circumstances beyond 'impossibility'"). In cases of such impossibility, "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U. S. 132, 142 (1963).

As related above, state law requires some United States citizens, including student members of YCT, to pay nonresident tuition, as calculated by Section 54.051(d) of the Texas Education Code.[2] However, given that state law also allows an alien who is not lawfully present in the United States to pay resident tuition if that individual qualifies under Tex. Educ. Code § 54.052(a)(3),[3] federal law requires that all United States citizens also be made "eligible for such a

---

[2]     Nonresident tuition is routinely charged to such individuals in practice. Further, there is no provision within the Texas Education Code that either exempts all United States citizens from paying nonresident tuition or applies universally to qualify them for resident tuition. *Cf.* Tex. Educ. Code § 54. 0501(4) (defining "nonresident tuition" as "the amount of tuition paid by a person who is not a resident of this state and who is not entitled or permitted to pay resident tuition").

[3]     That this Section does not specifically refer to "an alien who is not lawfully present in the United States," or some equivalent term, is of no consequence for the purposes of conflict preemption. First, Section 54.053(3)(B) refers to an individual that "is not a citizen or permanent resident of the United States." Further, aliens not lawfully present in the country routinely qualify for resident tuition in practice through the application of this statutory regime. *See Jones*, 430 U.S. at 526 ("This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written"). And finally, the Office of the Registrar and the Admissions Office at the University of North Texas both publicly state that such individuals may qualify for resident tuition. *See* Non-U.S. Citizen Basing Residency on Self, *available at* https://registrar.unt.edu/residency/non-us-citizen-basing-residency-self; *see also* Texas     Resident     Tuition     for     International     Students,     *available     at* https://admissions.unt.edu/international/texas-resident-tuition. Thus, certain aliens not lawfully present in the country undoubtedly qualify for resident tuition in Texas.

benefit (in no less an amount, duration, and scope) without regard to" residency, 8 U.S.C. §
1623(a). This facial conflict between state and federal law clearly supports a finding of
impossibility preemption.

Indeed, it is impossible for anyone to harmonize these two inherently contradictory
provisions. No judge can possibly reconcile these two statutory regimes. *See Merck Sharp &
Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (observing that in addressing impossibility,
"the judge must simply ask himself or herself whether the relevant federal and state laws
irreconcilably conflict" (internal quotation marks omitted)). Nor may members of a "governing
board of each institution of higher education" both "cause to be collected from students registering
at the institution tuition or registration fees at the rates prescribed" by state law, *see* Tex. Educ.
Code § 54.051(b), and also extend the "postsecondary education benefit" of resident tuition to all
United States citizens, *see* 8 U.S.C. § 1623(a). And most relevantly for the purposes of conflict
preemption, it is "impossible for a private party to comply with both state and federal
requirements." *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English*, 496
U. S. at 79).

In *Bartlett*, the Supreme Court found preemption where "it was impossible for Mutual to
comply with both its state-law duty to strengthen the warnings on sulindac's label and its federal-
law duty not to alter sulindac's label." 570 U.S. at 480. In *PLIVA*, the Court found preemption
where "it was impossible for the Manufacturers to comply with both their state-law duty to change
the label and their federal-law duty to keep the label the same." 564 U.S. at 618. And in the instant
case, it is obviously impossible for the same student to comply with both his state-law duty to pay
nonresident tuition and his federal-law entitlement to only pay resident tuition. Because the state
law that imposes nonresident tuition on some students that are American citizens directly conflicts

with federal law, the inescapable conclusion follows that the provision is invalid and without effect. And if this Court finds that the state statute has been preempted based on impossibility, it need go no further in its analysis.

### B.  Tex. Educ. Code § 54.051(d) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

However, a distinct second variety of conflict preemption also renders Section 54.051(d) invalid. That state provision not only conflicts with 8 U.S.C. § 1623(a) because it is impossible to comply with both, but also because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Gade*, 505 U.S. at 98 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As was observed by Chief Justice Marshall long ago, the "unavoidable consequence" of federal supremacy under our constitutional order is that "the States have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436. While what constitutes "a sufficient obstacle" for the purposes of conflict preemption "is a matter of judgment," that determination is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Additionally, where the federal provision falls within "an area of uniquely federal interest," the state law's "conflict with federal policy need not be as sharp" for preemption to occur. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

The federal government's power to regulate the uniquely federal interest of immigration and naturalization is well established. This authority is derived from several sources, including Congress's power to "establish an uniform Rule of Naturalization." *Hines*, 312 U.S. at 66 (quoting U.S. Const., art. I, § 8, cl. 4). And Congress's power in this arena is even more expansive when combined with the Necessary and Proper Clause. *See, e.g.*, *Chadha v. Immigration &*

14

*Naturalization Serv.*, 634 F.2d 408, 418 (9th Cir. 1980) (referring to Congress's "considerable power over aliens" when the two clauses are "read in conjunction"), *aff'd*, 462 U.S. 919 (1983); *Knauer v. United States*, 328 U.S. 654, 673 (1946) (holding that the power of "denaturalization" is necessary and proper to Congress's power over naturalization). Even apart from Congress's enumerated powers, the federal government possesses authority over immigration pursuant to its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) (characterizing the "right to exclude or to expel all aliens" as "an inherent and inalienable right of every sovereign and independent nation").

It is also "well settled" that the federal government possesses "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394; *see also Toll v. Moreno*, 458 U.S. 1, 10 (1982) (referring to "the preeminent role of the Federal Government with respect to the regulation of aliens within our borders"). It has long been recognized that "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.'" *Hines*, 312 U.S. at 66 (quoting *Gibbons*, 22 U.S. at 211). Perhaps the best explanation of the preeminence of the federal government's power over immigration came in *Hines*:

> That the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution, was pointed out by the authors of The Federalist in 1787, and has since been given continuous recognition by this Court. When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute, for Article VI of the Constitution provides that "This

15

> Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

312 U.S. at 62-63 (quoting U.S. Const., art. VI, cl. 2). Because international relations, including immigration, is "the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority," it follows that "[a]ny concurrent state power that may exist is restricted to the narrowest of limits." *Id*. at 68.

In exercising its broad power over immigration, Congress has chosen to establish an "extensive and complex" statutory scheme. *Arizona*, 567 U.S. at 395; *see also Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (describing the Immigration and Nationality Act as a "comprehensive and complete code covering all aspects of admission of aliens to this country"). And IIRIRA has specifically been referred to as a "comprehensive immigration law" by the Supreme Court. *See Barton v. Barr*, 140 S. Ct. 1442, 1446 (2020). In explaining the elaborate nature of the federal government's regulation of immigration, the Supreme Court provided a useful (though necessarily inexhaustive) list of interrelated provisions in *Arizona v. United States*. *See* 567 U.S. at 395-96. Prominent among the Court's list of provisions was 8 U.S.C. §§ 1325 & 1326, which penalize unlawful entry and unlawful reentry into the country. *Id*. at 395. Perhaps more than any others, those provisions clearly address what the Court has identified as the significant "public interest" in implementing "effective measures to prevent the illegal entry of aliens." *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).[4] The Court also specifically cited 8 U.S.C. § 1622,

---

[4]     Conflict preemption still unquestionably applies here even though Texas arguably also seeks to dissuade illegal immigration, for example by requiring someone that is not "a citizen or permanent resident of the United States" to submit "an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply" to the institution of higher education. *See* Tex. Educ. Code § 54.053(3)(B). This is because

which is the provision that "authorizes States to deny noncitizens a range of public benefits." *Arizona*, 567 U.S. at 396. As explained above, Section 1622's denial of government benefits is modified by Section 1623, which is the provision that lies at the very heart of this case. Given the interplay between those two provisions, if Section 1622 is an essential part of Congress's "extensive and complex" regulation of immigration, then so too is Section 1623.

