**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:20-CV-973 |
| THE UNIVERSITY OF NORTH TEXAS, THE | § | |
| UNIVERSITY OF NORTH TEXAS SYSTEM, | § | JUDGE SEAN D. JORDAN |
| NEAL SMATRESK, PRESIDENT OF THE | § | |
| UNIVERSITY OF NORTH TEXAS and | § | |
| SHANNON GOODMAN, VICE PRESIDENT | § | |
| FOR ENROLLMENT OF THE UNIVERSITY | § | |
| OF NORTH TEXAS; | § | |
| *Defendants*. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT**

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
JOSEPH AARON BARNES, SR.
Texas Bar No. 24099014
abarnes@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

STATEMENT OF ISSUES ..................................................................................................... 1

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................... 3

I.      STATUTORY HISTORY ................................................................................................. 3

II.     YOUNG CONSERVATIVES OF TEXAS ....................................................................... 3

STANDARD OF REVIEW ...................................................................................................... 5

SUMMARY OF THE ARGUMENT ...................................................................................... 6

ARGUMENT AND AUTHORITIES ...................................................................................... 7

I.      TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A) ......................................................... 7

II.     EVEN IF TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS NOT EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A), IT IS STILL INVALID UNDER THE PRINCIPLES OF CONFLICT PREEMPTION ............................... 10

     A.  Compliance with both Tex. Educ. Code § 54.051(d) and 8 U.S.C. § 1623(a) is impossible ......................................................................................... 12

     B.  Tex. Educ. Code § 54.051(d) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ......................................................................................................... 14

CONCLUSION ........................................................................................................................ 20

CERTIFICATE OF SERVICE ............................................................................................... 21

# TABLE OF AUTHORITIES

**Cases:**                                                                                                **Page(s):**

*Alden v. Maine,*
    527 U.S. 706 (1999)..................................................................................2

*Altria Grp., Inc. v. Good,*
    555 U.S. 70 (2008)....................................................................................8

*Arizona v. United States,*
    567 U.S. 387 (2012)..................................................... 11, 15, 16, 17, *passim*

*Baker v. Farmers Elec. Co-op,*
    34 F.3d 274 (5th Cir. 1994) ....................................................................5

*Barton v. Barr,*
    140 S. Ct. 1442 (2020)............................................................................16

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988)................................................................................14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................5

*Chadha v. Immigration & Naturalization Serv.,*
    634 F.2d 408 (9th Cir. 1980),
    *aff'd,* 462 U.S. 919 (1983) ...............................................................14, 15

*Chamber of Commerce of the United States v. Whiting,*
    563 U.S. 582 (2011)................................................................................8

*Cipollone v. Liggett Grp.,*
    505 U.S. 504 (1992)...........................................................................8, 11

*Coventry Health Care of Mo., Inc. v. Nevils,*
    137 S. Ct. 1190 (2017)............................................................................8

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)...................................................................2, 10, 11, 14

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993).............................................................................6, 8

*Elkins v. Moreno,*
    435 U.S. 647 (1978)...............................................................................16

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990)........................................................................................6, 7

*Florida Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963)...........................................................................................12

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893)...........................................................................................15

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)............................................................ 6, 11, 14, 17, *passim*

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)...........................................................................................10

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824).........................................................................11, 15

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)....................................................................................14, 15, 16

*International Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)...........................................................................................17

*Jones v. Rath Packing Co.*,
  430 U.S. 519 (1977).......................................................................................11, 12

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020)........................................................................................2, 6

*Knauer v. United States*,
  328 U.S. 654 (1946)...........................................................................................15

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
  892 F.2d 1238 (5th Cir. 1990) ............................................................................5

*Maryland v. Louisiana*,
  451 U.S. 725 (1981)..............................................................................................2

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)........................................................................2, 14

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)..........................................................................................7, 8

*Merck Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019) ........................................................................13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ............................................................................19

*Motor Coach Employees v. Lockridge*,
    403 U.S. 274 (1971) ..........................................................................17

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) ..........................................................................13

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ..................................................................7, 10, 11

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ......................................................................17, 18

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) ..............................................................11, 12, 13

*Rosas v. U.S. Small Bus. Admin.*,
    964 F.2d 351 (5th Cir. 1992) ...............................................................5

*Toll v. Moreno*,
    458 U.S. 1 (1982) ..............................................................................15

