UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION | § § § |
| v. | §  CIVIL NO. 4:20-CV-973-SDJ § |
| THE UNIVERSITY OF NORTH TEXAS, ET AL. | § § § |

**MEMORANDUM OPINION AND ORDER**

This case challenges the enforceability of a Texas law that allegedly compels United States citizens to pay a higher rate of college tuition than some aliens not lawfully present in the country. Plaintiff Young Conservatives of Texas Foundation ("Young Conservatives") filed suit seeking declaratory and injunctive relief, claiming that a certain provision of the Texas Education Code conflicts with, and is therefore preempted by, federal law. The suit is against the University of North Texas; the University of North Texas System; Neal Smatresk, in his official capacity as the University's president; and Shannon Goodman, in his official capacity as the University's Vice President for Enrollment (collectively, "UNT").

UNT moves to dismiss the case on the grounds that Young Conservatives lacks standing and has no cause of action to bring its preemption claim. Neither argument carries the day. Young Conservatives has both associational standing to bring this preemption challenge on behalf of its student members and a cause of action sounding in equity under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The motion to dismiss, (Dkt. #7), is therefore **DENIED**.

1

# I. Background

Taken together, Sections 54.051 and 54.052 of the Texas Education Code permit persons who meet certain residency requirements and are enrolled in a state-operated institution of higher education to qualify as Texas "residents" for the purpose of receiving in-state tuition rates. TEX. EDUC. CODE §§ 54.051(c), 54.052. Anyone who fails to meet those residency requirements is not entitled to receive in-state tuition—regardless of whether that person is a United States citizen—and must pay higher tuition rates. *Id.* §§ 54.051(d), 54.052. In some situations, this statutory scheme provides that aliens who are unlawfully in the country may pay in-state-tuition rates while United States citizens from states other than Texas may not.

Enter Section 1623(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), a federal statute. Section 1623(a) provides that

> an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).

Asserting that these state and federal statutes conflict with one another, Young Conservatives sued UNT on behalf of certain of its members, each of whom is a United States citizen from a state other than Texas and a student at the University. Young Conservatives seeks a declaration that Section 1623(a) of IIRIRA preempts Section 54.051(d) of the Texas Education Code and an injunction prohibiting UNT officials from applying the tuition rates set forth in Section 54.051(d). (Dkt. #1-5).

Such relief is warranted, Young Conservatives says, because the university-official defendants "have acted and continue to act without legal authority" by imposing higher tuition rates on its student members based on the preempted state law. (Dkt. #1-5 ¶ 32).

UNT now moves to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. #7). It argues that Young Conservatives has neither standing nor a cause of action to claim that Section 54.051(d) of the Texas Education Code is preempted. (Dkt. #7, #29). Young Conservatives disagrees with both points and contends that it has met the threshold requirements to invoke judicial power. (Dkt. #28, #31).

## II. LEGAL STANDARDS

Because motions to dismiss under Rules 12(b)(1) and 12(b)(6) are distinct and involve different standards, the Court sets forth each standard before addressing UNT's arguments.

### A. Legal Standard for Rule 12(b)(1) Motions

The power of federal courts is circumscribed by the limits set forth in Article III of the Constitution. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Article III legitimizes the use of judicial power "to declare the rights of individuals and to measure the authority of governments" in the resolution of "cases" and "controversies." *Id.* For that reason, a federal court must dismiss a case for lack of subject-matter jurisdiction if the court lacks "the statutory or constitutional power

to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation omitted).