Section 1601 also provides concrete evidence that Congress specifically intended Section 1623 to dissuade illegal immigration by limiting the circumstances under which aliens not lawfully present in the country may qualify for postsecondary education benefits. Section 1601 applies directly to all of Chapter 14 of Title 8 of the United States Code, including Section 1623, and contains "statements concerning national policy with respect to welfare and immigration" that have been codified into federal law. 8 U.S.C. § 1601. Congress first affirms in Section 1601 that "[i]t continues to be the immigration policy of the United States that . . . the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2)(B). It then overtly recognizes the "compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6).

The complexity of Congress's regulation of immigration and naturalization results, at least in part, from the federal government's need to balance multiple competing interests. Thus, while Congress explicitly penalizes unlawful entry into the country, it does not seek to prevent illegal immigration "at all costs," instead electing to "proceed consistent with other priorities." *See Pac.*

---

"conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)). Thus, even where the "ultimate goal" of both laws is the same, a state law is still preempted "if it interferes with the methods by which the federal statute was designed to reach that goal." *Gade*, 505 U.S. at 103 (quoting *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

17

*Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983); *see, e.g.*, 8 U.S.C. § 1643(a)(2) ("Nothing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under Plyler v. Doe…"). And Section 1623 provides a prototypical example of this congressional balancing of competing interests. Pursuant to its broad authority over immigration, Congress was undoubtedly empowered to prohibit any postsecondary education benefit from being extended to any alien not lawfully present in the country under any circumstances. However, Congress instead elected to balance the federal interest in disincentivizing illegal immigration, the States' interests in maintaining flexibility in the administration of their public universities, and private citizens' interest in access to postsecondary education benefits that are at least equal to those available to aliens not lawfully present in the country.

In practice, Section 1623 functions as follows. It first dissuades illegal immigration by significantly limiting the circumstances under which "an alien who is not lawfully present in the United States" is "eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit." 8 U.S.C. § 1623(a). Such an individual may only be eligible in states where "a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." *Id*. States retain the flexibility to make both aliens not lawfully present in the country and all United States citizens eligible for these benefits. Alternatively, states may choose to make no such alien eligible for those benefits and continue to restrict the citizens that qualify based on state residency. What a state cannot do is have its cake and eat it too.

The kind of conditional preemption that is present in Section 1623 is by no means unprecedented. *See Gade*, 505 U.S. at 103 (finding that conflicting state laws were preempted by

OSHA, which "does not foreclose a State from enacting its own laws to advance the [statute's] goal," but "does restrict the ways in which it can do so"). In fact, such "tailored exceptions" to a "pre-emptive command demonstrates that Congress did not by any means act 'cavalierly' here." *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006). Rather, Congress proceeded with caution and prudence in seeking to accomplish its important federal objectives.

Finally, Section 1623 acts upon a third interest group—private citizens of the United States. The provision does this by ensuring that citizens may qualify for postsecondary benefits that are at least equivalent to those enjoyed by aliens not lawfully present in the United States. For states that elect not to extend resident tuition to such aliens, out-of-state citizens may also be denied resident tuition. But for other states that do allow such aliens to qualify based on residency, all citizens are also entitled to equal access to this same benefit. And where citizens gain an entitlement to this government benefit as a function of federal law, the state is not permitted to enforce any law denying that benefit or placing a burden upon these citizens. Or, put differently, the state statute then "actually conflicts" with federal law and is thus preempted.

In the instant case, the State has chosen to exercise the flexibility granted by Section 1623 by extending resident tuition to aliens not lawfully present in the United States. And by doing so, the State has willfully brought itself within the scope of the conditional preemption contained in Section 1623. Thus, 8 U.S.C. § 1623(a) implicitly preempts any application of Section 54.051(d) of the Texas Education Code to citizens of the United States. While the state "may have understandable frustrations with the problems caused by illegal immigration," as well as how the federal government has chosen to address those problems, "the State may not pursue policies that undermine federal law." *See Arizona*, 567 U.S. at 416.

## CONCLUSION

Because no genuine issue of material fact exists and the state provision requiring Defendants to charge some United States citizens nonresident tuition is clearly and manifestly preempted by federal law, summary judgment is appropriate, and a permanent injunction that prevents Defendants from applying the preempted state provision to citizens is warranted.

Respectfully submitted,

*/s/Robert Henneke*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
JOSEPH AARON BARNES, SR.
Texas Bar No. 24099014
abarnes@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:     (512) 472-2700
Facsimile:     (512) 472-2728

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed on January 8, 2021 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/Robert Henneke
ROBERT HENNEKE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION | § § § § | |
| *Plaintiff,* | § § § | CIVIL ACTION NO. 4:20-CV-973 |
| v. | § § | JUDGE SEAN D. JORDAN |
| THE UNIVERSITY OF NORTH TEXAS, THE UNIVESITY OF NORTH TEXAS SYSTEM, NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS and SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS; | § § § § § § § § | |
| *Defendants.* | § | |

**DECLARATION OF WILLIAM C. DOMINGUEZ**

I, William C. Dominguez, hereby declare as follows:

1.     I am over the age of 18, of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am the State Chairman of Young Conservatives of Texas ("YCT"), a non-partisan youth organization committed to advancing conservative values.

3.     In my role as State Chairman, I oversee all YCT chapters at colleges and universities across the state of Texas.

4.     YCT has established and currently maintains a chapter at the University of North Texas ("UNT") in Denton County, Texas.

5.     YCT's members include United States citizens that do not qualify as Texas residents and are not otherwise exempt from the requirement to pay nonresident tuition.

6.     YCT's members include individuals that are currently enrolled as undergraduate students at UNT.

7.     YCT's core organizational purpose is to advance conservative values by educating students and the public, advocating for conservative policies, engaging in campus activism, and publishing ratings of the Texas Legislature.

8.     Pursuant to this core purpose, YCT has repeatedly taken stands on issues of higher education. Advocacy for higher education reform is central to YCT's role as Texas's preeminent conservative youth organization. YCT not only advocates for such reforms statewide, but also focuses in on campus specific policies, including those at UNT. *See* Exhibit A.

9.     For example, YCT advocates for increased competition, transparency, and accountability in higher education. *See* Exhibits B, C, and D.

10.     YCT has also fought hard to eliminate wasteful spending as a means of lowering tuition. *See* Exhibits E and F.

11.     YCT has consistently mounted a conservative opposition to tuition deregulation. *See* Exhibits G and H.

12.     And, most relevantly, YCT has repeatedly opposed the disparate treatment of aliens who are not lawfully present in the United States and United States citizens from other states with regard to tuition. *See* Exhibits I, J, K, and L.

13.     The denial of resident tuition rates to United States citizens has impaired YCT's ability to advance conservative values by causing the organization to expend scarce resources that would otherwise be dedicated to advocacy in other policy areas.

Pursuant to 28 U.S.C. § 1746, I, William C. Dominguez, declare under penalty of perjury that the foregoing is true and correct. Executed on this _5_ day of January, 2021, in _DALLAS_, Texas.