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) ..........................................................................16

**Constitution, Statutes & Rules:**

U.S. Const., art. I, § 8, cl. 4 ..............................................................................14
U.S. Const., art. VI, cl. 2 ..........................................................................1, 2, 16

8 U.S.C.
    § 1325 ............................................................................................16
    § 1326 ............................................................................................16
    § 1601 ............................................................................................17
    § 1601(2)(B) ...................................................................................17
    § 1601(6) ........................................................................................17
    § 1621(a) ..........................................................................................8
    § 1621(c)(1)(B) .................................................................................8
    § 1621(d) ..........................................................................................9
    § 1622 ......................................................................................16, 17

§ 1623...................................................................................................................3, 5, 6

§ 1623(a) ...................................................................................... 1, 2, 9, 10, *passim*

§ 1643(a)(2) ........................................................................................................18

Tex. Educ. Code

§ 54.051(b)............................................................................................................13

§ 54.051(d)............................................................................................ 1, 2, 3, 5, *passim*

§ 54.051(m)............................................................................................................9

§ 54.052(a)(3) ..................................................................................2, 9, 10, 12

§ 54.053(3)(B)...........................................................................................10, 12, 16

Fed. R. Civ. P.

§ 1.........................................................................................................................5

§ 56.........................................................................................................................1

§ 56(a) ...................................................................................................................5

## **Other Authorities:**

Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403,
    Sec. 2, effective June 16, 2001 ................................................................3, 10

Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528,
    Sec. 3, effective September 1, 2005...........................................................3, 10

Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208,
    Div. C, Title V, Subtitle A, § 505, 110 Stat. 3009-672 (1996)............................................3

TO THE HONORABLE SEAN D. JORDAN:

Plaintiff Young Conservatives of Texas Foundation ("Plaintiff" or "YCT") files this motion for summary judgment seeking declaratory and injunctive relief. Fed. R. Civ. P. 56. Specifically, Plaintiff seeks a declaration that Section 54.051(d) of the Texas Education Code, as applied to United States citizens, is preempted by 8 U.S.C. § 1623(a). This state statute is preempted because it establishes an unconstitutional tuition rate for nonresident citizens in violation of federal law. Accordingly, Plaintiff further seeks a declaration that the legal determinations and resulting actions taken by Defendant Neal Smatresk and Defendant Shannon Goodman in charging nonresident tuition to United States citizens were incompatible with federal law and thus without legal authority, invalid, and of no force or effect. Finally, Plaintiff requests that this Court enter an order permanently enjoining Defendants, as well as any and all agents, administrators, employees, and other persons acting on behalf of Defendants, from applying Section 54.051(d) of the Texas Education Code to United States citizens. Plaintiff seeks summary judgment because no genuine issue of material fact exists, and Plaintiff is entitled to judgment as a matter of law as to its preemption claim.

## STATEMENT OF ISSUES

1. Whether the state statute that charges nonresident tuition to United States citizens is preempted by Section 1623 of the federal Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

## INTRODUCTION

The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the United States Constitution are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl.

2. The Supremacy Clause "provides a rule of decision for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). It is a "basic" and long settled principle that state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819)). Thus, Congress's power to preempt state law is a "fundamental principle of the Constitution," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and when such preemption occurs, "[t]he States . . . are bound by obligations imposed by . . . federal statutes that comport with the constitutional design," *Alden v. Maine*, 527 U.S. 706, 755 (1999).

At its core, this case presents a straightforward instance of federal preemption. Federal law only allows "an alien who is not lawfully present in the United States" to qualify for resident tuition based on residence within the state if that same tuition rate is made available to United States citizens without regard to whether they are state residents. 8 U.S.C. § 1623(a). Texas law specifically allows such aliens to qualify for resident tuition based on residence within the state. Tex. Educ. Code § 54.052(a)(3). Accordingly, federal law mandates that resident tuition be made available to any United States citizen attending a Texas public university, regardless of whether that citizen is a state resident. 8 U.S.C. § 1623(a). However, Section 54.051(d) of the Texas Education Code denies resident tuition rates to United States citizens that do not qualify as Texas residents and is therefore preempted.