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction can mount either a facial or a factual challenge. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When, like here, a party makes a Rule 12(b)(1) motion without presenting any evidence, the challenge to subject-matter jurisdiction is facial. *Id.* In assessing such a challenge, the court looks only at the sufficiency of the allegations in the complaint and assumes them to be true. *Id.* If the allegations are sufficient to establish jurisdiction, the complaint stands. *Id.* Because the "burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," the "plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

**B. Legal Standard for Rule 12(b)(6) Motions**

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are

not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [its] claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

### III. DISCUSSION

UNT makes two principal arguments in its dismissal motion. First, it asserts that Young Conservatives lacks Article III standing to bring its preemption challenge to Section 54.051(d). Second, UNT contends that this suit must be dismissed because Young Conservatives does not have a cause of action for its preemption claim. The Court addresses each in turn.

**A. Constitutional Standing**

The first question that the Court must answer is whether Young Conservatives has standing to claim that Section 54.051(d) of the Texas Education Code is preempted by federal law. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (describing constitutional standing as a threshold jurisdictional inquiry). Constitutional standing, which is a plaintiff's personal stake in the outcome of the case, is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 733 (quotation omitted). For a litigant to have standing, it usually must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a

5

likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (cleaned up). When these requirements are met, the plaintiff may sue on its own behalf. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1992).

An association, like Young Conservatives, may also "have standing to assert the claims of its members even where it has suffered no injury from the challenged activity." *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (alteration and quotation omitted). To establish associational standing, the association must show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). In this case, only the first prong is in dispute.[1]

---

[1] UNT does not contest that Young Conservatives has satisfied the second and third prongs of associational standing—and for good reason. Young Conservatives alleges that its goal in bringing this lawsuit is to prevent the disparate treatment of its student members as to tuition rates, which is germane to the organization's core purpose of advancing conservative values. (Dkt. #1-5 ¶¶ 1, 19). Additionally, neither Young Conservatives' preemption claim nor its request for declaratory and injunctive relief requires the participation of individual members in this lawsuit. *See Hunt*, 432 U.S. at 343 (recognizing that requests for "a declaration, injunction, or some other form of prospective relief" generally do not require individual determinations because "the remedy, if granted, will inure to the benefit of those members of the association actually injured" (quoting *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 549 (concluding that an association of doctors had standing to seek injunctive relief against a board of medical examiners for retaliatory conduct). For these reasons, the

To satisfy the injury-in-fact component of the first prong, an association must make "specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). At later stages of litigation, the association may need to present evidence to support its allegations that specific members of its organization have been harmed. *See id.* at 492, 499 (requiring, at the merits stage, that an organization identify members who have been injured). But such proof is not required at the pleading stage; the association's allegations of a concrete injury to its members are sufficient. *See Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on lack of associational standing.").

Here, Young Conservatives alleges that some of its members are U.S. citizens who are currently attending UNT and are being charged nonresident tuition under Section 54.051(d) of the Texas Education Code. (Dkt. #1-5 ¶¶ 1, 16). And these members, Young Conservatives asserts, have suffered and continue to suffer economic injuries in the form of increased tuition fees, allegedly in violation of federal law and the Supremacy Clause. (Dkt. #1-5 ¶¶ 1, 16–18). These economic harms are sufficiently concrete and particularized injuries for purposes of establishing standing. *See Pac. Gas & Elec. Co. v. FERC*, 106 F.3d 1190, 1195 (5th Cir. 1997) (concluding that a high risk of economic injury is sufficiently real, immediate, and direct).

---

Court has little trouble concluding that both the second and third prongs of associational standing are met here.

7

UNT has not acknowledged—much less meaningfully grappled with—the alleged economic injuries of Young Conservatives' members. Instead, UNT contests the second and third elements of the traditional standing test, contending in conclusory fashion that Young Conservatives' claimed injury is not caused by the challenged conduct or redressable by a favorable court decision. A declaration that Section 54.051(d) of the Texas Education Code is unconstitutional, the argument goes, would not benefit Young Conservatives' members because they would still not be entitled to resident tuition. But UNT has not attempted to explain, and the Court fails to see, why that is so.