William C. Dominguez

# EXHIBIT A



OF TEXAS

MENU          Contribute

## Find a YCT Chapter :

*Search Schools...*

# College Irresponsibility

Blog / October 27, 2008

Colleges students have been eager to complain about the rising cost of tuition, but students at the University of North Texas last week voted to hike their per-hour fees to pay for a new football field. Of course, they actually voted for a fee that won't go into effect until at least the fall of 2011 – when most of them will be long gone.

The per-hour athletics fee the UNT adds to the price of tuition will see a net increase of $7 per semester credit hour with promises from heads of the university, the athletic department, and members of the Student Government Association that it will improve the athletic programs of UNT. This new fee will also go to help pay for the development of a new football stadium, which officials say will help recruit better talent, improve our football program, and – not to worry – the new stadium will be all "green."

If students are concerned about the current amount they pay in tuition, and it should be implied by "they" most of the time that means mom and dad, why would they vote to increase their student fees?

Student fees are essentially taxes the university places on the students (and mom and dad) beyond the sticker-price of the per-hour tuition. One would assume that the last thing students would want is for any of these fees to increase. Of course, it is easier to vote for such an increase when it is for future students and future students' moms and dads.

The university was able to sell the fee hike to the students by stressing that it wouldn't go into effect for at least three years. That's shameful. Worse? Fourteen percent of the student body participated in the election, and out of those who voted, 58.1% voted in favor of the new fee.

The wording of the referendum was:

"In order for the University of North Texas to have a better Athletic program, which in turn can lead to national exposure and increased recognition of UNT; I agree to a dedicated Athletic Fee not to exceed $10 per semester credit hour, capped at 15 hours. Once the Athletic Fee is implemented, the Student Service Fee will be reduced by $3 per semester credit hour. The Athletic Fee shall not be implemented until the semester the new football stadium is complete, which is expected to be fall 2011."

With the de-regulation of tuition for public universities, many rightly worry about how it is becoming increasingly more expensive for middle class families to send their children to college, and an increase in student fees makes the price to attend a school like the University of North Texas that much more expensive.

## Sign up to get the latest:

*Email Address*

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas.
All rights reserved.

# EXHIBIT  B

# Republicans and Higher Education in Texas:
# A Crisis and an Opportunity
### by Publius Audax[1]

Texas faces a massive budget shortfall in the next biennium, and the State's options are limited by court decisions (K-12 education) and federal mandates (health care). The budget axe will fall disproportionately in the area of higher education

This juncture provides both great opportunities and great peril for the Texas Republican party. If the Republican legislature simply cuts the higher education budget, without further reforms, the universities will make the cuts as painful to students as possible, while protecting administrators and politically favored ("prestigious") professors. We can expect them to:

- increase tuition and mandatory fees
- slash financial aid, especially for the middle class
- cap enrollment in popular programs, like business.

Republicans in the legislature will be the scapegoats for these draconian cuts, incurring a political backlash from students, parents and alumni. The GOP could lose the support of an entire generation of youth, perhaps forever. Consider, for example, the violent reactions of students in Britain and California to recent austerity measures:
"Violent Protests Follow UK Fee Vote" http://on.wsj.com/eGREq2
"Berkeley Students Protest Higher Fees" http://on.wsj.com/fllF5Z

There is, however, a hidden opportunity that, if intelligently exploited by GOP leaders, can turn this around, actually winning support from college students while saving billions for the taxpayers.

This opportunity is a result of one simple fact: the higher education system is primarily organized for the benefit of its administrators and faculty, not students.

The Texas electorate is well aware of this fact, as a recent survey by the Texas Public Policy Foundation confirmed. 71% of Texas voters believed that Texas state universities could improve teaching while cutting costs. http://bit.ly/h7Scej As is so often the case, Texas voters are absolutely right.

The time has come to end the exclusive reliance on the bureaucratic, top-down, central-planning, Soviet-style model in higher education and to turn instead to the miracle of the free market, providing teachers and administrators with real incentives to improve teaching while cutting costs.

---

[1] "Publius Audax" is the pseudonym of a professor of the humanities at a major Texas public university, with over twenty years of teaching experience.

**What is to be Done**

**Get Higher Education Dollars Directly into the Hands of Students**

1. Zero out all direct appropriations to state colleges and universities, a savings of at least $15 billion. Instead, use some proportion of that amount (say, 75%) for scholarships that can be used by any Texas resident at any college in the state, private or public.

2. Pass a constitutional amendment channeling the returns from the Permanent University Fund to direct student aid for all students, as Colorado did successfully in 2004. The present arrangement encourages a wasteful over-investment in bricks and mortar.

**Free Students from the Heavy Hand of Bureaucrats and Faculty Senates**

3. Eliminate, or at least drastically scale back, the State's 42-hour mandatory "core". A 12-unit core (e.g., 3 each in American government, American history, math and science) would be sufficient. Instead, require all bachelors' programs to permit student at least 30 hours of free electives.

4. Enable private colleges and for-profit companies to create charter colleges, empowered to offer courses and degrees on state campuses.

**Provide Colleges, Departments and Individual Professors with both the Freedom and the Incentive to Teach**

5. Tie the salaries of administrators to the number of students enrolled in their programs, and tie the salaries of professors to the number of students they teach. At the same time, impose a mandatory grade curve (e.g., no more than 50% As and Bs), with deviations from the curve resulting in proportional deductions in salary.

6. Empower professors to teach as many students in as many sections of whatever courses they choose, and to hire their own teaching assistants, in order best to meet student demand.

7. Enable colleges, departments and individual professors to rebate tuition for their courses directly back to students, with the rebates deducted from their salaries. This will bring real price competition between teachers and programs, holding down spiraling tuition costs.

Students will see an immediate improvement in their freedom of choice and in the quality of educational opportunities, as for the first time real resources will follow them, inducing competition among professors and programs to provide students with the best instruction. For the full proposal, see " Needed Reforms for Public Higher Education in Texas," http://bit.ly/ihRfJb

# EXHIBIT  C

# Young Conservatives of Texas
# Legislative Affairs

## Public Testimony before the House Committee on Higher Education
*Tony McDonald, Vice Chairman for Legislative Affairs*
April 1st, 2009

I would like to thank Chairman Branch, Vice Chairman Castro, and all of the members of the House Committee on Higher Education for the opportunity to share my thoughts on House Bill 2504.

As a recent graduate of The University of Texas at Austin, I've experienced firsthand the frustration of attempting to register for classes without complete information about the courses that I was considering.

House Bill 2504 would provide much needed transparency for students, allowing them to access information about the syllabus, the reading requirements, the professor, and the costs of each course for which they are considering enrollment.

Currently students are mostly blind to all of this information.  We are forced to invest thousands of dollars, some of which is borrowed or granted by the taxpayers, with incomplete information about the value of the classes that we are choosing.

Had this information been available to me, I could have avoided that Geography class with the graduate student that required a book only printed in the UK.  I could have avoided taking two Geology courses that taught essentially the same thing. The list goes on and on.  Simply put, I could have made better and more informed decisions about my education.

At the same time, this bill will provide an opportunity for the public to receive a snap-shot of the education that they are investing in, both through their taxes and through their children's tuition.

House Bill 2504 is common sense legislation that will empower students and their families to make better decisions about the classes that they choose to take and the professors that they choose to learn from. It will open up our universities to a greater level of scrutiny from taxpayers and families which will, in turn, ensure greater accountability.

Texas universities demand a greater level of transparency and House Bill 2504 provides some of it.  I urge all of you to support this common sense legislation.