There are three routes this Court can travel in addressing the federal government's preemption of state law in this case. The first and most direct route is "express preemption," which only requires this Court to read the explicit, unambiguous language of Section 1623 and decide whether the state provision falls within the scope of preemption that Congress intended. The second, slightly more complex route is one type of "conflict preemption" that looks to whether

2

compliance with both state and federal law is impossible. The third and most intricate route is the other type of "conflict preemption" that requires a determination of whether the state law obstructs Congress's purposes and objectives. In order to completely and thoroughly apprise this Court, all three paths are mapped out below. However, no matter which route this Court elects to take, the destination remains the same—Section 54.051(d) of the Texas Education Code, as applied to United States citizens, has been preempted by federal law and is unconstitutional.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   STATUTORY HISTORY

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (hereinafter "IIRIRA") was enacted by the 104th United States Congress on September 30, 1996. Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, Div. C, Title V, Subtitle A, § 505, 110 Stat. 3009-672 (1996). One of IIRIRA's provisions, codified as 8 U.S.C. § 1623, preempts any state law that denies United States citizens a "postsecondary education benefit" of the same "amount, duration, and scope" as the benefits available to "an alien who is not lawfully present in the United States" if the alien is eligible for those benefits "on the basis of residence." Afterwards, the Texas legislature adopted statutory criteria that allows such aliens to qualify for "resident tuition." *See* Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2, effective June 16, 2001; *see also* Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528, Sec. 3, effective September 1, 2005. The moment that criteria was adopted into law, the state statute that charges "nonresident tuition"—Tex. Educ. Code § 54.051(d)—was immediately preempted with regard to United States citizens.

### II.   YOUNG CONSERVATIVES OF TEXAS

YCT is a non-partisan youth organization whose core organizational purpose is to promote conservative values. Declaration of William C. Dominguez, ¶ 2 ("Dominguez Decl."). In

3

advancing this core objective, YCT seeks to educate students and the public, advocate for conservative public policies, engage in campus activism, and hold elected representatives accountable by publishing ratings of those in the Texas Legislature. Dominguez Decl., ¶ 7. YCT has student chapters at colleges and universities across the state of Texas, including a chapter at the University of North Texas. Dominguez Decl., ¶¶ 3, 4. Many of YCT's members are United States citizens that do not qualify as Texas residents and are not otherwise exempt from the requirement to pay nonresident tuition. Dominguez Decl., ¶ 5. While these members could theoretically bring individual suits themselves, college students often lack the resources to effectively advance such legal claims. However, neither the claim asserted, nor the relief requested, is of the nature that would require their individual participation in this lawsuit.

As an on-campus group comprised of college students, advocacy for higher education reform is germane to YCT's core purpose of advancing conservative values. Dominguez Decl., ¶ 8. Accordingly, YCT's advocacy for higher education reform extends to both statewide issues and campus specific policies. Dominguez Decl., ¶ 8. In bringing conservative solutions to the many problems of higher education, YCT has promoted increased competition, transparency, and accountability in higher education. Dominguez Decl., ¶ 9. YCT has also advocated for the elimination of wasteful spending and opposed tuition deregulation as ways of lowering tuition. Dominguez Decl., ¶¶ 10, 11. Perhaps most relevant to the instant case, YCT has repeatedly opposed allowing those in the country illegally to pay resident tuition while United States citizens from other states must pay a higher rate. Dominguez Decl., ¶ 12. This unequal treatment of American citizens directly conflicts with the core tenets of YCT as an organization and injures many of its members. Dominguez Decl., ¶¶ 5, 8. And YCT's opposition to this practice has perceptibly impaired its ability to advocate in other policy areas by draining its organizational

resources. Dominguez Decl., ¶ 13. This Court should thus redress the injuries inflicted upon YCT and its members by the application of nonresident rates of tuition to United States citizens.

## STANDARD OF REVIEW

Plaintiff challenges the validity and constitutionality of applying Tex. Educ. Code § 54.051(d) to United States citizens, specifically alleging that this state provision has been preempted by 8 U.S.C. § 1623. Whether a state statute is federally preempted is a pure question of law. *Baker v. Farmers Elec. Co-op.*, 34 F.3d 274, 278 (5th Cir. 1994). While discovery in this case has yet to commence, a grant of summary judgment at this early stage is not unusual in cases involving purely legal questions. *See Rosas v. U.S. Small Bus. Admin*., 964 F.2d 351, 359 (5th Cir. 1992) ("As the issues to be decided by the district court were purely legal in nature, the court did not abuse its discretion in deciding the summary judgment motion prior to completion of discovery."); *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1269 (5th Cir. 1990) (affirming summary judgment granted prior to discovery because "many of the issues raised by the summary judgment motions were purely legal and . . . discovery would therefore not aid their resolution.").