It is undisputed that Section 54.051(d) sets the tuition rates for nonresident students at UNT and, when applied, requires them to pay more to attend the University than students who qualify as Texas residents. TEX. EDUC. CODE § 54.051(d); *see also* TEX. EDUC. CODE §§ 54.051(c), 54.052. It is also alleged that UNT, through the actions of Defendants Smatresk and Goodman—the University's president and its vice president for enrollment—is applying Section 54.051(d) to unlawfully charge some of Young Conservatives' student members nonresident tuition while allowing aliens unlawfully present in the country to pay in-state-tuition rates. (Dkt. #1-5 ¶¶ 16–18, 31–33). So, the asserted economic injuries of Young Conservatives' student members are, without question, fairly traceable to the challenged action and likely would be redressed by an injunction prohibiting the UNT officials from enforcing Section 54.051(d)'s tuition rates against those members.

8

In sum, when Young Conservatives' allegations are accepted as true, some of its student members have standing to challenge Section 54.051(d) of the Texas Education Code on preemption grounds. Young Conservatives has therefore met its burden, at this stage, to show that it has associational standing to bring this suit on behalf of those members.[2]

## B. Cause of Action Under *Ex parte Young*

Having confirmed that Young Conservatives has standing to challenge the constitutionality of Texas Education Code § 54.051(d), the Court turns to UNT's second argument for dismissal. UNT contends that this suit should be dismissed because Young Conservatives does not have a cause of action to bring its preemption claim. The Court disagrees.

As an initial matter, Young Conservatives does not argue that the Supremacy Clause provides a cause of action. And rightfully so: "the Supremacy Clause . . . certainly does not create a cause of action" either expressly or impliedly. *Armstrong*

---

[2] UNT also suggests that this Court lacks subject-matter jurisdiction if Young Conservatives does not have a cause of action for its preemption claim. Not so. As the Supreme Court has made clear, jurisdiction and a cause of action are two independent requirements to invoke the power of the judiciary: "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed. 2d 210 (1998). Consistent with this notion, the Supreme Court more recently clarified that constitutional standing is a matter distinct from and anterior to the question of whether a plaintiff has a cause of action under a statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4, 134 S.Ct. 1377, 188 L.Ed. 2d 392 (2014) (explaining that the cause-of-action inquiry is not jurisdictional and that labeling it as either "statutory standing" or "prudential standing" is "misleading"). Of course, this is not to say that a plaintiff's claim can proceed in federal court without a cause of action. It can't. But the "failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

*v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015). The clause "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* Young Conservatives also disclaims any effort to identify a federal statute that supplies a cause of action for its preemption claim.[3] *See* (Dkt. #28 at 2). Instead, Young Conservatives relies on the equitable cause of action recognized in *Ex parte Young* that allows federal courts to "grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326.

Even where, as here, no one "is arguing about sovereign immunity," *Ex parte Young*'s second holding is relevant to whether a party "has an equitable cause of action" to enjoin unlawful state action. *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 n.3 (5th Cir. 2021). When "an individual claims federal law immunizes him from state regulation," the longstanding doctrine of *Ex parte Young* allows a court to "issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326; *accord Ex parte Young*, 209 U.S. at 155–56. An "official-capacity equitable claim is cognizable under *Ex parte Young*" if (1) the defendant is a state official, (2) the complaint seeks prospective, injunctive relief based on an ongoing violation of federal law, and (3) the defendant state official bears

---

[3] Young Conservatives does not argue that it has an implied cause of action under 8 U.S.C. § 1623 or that the immigration statute at the heart of its preemption claim otherwise gives rise to a viable claim under 42 U.S.C. § 1983. So, the Court need not and will not reach those issues. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) (explaining that courts should "rely on the parties to frame the issues for decision and assign to [themselves] the role of neutral arbiter of matters the parties present" (quotation omitted)).

10

a sufficiently close connection to the unlawful conduct such that a district court can meaningfully redress the asserted injury with an injunction against that official. *Mack*, 4 F.4th at 311–12. These elements are met here.