*For more information about Young Conservatives of Texas or our Legislative Agenda, please visit www.YCT.org. Mr. McDonald can be reached by telephone at (512) 923-6893 or by email at tony.mcdonald@yahoo.com.*

# EXHIBIT  D



## Accountability in Higher Education Costs

### Randy Samuelson, Chairman

In 2003, the State Legislature passed HB 3015, a bill that allowed the individual universities to set their own tuition rates instead of the State Legislature controlling those rates.  This bill is known as "tuition deregulation," but the bill did not actually deregulate the university system.  Instead, the Legislature divested itself of the ability to control the tuition rates of the universities and allowed the administrators, regents, and chancellors of the respective universities to set their own rates.   The result of this bill was the administrators at the largest universities, specifically UT and A&M, raising tuition rates by leaps and bounds without notice to students and parents who had already planned for a lower cost of higher education.  The universities still receive a majority of their money from the State Legislature, but they now have the ability to raise tuition each semester without accountability.

Young Conservatives of Texas (YCT) fought this bill in 2003 and unsuccessfully pushed for a repeal of this law in 2005.   The "tuition deregulation" plan has tremendously raised the cost of education for college students and has priced many students out of their first choice of universities. There are also fewer grants and financial aid given by Texas because the cost of the higher education has risen, on average, nearly 25% statewide over the last three years.  Because the cost of education has risen and the percentage of state funds going to financial aid has remained the same, fewer students now receive financial aid.  YCT believes the Legislature made a mistake in passing the tuition deregulation law in 2003 and we urge the Legislature to enact a plan to hold the universities accountable for the skyrocketing costs.

To hold the universities accountable, YCT proposes a three point plan.

1) Require the State Comptroller to audit the universities and also subject the individual universities to sunset reviews.  Texas should begin treating the individual university systems like other State Agencies to ensure that the universities do not have wasteful spending.

2) Subject the Board of Regents at the university systems to elections instead of a Gubernatorial appointment.  This vote should be a vote of affirmation or confirmation with the current students, parents, school employees, and registered alumni of each individual university having a vote.  By holding elections, the Board of Regents will be held accountable for tuition increases and will be forced to give reasons for their spending policies.

3) Submit a stipulation in the higher education code that requires a dollar-for-dollar reduction in matching state money for every dollar earned by a tuition increase.  Because the universities still receive a majority of their money from the State Legislature, their biennial appropriation should be reduced proportionally for every dollar that the universities raise through tuition hikes.

Young Conservatives of Texas
www.yct.org
www.yctleg.org

# EXHIBIT  E



**OF TEXAS**

MENU      Contribute

# Find a YCT Chapter :

*Search Schools...*

# Young Conservatives of Texas at Texas Tech Disappointed in 2010-2011 Increased Budget through Tuition Hikes

Press Releases / August 11, 2010

The Young Conservatives of Texas at Texas Tech, a non-partisan, conservative grassroots organization, is disappointed in the budget passed by the Board of Regents on August 6, 2010 for the 2010 – 2011 academic year.

Earlier this year, Governor Rick Perry made cuts to higher education funding, which caused a $29.7 million gap in the Texas Tech budget for the 2010-2011 school year. To compensate, the Board of Regents raised tuition rates by 9.95% in May. According to the newly approved budget, even with the 5 percent state mandated reduction, the Texas Tech budget is up 3% or $44 million from last year.

The Board of Regents states that the increase in tuition rates is to further projects and research in Texas Tech's journey to Tier-1 status. "YCT is adamantly opposed to Texas Tech attaining Tier-1 status on the backs of students," said Jeff Morris, Tech YCT Chairman.

Overall, YCT feels that the Board of Regents decided to forgo balancing the budget and took the easy way out by passing the burden on to students. In the future, there are other possible

alternatives which should be looked into for future budgets such as decreasing unnecessary expenditures.

YCT suggests reducing unnecessary spending to cover potential future budget gaps. This could include reducing the $700,000 being spent on "green" art at the new Rawls College of Business Administration building; or, placing the several building renovations on hold, such as, the Sports Studies Center at an expected cost of $2.9 million.

###

Sign up to get the latest:

*Email Address*

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas.
All rights reserved.

# EXHIBIT  F



MENU          Contribute

## Find a YCT Chapter :

*Search Schools...*

# And people wonder why tuition has increased so much?

Blog / May 12, 2009

KTRK Houston has recently aired a series of investigative reports on the out of control spending at the University of Houston. There is no doubt in my mind that this type of fraud is going on elsewhere. Check out the videos, become informed, and demand answers from your state legislators. Let's enact policies that drive down tuition and improve educational quality, not write universities more blank checks.

School dollars paying for exotic trips: http://abclocal.go.com/ktrk/story?section=news/13_undercover&id=6802443

Is U of H tuition paying bar bills?: http://abclocal.go.com/ktrk/story?section=news/13_undercover&id=6800225

U of H makes changes after investigation: http://abclocal.go.com/ktrk/story?section=news/13_undercover&id=6808062

Sign up to get the latest:

*Email Address*

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas.
All rights reserved.

# EXHIBIT  G

# The Conservative Case Against Tuition Deregulation

**By: Tony McDonald**

"Don't conservatives support deregulation?"

I can't count the number of times I've been asked this question, by allies and opponents alike in my struggle against Texas's tuition policy.

"Yes," I always respond.  And "tuition deregulation" didn't deregulate anything.

When the policy was proposed in 2003, my organization, Young Conservatives of Texas, opposed it from the beginning.  YCT understood that the proposed policy would not "deregulate" higher education.  It wouldn't expand competition or end government favoritism, to allow the best providers to win in the battle for their customers, Texas students.

Instead, the policy merely transferred the power to set tuition and fees from the elected Texas legislature, a body that was accountable to the people, to an unelected body; the appointed boards of regents.

This is the underlying problem with the tuition deregulation.

What many conservatives who supported the tuition "deregulation" policy forgot was that our public universities are government agencies; no different than our department of transportation or department of public safety.  Allowing them unlimited control to set the fees they charge Texas families would be no different than allowing the department of transportation to charge anything they would like for license plates.

Without restraints, government bureaucracies will always find some way to rationalize their need for more tax dollars.  As President Ronald Reagan once wittily proclaimed: "Government is like a baby. An alimentary canal with a big appetite at one end and no sense of responsibility at the other."

In the decade spanning from 1998 to 2008, my alumnus, The University of Texas at Austin served as a poster child for that lack of responsibility.   The University's budget more than doubled from 997 Million to 2.076 Billion.  While I'm sure that UT President Bill Powers would provide an emphatic defense of every dollar of that spending.  However, there are some critics that can question him, and with good cause.  According to the Texas Public Policy Foundation, administrative costs have risen to 14% of Higher Education budgets.   Productivity decline over the last quarter century has become the norm in higher education.  It now takes 21 employees to educate every 100 students.  This is compared to 18 employees for every 100 students in 1970.  These facts lead one

to believe that our university administrators are not interested in efficiency so much as they're interested in using other people's money to fund their pet projects.

So as budgets rise unrestrained, the Universities are forced to look somewhere for additional funding.

Administrators will claim that our state government has not accommodated them. They'll often stretch the facts to allege that state funding has gone down.  But research will show that state funding has remained relatively stable, and in fact has grown slightly over the last decade.  The growth may not have kept pace with rapidly expanding budgets, but higher education certainly hasn't been shortchanged.

The universities instead have tapped their new found resource … Texas families. Students and their families after 2003 became the path of least resistance for university administrators wishing to take-in and spend more money.  In the race to expand their budgets, administrators have rapidly increased tuition.  Across the state, total academic costs have grown by 53% from $1934 in 2003 to $2,952 in 2007.