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). To prevail on a motion for summary judgment, a movant must show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Given that the sole issue before this Court is strictly legal in nature, and that the controlling law on that sole issue is abundantly clear, Plaintiff has already met that burden in the instant case. Accordingly, in a case such as this, which

involves only the application of a rule of decision for determining whether federal or state law applies, summary judgment is the proper means of addressing Plaintiff's constitutional claim.

## SUMMARY OF THE ARGUMENT

Generally speaking, "state law is pre-empted under the Supremacy Clause . . . in three circumstances": 1) express preemption; 2) conflict preemption; and 3) field preemption.[1] *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). These categories are not "rigidly distinct," *id*. at 79 n.5, and field and conflict preemption are often grouped together into the larger category of "implied preemption," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). However, regardless of which species of preemption is being invoked, "all preemption arguments[] must be grounded 'in the text and structure of the statute at issue.'" *Garcia*, 140 S. Ct. at 804 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U. S. 658, 664 (1993)).

In this case, the application of Section 54.051(d) of the Texas Education Code to United States citizens on the basis of residency is clearly and manifestly preempted by 8 U.S.C. § 1623. First, Section 54.051(d) is expressly preempted because it unambiguously falls within the substance and scope of the preemption provision contained in Section 1623. The explicit statutory language of Section 1623 clearly demonstrates that Congress intended to preempt certain kinds of state laws. And Section 54.051(d) of the Texas Education Code falls well within the scope of that preemptive intent.

However, even if this Court determines that express preemption does not apply, Section 54.051(d) of the Texas Education Code would still be invalid under either test for conflict preemption. First, Section 54.051(d) directly conflicts with the federal statute's structure and

---

[1]     The category of field preemption is inapplicable to the instant case. Therefore, this Motion addresses only express preemption and the two distinct tests for conflict preemption.

purpose, making compliance with both impossible. Indeed, private citizens from out of state cannot pay both the nonresident tuition required under state law and the resident tuition they are entitled to under federal law. Nor can this facial conflict be harmonized by school administrators or judges. Therefore, Section 54.051(d) must yield to federal law under the "impossibility" test for conflict preemption.

Finally, even if it were somehow possible to comply with both provisions, Section 54.051(d) of the Texas Education Code must still fall since it impermissibly obstructs Congress's overall purposes and objectives. The federal government's power to regulate immigration is both broad and well established. In exercising that power, Congress has created an extensive and complex statutory scheme of interrelated provisions that balances multiple competing interests. Section 1623, which seeks both to disincentivize illegal immigration and ensure equal treatment of American citizens, is essential to that broader regulation of immigration. Given that immigration constitutes a uniquely federal interest, the State's pursuit of policies that undermine federal immigration law is implicitly preempted.

## ARGUMENT AND AUTHORITIES

I.   TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A).

Congress possesses the power to employ "express language" to "pre-empt, i.e., invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Although the Supreme Court has recognized that even express preemption "fundamentally is a question of congressional intent," it remains true that "when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English*, 496 U.S. at 78-79. Indeed, where the language of "a statutory provision . . . expressly pre-empts state law," a court "need not go beyond that language to determine" Congress's intent. *See Medtronic, Inc. v. Lohr*,

518 U.S. 470, 484 (1996). Courts instead "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp.*, 507 U.S. at 664). In doing so, courts do not require Congress "to employ a particular linguistic formulation when preempting state law." *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1199 (2017); *see also Gade*, 505 U.S. at 112 (Kennedy, J., concurring in part and concurring in the judgment) (observing that the Court has "never required any particular magic words in our express pre-emption cases").

Where a federal law contains an express preemption clause, the only question that remains is "the substance and scope of Congress' displacement of state law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). In other words, where "the pre-emptive scope of [a federal statute] is governed entirely by the express language" of one of its provisions, a court then "need only identify the domain expressly pre-empted" by that provision. *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992). Much like the threshold question of whether a provision constitutes an express preemption, a court's "understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose*." *Medtronic*, 518 U.S. at 485-86 (internal quotation marks omitted). And again, congressional intent regarding scope "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Id.* at 486.