First, Young Conservatives is suing Defendants Goodman and Smatresk in their official capacities as officials at the University of North Texas, a public university. (Dkt. #1-5 ¶¶ 4, 5). These defendants are therefore state officers for purposes of *Ex parte Young*. *Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318, 320–21 (5th Cir. 2008) (concluding that the plaintiff's claim against a public university administrator could proceed under *Ex parte Young*). UNT does not argue otherwise.

Second, Young Conservatives' complaint requests relief prospectively requiring Defendants Goodman and Smatresk to refrain from imposing nonresident tuition rates on its U.S.-citizen members based on an allegedly preempted state law. In other words, Young Conservatives "seeks injunctive relief for an ongoing violation of federal law." *See Mack*, 4 F.4th at 312. Again, UNT does not argue otherwise.

Third, as to *Ex parte Young*'s connection requirement, Defendant Goodman is the Vice President for Enrollment of the University of North Texas and is "responsible for determining resident status for tuition purposes." (Dkt. #1-5 ¶ 5). Defendant Smatresk, the President of the University, is in charge of "administering all university policies and procedures." (Dkt. #1-5 ¶ 4). In these roles, the UNT officials "apply, administer, or oversee the requirements of Section 54.051," (Dkt. #1-5 ¶ 31), and, in doing so, are allegedly enforcing nonresident tuition rates against some of Young Conservatives' members in violation of federal law, (Dkt. #1-5 ¶¶ 16–18, 32).

For these reasons, Defendants Goodman and Smatresk bear a "sufficiently close" connection to the challenged enforcement of Section 54.051(d) such that the Court can meaningfully redress Young Conservatives' asserted injuries with an injunction against them. *See Mack*, 4 F.4th at 312; *see also Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (noting that "the precise scope of the requirement for a connection" between the alleged unlawful conduct and the defendant state officer "has not been defined," and suggesting that a "case-by-case approach" is appropriate). Once more, UNT does not argue otherwise. Thus, based on the well-pleaded allegations in the complaint, Young Conservatives has stated a plausible official-capacity equitable claim under *Ex parte Young*.

UNT has two responses, neither of which is persuasive. It insists on dismissal of this suit because Young Conservatives' complaint does not expressly invoke *Ex parte Young*. This procedural argument is easily dispatched. For one thing, a complaint need not include "magic words." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000). And more specifically, the federal pleading rules do not require a plaintiff to expressly invoke a cause of action to state a plausible claim for relief. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12, 135 S.Ct. 346, 190 L.Ed.2d 309 (2014) (per curiam). What is required, instead, is that a plaintiff "plead *facts* sufficient to show that her claim has substantive plausibility." *Id.* at 12 (emphasis added). So long as a complaint "alleges facts upon which relief can be granted, it states a claim even if it fails to categorize correctly the legal theory giving rise to the claim." *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309

(5th Cir. 2021) (quotation omitted); *see also Smith v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, 735 F. App'x 848, 854 (5th Cir. 2018) (per curiam) ("It bears emphasizing that factual allegations alone may state a claim for relief—even without referencing the precise legal theory (or statute) upon which the plaintiff seeks relief.").

Here, as detailed above, Young Conservatives' complaint satisfies *Ex parte Young*'s straightforward inquiry: "It requests relief prospectively requiring the [UNT] Officials to refrain from taking future actions to enforce an unlawful [state law]." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 472 (5th Cir. 2020) (en banc); *see also id.* at 475 (noting that the case could proceed against state officials because the plaintiff had "a cause of action against them *at equity*, regardless of whether it [could] invoke § 1983"); *id.* at 502 & n.7 (Oldham, J., concurring) (agreeing that the plaintiff had a cause of action to bring an equitable official-capacity claim even though it did not expressly invoke *Ex parte Young*); *id.* at 493 & n.2 (Elrod, J., concurring) (same). True, Young Conservatives' allegations do not specifically include the words "*Ex parte Young*." But an official-capacity equitable claim under *Ex parte Young* could plausibly come within those allegations. Young Conservatives has therefore alleged facts sufficient to show its claim has substantive plausibility. And that is all Young Conservatives must do at the Rule 12(b)(6) stage "to stave off threshold dismissal for want of an adequate statement of [its] claim." *See Johnson*, 574 U.S. at 12.