Right now our state representatives and senators are meeting for the 81st Texas legislature.  Lawmakers have an important opportunity to pass legislation that would freeze tuition and limit future increases.  Any legislation which would limit tuition increases and put the authority over tuition back in the hands of the legislature would be a dramatic improvement over our current situation.

Our elected officials must act to prevent university administrators from continuing to reach into the wallets of students and their families in their race to spend more. Repealing tuition deregulation would protect Texas students and their families and force our universities to make wise decisions about how best to spend the public's money in the future.

*Tony McDonald is the Vice Chairman for Legislative Affairs for Young Conservatives of Texas.*

# EXHIBIT  H



MENU          Contribute

## Find a YCT Chapter :

*Search Schools...*

# YCT Applauds Senator Schwertner on Tuition Deregulation Bill

December 12, 2014

FOR IMMEDIATE RELEASE

December 12, 2014

Contact: Jenna White, Executive Director
Mobile: (281) 460-8545
Email: JennaAWhite@gmail.com

Austin, TX — Today, Young Conservatives of Texas (YCT) applauded State Senator Charles Schwertner for filing SB 233, bringing attention to the issue of tuition deregulation and skyrocketing tuition costs.

In 2003, the State of Texas faced a $10 Billion shortfall. As a way to mitigate cuts to higher education funding, the Legislature passed 'tuition deregulation' (HB 3015) which authorized unelected university boards of regents to set tuition rates, instead of the democratically elected legislature.

Since the passage of this bill, tuition rates have more than doubled and designated tuition has increased 222 percent.

"There is no issue we've had to educate elected officials and candidates on more than tuition deregulation," said YCT State Chairman Jeff Morris. "Most assume it is a good conservative policy because it has the word 'deregulation' in it, but the name is a misnomer at best."

At the time of passage, those in support argued the bill was justified based on the increasing value of a college education.

"A degree from UT or A&M is worth a lot of money and students may have to pay more for it through tuition deregulation," said Rep. Fred Brown (R – Bryan). "If you get the best education, it's going to cost a little extra money and there's no way around it."[1]

Even the conservative Speaker of the House, Tom Craddick, thought the policy made sense.

"I don't think this bill will shut anyone out of our higher education," said Craddick. "Universities need flexibility, I don't think all of them are going to go to the maximum."[2]

Craddick's support of the bill and decision to add $500 million to the Higher Education budget in exchange for its passage drew harsh criticism from YCT, who opposed tuition deregulation even in 2003.

"Speaker Craddick is attempting to insert complete and immediate tuition deregulation after both the House and Senate rejected wholesale tuition deregulation," said then YCT State Chairman David Rushing.[3]

Some legislators had doubts about the bill and foresaw that its effects on students could be drastic.

"Universities would cater to the very rich and the very poor, and the middle class would be left out in the cold," said Rep. Sylvester Turner (D – Houston). "We should not balance the budget on the backs of middle-class families."[4]

"Our position at Texas Tech has been that we're in favor of some flexibility, but we're really opposed to total deregulation," said Texas Tech Regent Robert Brown. "As tuition continues to increase, universities could control enrollment by raising tuition and keeping students out who cannot afford higher payments."[5]

For years, this issue has been at the top of YCT's legislative priorities, but has not received much attention.

Last week, Senator Schwertner wrote a heartfelt piece about putting an end to tuition deregulation. In the editorial, he argued that because student loans are so readily accessible, inflated cost is a major reason for the huge increase in student loan debt across our state.

"In the fall of 2003, a resident undergraduate attending class full time paid $1,934 per semester in tuition and fees. A decade later, the same student owed an average of $3,951 per semester," said Schwertner. "Are we really expected to believe that the value of an undergraduate degree is worth twice what it was only a decade ago?"[6]

As a solution, Schwertner has filed SB 233 which caps the amount a university can raise tuition to the previous year's tuition rate plus inflation. Additionally, it prohibits universities from raising fees more than the previous year plus inflation without student approval.

"We are very proud of Senator Schwertner for stepping up to the plate and taking on this issue," continued State Chairman Jeff Morris. "We encourage his fellow legislators to sign on to the bill and push hard for its passage this coming Session."

[1] Houston Chronicle: UT president lauds House bill as 'wise' (4/25/03)

[2] Lubbock Avalanche-Journal: Craddick backs tuition freedom for universities (5/4/03)

[3] Houston Chronicle: Tuition Issue still matter of concern (5/29/03)

[4] Austin American Statesman: Bill to deregulate tuition advances (4/30/03)

[5] El Paso Times: College to set tuitions (5/29/03)

[6] Texas Tribune: Tuition deregulation is failing Texas students (12/7/14)

*Young Conservatives of Texas is a non-partisan organization that has promoted conservatism at universities across the Lone Star State for over three decades. The State's most active political youth organization, YCT is composed of hundreds of members and alumni who participate in the full spectrum of politics. YCT issues the most respected ratings of the Texas legislature and is the only conservative group to have done so without interruption over the past 20 legislative sessions. For more information about YCT, please visit .*

###

PDF Version of Press Release

Sign up to get the latest:

*Email Address*

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas.
All rights reserved.

# EXHIBIT  I



## YOUNG CONSERVATIVES OF TEXAS – Legislative Affairs
### POLICY BRIEF:
## *IN-STATE COLLEGE TUITION*
## *FOR ILLEGAL IMMIGRANTS*

<u>Executive Summary</u>

In the 77th Texas Legislature (Spring 2001) legislation was initiated that would allow students who meet certain criteria (Mexican nationals having attended one year of high school in Texas while residing within the state and pledging to gain citizenship) to be eligible to attend Texas universities, colleges and community colleges at the discounted rate charged to Texas residents (HB 1043, passed and signed into law, and SB 1526). After amendments, the bill only pertained to students who attended a Texas High School for two years and signs an affidavit swearing that they are in the process of obtaining legal permanent residency. The bill's author (Rep. Rich Noriega, D-Houston) argued that college registrars were being forced to interpret and enforce immigration law. The bill passed the House of Representatives while only receiving opposition from one member upon both recorded votes (Rep. Will Hartnett, R-Dallas) and opposition from another member during the first recorded vote (Rep. Jerry Madden, R-Plano). In the Senate, three members voiced opposition (Sen. Mike Jackson, R-La Porte; Sen. Jane Nelson, R-Lewisville; Sen. Jeff Wentworth. R-San Antonio). The legislation certainly creates no barrier to illegal immigrants seeking to obtain in-state tuition status and, instead, seeks to eliminate the barriers and disincentives which were previously in place. In 2001, it was thought that about 3,154 Texas students would be affected by the bill and that about 2,221 students graduate from Texas high schools each year without citizenship. Therefore the cost and lost revenue for the state to educate these students at in-state tuition rates (assuming appropriate rates of attendance and retention) would quickly rise to more than $50,000,000 annually, according to the Legislative Budget Board. (UPDATE: The actual cost of these exemptions is dependent on funding formulas used. However, it is clear that these exemptions cost Texas tax payers dozens of millions of dollars annually). It could be assumed that, because of the difficulty of numbering those wishing to stay in the country anonymously, the actual cost could rise much higher. (UPADTE: Indeed the estimated numbers were far from correct. According to information obtained from the Texas Higher Education Coordinating Board, the number of HB 1403 exemptions totaled nearly 12,000 in 2005). By removing incentives towards establishing legal residency, the state, in fact, encourages illegal immigration. This legislation, and other existing pilot programs, treated most foreign students differently from their Mexican counterparts. Finally, in-state tuition was granted originally in order to enable, empower and encourage Texas citizens and residents to attend universities and colleges within the state and gain satisfactory education at a reasonable price.