While the language of both the federal statute and state statute in the instant case is straightforward, how the texts of those statutes function requires a brief explanation of the statutory framework of each. Federal law provides that "an alien" that does not fall within one of three named categories "is not eligible for any State or local public benefit," 8 U.S.C. § 1621(a), including any "postsecondary education" benefit, 8 U.S.C. § 1621(c)(1)(B). However, one of the

statute's two exceptions to this general rule is that "[a] State may provide that an alien who is not lawfully present in the United States is eligible" for such benefits, but "only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d). Section 1623 then imposes an additional condition for cases where a state has passed a statute that provides eligibility for a postsecondary education benefit on the basis of residency:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a). Section 1623 is central to the instant case because it is the provision that expressly invalidates state statutes that fall within its scope.

For its part, Texas's statutory scheme provides that "[u]nless the student establishes residency or is entitled or permitted to pay resident tuition as provided by this subchapter, tuition for a student who is a citizen of any country other than the United States of America is the same as the tuition required of other nonresident students." Tex. Educ. Code § 54.051(m). However, any person—including an alien not lawfully present in the United States—is considered a state resident if he has "graduated from a public or private high school . . . or received the equivalent of a high school diploma" in Texas as well as "maintained a residence continuously" in Texas for both "the three years preceding the date of graduation or receipt of the diploma equivalent" and "the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education." Tex. Educ. Code § 54.052(a)(3). If the person attempting to qualify under this provision "is not a citizen or permanent resident of the United States, an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply" is required to be submitted to the institution of higher education. Tex.

Educ. Code § 54.053(3)(B). When these criteria are met, the individual then becomes eligible to pay resident tuition under Section 54.051(c) rather than the higher rate of nonresident tuition as calculated pursuant to Section 54.051(d).

When these two statutory regimes are considered in tandem, Section 1623's preemptive effect upon Section 54.051(d) becomes clear and manifest. Texas has extended a "postsecondary education benefit"—resident tuition—to aliens who are not lawfully present in the United States but that qualify as Texas residents under Section 54.052(a)(3) of the Texas Education Code. Further, Texas enacted that statutory criteria for determining residency after August 22, 1996. *See* Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2, effective June 16, 2001; *see also* Acts 2005, 79th Leg., 2005 Tex. Ch. 888, 2005 Tex. SB 1528, Sec. 3, effective September 1, 2005. As the text of Section 1623 makes clear, any such extension of postsecondary education benefits to aliens who are not lawfully present in the United States invalidates the state statute that denies those same benefits to United States citizens. Accordingly, Section 54.051(d) of the Texas Education Code, as applied to United States citizens, falls well within the scope of Congress's displacement of state law and is thus expressly preempted.

**II.     EVEN IF TEX. EDUC. CODE § 54.051(D), AS APPLIED TO UNITED STATES CITIZENS, IS NOT EXPRESSLY PREEMPTED BY 8 U.S.C. § 1623(A), IT IS STILL INVALID UNDER THE PRINCIPLES OF CONFLICT PREEMPTION.**

Express preemption is not the only way a federal statute may invalidate a state statute. When "a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok*, 575 U.S. at 376-77. In distinguishing "between 'express' and 'implied' pre-emptive intent," the Supreme Court has traditionally "treat[ed] 'conflict' pre-emption as an instance of the latter." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884, (2000). Thus, "the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict," *Crosby*, 530 U.S. at

388, but instead is often "implicitly contained in [the federal statute's] structure and purpose," *Cipollone*, 505 U.S. at 516 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

It has long been recognized that "acts of the State Legislatures" that "interfere with, or are contrary to the laws of Congress" are invalid, even if they are "enacted in the execution of acknowledged State powers." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210-11 (1824); *see also Gade*, 505 U.S. at 108 (stating that "under the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield" (internal quotation marks omitted)). And while courts have traditionally gone to "great lengths attempting to harmonize conflicting statutes" when applying other legal principles, the text of the Supremacy Clause "suggests that courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011). Further, finding that a state statute falls outside the scope of an express preemptive provision "does not bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the pre-emption of laws falling outside the clause." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (internal quotation marks omitted).

Under the principles of conflict preemption, a "state law is pre-empted if that law *actually* conflicts with federal law." *Cipollone*, 505 U.S. at 516 (emphasis added). This can occur under either of two circumstances: 1) "where compliance with both state and federal law is impossible"; or 2) "where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (internal quotation marks omitted). As explained below, both varieties of conflict preemption are present in the instant case.