13

UNT separately argues that Young Conservatives' suit cannot proceed in equity because IIRIRA precludes private enforcement of Section 1623(a). Congress may, if it so chooses, either expressly or impliedly preclude *Ex parte Young* actions as to a particular statute or type of suit. *Armstrong*, 575 U.S. at 327; *see also, e.g.*, 28 U.S.C. § 1341 (prohibiting federal judicial restraints on the collection of state taxes). UNT does not contend that IIRIRA expressly precludes such actions arising from Section 1623(a)'s statutory requirement. Instead, relying on *Armstrong*, UNT says that IIRIRA implicitly forecloses an *Ex parte Young* action for equitable relief. This argument also misses the mark.

In *Armstrong*, the Supreme Court considered whether Medicaid providers could sue state officials to enforce Section 30(A) of the Medicaid Act. 575 U.S. at 322. After concluding that the providers did not have an implied cause of action under the Supremacy Cause, the Court turned to whether the suit could proceed against the state officials in equity. *Id.* at 327. No, the Court concluded: "[T]he Medicaid Act implicitly precludes private enforcement of § 30(A), and respondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement." *Id.* at 328.

The Court's "intent to foreclose" analysis rested on two aspects of Section 30(A). *Id.* (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)). Writing for the Court, Justice Scalia first referred to the withholding of federal funds by the Secretary of Health and Human Services as the "sole remedy" Congress provided for a state's failure to comply with

14

Medicaid's requirements. *Id.* (citing 42 U.S.C. § 1396c); *see also Alexander v. Sandoval*, 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (recognizing that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"). But that alone, Justice Scalia explained, was not determinative. *Id.* at 328 (citing *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 n.3, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011)).

Even if the existence of a provision authorizing the Secretary of Health and Human Services to enforce Section 30(A) by withholding funds "might not, *by itself*, preclude the availability of equitable relief," it did so "when combined with the judicially unadministrable nature of [the statute's] text." *Id.* "It is difficult to imagine," said the Court, "a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.* (alteration in original) (quoting 42 U.S.C. § 1396a(a)(30)(a) (2012)). For these reasons, the Court held that the "sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, . . . shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.* at 329.

Here, UNT attempts to analogize this case to *Armstrong* but fails to point to sufficient textual evidence that Congress implicitly eliminated the availability of equitable relief under *Ex parte Young*. It is true, as UNT points out, that IIRIRA grants authority to the Secretary of Homeland Security and other senior federal

15

officials to "administ[er] and enforce[] . . . all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103. But this general recognition of enforcement authority—as opposed to the "express provision of one method of enforcing a substantive rule"—provides no guidance as to how Section 1623(a) should be enforced. *See Armstrong*, 575 U.S. at 328 (quoting *Alexander*, 532 U.S. at 290). Is Section 1623(a) enforced by withholding federal dollars from postsecondary educational institutions that fail to comply with the provision's substantive rule, by imposing a fine for such a failure, by initiating an enforcement action to compel compliance, or, perhaps, by some other less traditional mechanism? The answer is nowhere to be found in the text of 8 U.S.C. § 1103. And UNT does not cite any other provision of IIRIRA indicating that Congress provided a "sole remedy" for violations of Section 1623(a). *See Armstrong*, 575 U.S. at 328.