Young Conservatives of Texas – Legislative Affairs
www.yct.org
www.yctleg.org



Statistical Overview

| | |
|---|---|
| $51,211,638 | The negative impact to budget as reported by the bills original fiscal note for FY 2005, as calculated by the LBB |
| $51,716,295 | The negative impact to budget as reported by the bills original fiscal note for FY 2006, as calculated by the LBB |
| $374,000,000 | The estimated amount spent on educating illegal immigrants in primary and secondary education as testified by Danny Morales, on behalf of Paul Bettencourt Harris County Tax Assessor/Collector |
| 2,221 | The number of students who graduate in Texas without citizenship as testified by Rep. Noriega in response to a question from Sen. Nelson |
| 11,556 | The number of HB 1403 waivers in 2005, as reported by the Texas Higher Education Coordinating Board |
| 20,000 | The approximate number of students who graduate in Texas without Social Security Numbers as testified by Rep. Noriega in response to a question from Sen. Nelson |
| 0 (Zero) | The number of witness registering any testimony against the bill during both sessions that the Senate Education Committee considered HB 1403 |
| 2 | The number of State Representatives voting against HB 1403 in either of the recorded votes |
| 3 | The number of State Senators who registered a "no" vote against HB 1403 |

Young Conservatives of Texas – Legislative Affairs
www.yct.org
www.yctleg.org

**EXHIBIT  J**



MENU          Contribute

## Find a YCT Chapter :

*Search Schools...*

# YCT Applauds Birdwell for Efforts to Repeal In-State Tuition for Illegal Aliens

Press Releases / May 10, 2011

FOR IMMEDIATE RELEASE
May 10, 2011

Contact: Daniel Cervera, (940) 642-0513

**AUSTIN —** Young Conservatives of Texas (YCT), the most active political youth organization in Texas, announced Tuesday its full endorsement of Senator Brian Birdwell's recent bid to defund in-state tuition for illegal aliens.

"Senator Birdwell should be praised for working on behalf of Texans to end in-state tuition for illegal aliens," said Tony McDonald, a UT law student and YCT Senior Vice Chairman for Legislative Affairs. "At a time when tough decisions are being made about the budget, Texans just can't afford to use the state's scarce financial resources to reward illegal activity."

A legislative committee report reveals Senator Birdwell's proposed amendments would save Texans an estimated $153 million by end of the 2016 fiscal year. Under current Texas law, U.S. citizens whose residence lies out-of-state are subject to higher tuition rates than students who continue to live in the country illegally.

"A system that unfairly rewards illegal immigration while charging legal U.S. citizens a higher tuition rate is not only insulting, it's irresponsible governance," said Daniel Cervera, a first-generation American and YCT Chapter Chairman at Baylor University. "I honestly can't believe Texans have put up with this law for as long as they have."

*YCT, which was founded in 1980, issues the most respected ratings of the Texas legislature and is the only conservative group to have done so without interruption over the last 18 legislative sessions. YCT has chapters at universities across Texas. To learn more about YCT, their legislative ratings, or their endorsements, visit www.yct.org.*

## Sign up to get the latest:

*Email Address*

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas.
All rights reserved.

# EXHIBIT  K



MENU        Contribute

## Find a YCT Chapter :

*Search Schools...*

# YCT Calls Out David Sibley Vote For In-State Tuition For Illegal Immigrants

Press Releases / June 14, 2010

As early voting begins in SD 22, the Young Conservatives of Texas, a non-partisan, independent, grassroots organization with chapters at universities all over the State of Texas calls out David Sibley, Republican candidate for Senate District 22, for voting in favor of illegal immigrants receiving in-state tuition.

House Bill 1403, which allowed illegal immigrants to be offered in-state tuition rates by Texas colleges and universities, was passed through the state legislature in 2001. As a state senator, prior to becoming a lobbyist, David Sibley voted in favor of HB 1403.

"HB 1403 encourages more inflow of illegal immigrants into Texas and penalizes foreign students who come legally to the United States to study," Tony McDonald, Senior Vice-Chairman of Legislative Affairs said. "In addition to voting in support of tuition breaks for illegal immigrants, David Sibley donated thousands of dollars to Democratic candidates and officeholders. Sibley even donated to Dem. State Rep. Rick Noriega, the author of this bad bill who later ran against Sen. John Cornyn."

YCT, which was founded in 1980, issues the most respected ratings of the state legislature and is the only conservative group to have done so without interruption over the last 18 legislative

sessions. YCT has chapters at universities all across the state. To learn more about YCT, their legislative ratings, or their endorsements visit www.yct.org.

## Sign up to get the latest:

Email Address

Submit

© Copyright 1980 - 2020 Young Conservatives of Texas. All rights reserved.

# EXHIBIT  L



# LEGISLATIVE AGENDA
# 86TH LEGISLATURE

*2019 YCT.ORG*

*Young Conservatives of Texas (YCT) releases its legislative agenda each session with the hope that Texas legislators will support bills that promote effective, limited government. Our priorities also shape our endorsement and legislative ratings process. They are designed to make clear to challengers and incumbents alike the foundational principles that guide our organization.*

# CONTENTS

| Subject | Page |
|---|---|
| Top Legislative Priorities | 2 |
| Higher Education | 3 |
| K-12 Education | 4 |
| Life & Liberty | 5 |
| Fiscal | 6 |
| Healthcare | 7 |
| Immigration | 8 |
| Government & Ethics | 9 |
| Other | 10 |
| Citations/Further Explanation | 11 |

# TOP LEGISLATIVE PRIORITIES

# 86TH LEGISLATURE

Below are YCT's "Top Legislative Priorities," which can also be found throughout this document.

## **FAVOR**

- Eliminating all so called "free-speech zones," especially those in place at public universities. [1]
- Repealing tuition "deregulation" of public universities. [2]
- Eliminating all so called "gun-free zones," especially those still in place at public universities. [3]
- The implementation of Constitutional Carry. [4]
- Encouraging competition in our public-school system through universal school choice or education savings accounts.
- Ending all state government benefits granted to individuals in this country illegally.
- Requiring zero-based budgeting for all government agencies.
- A constitutional amendment requiring that no governing entity raises spending more than the combined growth of population and rate of inflation.
- "Truth in Budgeting." The Legislature should fully balance the biennial budget without the use of deception and/or accounting tricks. We support the Conservative Texas Budget as proposed by the Texas Public Policy Foundation. [5]
- Barriers to municipalities and counties from enacting overbearing regulations that encroach upon personal liberties, product sale and use, employment, and property rights.
- Paycheck Protection Act and any legislation that ensures taxpayer money is not used for partisan politics and further empowers individual employees as opposed to local government unions. [6]

## **OPPOSE**

- The restriction of the time, place, manner of speech, and assembly more than absolutely necessary to protect normal academic and institutional activities.
- The creation of any new taxes and fees.
- Medicaid Expansion, or any attempt to further socialize the delivery of healthcare and medicine.
- Using race, ethnicity, gender, sexual preferences, or citizenship as a factor in determining either college acceptance or the amount of state scholarship/grant dollars a student receives.
- Any unnecessary regulations on cigarettes, including e-cigarettes.
- Targeting individuals and organizations for political purposes through campaign finance law, or expanding the reach of the Texas Ethics Commission.
- Any taxpayer-funded abortion and/or contraception, including university subsidized Plan B.
- Revenue collection through the use of property and franchise taxes.
- Arbitrary DWI checkpoints, blood draws by non-medical professionals, "no refusal" policies, and any reduction in the maximum blood alcohol content rules for DWI crimes.
- Any expansion of regulated gambling. [7]

# HIGHER EDUCATION

**FAVOR**

- Eliminating all so called "free speech zones," especially those still in place at public universities.[1]
- The repeal or erosion of tuition "deregulation." [8]
- Eliminating all so called "gun-free zones," especially those still in place at public universities. [9]
- Capping the amount colleges and universities can raise tuition/fees to the previous year's rate plus inflation.
- State intervention regarding newly added core requirements at public universities. [10]
- An appropriations rider requiring any cuts in higher education funding to be taken from research and administrative overhead as opposed to core undergraduate teaching functions.
- Requiring the state Comptroller to audit public colleges and universities.
- Shifting a large amount of the state's appropriated money from individual universities to the Texas Grant Program. [11]
- Transparency in mandatory fees imposed upon students at public universities.
- Eliminating the Sunset exemption for Higher Education and requiring each university system to undergo a sunset review.
- Separating the teaching and research budgets of state colleges and universities in order to increase efficiency and transparency.

**OPPOSE**

- In-state tuition rates and all financial assistance for illegal immigrants.
- Universities lobbying with tax dollars, student fees, or tuition dollars.
- The "Top Ten Percent" Rule and any other automatic admission policies.
- State or student tuition/fee funding for ethnic and gender studies programs and centers.
- Using race, ethnicity, gender, or sexual preferences as a factor in determining either acceptance, or the amount of state scholarship/grant dollars a student receives. [12]
- Current mandates requiring a certain portion of every student's tuition be set-aside for financial aid.
- Awarding tenure solely on the basis of seniority and/or longevity.
- The restriction of the time, place, manner of speech, and assembly more than absolutely necessary to protect normal academic and institutional activities. [13]
- Tuition Revenue or Capital Construction bond packages. [14]
- Any attempt to weaken or eliminate the Texas Higher Education Coordinating Board.

# K-12 EDUCATION

**FAVOR**

- Eliminating the use of property taxes for public school maintenance and operation funding.
- Legislation requiring 75% or more of a school district's budget, excluding bussing costs, goes directly towards classroom teachers and student instruction.
- Giving school districts more flexibility to review and dismiss teachers.
- Allowing retired workers in relevant fields to go through a streamlined certification process to increase the number of certified teachers.
- Promote English-immersion programs rather than bilingual education programs.
- Allowing parents to be able to access all school district records concerning their child. [15]
- Transparency in sexual-education classes.
- Eliminating the Texas Education Agency and giving their responsibilities to the State Board of Education.
- Encouraging competition in our public-school system through universal school choice or education savings accounts. [16]
- Restricting the power of the government to interfere with the private school curricula.
- Legislation allowing teachers to have more discretion in the creation and enforcement of classroom rules.

**OPPOSE**

- Any unnecessary increase in funding for education. [17]
- Expensive and excessive standardized testing.
- All legislation that would criminalize childish misbehavior in school.
- The "minimum salary schedule" for teachers. Compensation should be individually-based, results-oriented, and based off of merit.
- The universal implementation of any federal teaching standards.
- Expansion and increased funding for pre-kindergarten in public schools. [18]
- Limiting food choices in public schools for "nutritional" purposes.
- Any attempt to subvert public school curriculum to advocate an ideology, and/or erode foundational American concepts.
- Measures limiting the parental rights or discouraging parents from homeschooling their children.

# ISSUES OF LIFE AND LIBERTY

## FAVOR

- Protecting the lives of unborn children, though all legislation that decreases or eliminates abortion in Texas.
- Any expansion of Second Amendment rights, including the complete elimination of so called "gun-free" zones on public property, allowing for constitutional carry, and loosening the restrictions on a law-abiding citizen's ability to purchase guns and ammunition.
- Any legislation that prevents municipalities and counties from enacting overbearing regulations that encroach on personal liberties, product sale and use, employment opportunities, and property rights.
- Legislation explicitly allowing Transportation Network Companies to operate statewide in Texas.
- Eliminating "Blue Laws" in Texas.
- Protecting private property rights by limiting the government's power of eminent domain, protecting against eminent domain corruption, and abuse, and ensuring that property owners receive full compensation for the value of their property.
- Legislation that protects law-abiding citizens from having their online privacy violated by the government or private entities.
- Legislation allowing direct-sale of automobiles to Texans.
- Reforming Texas's Criminal Justice System, including eliminating frivolous, victimless felonies. [19]
- Legislation ensuring that no arrests take place for non-jailable offenses.
- The Repeal on the Statewide Ban on texting while driving.
- Texas's ability to utilize Capital Punishment where appropriate.[20]

## OPPOSE

- Targeting of individuals and organizations for political purposes through campaign finance law or expanding the reach of the Texas Ethics Commission.
- Any efforts to institute a statewide smoking ban, as well as limits on e-cigarette use.
- Regulations and fines against private entities that refuse to provide services they object to for religious or personal reasons.
- The Texas "Open Container" law.
- Municipalities annexing land without the consent of the affected residents.
- Arbitrary DWI checkpoints, blood draws by non-medical professionals, and "no refusal" policies as well as any reduction in the maximum blood alcohol content rules for DWI.
- Raising the legal age to purchase cigarettes and tobacco above that of eighteen years of age.
- Any taxpayer-funded abortion and/or contraception.
- Civil Asset Forfeiture without charging an individual with a crime. [21]

# FISCAL ACCOUNTABILITY

**FAVOR**

- "Truth in Budgeting." The Legislature should fully balance the biennial budget without the use of deception and/or accounting tricks. We support the Conservative Texas Budget proposed by the Texas Public Policy Foundation. [4]
- A constitutional amendment requiring a zero-based budget and any legislation requiring agencies to also use the zero-based budgeting method.
- A constitutional amendment requiring that no governing entity raises spending more than the combined growth of population and rate of inflation.
- A constitutional amendment requiring two-thirds approval of both chambers of the Legislature for any new tax or fee increase.
- Abolishing the franchise tax and reforming the property tax.
- Defunding the Texas Enterprise Fund and pre-empting municipalities from offering tax abatements and cash awards to companies for relocating to Texas.

**OPPOSE**

- The creation of any new taxes or fees.
- Diverting dedicated funds from their specified purposes.
- Excessive licensure of, and regulation of entry into, already regulated professions.
- Funding of any government program designed to award corporate welfare or engage in cronyism by choosing winners and losers in the free market.
- Any regulations that unnecessarily burden business and/or reduce incentives for expansion.
- So called "green" energy tax breaks, including carbon emission taxes, electric car subsidies and wind energy subsidies.

# HEALTHCARE

**<u>FAVOR</u>**

- The expansion of scope of practice for all medical professionals to the fullest extent of their training. Specifically, expanded scope of practice for Optometrists, Advanced Practice Registered Nurses (APRNs), and Podiatrists.
- Interstate compacts to allow for more choice in insurance providers.
- Any legislation that encourages transparency in healthcare costs.
- Comprehensive entitlement reform to decrease individual dependence on government.
- Protecting private religious institutions, entities, and businesses from healthcare mandates which force a violation of sincerely held religious principles.

**<u>OPPOSE</u>**

- Medicaid Expansion, or any attempt to further socialize the delivery of healthcare and medicine.
- Increasing taxes or fees to fund public healthcare programs.
- Excessive regulations that limit patient access to quality, affordable healthcare.
- The current convoluted prescriptive authority model for Texas' Advanced Practice Registered Nurses.

# IMMIGRATION

**FAVOR**

- Requiring all employers to use the "E-Verify" system during the hiring process.
- Requiring documentation of legal status in the U.S. to receive a driver's license and further require that all licenses issued to non-citizens expire when the individual's legal status in the U.S. terminates, and for that expiration date and residency status to be clearly noted on their licenses.
- Requiring proof of U.S. citizenship when registering to vote.
- Allowing officers of the law to inquire about legal status during a lawful stop, detention, or arrest.
- Making English the official language of the State of Texas.
- Improving border security through strategically increasing the amount of border patrol agents, constructing fences and barriers where lawfully accessible, and investing in new technologies.

**OPPOSE**

- Any effort to enact amnesty for those here illegally, regardless of age.
- Illegal immigrants receiving state entitlements, healthcare, or education.
- Any special considerations for the children of illegal immigrants.
- Any temporary release from custody of arrested illegal immigrants before the conclusion of their trials.

# GOVERNMENT AND ETHICS

**FAVOR**

- Public and transparent legislative committee voting records.[22]
- Paycheck Protection Act and any legislation that ensures taxpayer money is not used for partisan politics and further empowers individual employees as opposed to local government unions.[6]
- Electronic record voting in machine readable format.
- Requiring strict and transparent disclosures of campaign expenditures and ending the practice of conglomeration of expenses through consulting firms. [23]
- Changing the name of the Texas Ethics Commission to that of the Texas Compliance Commission and giving sole-appointment authority to the Governor of Texas.
- Moving school board and local elections to the unified November election date.
- Making the process for taxpayer rollback elections easier and more taxpayer-friendly.

**OPPOSE**

- Any effort to allow collective bargaining by public employees, or any measure to erode the state's "Right to Work" laws.
- Allowing any individuals to cast a ballot for election online.
- Allowing for Election Day voter registration or decreasing the 30-day deadline before Election Day to be appropriately registered.
- Any effort to take redistricting out of the hands of a democratically-elected legislative body.
- All efforts to cap campaign contributions or spending.

# OTHER

**FAVOR**

- All efforts to nullify any unconstitutional federal law.
- A constitutional amendment allowing for the repeal of any federal law or regulation upon a vote of two-thirds of all state legislators.
- Exempting intrastate-produced firearms from federal firearms laws and the authority of Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE).
- Banning racial, ethnic, gender, or citizenship status preferences from being used in hiring, promotion, and contracting decisions by state agencies, counties, cities and other political subdivisions of the state of Texas.
- Eliminating or privatizing the Texas State Lottery.
- Eliminating the vehicle inspection tax.

**OPPOSE**

- Any measure related to judicial selection or appointment as a preferred method to direct elections.
- "Hate Crimes" laws and laws that afford protected class status to particular segments of society.
- Any effort to expand regulated gambling in Texas. [6]
- Use of cameras or any other photo/video recording equipment to enforce red light or other traffic laws.
- Any effort to restrict the ability of law-abiding citizens to film police officers while in commission of their duties.

# CITATIONS AND FURTHER EXPLANATION

1. Senate Bill 1151 (85R)
2. House Bill 3015 (78R).
3. Senate Bill 11 (84R).
4. House Bill 357(86R)
5. Conservative Texas Budget. YCT is a coalition member. The 2020-21 Conservative Texas Budget limits growth of all Texas state government spending to the rate of population growth plus inflation for the last two fiscal years. $156.5B State Funds, $234.1B All Funds, and 8% Increase.
6. Paycheck Protection Act. Over two million Texans voted in favor of non-binding ballot Proposition 3 in 2016 Republican Primary Election leading to its roughly 83% to 17% passage.
7. YCT believes that the issue of the expansion of gambling has little to do with liberty and everything to do with increasing the size and scope of government. As such, YCT opposes the regulated practice of gambling in the state of Texas. Regulated gambling would create large, expensive bureaucratic agencies that would grow government exponentially and cost the state billions of dollars.
8. The tuition deregulation experiment has failed. Since the legislature placed the power to raise tuition in the hands of unelected bureaucrats in 2003, tuition has risen rapidly statewide. The legislature should act immediately to limit tuition increases.
9. The passage of Senate Bill 11 in the 84th legislative session though a step in the right direction still leaves exceptions to areas in which law-abiding citizens who obtain a License to Carry are relegated to not carry on college campuses. Even worse, is the now contrast in rules as they vary from campus to campus. YCT supports legislation that works to correct 'watered-down' campus carry.
10. Public universities are slowly increasing the requirements for graduation by making it mandatory for students to take classes that are meant to indoctrinate students with leftist propaganda.
11. Toward Excellence, Access and Success Grant Program (TEXAS Grant). Allowing state funds to follow students will increase competition in higher education, thus increasing the effectiveness of universities in Texas.
12. By creating quotas or giving preferential treatment to specific segments of society, the most empirically deserving are often deprived of opportunities that have otherwise been earned through their own hard work. YCT has long opposed affirmative action in college admissions and would rather see a system in place where a sequential number was used through the entirety of the process so to ensure that no identifying information itself was used to decide admissions.
13. i.e. "free speech areas" on campus.
14. House Bill 100 (84R).
15. Senate Bill 242 (85R)
16. Education should be about the students, not the system, and we should allow for all parents to utilize their child's share of state-appropriated funds for public school enrollment, private school tuition and transportation costs, or for the purpose of homeschooling.
17. The problems with public education are structural, not fiscal. Education can be improved through market reforms, not increased spending. The bulk of education spending needs to be moved from administrative bureaucracy to the classroom.
18. House Bill 4 (84R).
19. TPPF's Marc Levin notes that: "The Constitution lists only three federal crimes, but the number of statutory federal crimes has now swelled to around 4,500. This is to say nothing of the thousands of bizarre state-level crimes, such as the 11 felonies in Texas related to the harvesting of oysters. The explosion of non-traditional criminal laws grows government and undermines economic freedom. Criminal law should be reserved for conduct that is blameworthy or threatens public safety, not wielded to regulate non-fraudulent economic activity involving legal products." See http://www.rightoncrime.com/the-conservative-case-for-reform/
20. Robert Bork in Gregg V. Georgia in the Summary of Argument states "The death penalty is traditional sanction for those offenses society considers the most dangerous. Whether that penalty is necessary, or even appropriate in a particular case is a judgement properly left to the representatives of the people and to the judges and juries who must decide whether to impose society's ultimate sanction. We submit that it is inappropriate for this court to substitute its judgement above the propriety of the death penalty for that of the legislatures both more properly charged with the duty of making that judgement and more advantageously situated to collect and assess the relevant information." (A Time to Speak, page 7)
21. Current law enables law enforcement to seize personal property without charging an individual with a crime under civil law. Individuals can challenge the forfeiture in a civil suit but pay for this proceeding from their own pockets as state appointed attorneys are not provided unless for criminal defense cases. The Institute for Justice estimates that law enforcement agencies within the state of Texas average over $41M in forfeitures every year which potentially encourages 'policing for profit' as opposed to public service and safety.
22. House Bill 4, Amendment 11 (85R)
23. Currently, candidates often make lump-sum payments to their general consultants and allow the consultants to make purchasing decisions without revealing individual contractors and vendors. This process conceals necessary information about candidates and their campaign activities and subverts the transparent design of the reporting system.

# THIS PAGE INTENTIONALLY LEFT BLANK