### A.  Compliance with both Tex. Educ. Code § 54.051(d) and 8 U.S.C. § 1623(a) is impossible.

Where state and federal law "directly conflict" such that it is impossible to comply with both, the "state law must give way" to its federal counterpart. *PLIVA*, 564 U.S. at 617-18 (internal quotation marks omitted). In fact, impossibility it the prototypical—and perhaps only— circumstance of a "direct conflict." *Id.* at 618 n.4 (declining to "address whether state and federal law 'directly conflict' in circumstances beyond 'impossibility'"). In cases of such impossibility, "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U. S. 132, 142 (1963).

As related above, state law requires some United States citizens, including student members of YCT, to pay nonresident tuition, as calculated by Section 54.051(d) of the Texas Education Code.[2] However, given that state law also allows an alien who is not lawfully present in the United States to pay resident tuition if that individual qualifies under Tex. Educ. Code § 54.052(a)(3),[3] federal law requires that all United States citizens also be made "eligible for such a

---

[2]     Nonresident tuition is routinely charged to such individuals in practice. Further, there is no provision within the Texas Education Code that either exempts all United States citizens from paying nonresident tuition or applies universally to qualify them for resident tuition. *Cf.* Tex. Educ. Code § 54. 0501(4) (defining "nonresident tuition" as "the amount of tuition paid by a person who is not a resident of this state and who is not entitled or permitted to pay resident tuition").

[3]     That this Section does not specifically refer to "an alien who is not lawfully present in the United States," or some equivalent term, is of no consequence for the purposes of conflict preemption. First, Section 54.053(3)(B) refers to an individual that "is not a citizen or permanent resident of the United States." Further, aliens not lawfully present in the country routinely qualify for resident tuition in practice through the application of this statutory regime. *See Jones*, 430 U.S. at 526 ("This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written"). And finally, the Office of the Registrar and the Admissions Office at the University of North Texas both publicly state that such individuals may qualify for resident tuition. *See* Non-U.S. Citizen Basing Residency on Self, *available at* https://registrar.unt.edu/residency/non-us-citizen-basing-residency-self; *see also* Texas Resident Tuition for International Students, *available at* https://admissions.unt.edu/international/texas-resident-tuition. Thus, certain aliens not lawfully present in the country undoubtedly qualify for resident tuition in Texas.

benefit (in no less an amount, duration, and scope) without regard to" residency, 8 U.S.C. § 1623(a). This facial conflict between state and federal law clearly supports a finding of impossibility preemption.

Indeed, it is impossible for anyone to harmonize these two inherently contradictory provisions. No judge can possibly reconcile these two statutory regimes. *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (observing that in addressing impossibility, "the judge must simply ask himself or herself whether the relevant federal and state laws irreconcilably conflict" (internal quotation marks omitted)). Nor may members of a "governing board of each institution of higher education" both "cause to be collected from students registering at the institution tuition or registration fees at the rates prescribed" by state law, *see* Tex. Educ. Code § 54.051(b), and also extend the "postsecondary education benefit" of resident tuition to all United States citizens, *see* 8 U.S.C. § 1623(a). And most relevantly for the purposes of conflict preemption, it is "impossible for a private party to comply with both state and federal requirements." *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English*, 496 U. S. at 79).

In *Bartlett*, the Supreme Court found preemption where "it was impossible for Mutual to comply with both its state-law duty to strengthen the warnings on sulindac's label and its federal-law duty not to alter sulindac's label." 570 U.S. at 480. In *PLIVA*, the Court found preemption where "it was impossible for the Manufacturers to comply with both their state-law duty to change the label and their federal-law duty to keep the label the same." 564 U.S. at 618. And in the instant case, it is obviously impossible for the same student to comply with both his state-law duty to pay nonresident tuition and his federal-law entitlement to only pay resident tuition. Because the state law that imposes nonresident tuition on some students that are American citizens directly conflicts

13

with federal law, the inescapable conclusion follows that the provision is invalid and without effect. And if this Court finds that the state statute has been preempted based on impossibility, it need go no further in its analysis.

### B.  Tex. Educ. Code § 54.051(d) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

However, a distinct second variety of conflict preemption also renders Section 54.051(d) invalid. That state provision not only conflicts with 8 U.S.C. § 1623(a) because it is impossible to comply with both, but also because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Gade*, 505 U.S. at 98 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As was observed by Chief Justice Marshall long ago, the "unavoidable consequence" of federal supremacy under our constitutional order is that "the States have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436. While what constitutes "a sufficient obstacle" for the purposes of conflict preemption "is a matter of judgment," that determination is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Additionally, where the federal provision falls within "an area of uniquely federal interest," the state law's "conflict with federal policy need not be as sharp" for preemption to occur. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

The federal government's power to regulate the uniquely federal interest of immigration and naturalization is well established. This authority is derived from several sources, including Congress's power to "establish an uniform Rule of Naturalization." *Hines*, 312 U.S. at 66 (quoting U.S. Const., art. I, § 8, cl. 4). And Congress's power in this arena is even more expansive when combined with the Necessary and Proper Clause. *See, e.g.*, *Chadha v. Immigration &*

*Naturalization Serv.*, 634 F.2d 408, 418 (9th Cir. 1980) (referring to Congress's "considerable power over aliens" when the two clauses are "read in conjunction"), *aff'd*, 462 U.S. 919 (1983); *Knauer v. United States*, 328 U.S. 654, 673 (1946) (holding that the power of "denaturalization" is necessary and proper to Congress's power over naturalization). Even apart from Congress's enumerated powers, the federal government possesses authority over immigration pursuant to its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) (characterizing the "right to exclude or to expel all aliens" as "an inherent and inalienable right of every sovereign and independent nation").

It is also "well settled" that the federal government possesses "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394; *see also Toll v. Moreno*, 458 U.S. 1, 10 (1982) (referring to "the preeminent role of the Federal Government with respect to the regulation of aliens within our borders"). It has long been recognized that "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.'" *Hines*, 312 U.S. at 66 (quoting *Gibbons*, 22 U.S. at 211). Perhaps the best explanation of the preeminence of the federal government's power over immigration came in *Hines*:

> That the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution, was pointed out by the authors of The Federalist in 1787, and has since been given continuous recognition by this Court. When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute, for Article VI of the Constitution provides that "This

15

> Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

312 U.S. at 62-63 (quoting U.S. Const., art. VI, cl. 2). Because international relations, including immigration, is "the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority," it follows that "[a]ny concurrent state power that may exist is restricted to the narrowest of limits." *Id*. at 68.

In exercising its broad power over immigration, Congress has chosen to establish an "extensive and complex" statutory scheme. *Arizona*, 567 U.S. at 395; *see also Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (describing the Immigration and Nationality Act as a "comprehensive and complete code covering all aspects of admission of aliens to this country"). And IIRIRA has specifically been referred to as a "comprehensive immigration law" by the Supreme Court. *See Barton v. Barr*, 140 S. Ct. 1442, 1446 (2020). In explaining the elaborate nature of the federal government's regulation of immigration, the Supreme Court provided a useful (though necessarily inexhaustive) list of interrelated provisions in *Arizona v. United States*. *See* 567 U.S. at 395-96. Prominent among the Court's list of provisions was 8 U.S.C. §§ 1325 & 1326, which penalize unlawful entry and unlawful reentry into the country. *Id*. at 395. Perhaps more than any others, those provisions clearly address what the Court has identified as the significant "public interest" in implementing "effective measures to prevent the illegal entry of aliens." *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).[4] The Court also specifically cited 8 U.S.C. § 1622,

---

[4]     Conflict preemption still unquestionably applies here even though Texas arguably also seeks to dissuade illegal immigration, for example by requiring someone that is not "a citizen or permanent resident of the United States" to submit "an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply" to the institution of higher education. *See* Tex. Educ. Code § 54.053(3)(B). This is because

which is the provision that "authorizes States to deny noncitizens a range of public benefits." *Arizona*, 567 U.S. at 396. As explained above, Section 1622's denial of government benefits is modified by Section 1623, which is the provision that lies at the very heart of this case. Given the interplay between those two provisions, if Section 1622 is an essential part of Congress's "extensive and complex" regulation of immigration, then so too is Section 1623.

Section 1601 also provides concrete evidence that Congress specifically intended Section 1623 to dissuade illegal immigration by limiting the circumstances under which aliens not lawfully present in the country may qualify for postsecondary education benefits. Section 1601 applies directly to all of Chapter 14 of Title 8 of the United States Code, including Section 1623, and contains "statements concerning national policy with respect to welfare and immigration" that have been codified into federal law. 8 U.S.C. § 1601. Congress first affirms in Section 1601 that "[i]t continues to be the immigration policy of the United States that . . . the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2)(B). It then overtly recognizes the "compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6).

The complexity of Congress's regulation of immigration and naturalization results, at least in part, from the federal government's need to balance multiple competing interests. Thus, while Congress explicitly penalizes unlawful entry into the country, it does not seek to prevent illegal immigration "at all costs," instead electing to "proceed consistent with other priorities." *See Pac.*

---

"conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)). Thus, even where the "ultimate goal" of both laws is the same, a state law is still preempted "if it interferes with the methods by which the federal statute was designed to reach that goal." *Gade*, 505 U.S. at 103 (quoting *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

*Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983); *see, e.g.*, 8 U.S.C. § 1643(a)(2) ("Nothing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under Plyler v. Doe…"). And Section 1623 provides a prototypical example of this congressional balancing of competing interests. Pursuant to its broad authority over immigration, Congress was undoubtedly empowered to prohibit any postsecondary education benefit from being extended to any alien not lawfully present in the country under any circumstances. However, Congress instead elected to balance the federal interest in disincentivizing illegal immigration, the States' interests in maintaining flexibility in the administration of their public universities, and private citizens' interest in access to postsecondary education benefits that are at least equal to those available to aliens not lawfully present in the country.

In practice, Section 1623 functions as follows. It first dissuades illegal immigration by significantly limiting the circumstances under which "an alien who is not lawfully present in the United States" is "eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit." 8 U.S.C. § 1623(a). Such an individual may only be eligible in states where "a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." *Id*. States retain the flexibility to make both aliens not lawfully present in the country and all United States citizens eligible for these benefits. Alternatively, states may choose to make no such alien eligible for those benefits and continue to restrict the citizens that qualify based on state residency. What a state cannot do is have its cake and eat it too.

The kind of conditional preemption that is present in Section 1623 is by no means unprecedented. *See Gade*, 505 U.S. at 103 (finding that conflicting state laws were preempted by

OSHA, which "does not foreclose a State from enacting its own laws to advance the [statute's] goal," but "does restrict the ways in which it can do so"). In fact, such "tailored exceptions" to a "pre-emptive command demonstrates that Congress did not by any means act 'cavalierly' here." *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006). Rather, Congress proceeded with caution and prudence in seeking to accomplish its important federal objectives.

Finally, Section 1623 acts upon a third interest group—private citizens of the United States. The provision does this by ensuring that citizens may qualify for postsecondary benefits that are at least equivalent to those enjoyed by aliens not lawfully present in the United States. For states that elect not to extend resident tuition to such aliens, out-of-state citizens may also be denied resident tuition. But for other states that do allow such aliens to qualify based on residency, all citizens are also entitled to equal access to this same benefit. And where citizens gain an entitlement to this government benefit as a function of federal law, the state is not permitted to enforce any law denying that benefit or placing a burden upon these citizens. Or, put differently, the state statute then "actually conflicts" with federal law and is thus preempted.

In the instant case, the State has chosen to exercise the flexibility granted by Section 1623 by extending resident tuition to aliens not lawfully present in the United States. And by doing so, the State has willfully brought itself within the scope of the conditional preemption contained in Section 1623. Thus, 8 U.S.C. § 1623(a) implicitly preempts any application of Section 54.051(d) of the Texas Education Code to citizens of the United States. While the state "may have understandable frustrations with the problems caused by illegal immigration," as well as how the federal government has chosen to address those problems, "the State may not pursue policies that undermine federal law." *See Arizona*, 567 U.S. at 416.

**CONCLUSION**

Because no genuine issue of material fact exists and the state provision requiring Defendants to charge some United States citizens nonresident tuition is clearly and manifestly preempted by federal law, summary judgment is appropriate, and a permanent injunction that prevents Defendants from applying the preempted state provision to citizens is warranted.

Respectfully submitted,

*/s/Robert Henneke*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
JOSEPH AARON BARNES, SR.
Texas Bar No. 24099014
abarnes@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed on January 11, 2021 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/Robert Henneke
ROBERT HENNEKE