Nor does UNT point to a "detailed," "carefully crafted," and "intricate remedial scheme," for violations of Section 1623(a) that shows Congress meant to remove *Ex parte Young* from the arsenal of a private party. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73–74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In *Seminole Tribe*, for example, the plaintiff invoked *Ex parte Young* in attempting to compel the State of Florida to "negotiate in good faith with [the] tribe toward the formation of a compact" governing certain gaming activities, as required by Section 2710(d)(3) of the Indian Gaming Regulatory Act. *Id.* at 47; *accord* 25 U.S.C. § 2710(d)(3). The Court rejected this effort, explaining that "Congress passed § 2710(d)(3) in conjunction with the

16

carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)." *Seminole Tribe*, 517 U.S. at 73–74.

That latter provision, the Court observed, allows a tribe to sue for violations of the duty to negotiate 180 days after requesting such negotiations but limits the remedy a court can grant to "an order directing the State and the Indian tribe to conclude a compact within 60 days." *Id.* at 74; *accord* 25 U.S.C. §§ 2710(d)(7)(B)(i) and (iii). The only sanction for the violation of such an order is that each party must "submit a proposed compact to a mediator," who then selects the one which best comports with the terms of the Act. *Seminole Tribe*, 517 U.S. at 74; *accord* 25 U.S.C. § 2710(d)(7)(B)(iv). And if the state fails to abide by the mediator's selected compact, the exclusive remedy is that the Secretary of the Interior, in consultation with the tribe, prescribes regulations governing gaming on the tribal lands at issue. *Seminole Tribe*, 517 U.S. at 74–75; *accord* 25 U.S.C. § 2710(d)(7)(B)(vii). Considering this statutory scheme, the Court determined that permitting enforcement of Section 2710(d)(3) under *Ex parte Young* would render Section 2710(d)(7) superfluous. *Seminole Tribe*, 517 U.S. at 75. Indeed, "it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*." *Id.*

By contrast, neither Section 1623 nor (at least to the Court's knowledge) any other provision of IIRIRA provides a specific procedure that parties affected by a violation of Section 1623(a)'s requirement may invoke in lieu of *Ex parte Young*. Thus, even if 8 U.S.C. § 1103 supports UNT's position—a dubious proposition for, among

17

other reasons, the precedent described above—such a general grant of agency enforcement authority does not, by itself, establish Congress's intent to foreclose an *Ex parte Young* action. *See Stewart*, 563 U.S. at 256 n.3 ("[T]hat the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." (quotations omitted)). An official-capacity equitable claim under *Ex parte Young*, then, appears to be an anticipated supplement to executive-branch enforcement of Section 1623(a). *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.").

But there is more. Unlike the claim at issue in *Armstrong*, Young Conservatives' preemption challenge to Section 54.051(d) would not require application of a "judicially unadministrable" standard. Section 1623(a) of IIRIRA is not "judgment-laden," "broad," or "[un]specific." *See Armstrong*, 575 U.S. at 328. To the contrary, it sets forth a simple rule: If a university provides an educational benefit based on residence to an alien who lacks lawful immigration status, then that university must provide the same benefit to a United States citizen regardless of the citizen's residency. Because it is "difficult to imagine" a more straightforward requirement, UNT wisely does not argue that Section 1623(a) presents the same kind of judicial administrability problem as the Medicaid provision in *Armstrong*. *See id.*

18

At bottom, this lawsuit is a classic application of *Ex parte Young*: Young Conservatives seeks prospective injunctive relief that would prevent UNT officials from enforcing a state law against its members that allegedly runs counter to federal law. UNT has not identified, and the Court has not found, textual evidence in IIRIRA showing that Congress intended to foreclose private enforcement of Section 1623(a) in the courts. Young Conservatives' preemption challenge to Section 54.051(d) of the Texas Education Code, therefore, may proceed under *Ex parte Young*.

### IV. CONCLUSION

For the foregoing reasons, UNT's motion to dismiss, (Dkt. #7), is **DENIED**.

**So ORDERED and SIGNED this 28th day of October, 2021.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE