**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **YOUNG CONSERVATIVES OF TEXAS FOUNDATION** | § § § | |
| *Plaintiff,* | § § | |
| | § | **CIVIL ACTION NO. 4:20-cv-00973** |
| **v.** | § § | |
| **THE UNIVERSITY OF NORTH TEXAS, THE UNIVERSITY OF NORTH TEXAS SYSTEM, NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS and SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS,** | § § § § § § § § | |
| *Defendants.* | § § | |

**DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... III

I.   STATEMENT OF ISSUES ............................................................................ 1

II.   STATEMENT AND RESPONSE OF UNDISPUTED MATERIAL FACTS ............. 3

    A.   Relevant Procedural History ......................................................... 3

    B.   Relevant Statutory History ............................................................ 3

        1.   *Texas Education Code Chapter 54, Tuition and Fees* ................................ 4

        2.   *IIRIRA* ............................................................... 7

    C.   Relevant Facts ............................................................................ 9

III.   STANDARD OF REVIEW ............................................................................ 10

    A.   Summary Judgment Standard ....................................................... 10

    B.   Permanent Injunction Standard .................................................... 11

IV.   SUMMARY OF THE ARGUMENT ............................................................... 12

V.   ARGUMENT ........................................................................................... 15

    A.   YCT has failed to attach competent summary-judgment evidence in support of its claims. ....................................................................... 15

    B.   YCT has failed to identify a cognizable cause of action in its Motion for Summary Judgment, and for that reason alone, YCT's motion should be denied. ...................................................................................... 16

        1.   *No individual cause of action for enforcement of federal law* ................. 16

        2.   *Supremacy Clause alone does not create a cause of action* ..................... 17

        3.   *No constitutional right to in-state tuition* ................................................. 17

    C.   YCT's suit is barred by sovereign immunity. ................................ 19

        1.   *Defendants, either as state educational institutions or state officials, are entitled to sovereign immunity.* ................................................................. 19

        2.   *Ex parte Young is the only possible exception to Defendants' immunity.* 20

        3.   *The motion before the Court fails to state or argue an Ex parte Young claim.* .................................................................................................... 21

        4.   *Ex parte Young does not apply.* ............................................................. 22

        5.   *YCT has failed to identify a proper Ex parte Young defendant.* .............. 23

        6.   *UNT lacks any connection to enforcement of the challenged law.* ........... 25

        7.   *Because Smatresk and Goodman do not enforce the challenged law, relief directed to them will not redress Plaintiff's injury.* ................................... 28

8. *UNT and the UNT System are not amenable to suit and should be dismissed.* ............................................................. *30*

9. *Complexity of statute precludes private action.* ......................... *30*

**D.** **YCT does not have standing to bring this action.** ............................... **31**

**E.** **Federal law does not preempt Texas Education Code Section 54.051(d).** ...... **36**

1. *Section 54.051(d) does not conflict with Section 1623.* .......................... *44*

2. *The broader Texas tuition scheme does not conflict with Section 1623.* ... *45*

**F.** **YCT has failed to plead or prove the elements of a permanent injunction.** ... **52**

**G.** **YCT's proposed injunctive relief fails to comply with Rule 65.** ..................... **53**

**CONCLUSION** ................................................................................................................ **55**

**CERTIFICATE OF SERVICE** ....................................................................................... **57**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Travelers Indem. Co.*,
    465 F.3d 156 (5th Cir. 2006) ........................................................................... 13

*Air Evac Ems, Inc. v. Tex. Mut. Ins. Co.,*,
    851 F.3d 507, 519 (5th Cir. 2017) ................................................................... 31

*Alden v. Maine*,
    527 U.S. 706 (1999)........................................................................................... 22

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 ...................................................................................................... 14

*APFA Inc. v. UATP Mgmt., LLC*,
    537 F. Supp. 3d 897 (N.D. Tex. 2021) ............................................................. 37

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015)................................................................... 20, 25, 33, 34

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
    627 F.3d 547 (5th Cir. 2010) ....................................................................... 35, 37

*Bibolotti v. Am. Home Mortg. Servicing, Inc.*,
    4:11-CV-472,2013 WL 2147949 (E.D. Tex. May 15, 2013) ............................ 18

*Boudreaux v. Swift Transp. Co., Inc.*,
    402 F.3d 536 (5th Cir. 2005) ........................................................................... 14

*Boyd v. Biggers*,
    31 F.3d 279 (5th Cir. 1994) ............................................................................. 23

*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*,
    347 U.S. 483 (1954).......................................................................................... 40

*California v. Texas*,
    141 S. Ct. 2104 (2021)...................................................................................... 38

*Campo v. Allstate Ins. Co.*,
    562 F.3d 751 (5th Cir. 2009) ........................................................................... 45

*Cano v. Bexar County, Tex.*,
    280 Fed. Appx. 404 (5th Cir. 2008)................................................................. 18

*Celotex Corp.v. Catreet*,
    477 U.S. 317 (1986) ............................................................................................. 13, 14

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011) ...................................................................................................... 52

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ...................................................................................................... 40

*City of Arlington v. Randall*,
    301 S.W.3d 896 (Tex. App.—Fort Worth 2009, pet. denied) ...................................... 25

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ........................................... 24, 25, 26, 27, 28, 33, 38

*City Plan Dev., Inc. v. Office of Labor Comm'r*,
    117 P.3d 182 (Nev. 2005) .............................................................................................. 50

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ...................................................................................................... 52

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) ...................................................................................................... 35

*Day v. Bond*,
    500 F.3d 1127 (10th Cir. 2007) .............................................................................. 19, 20

*Day v. Sebelius*,
    376 F. Supp. 2d 1022 (D. Kan. 2005) ..................................................................... 21, 22

*In re Child. Ed. Litig.*,
    501 F. Supp. 544 (S.D. Tex. 1980) ............................................................................... 41

*Equal Access Educ. v. Merten*,
    305 F.Supp.2d 585 ........................................................................................................ 50

*Escobar-Molano v. Univ. of N. Tex., Case No.*,
    4:05-317, 2005 WL 8161012 (E.D. Tex. Oct. 27, 2005) .............................................. 23

*Ex parte Young*,
    209 U.S. 123 (1908) .......................................................................................... 23, 24, 25, 29

*Florida Lime Avocado Growers*, supra
    373 U.S., 83 S.Ct. 1210, 10 L.Ed.2d 248 ............................................................... 41, 45

*Foss v. Arizona Bd. of Regents*,
    1 CA-CV 18-0781, 2019 WL 5801690 (Ariz. Ct. App. Nov. 7, 2019) ............................ 19, 20

*Freedom From Religion Foundation, Inc. v. Mack*,
   4 F.4th 306 (5th Cir. 2021) ............................................................... 22, 23, 25, 26, 31

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ................................................................................... 45, 46

*Gonzalez v. Thaler*,
   565 U.S. 134 (2012) ........................................................................................... 23

*Green Valley Special Util. Dist. v. City of Schertz*,
   969 F.3d 460 (5th Cir. 2020) ...................................................................... 23, 24

*Hafer v. Melo*,
   502 U.S. 21 (1991) ............................................................................................. 23

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................................... 16

*Hernandez v. Yellow Transp., Inc.*,
   670 F.3d 644 (5th Cir. 2012) ............................................................................ 14

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ....................................................................................... 45, 52

*Hunter v. Branch Banking & Tr. Co.,* ,
   No. 3:12-CV-2437-D, 2013 WL 4052411 (N.D. Tex. Aug. 12, 2013) ................... 35

*I.N.S. v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ........................................................................................... 54

*Idaho v. Couer d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997) ........................................................................................... 24

*Inst. of Am., Inc. v. Korioth*,
   993 F.2d 479 (5th Cir. 1993) .............................................................................. 3

*Jarecha v. Immigration and Naturalization Service*,
   417 F.2d 220 (5th Cir. 1969) ............................................................................ 54

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) .................................................................. 26, 30, 31

*K.P. v. LeBlanc*,
   729 F.3d 427 (5th Cir. 2013) ............................................................................ 24

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 20, 35, 37

*Martinez v. Regents of Univ. of California*,
   241 P.3d 855 (Cal. 2010) ................................................................................. 51

*Maryland Stadium Auth. v. Ellerbe Becket Inc.*,
   407 F.3d 255 (4th Cir. 2005) ........................................................................... 40

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ................................................................................. 40, 44

*Mendoza v. Detail Solutions, LLC*,
   No. 3:10–CV–2436–G, 2012 WL 6115947 (N.D.Tex. Dec.10, 2012) .................... 18

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ....................................................................................... 43

*Morris v. Livingston,,*
   739 F.3d (5th Cir. 2014) .................................................... 26, 27, 28, 29

*Murphy v. National Collegiate Athletic Assn.*,
   138 S. Ct. 1461  (2018) .................................................................................. 38

*My-Tech, Inc. v. Univ. of N. Tex. Health Science Ctr. at Ft. Worth*,
   166 S.W.3d 880 (Tex. App.—Dallas 2005, pet. denied) ..................................... 23

*N.A.A.C.P. v. City of Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) ................................................... 16, 36, 37

*N.A.A.C.P., Boston Chapter v. Harris*,
   607 F.2d 514 (1st Cir.1979) ............................................................................ 22

*Ne. Fla. Chapter of Associated Gen. Contractors*,
   508 U.S ................................................................................................. 20, 38

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) .................................................. 26, 29, 31, 32

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) ................................................................................. 39, 40

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*,
   534 U.S. 426 (2002) ....................................................................................... 41

*Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*,
   767 F.3d 503 (5th Cir. 2014) ........................................................................... 14

*Plyler v. Doe*,
   457 U.S. 202 (1982) ....................................................................................... 41

*Prison Justice League v. Bailey,*
    697 Fed. Appx. 362 (5th Cir. 2017)......................................................................... 37

*Ragas v. Tenn. Gas Pipeline Co.,*
    136 F.3d 455 (5th Cir. 1998) ................................................................................. 14

*Rajeh v. Steel City Corp.,*
    813 N.E.2d 697 (Ohio Ct. of Appeals, 7th Dist., 2004) ........................................ 50

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)............................................................................................... 14

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947)............................................................................................... 40

*Roberts v. City of Shreveport,*
    397 F.3d 287 (5th Cir. 2005) ................................................................................. 18

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973)................................................................................................... 40

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)............................................................................................... 57

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2016) ........................................................................... 56, 57

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996)................................................................................................. 24

*Shah v. Univ. of Tex. Southwestern Med. Sch.,*
    129 F.Supp.3d 480 (N.D. Tex. 2015) .................................................................... 32

*Siegert v. Gilley,*
    500 U.S. 226 (1991)............................................................................................... 23

*Smith v. Lopez,*
    519 F. Supp. 3d 395 (W.D. Tex. 2021)................................................................... 14

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)............................................................................................... 35

*Tenth St. Residential Ass'n v. City of Dallas, Tex.,*
    968 F.3d 492 (5th Cir. 2020) ................................................................................. 36

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ................................................................................. 26

*Tex. Democratic Party v. Benkiser,*
    459 F.3d 582 (5th Cir.2006) ........................................................................ 37

*Touche Ross & Co. v. Redington,,*
    442 U.S. 560 (1979) ..................................................................................... 20

*United Motorcoach Ass'n, Inc. v. City of Austin,*
    851 F.3d 489 (5th Cir. 2017) ................................................................. 15, 55

*United States Sec. & Exch. Comm'n v. Berrettini,,*
    Case No. 10-cv-1614, 2015 WL 5159746 (N.D. Ill. Sept. 1, 2015) ............ 18

*United States v. Lopez,*
    514 U.S. 549 (1995) ..................................................................................... 40

*United States v. Rodriguez,,*
    980 F.2d ........................................................................................................ 14

*United States v. Sineneng-Smith,*
    140 S. Ct. 1575 (2020) ............................................................................ 15, 25

*United States v. Zadeh,*
    820 F.3d 746 (5th Cir. 2016) ...................................................................... 45

*Vlandis v. Kline,*
    412 U.S. 441 (1973) ..................................................................................... 21

*Whole Woman's Health v. Jackson,*
    13 F.4th 434 (5th Cir. 2021) ...................................................................... 30

*Whole Woman's Health v. Jackson,*
    142 S. Ct. 522 (2021) ................................................................................... 30

*Wilson v. Glenwood Intermountain Properties, Inc.,*
    98 F.3d 590 (10th Cir.1996) ........................................................................ 22

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................................ 46, 54

## <u>Statutes</u>

8 U.S.C. § 1103 ..................................................................................... 27, 57

8 U.S.C. § 1601 ..................................................................................... 10, 11

8 U.S.C. § 1602-1614, §§ 1621-1632 ......................................................... 10

8 U.S.C. § 1602 ........................................................................................... 10

8 U.S.C. § 1604 ............................................................................................................. 10

8 U.S.C. § 1605 ............................................................................................................. 10

8 U.S.C. § 1606 ............................................................................................................. 10

8 U.S.C. § 1607 ............................................................................................................. 10

8 U.S.C. § 1608 ............................................................................................................. 10

8 U.S.C. § 1609 ............................................................................................................. 10

8 U.S.C. § 1610 ............................................................................................................. 10

8 U.S.C. § 1611 ...................................................................................................... 10, 94

8 U.S.C. § 1612 .............................................................................................. 10, 11, 12, 94

8 U.S.C. § 1613 .................................................................................................... 10. 94

8 U.S.C. § 1614 ............................................................................................................. 10

8 U.S.C. § 1621 .................................................................................... 10, 77, 80, 88, 89,94, 96

8 U.S.C. § 1622 ...................................................................................................... 10, 77

8 U.S.C. § 1623.. 2, 4, 10, 12, 26, 42, 45, 66, 72, 73, 74, 75, 76, 77, 78, 80, 81, 83, 85, 87, 88, 89, 90, 95, 96

8 U.S.C. § 1624 ...................................................................................................... 10, 78

8 U.S.C. § 1625 ...................................................................................................... 10, 78

8 U.S.C. § 1626 ............................................................................................................. 10

8 U.S.C. § 1627 ............................................................................................................. 10

8 U.S.C. § 1628 ............................................................................................................. 10

8 U.S.C. § 1629 ............................................................................................................. 10

8 U.S.C. § 1630 ............................................................................................................. 10

8 U.S.C. § 1631 ............................................................................................................. 10

8 U.S.C. § 1632 ............................................................................................................. 10

29 U.S.C. § 1144 ........................................................................................................... 76

49 U.S.C. § 41713 ......................................................................................................... 77

Tex. Educ. Code § 54.051.... 2, 3, 4, 5, 7, 13, 19, 20, 21, 22, 42, 43, 45, 46, 47, 48, 49, 50, 52, 53, 55, 66, 71, 72, 73, 74, 75, 78, 81, 83, 84, 85, 86, 87, 90, 91, 93, 96, 98

Tex. Educ. Code § 54.052 ................................................................ 8, 10, 20, 30, 31, 86, 96

Tex. Educ. Code § 54.053 ................................................................ 29, 30, 31, 86

Tex. Educ. Code § 54.0015 ................................................................ 13, 50, 55

Tex. Educ. Code § 54.0501 ................................................................ 13

Tex. Educ. Code § 54.075 ................................................................ 8, 9, 13, 50, 55

Tex. Educ. Code § 61.022 ................................................................ 6

U.S. Const., Art. VI, cl. 2 ................................................................ 67, 68

## Rules

Fed. R. Civ. P. 65 ................................................................ 3, 15, 17, 56, 57, 58

Fed. R. Evid. 602 ................................................................ 19

Fed. R. of Evid. 901 ................................................................ 18

Fed. R. of Evid. 902 ................................................................ 9

## Regulations

10 Tex. Admin. Code § 21.22 ................................................................ 14

19 Tex. Admin. Code § 21.2 ................................................................ 13

19 Tex. Admin. Code § 21.24 ................................................................ 9, 13

19 Tex. Admin. Code § 21.25 ................................................................ 10, 14, 15, 53

19 Tex. Admin. Code § 21.27 ................................................................ 14, 15

UNT[1] respectfully submits this Consolidated Response to Plaintiff Young Conservatives of Texas Foundation's ("YCT") Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment. Plaintiff comes before this Court seeking an extraordinary determination that Congress and the Texas Legislature have been in conflict with one another for almost twenty-five years. And despite no enforcement claims by the federal government that Texas has run afoul of federal law during that time, this Court is the proper venue to make such a determination on the claims of unidentified students at one of the many Texas institutions of higher education.  Nothing in law, fact, or policy supports such a finding.  YCT's summary judgment must be denied because Defendants are not proper parties in this action under *Ex parte Young*, YCT has not met its burden to establish Article III standing, federal law does not preempt Section 54.051(d), and YCT has failed to establish it is entitled to an injunction. On the contrary, UNT is entitled to summary-judgment dismissing YCT's claims for the very same reasons.

## I.     Statement of Issues

YCT has attempted to simplify this case into a single legal question: "Whether the state statute that charges nonresident tuition to United States citizens is preempted by Section 1623 of the federal Illegal Immigration Reform and Immigrant Responsibility Act of 1996"? Dkt. 5 at 1. Before this honorable Court can consider the merits of this question, however, YCT must address (and prove) the following:

1. Whether any of YCT's proffered summary judgment evidence is proper.

2. Whether YCT's motion states a cause of action supporting its claim for equitable relief in three separate respects, including:

    a.   Whether YCT has an individual right of action to enforce 8 U.S.C. § 1623;

---

[1] Defendants the University of North Texas, the University of North Texas System, Neal Smatresk, and Shannon Goodman are collectively referred to as "Defendants" or "UNT" in this Response and Motion.

      b.   Whether the Supremacy Clause creates an individual cause of action; and

      c.   Whether there is a constitutional right to pay in-state tuition.

3.   Whether YCT's suit is barred by sovereign immunity, considering the following sub-issues:

      a.   Whether the Defendants are entitled to sovereign immunity as educational institutions and state officials;

      b.   Whether *Ex parte Young* applies as a possible exception to immunity.

4.   Whether YCT has established its right to present its case to this Court by meeting its threshold requirements of proving associational standing, including:

      a.   Whether YCT has met the injury-in-fact requirement of Article III standing by identifying specific evidence demonstrating how UNT's compliance with Texas Education Code § 54.051(d) has caused any injury to YCT as an organization or to each of its members.

      b.   Whether YCT has proven facts supporting its contention that the requested relief—an injunction against the UNT officials—will redress YCT's alleged injury or instead demands a judicially in-administrable remedy inconsistent with the principles of federalism and comity and against the public interest.

Should YCT meet these threshold requirements, the merits issues for resolution in Plaintiff's motion are as follows:

5.   Whether IIRIRA Section 1623 preempts Texas Education Code Section 54.051(d) as applied to U.S. citizens.

6.   Whether YCT has met the elements of a claim for a permanent injunction against UNT, and specifically whether an injunction against any UNT Defendant is in the public interest.

7.   Whether YCT's request for injunctive relief complies with Federal Rule of Civil Procedure 65.

      For the reasons set forth below, the answer to each of these inquiries must be "no."

Therefore, YCT's motion for summary judgment should be denied and UNT's cross-motion granted, and YCT's suit should be dismissed.

## II.    Statement and Response of Undisputed Material Facts

### A.    Relevant Procedural History

To aid the Court, UNT briefly provides the following relevant procedural history of this case. YCT filed its original state-court petition requesting a declaratory judgment declaring federal preemption of Texas Education Code Section 54.051(d) and a permanent injunction, Dkt. 1 at 8–9, which UNT timely removed to this Court on December 23, 2020. Dkt. 2. This Court denied Plaintiff's Motion to Remand, noting: "the question of preemption is particularly one for federal courts." Dkt. 22 at 9 (quoting *SelfIns. Inst. of Am., Inc. v. Korioth*, 993 F.2d 479, 484 (5th Cir. 1993)).

Because IIRIRA, under its plain terms and the relevant case law, does not provide a private right of action to YCT, UNT moved for the dismissal of YCT's lawsuit, Dkt. 7, which the Court denied on October 21, 2021, Dkt. 34. Shortly after, on December 13, 2021, YCT amended its Complaint to abandon its claim to organizational standing. Dkt. 44. Although the Court struck YCT's Amended Complaint, Dkt. 48, YCT has repeatedly contended in response to discovery on this topic that it amended its complaint to remove all allegations related to its claim to organizational standing. Exhibit A at ¶¶ 15–18; Exhibit B Correspondence from YCT.

Before the Court is now UNT's response to YCT's motion and cross-motion for summary judgment. *See* Dkt. 5. YCT seeks summary judgment on its argument that the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") preempts Texas Education Code Section 54.051(d). YCT's claim should fail as both a matter of law and fact.

### B.    Relevant Statutory History

Plaintiff claims that Texas Education Code Section 54.051(d) as applied to United States citizens is preempted by 8 U.S.C. § 1623(a) and seeks to prevent the Defendants from applying Section 54.051(d) to United States citizens. Dkt. 5 at 7. In order to consider the sweeping impact

of such a request, it is necessary to examine the two statutory schemes that are implicated under this analysis.

> ### 1.   *Texas Education Code Chapter 54, Tuition and Fees*

Texas Education Code Section 54.051(d) is one of many statutory provisions under Chapter 54, Subchapter B "Tuition Rates." Specifically, this provision states:

> Unless a different rate is specified by this section, tuition for a nonresident student at a general academic teaching institution or medical and dental unit is an amount per semester credit hour equal to the average of the nonresident undergraduate tuition charged to a resident of this state at a public state university in each of the five most populous states other than this state, as computed by the coordinating board under this subsection. The ***coordinating board*** shall set the tuition rate provided by this subsection for each academic year and report that rate to each appropriate institution not later than January 1 of the calendar year in which the academic year begins, or as soon after that January 1 as practicable. In computing the tuition rate, the ***coordinating board*** shall issue the nonresident tuition rates for the other states in effect for the academic year in progress when the board makes the computation.

Tex. Educ. Code § 54.051(d) (emphasis added).

The statutory scheme governing the Texas Higher Education Coordinating Board's ("Coordinating Board" or "THECB") adoption of tuition rates is complex, but determining the rate is only one component of the broader residency status determination process. The Coordinating Board was created by the Texas Legislature in 1965 and is governed by a board of nine members appointed by the Governor. *See* TEX. EDUC. CODE § 61.022. One of its purposes is to create a state agency that would provide leadership and coordination for the Texas higher education system to provide for an efficient and effective system. *Id*. at 61.02(a).

Section 54.0151(d) requires that in establishing tuition for nonresident students, the Coordinating Board must do the following: (1) identify the five most populous states other than Texas, (2) determine the average nonresident undergraduate tuition charged to Texas residents in those states, (3) determine an average of those rates, (4) establish this rate for each academic year,

and (5) report that rate to each institution annually. *Id*. Subsection (d) sets a basic tuition rate and serves as a fundamental block of the tuition determination process. It does not, however, include any requirements related to the determination of residency, distinctions between "U.S. citizens" and "non-U.S. citizens," or waivers. Those issues extend far beyond Section 54.0151(d) and implicate an extensive state-wide statutory and regulatory scheme governing tuition and fees for institutions of higher education in Texas. For perspective on the breadth of this statutory scheme, a printed version of Texas statutes online version of Chapter 54 "Tuition and Fees" is 127 pages long, and section 54.051(d) is one of 16 subsections in .051 alone.

Section 54.051(d), which prescribes the Coordinating Board's duties, is only one statutory provision of a much broader regulatory scheme that establishes the Texas statewide higher education system of tuition and fees as applicable to all institutions of higher education. *Id*. at § 54.002. Chapter 54 applies not only to University of North Texas System, but also to the 37 public four-year institutions in Texas including the University of Texas System, Texas A&M System, University of Houston System, Texas State University System, Texas Tech University System, and multiple independent-public colleges such as Texas Women's University. *See* Texas Higher Education Coordinating Board "2021 Texas Public Higher Education Almanac," *available at* https://reportcenter.highered.texas.gov/agency-publication/almanac/2021-texas-public-higher-education-almanac/.

Section 54.051(d) does not govern the actual determination of residency, but rather only establishes the process for determining the nonresident student rate. The process of determining resident versus non-resident status is subject to multiple statutory and regulatory requirements that are also governed by the Coordinating Board and not subject to supplementation by UNT. TEX. EDUC. CODE § 54.075 ("The Coordinating Board shall adopt rules to carry out the purposes of

[Subchapter B]. An institution of higher education may not require a person to provide evidence of resident status that is not required by coordinating board rule."). The law further provides that "the [THECB] by rule shall adopt definitions related to the resident status of students for purposes of this title and to tuition and fee exemptions and waivers for students under this chapter *as necessary to ensure consistency* in the application of this chapter and other related state laws and policies." *Id* at § 54.0015. The process of establishing tuition rates and resident status is the exclusive authority of the Coordinating Board. *Id*. Institutions of higher education, including UNT, are prohibited from collecting any tuition of any kind except as permitted by law. *Id*. at § 54.003.

Tuition status is determined by meeting statutory and administrative requirements and/or by qualifying for a specific type of tuition waiver established by the Coordinating Board, and ultimately, each residency tuition determination is unique to each individual student. The determination of resident status is governed by Section 54.052 of the Texas Education Code and the related regulations. The Coordinating Board is required to adopt rules concerning the determination of residency status for tuition purposes. TEX. EDUC. CODE § 54.075. It has done so under Title 19, Subchapter B of the Texas Administrative Code.

THECB Rule 21.25 requires that each student applying to enroll at a Texas higher education institution must complete a set of core residency requirements to determine eligibility as a resident ("Core Residency Questions") as part of the admissions process. *See* Core Residency Questions attached as Exhibit C, att. A and *available at* https://reportcenter.highered.texas.gov/ agency-publication/blank-forms-templates/cfat-residency-core-questions/.[2]  Rule 21.24 provides a detailed set of requirements for determination of resident status and the supporting documentation required. 19 TEX. ADMIN. CODE § 21.24; *see* Documentation to Support

---

[2] *See* Fed. R. Evid. 902(5).

Establishing and Maintaining Domicile in Texas attached as Exhibit C, att. B and *available at* https://registrar.unt.edu/ sites/default/files/documentation-to-support-domicile-and-residency.pdf and attached as Exhibit C, att. B.

Students have multiple methods they can utilize to establish qualification for resident status tuition including high school graduation in Texas, establishment and maintenance of domicile, and various waivers or exemptions. *See* TEX. EDUC. CODE § 54.052. All U.S. Citizens are eligible to establish resident status under any of the provisions of Section 54.052(a)(1–3). A non-U.S. citizen can establish domicile pursuant to Section 54.052(a)(1-2) by providing documentation in addition to that required of U.S. citizens as required under Texas Administrative Code Rule 21.24(d). A non-U.S. citizen that cannot provide such documentation may qualify for resident status by satisfying the Texas state graduation requirements and filing an affidavit that they will be applying for permanent residence status in addition to the other documentation required for U.S. citizens. *Id.* at 54.042(a)(3)(B); 19 TEX. ADMIN. CODE § 21.25(a)(B).

### 2.   *IIRIRA*

In 1996, Congress enacted two companion pieces of legislation, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") and the Illegal immigration Reform and Immigrant Responsibility Act ("IIRIRA"). 8 U.S.C. §§ 1601-1614, §§ 1621-1632 respectively.  More commonly, this legislation was referred to as the Welfare Reform Act of 1996.  PRWORA was meant to fight welfare dependency in general and to specifically limit the federal public benefits available to aliens, lawful and unlawful.  IIRIRA expanded on those provisions and established eligibility requirements for aliens to receive state and local benefits.

The purpose of these laws was to encourage self-sufficiency among immigrants, decrease dependence on public resources, and to not incentivize immigration to the U.S. for benefits.  8 U.S.C. § 1601(1-2).  PRWORA placed restrictions on the receipt of direct federal benefits from

programs including the Temporary Assistance for Needy Families, Supplemental Security Income, Medicaid, the State Child Health Insurance Program, and the Food Stamps Program.  8 U.S.C. § 1612.

IIRIRA established the limitation on providing state and local public benefits to not qualified aliens. *Id*. at §§ 1621-1632.  Unlike the federal portion of the laws, IIRIRA did not create a blanket prohibition on the granting of benefits, but rather shifted the decision-making authority to the states to determine what state and local public benefits it would provide to illegal aliens.  *Id*. at § 1621(d).  It provides:

> (d)   State Authority to Provide for Eligibility of Illegal Aliens for State and Local Public Benefits.—A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after the date of the enactment of this Act which affirmatively provides for such eligibility. *Id*.

A "State or local public benefit" means:

> (A) Any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

> (B) Any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a state or local government. *Id*. at § 1621(1)(B).

The state also has the authority to limit the eligibility for benefits of a qualified alien.  *Id*. at § 1622.  In limiting eligibility of aliens for higher education benefits, IIRIRA requires that no preferential treatment of the alien be given on the basis of residence.  *Id*. at § 1623.

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States I eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident. *Id*. at § 1623(a).

This statute is the basis of Plaintiff's preemption claim and is discussed more fully herein.

**C.    Relevant Facts**

1.    Resident tuition means the amount of tuition paid by the person who is a resident of this state. TEX. EDUC. CODE § 54.0501(7).

2.    Nonresident tuition means the amount of tuition paid by a person who is not a resident of this state and who is not entitled or permitted to pay resident tuition under this subchapter. TEX. EDUC. CODE § 54.0501(4).

3.    The Texas Higher Education Coordinating Board ("Coordinating Board") establishes the tuition rate for a nonresident student. TEX. EDUC. CODE § 54.051(d); 19 TEX. ADMIN. CODE §21.2; https://www.highered.texas.gov/ institutional-resources-programs/funding-facilities/tuition-and-fees-data/nonresident-tuition/; Goodman Depo 12:20-24.

4.    The Coordinating Board establishes the definitions for determining residency of students and tuition and fee exemptions and waivers for students. TEX. EDUC. CODE § 54.0015, 54.075; 19 Tex. Admin. Code § 21.21–22, 21.24; Deposition of Shannon Michael Goodman ("Goodman Depo") attached as Exhibit D at 25:2–15.

5.    Core Residency Questions are promulgated by the Coordinating Board and set forth in the Apply Texas Application. 10 TEX. ADMIN. CODE § 21.22(4); Goodman Depo 23:14-18. Declaration of James Garrison attached as Exhibit C at ¶ 3 ("Garrison Declaration")

6.    UNT utilizes the Apply Texas Application and the CommonApp for admissions purposes. Both applications utilize the Core Residency Questions. Goodman Depo 25:22:13–23:23; 26:19–23; Garrison Declaration at ¶ 3.

7.    Apply Texas is the state's common admission application process administered by the Coordinating Board. Goodman Depo 22:13-21.

8.    UNT has no authority or role in establishing Core Residency Questions or standards for tuition exemptions and waivers. Goodman Depo 24:23–25:15.

9

9.      UNT officials only review residency determinations when a student seeks a reclassification. The student would be required to submit the same information and documentation as required for the initial determination and the same standards would be applied by UNT. Goodman Depo 27:23-28:14; 19 Tex. Admin. Code §21.27.

10.     The Coordinating Board reviews the student's information and makes a residency determination that is then provided to UNT. Goodman Depo 23:19-23.

11.     There are multiple ways for a student to qualify for resident tuition. Garrison Declaration at ¶ 5.

12.     A United States citizen or national is eligible to qualify for resident tuition in the same or lesser manner as a non-US citizen or Permanent Resident. Garrison Declaration at ¶ 7.

13.     A student who is not a U.S. citizen or Permanent Resident, in addition to satisfying all other residency requirements applicable to a U.S. citizen or Permanent Resident, must file a signed affidavit stating that the student will apply to become a Permanent Resident of the U.S. as soon as eligible ("Permanent Resident Affidavit") in order to receive resident tuition. 19 Tex. Admin. Code § 21.25; Garrison Declaration at ¶ 8.

14.     Non-Texas students have no additional affidavit requirements for satisfying residency. 19. Tex. Admin. Code §21.25; Garrison Declaration at ¶ 9.

15.     The Coordinating Board establishes the requirements of the Permanent Resident Affidavit. 19 Tex. Admin. Code § 21.27.

16.     UNT currently enrolls more than 6,000 students that pay nonresident tuition. An injunction stopping UNT from charging those students nonresident tuition would result in a loss of approximately $25,000,000 dollars per semester. Garrison Declaration at ¶ 10.

## III.   Standard of Review

### A.     Summary Judgment Standard

YCT bears the initial burden of "informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). To satisfy this burden,

YCT must provide affidavits or identify any portion of the pleadings, discovery, or admissions that demonstrate the absence of a triable dispute of material fact. *Celotex Corp.*, 477 U.S. at 323; *Rodriguez*, 980 F.2d at 1019. If YCT fails to meet this initial burden, "the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (internal citation omitted). Should YCT carry its initial burden, UNT must identify specific evidence in the record and articulate the precise manner in which this evidence raises a genuine dispute of material fact. *Smith v. Lopez*, 519 F. Supp. 3d 395, 401 (W.D. Tex. 2021) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

In determining the merits of a motion for summary judgment, a court has no duty to search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a court may not make credibility determinations or weigh the evidence but must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citations omitted).

## B.    Permanent Injunction Standard

Through its summary judgment motion, YCT seeks a permanent injunction in vague terms—"a permanent injunction that prevents Defendants from applying the preempted state provision to citizens." *See* Dkt. 6 at 20. YCT did not seek a preliminary injunction here and seeks only this permanent injunctive relief.

The elements of a permanent injunction are essentially the same as those for a preliminary injunction "with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987). Those elements are "(1) success on the merits; (2) the failure to grant the injunction will

result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest." *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492–93 (5th Cir. 2017). Finally, every order granting an injunction must comply with Federal Rule of Civil Procedure 65, which requires that such an order must (a) state the reasons why the injunction issued; (b) state the terms of the injunction specifically, and (c) describe "in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *See* Fed. R. Civ. P. 65(d)(1)(A)-(C).

## IV.     Summary of the Argument

YCT has asked this court for "a permanent injunction that prevents Defendants from applying" Texas Education Code Section 51.051(d) "to citizens." YCT's claims have significant jurisdictional defects that have remained since the inception of the case. YCT fails to establish a cause of action as there is no independent enforcement right under this federal law, the Supremacy clause creates no individual cause of action, and Plaintiff identifies no constitutional right that has been violated.  YCT has failed to identify a cognizable cause of action in the motion before the Court, and for that reason alone, YCT's motion must be denied.[3]

YCT's suit is barred by sovereign immunity and *Ex parte Young* provides no exception. YCT has not established that the requested relief—an injunction against the UNT officials—will redress YCT's alleged injury. Review of the regulations implementing the Texas tuition statutes demonstrates that designation and administration of tuition in Texas higher education institutions involves several governmental and third-party entities. As the facts show, UNT's officials play no

---

[3] To the extent the Court has identified other potential theories of justiciability potentially available to YCT, those arguments are not the subject of Plaintiff's motion. Plaintiffs have not attached sufficient evidence to proceed under any such theory, and any opinion on such theories would necessarily be advisory. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quotation omitted) (noting that courts should "rely on the parties to frame the issues for decision and assign to [themselves] the role of neutral arbiter of matters the parties present").

role whatsoever in setting, determining, or otherwise applying the tuition rate established in Education Code § 54.051(d), as that responsibility is *expressly* delegated by the Texas Legislature to the Texas Higher Education Coordinating Board. Additionally, UNT has no power or authority to determine whether a student meets the Texas Legislature's definition of "resident status" defined in Education Code § 54.052, as the process for determining resident status is administered by the Texas Higher Education Coordinating Board and a third-party vendor outside of UNT's control. Because the UNT Defendants play no role in setting the statutory tuition rates established by section 54.051 or assigning residency status to any individual applicant or student, an injunction against the UNT officials cannot redress YCT's alleged injury.

Even if the Court finds that a UNT official has the requisite nexus to the alleged unconstitutional action, the Court cannot meaningfully redress the alleged injury with an injunction against the UNT Defendants. Any such order would have far-reaching impacts, including upending the Texas higher education finance system, creating the potential for a patchwork of tuition rates across the state, and violating the principles of federalism and comity, and thus could not be in the public interest. In addition, the complexity of Texas's statutory tuition regime and enabling regulations coupled with the complexity of enforcement actions under IIRIRA foreclose the viability of equitable relief.

Even assuming YCT has a viable cause of action, YCT has failed to prove that it meets the rigorous requirements of Article III standing. YCT has failed to provide any evidence establishing associational standing.[4]  YCT has failed to prove the injury-in-fact element of Article III standing

---

[4] YCT has abandoned any claim of organizational standing in this matter. *See* Exhibits A-B. Regardless, YCT has failed to prove that the organization has expended significant resources to counteract the alleged unlawful conduct; instead, YCT's summary-judgment attachments prove—at best—only routine lobbying activities. *See N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

because it has not attached any—let alone specific—evidence demonstrating how UNT's compliance with Texas Education Code § 54.051(d) has injured its members. Even if Section 1623 conveys a legally protected interest,[5] there is no evidence substantiating YCT's claim that UNT's compliance with Texas Education Code § 54.051(d) has caused any injury to its members. YCT has not attached evidence proving that UNT provides "benefits" to "an alien who is not lawfully present in the United States" in violation of Section 1623. Contrary to YCT's assertions, Plaintiff's request for equitable relief is not a "pure question of law" because mere recitation of the law, without evidence proving the application is unlawful, is insufficient to obtain judgment on an as-applied challenge. Because Plaintiff has failed to produce evidence substantiating its alleged injuries, YCT's motion must be denied, and summary judgment should be entered in favor of UNT. Because YCT has failed to attach evidence establishing associational standing, the Motion must be denied, and summary judgment should be entered in favor of UNT.

If the Court finds that Plaintiff has met the multitude of preliminary requirements, YCT's argument still fails as federal law does not preempt the Texas Education Code.  The plain language of Section 1623 and Section 54.051(d) demonstrates that there is no express preemption.  Further, Plaintiff cannot establish its implied preemption claims on either impossibility or obstacle.  The federal law clearly intends that the states have the power to determine the granting of benefits to unlawfully present aliens.

Finally, Plaintiff's request for relief should fail as it does not meet the requirements of a permanent injunction or Federal Rule of Civil Procedure 65.  The relief that YCT seeks from this

---

[5] As discussed below, UNT denies that a particular tuition "rate" constitutes a "postsecondary education benefit" under IIRIRA.

Court is extraordinary and effectively requires this Court to act as a super-legislature and rewrite long-standing Texas education policy.

## V.   ARGUMENT

### A.   YCT has failed to attach competent summary-judgment evidence in support of its claims.

YCT's scant summary-judgment evidence is rife with inadmissible statements and unauthenticated documents. Thus, UNT objects to the admissibility of Exhibits A–L and paragraphs 5, 6, and 8–12 of the Dominguez Declaration. *See* Dkt. No. 5.

> *1.   The documents attached to the Dominguez Declaration are inadmissible hearsay.*

Exhibits A–L to YCT's Motion for Summary Judgment include unauthenticated internet posts and articles. Federal Rule of Evidence 901 requires the proponent of evidence to produce authenticating evidence sufficient to support a finding that the item is what the proponent claims it is. Fed. R. Evid. 901. "Private web-sites, however, are not self-authenticating." *Bibolotti v. Am. Home Mortg. Servicing, Inc.*, 4:11-CV-472, 2013 WL 2147949, at *3 (E.D. Tex. May 15, 2013) (citing *Mendoza v. Detail Solutions, LLC*, No. 3:10–CV–2436–G, 2012 WL 6115947, at *1 (N.D.Tex. Dec.10, 2012) (rejecting unauthenticated internet printouts offered in support of summary judgment because the materials did not comply with Federal Rule of Evidence 901). And "[n]ewspaper articles . . . are hearsay and therefore do not constitute competent summary judgment evidence." *Cano v. Bexar County, Tex.*, 280 Fed. Appx. 404, 406 (5th Cir. 2008) (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)).

YCT makes no attempt to authenticate these exhibits. The Dominguez Declaration contains insufficient evidence to meet Rule 901's threshold requirements. *See* Dkt. No. 5; *see also United States Sec. & Exch. Comm'n v. Berrettini*, Case No. 10-cv-1614, 2015 WL 5159746, *6 (N.D. Ill. Sept. 1, 2015) (the affidavit of a witness who captured the webpage, along with some

circumstantial evidence of authenticity such as the URL, date of printing, title of the website, author of the website, or other identifying information, is required). Because the Dominguez Declaration and Exhibits A–L lack indicia of authenticity, they are not competent summary judgment evidence and should be struck.

        2.     *The Dominguez Declaration is not based on personal knowledge and includes inadmissible hearsay.*

Under Federal Rule of Evidence 602, witness testimony is admissible only if supporting evidence is introduced sufficient to support a finding that the witness has personal knowledge of the subject of the testimony. Fed. R. Evid. 602. While Dominguez states he "oversees" each YCT chapter "at colleges and universities across the [S]tate of Texas," he provides no testimony to support the basis for his personal knowledge for the following statements:

- **Dominguez Declaration, Paragraph 5**: "YCT's members include United States citizen that do not qualify as Texas residents and are not otherwise exempt from the requirement to pay nonresident tuition."

- **Dominguez Declaration, Paragraph 6**: "YCT's members include individuals that are currently enrolled as undergraduate students at UNT."

Dominguez has failed to present any supporting evidence or testimony as to how he has personal knowledge of the specific membership information of YCT's UNT Chapter—presumably one chapter out of hundreds of universities and colleges across the State of Texas.

    **B.**    **YCT has failed to identify a cognizable cause of action in its Motion for Summary Judgment, and for that reason alone, YCT's motion should be denied.**

        1.     *No individual cause of action for enforcement of federal law*

In the motion before this Court, YCT argues that 8 U.S.C. § 1623 preempts Texas statutes that govern the tuition rates the University of North Texas and other Texas public universities can charge residents of the state. Every jurisdiction faced with the question of whether Section 1623 creates a private right of action has explicitly held it does not. *See, e.g., Day v. Bond*, 500 F.3d

1127, 1139 (10th Cir. 2007); *Foss v. Arizona Bd. of Regents*, 1 CA-CV 18-0781, 2019 WL 5801690, at *3 (Ariz. Ct. App. Nov. 7, 2019). Instead, under its plain terms, Congress has given sole responsibility for enforcing immigration laws to the Secretary of Homeland Security. *Id.*; *see* 8 U.S.C. § 1103(a)(1).[6] Because YCT has not identified a cause of action establishing any member's individual right to bring suit, the organization lacks standing and the Court lacks subject-matter jurisdiction to hear this suit. *Day*, 500 F.3d at 1140; *see also Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S at 663 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Further, because YCTF has no right to enforce this statute, it has failed to state a claim. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 566 (1979). Accordingly, and for the reasons set forth at length in UNT's motion to dismiss, Dkt. 7, and reply memorandum, Dkt. 29, the suit should be dismissed.

### 2.    Supremacy Clause alone does not create a cause of action

"It is equally apparent that the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324–25 (2015) (internal citations omitted); *see also* YCT's Response to UNT's Motion to Dismiss, Dkt. No. 28, at 6 (citing *Armstrong*, 575 U.S. at 326) ("[T]he Supremacy Clause does not confer a right of action.").  YCT fails to assert any other cause of action other than a "violation of the Supremacy Clause." Without more, Plaintiff's suit should be dismissed.

### 3.    No constitutional right to in-state tuition

YCT asserts the "Texas statute that establishes an unconstitutional tuition rate for nonresident citizens in violation of federal law" but fails to establish what constitutional right this

---

[6] "The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers."

case involves. Dkt. 5 at 1. There is no constitutional right related to postsecondary education generally and certainly none that would entitle nonresident citizens to pay resident tuition. *See generally San Antonio Indep. School Dist. V. Rodriguez*, 411 U.S.1 (1973). YCT does not dispute that states can force out-of-state residents to pay more in tuition. *Vlandis v. Kline*, 412 U.S. 441, 452–53 (1973) (noting that states have legitimate interests in establishing a preferential tuition basis for residents).

YCT's motion for summary judgment argues section 54.053(c) of the Texas Education Code is "unconstitutional," without articulating any rationale for its constitutional claim. Its motion never asserts that this statute creates an equal protection argument, for good reason, because there is no equal protection argument here.

Section 54.053(c) does not contain any requirement preventing any person from obtaining in-state tuition at a Texas school. YCT cannot demonstrate that section 54.053(c) has any application to it or any of its members. Accordingly, it is unable to demonstrate sufficient injury to establish standing. *See Day v. Sebelius*, 376 F. Supp. 2d 1022, 1039 (D. Kan. 2005), *aff'd sub nom. Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007) (rejecting an equal protection challenge based on similar arguments on ground that the challenged statute did not prevent out-of-state students from admission to Kansas schools).

Texas law, in fact, allows any United States citizen (or documented non-citizen) to attend a Texas school through processes that are less onerous than section 54.053(c). Any citizen of any other state can qualify for resident tuition in Texas simply by residing in Texas for one year. TEX. EDUC. CODE § 54.052(1).

Undocumented non-citizens are not eligible for resident tuition on that basis; instead, they can only become eligible under section 54.052(3), which applies only to students who graduated

from a Texas high school, while residing in Texas for three years before their graduation, *and* for one year before they enroll in a Texas school. Section 54.053(3) allows such students to qualify if—and only if—they certify that they will apply to become a permanent resident as soon as they become eligible to apply.

The Texas Education Code allows any citizen to qualify for Texas resident tuition merely by residing in Texas for one year. Undocumented non-citizens are not granted that privilege under the Texas Education Code. There is no possible equal protection argument in this case. *See Day v. Sebelius*, 376 F. Supp. 2d at 1039. A mere abstract denial of equal opportunity does not constitute injury in fact. *N.A.A.C.P., Boston Chapter v. Harri*s, 607 F.2d 514, 520 (1st Cir.1979); *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 593–94 (10th Cir.1996).

Nonresident citizens have no constitutional right to pay resident tuition in Texas. If they desire to pay resident tuition, the Texas Education Code is quite liberal in allowing them to establish resident status by living in Texas for one year. This privilege is not granted to undocumented noncitizens, who can only qualify if they have actually graduated from a Texas high school and lived here for three years. Plaintiffs have failed to identify a constitutional claim, a constitutional violation, or a constitutional injury.

**C.      YCT's suit is barred by sovereign immunity.**

*1.      Defendants, either as state educational institutions or state officials, are entitled to sovereign immunity.*

Suits against the State or state agencies "generally must be dismissed because they're barred by sovereign immunity." *Freedom From Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 311 (5th Cir. 2021).[7] This immunity extends to the University of North Texas System and The

---

[7] Many of the cases refer to "Eleventh Amendment immunity," but the Supreme Court is clear that this phrase is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 733 (1999).

University of North Texas, which are state educational institutions. *See Escobar-Molano v. Univ. of N. Tex.*, Case No. 4:05-317, 2005 WL 8161012, at *1 (E.D. Tex. Oct. 27, 2005) (collecting cases); *see also My-Tech, Inc. v. Univ. of N. Tex. Health Science Ctr. at Ft. Worth*, 166 S.W.3d 880, 882-83 (Tex. App.—Dallas 2005, pet. denied) (finding the University to be a "state institution and thus benefit[ting] from the doctrine of sovereign immunity). And the university officials that are sued here in their official capacities are similarly entitled to claim immunity, because "[s]uits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Immunity is a "threshold question, to be resolved as early in the proceedings as possible." *Boyd v. Biggers*, 31 F.3d 279, 284 (5th Cir. 1994) (per curiam) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991)); *see also Mack*, 4 F.4th at 312 ("[I]n adjudicating an official-capacity claim against an alleged official of the State, the district court should've started and ended with *Ex parte Young*.") (emphasis omitted). But regardless of *when* it is raised, it *may* be raised at any time, even on appeal. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

> 2.     *Ex parte Young is the only possible exception to Defendants' immunity.*

YCT's motion for summary judgment does not contend that Defendants have waived their immunity, and YCT points to no Congressional act that would abrogate Defendants' immunity. So, the only possible exception to Defendants' sovereign immunity here would be *Ex parte Young*, 209 U.S. 123 (1908).[8]

---

[8] As this Court has observed and consistent with guidance from the Fifth Circuit, *Ex parte Young* actually "has two holdings"—first, that a state official may "be sued, notwithstanding the State's sovereign immunity. Second, an equitable cause of action would open the federal courts to suits like the one against Young." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 496 (5th Cir. 2020) (en banc) (Oldham, J., concurring) (citations omitted). Defendants' argument here concerns only the first holding—that their immunity is not circumvented by *Ex parte Young* even assuming Plaintiff has a viable cause of action.

In *Young*, the Supreme Court for the first time recognized the legal fiction that "a suit is not 'against' a state [] when it seeks prospective, injunctive relief from a state actor based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). For *Ex parte Young* to apply, the defendant state official, "by virtue of his office," must have "some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (additions in original) (*citing Young*, 209 U.S. at 157). The fiction *Ex parte Young* embodies "infringes on state sovereignty," so the Supreme Court has frequently seen fit to limit its reach. *See Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (affirming that, in applying *Ex parte Young*, courts "must ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law.").

It is not disputed that Congress has not abrogated Defendants' immunity in this instance, and Defendants have not consented to suit. Accordingly, *Ex parte Young* "is the whole ballgame." *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 471 (5th Cir. 2020). If it does not apply, all Defendants are immune.[9]

> 3.     *The motion before the Court fails to state or argue an Ex parte Young claim.*

---

[9] Abrogation applies only if Congress has unequivocally expressed its intent to abrogate a state's sovereign immunity and has acted pursuant to a valid exercise of power. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996). And while sovereign immunity may be waived, such waiver must be clearly stated and will not be easily implied. *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). Defendants raised Eleventh Amendment immunity as an affirmative defense at the very beginning of this case. Plaintiffs do not contend (and could not plausibly contend) they have since waived it. And Plaintiffs do not claim that Congress has abrogated Defendants' immunity here.

A claim for declaratory relief must be accompanied by "a cause of action at common law or under some statutory[10] or constitutional[11] provision." *City of Arlington v. Randall*, 301 S.W.3d 896, 908 (Tex. App.—Fort Worth 2009, pet. denied). And the Fifth Circuit has been clear: "[T]he **only** way to bring an official-capacity claim against an officer of the State is to do so under the equitable cause of action recognized in *Ex parte Young*." *Mack*, 2021 WL 2887861, at *4 (citing 09 U.S. 123, 28 (1908)) (emphasis added). Here, YCT has failed to make any reference to or argument under *Ex parte Young* and its progeny in the motion before the Court. As this Court has observed in this case, courts should "rely on the parties to frame the issues for decision and assign to [themselves] the role of neutral arbiter of matters the parties present." *United States v. Sineng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quotation omitted); *see also* Dkt. 34 at 10 n. 3. The Court should not consider arguments not raised in YCT's pleadings or motions.

### 4.    *Ex parte Young does not apply.*

The Court's *Ex parte Young* analysis begins with the fundamental question of "whether the plaintiff has named the proper defendant or defendants." *City of Austin*, 943 F.3d at 997. If the challenged law charges a specific state actor or agency with enforcement, and a plaintiff has sued someone other than that specific actor or agency, the "*Young* analysis ends" at the outset—there is no proper defendant. *Id.* If, alternatively, the challenged statute does *not* name a state official or agency, only then does the Court consider whether the defendant "actually has the authority to enforce the challenged law." *Id.*

---

[10] As detailed at length in Defendant's Motion to Dismiss (Dkt. No. 7) and Reply (Dkt. No. 29), there is no express or implied statutory basis for YCT's attempt to enforce Section 1623 of the Illegal Immigration Reform and Immigrant Responsibility Act.

[11] Similarly, the Supremacy Clause of the U.S. Constitution does not supply a standalone cause of action. *See Armstrong*, 575 U.S. 320, 324–25 (2015) (holding that the Supremacy Clause is not the "'source of any federal rights,' and certainly does not create a cause of action." (internal citations omitted).

Even if there were a proper defendant here (and there is not), the Court must still determine

that the defendant has "some connection" to the challenged law. The Fifth Circuit's guidance here

is not a model of clarity, but some baseline rules to guide this analysis can be ascertained from the

cases. The "some connection" requirement means that the defendant has "the particular duty to

enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris*, 739

F.3d at 746 (5th Cir. 2014) (*citing Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (plurality

op.)); *see also Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (noting that

although the "precise scope" of the requirement for "some connection" has not been defined,

*Morris*'s adoption of the *Okpalobi* requirement is at least a minimal required showing). The Fifth

Circuit requires at minimum a "scintilla of 'enforcement' by the relevant state official with respect

to the challenged law." *City of Austin*, 943 F.3d at 1002; *see also K.P. v. LeBlanc*, 627 F.3d 115,

124 (5th Cir. 2010) (enforcement typically means "compulsion or constraint.").

Because whether a particular defendant enforces a challenged state law is a case-by-case

determination, the Court must conduct a "provision-by-provision analysis" to determine if *these*

Defendants have the requisition connection "to the enforcement of the particular statutory

provision" that is the subject of the litigation. *Tex. Democratic Party*, 978 F.3d at 179. The "some

connection" analysis should also include a determination that "a district court can meaningfully

redress [the alleged injury] with an injunction against the defendant state officials. *See Freedom

From Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021).

Here, however, the Court's analysis ends at the beginning: YCT challenges a state law that

designates a state agency enforcer who is not a party to this suit, and so, *Ex parte Young* does not

apply. *City of Austin*, 943 F.3d at 997.

> 5.    *YCT has failed to identify the proper Ex parte Young defendant who is
> designated by statute.*

YCT claims Section 54.051(d) of the Texas Education Code is preempted by federal law codified at 8 U.S.C. § 1623(a). *See* Dkt. 6 at 1 ("This state statute is preempted because it establishes an unconstitutional tuition rate for nonresident citizens in violation of federal law."). Specifically, Plaintiff seeks an order to prevent Defendants and those acting in concert with Defendants from "applying Section 54.051(d) . . . to United States citizens."

As informed by the Fifth Circuit, this Court's analysis begins with an analysis of whether the challenged law—here, section 54.051(d) of the Texas Education Code—charges a specific state official with enforcement of the law. *See City of Austin*, 943 F.3d at 997. It does.

The challenged statute provides in relevant part:

> "*The coordinating board shall set the tuition rate* provided by this subsection for each academic year and report that rate to each appropriate institution not later than January 1 of the calendar year in which the academic year begins, or as soon after that January 1 as applicable. In computing the tuition rate, *the coordinating board* shall use the nonresident tuition rates for the other states in effect for the academic year in progress when *the board* makes the computation."

Tex. Educ. Code § 54.051(d). The "[c]oordinating board" means the Texas Higher Education Coordinating Board (the "Coordinating Board" or "THECB"). Tex. Educ. Code § 54.051(a)(1).

"Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. The Texas Legislature tasked the Coordinating Board (and by the text of the statute, only the Coordinating Board) with enforcing the very process challenged here—the calculation of nonresident tuition rates. As the Fifth Circuit has made clear, YCT chose the wrong defendants and doomed its suit.

In *Morris v. Livingston*, an inmate in the custody of the Texas Department of Criminal Justice ("TDCJ") claimed a Texas statute requiring inmates to pay health care services fees was

unconstitutional. 739 F.3d 740, 742 (5th Cir. 2014). The inmate named the Governor of Texas as a defendant. *Id.* But the challenged statue specifically tasked the TDCJ with enforcing it in language virtually identical to the challenged law here: TDCJ "shall adopt policies" to ensure notice is given to an inmate before a fee is deducted from the inmate's account. *Id.* at 746. Because the statute did not "task [the] Governor" with its enforcement, the Governor was properly dismissed. *Id.*

This case is precisely the same. YCT chose to sue UNT, the UNT System, UNT's President, and UNT's Vice President of Enrollment. But none of these defendants are named in the challenged law, nor does the challenged law charge any of these defendants with its enforcement. Notably, YCT makes no effort to explain if, or how, these defendants are statutorily tasked with enforcing or applying the challenged law.[12] The Legislature made clear that, in fact, the named Defendants have no statutory role, and instead tasked a specific non-party state agency with enforcement of Section 54.051(d). Because that state agency is not before the Court, there is no proper defendant. *City of Austin*, 943 F.3d at 998.

### 6. UNT lacks any connection to enforcement of the challenged law.

The Court's *Ex parte Young* analysis can and—as a matter of law—should end with the determination that the Texas Legislature charged a state agency, which is not a party to this suit, with the specific duty of enforcing Section 54.051(d). Only if "no state official or agency" were named in the challenged law would the Court need to undertake an analysis of whether Defendants actually have "some connection" to the law under *Ex parte Young*. *City of Austin*, 943 F.3d at 998.

---

[12] To the contrary, Plaintiff acknowledges that the challenged law was enacted and is applied by the state. *See* Dkt. 6, at 18 ("[S]tates may choose" how to comply with 8 U.S.C. § 1623(a), but a "state cannot [] have its cake and eat it too.".

YCT presents no evidence to show that Defendants enforce the law. YCT attempts no explanation of why, in light of the Legislature tasking the Texas Higher Education Coordinating Board with enforcement, *these Defendants* are actually the enforcers of the law. Even if YCT could pass this first hurdle of naming a proper defendant, YCT is unable to show that the *Young* exception applies because UNT's officials lack "some connection" to enforcement of the challenged state law. *Young*, 209 U.S. at 157 (1908).

YCT does not allege (nor could it) that Defendants have a "general duty" to enforce Section 54.051(d), similar to the Attorney General's "general duty" to see that the laws of the state are implemented—and any such allegation would be insufficient to invoke *Ex parte Young*, anyway. *Okpalobi*, 244 F.3d at 416; *Morris*, 739 F.3d at 746. Nor could YCT show that Defendants have a "particular duty" to enforce Section 54.051(d) or a willingness to do so. *Id.* Defendants are referenced nowhere in Section 54.051(d). Contrastingly, the Coordinating Board is repeatedly mentioned and charged with specific duties and specific obligations under Section 54.051(d), including the duty to calculate non-resident tuition—the act giving rise to YCT's alleged harm.

Here, it cannot be disputed that the sole challenged provision—section 54.051(d)—does not expressly task UNT, the UNT System, Smatresk, or Goodman (or any UNT official) with its enforcement. Nor is there any indication any UNT officials would have a unique enforcement role relating to the statute. YCT's Complaint only confirms this point. YCT avers that Smatresk and Goodman "apply, administer, or oversee" Section 54.051 by "imposing nonresident tuition on United States citizens." Dkt. 2 at ¶ 31.[13] But this contention is simply a restatement of Defendants' obligation to collect the non-resident tuition that the Coordinating Board sets. This obligation is Defendants' only responsibility here, and it is not the responsibility that Plaintiff challenges. YCT

---

[13] YCT alleges that Goodman is "responsible for determining resident status for tuition purposes." Dkt. 2 at ¶ 5.

challenges the way non-resident tuition is calculated, and Defendants have absolutely no statutory role to play in that calculation. *See* Tex. Educ. Code § 54.051(d).

And, finally, YCT offers no evidence that Defendants have demonstrated a "willingness" to "enforce" Section 54.051(d). To the contrary, YCT alleges only that Defendants "collect out-of-state tuition" from non-resident U.S. citizens. Dkt. 2 at ¶ 28. YCT acknowledges that in performing this essentially ministerial function, Defendants' hands are tied by the "legal requirements placed on members of governing boards for institutions of higher education." *See* Dkt. 2 at ¶ 29. *Cf. Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532-33 (2021) (*Ex parte Young* did not apply to state-court clerks who carried out only non-discretionary, ministerial tasks).

The act of charging tuition to a non-resident student lacks the compulsive or constraining quality that the Fifth Circuit requires to find "enforcement" of a challenged law. *See K.P.*, 627 F.3d at 124 (state regulatory board did have enforcement authority, because challenged statute authorized board to differentiate between allowable and non-allowable claims). Defendants have no authority to choose to apply state law to some non-residents, but not to others—nor can Defendants second-guess the Coordinating Board's section 54.051(d) decision to come up with a different tuition rate for a non-resident than state law provides. The Coordinating Board tells Defendants how to make the residency determination, and what to do upon making that determination. *See* Tex. Educ. Code § 54.0015, 54.075 (definitions for determining residency of students and tuition and fee exemptions and waivers for students). UNT and its officials do not create the standards that govern these decisions, and they lack any authority to change them.

The lack of any authority under the challenged law is dispositive here. In *K.P.*, board members were proper defendants because "they *themselves* administered a fund from which a challenged law purported to exclude abortion providers." *Whole Woman's Health v. Jackson*, 13

F.4th 434, 442 (5th Cir. 2021) (*citing K.P.*, 627 F.3d at 124) (emphasis in original). Here, contrastingly, the challenged law gives Defendants no authority to (for example) change the standards for determining who is charged non-resident tuition and at what rates. The Defendants in this case are dissimilar, then, from the board in *K.P.* or the state defendants in *Air Evac*, who were specifically granted rate-setting authority and the ability to arbitrate fee disputes through the administrative process, and thereby ensured the state law was "enforced from start to finish." 851 F.3d 507, 519 (5th Cir. 2017).

That the Individual Defendants here are just two of many university administrators in the State of Texas, employed by universities that charge tuition to non-resident students, does not make them enforcers of the Texas law governing how the Texas Higher Education Coordinating Board calculates non-resident tuition. Smatresk and Goodman have no explicit or implicit statutory role in enforcing the challenged statute. They lack any connection, let alone some connection, to enforcement of the challenged law and are entitled to sovereign immunity.

> 7.    *Because Smatresk and Goodman do not enforce the challenged law, relief directed to them will not redress Plaintiff's injury.*

As the final component of its *Ex parte Young* analysis, the Court should determine whether it can meaningfully redress the alleged injury with an injunction against these state officials. *Mack*, 4 F.4th at 312. The lack of any connection between Smatresk and Goodman makes them inappropriate candidates for *Ex parte Young* relief because an injunction to prevent them from "applying" Section 54.051(d) will not provide YCT with any relief.

It is an "elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place." *Okpalobi*, 244 F.3d at 427. Here, Plaintiff asks for an injunction "enjoining the application of Section 54.051(d) of the Texas Education Code to United States citizens." Dkt. 2 at 10. Section 51.041(d), by its unambiguous terms, applies to how

the Coordinating Board establishes the tuition rate for a nonresident student. That is all it does. Smatresk and Goodman do not establish the tuition rate and have no statutory authority under the challenged law (or any other law) to do so. They certainly may not unilaterally create a new tuition classification based on residency. The governing law forbids it. *See* 19 Tex. Admin. Code § 21.25(c) ("An institution shall not impose any requirements in addition to the requirements established in this section for a person to establish resident status.").

Because Smatresk and Goodman have no authority with regards to the challenged law, the cases that find some redressable connection between the named state official defendants and the claimed injury are markedly different. *See, e.g. Shah v. Univ. of Tex. Southwestern Med. Sch.*, 129 F.Supp.3d 480, 496 (N.D. Tex. 2015) (*Ex parte Young* claim against university officials not barred by sovereign immunity because plaintiff alleged that university's policy caused his harm and was unconstitutional as applied). This case presents instead a situation very similar to *Okpalobi*, where the injunction entered by the district court as to the governor and attorney general was "utterly meaningless" because neither defendant "[had] any authority under the laws of Louisiana to order what cases the judiciary of Louisiana may or may not hear." 244 F.3d at 426-27.

Like the governor and attorney general in *Okpalobi*, Smatresk and Goodman did not cause the alleged injury here—they do not set tuition and do not create the standards governing the residency determination. Tex. Educ. Code § 54.051(d) (tuition); § 54.0015 (residency criteria). Neither can they redress the claimed injury—they have no authority to recalculate the applicable tuition rate or change the criteria for how residency is determined. An injunction that simply prohibits Defendants from charging tuition at all would make the same error as the district court in *Okpalobi*, which "confuse[d] the coercive impact of the statute itself and the ability—or the

absence of ability—of the [named defendants] to cause or redress the impact of the statute on the plaintiffs." 244 F.3d at 427.

> 8.   *UNT and the UNT System are not amenable to suit and should be dismissed.*

As the Court has already inferred in previous orders, UNT and the UNT System are not proper or necessary parties regardless of the Court's determination on the two Individual Defendants. If the suit proceeds properly against the Individual Defendants (and it should not for the reasons explained above), it is because *Ex parte Young*'s legal fiction applies to strip those individual defendants of the sovereign immunity that would otherwise apply. *City of Austin*, 943 F.3d at 997. Any relief that could be entered, then, would by entered against that official "by virtue of his office." *Id.* The state—either as the state, or through its instrumentalities like UNT and the UNT System—need not be a party. And, in fact, it is improper to "make the state a party" when the relief will be enforced against the state official acting unconstitutionally. *Id.* UNT and the UNT System should be dismissed because they are not susceptible to injunctive relief under the only theory available to Plaintiff.

> 9.   *Complexity of statute precludes private action.*

The federal immigration statute that YCT claims preempts Texas law is extremely complex and detailed, involving hundreds of pages of statutory text and regulations. The Supreme Court has placed strict limitations on the abilities of federal courts to entertain suits challenging such statutes, precluding private actions where the challenged statute (1) is highly complex, and (2) expressly delegates enforcement authority on the federal secretary charged with administration of the statute. *See Armstrong*, 575 U.S. at 328.

The reasons for this limitation are grounded in federalism. As the Supreme Court explained:

> "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress "wanted to make the agency remedy that it provided exclusive," thereby achieving "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decision-making," and avoiding "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action."

*Armstrong*, 575 U.S. at 328-29 (citations omitted). Just so here. The "sheer complexity" of the federal statute, coupled with an express administrative remedy (*see* 8 U.S.C. § 1103(a)(1), delegating enforcement authority to the Secretary of Homeland Security) counsel against a federal court entertaining a private cause of action in this matter.

That *Ex parte Young* may provide YCT with an equitable cause of action does not mean that *Ex parte Young* also waives Defendants' immunity (as explained herein, immunity is not waived). But even assuming that YCT had a cause of action, here, at the merits stage, the concerns articulated in *Armstrong* are doubly relevant. YCT seeks an injunction to prevent the "application" of the allegedly preempted Texas law. To do so and comply with Rule 65, the Court must necessarily step into the shoes of the Texas legislature to determine what it means for Texas law to be applied in a manner consistent with federal law. Such an interpretation, assuming it could be reached, necessarily applies only to the parties in this case. Different interpretations could be (and have been) reached by other courts already, providing a real-world example of the "inconsistent interpretations" *Armstrong* cautioned against. 575 U.S. at 329.

### D.   YCT does not have standing to bring this action.

In its state-court petition, YCT alleged its right to sue was based on organizational and associational standing. Dkt. 2 at 3 (alleging organizational standing based on draining of its organizational resources and associational standing based on direct harm to its members).

31

YCT has abandoned its claim to organizational standing. In response to interrogatories on this topic, YCT repeatedly responded: "Plaintiff has amended its complaint to remove the allegations referenced in this request. No further response is needed." Exhibit A at ¶¶ 15–18.[14]

YCT now relies entirely on associational standing as the basis for its lawsuit. In its order denying UNT's motion to dismiss, the Court held YCT's allegations of associational standing were sufficient, but YCT would need to submit evidence of associational standing at later stages of this litigation. Dkt. 34 at 7. Because discovery has closed and dispositive motions are due, now is the time for YCT to prove standing. As shown below, it has not and cannot prove associational standing.

### 1.    *Governing legal standard.*

Constitutional standing is a threshold inquiry. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008). To have standing, YCT must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. Dkt. 34 at 5 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)). This is a conjunctive test requiring YCT to prove each of its three prongs.

To establish associational standing, the association must show (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit. Dkt. 34 at 6 (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)).

---

[14] YCT also filed a First Amended Complaint in which it abandoned its claim to organizational standing. Dkt. 45. The Court struck this filing. Dkt. 48.

Whether a plaintiff has standing is evaluated as of the time the operative complaint is filed. *Hunter v. Branch Banking & Tr. Co.*, No. 3:12-CV-2437-D, 2013 WL 4052411, at *3 n.4 (N.D. Tex. Aug. 12, 2013) (Fitzwater, C.J.). Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the manner and degree of evidence required at the successive stages of the litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

> **2.      *YCT has produced no evidence of associational standing.***

YCT has offered no evidence of associational standing in this case. Rather than responding to any discovery directed at the alleged harm caused to its members, YCT sought protection from the Court. Dkt. 44. The Court granted protection, in part, but has required YCT to share with UNT's counsel the names and contact information of those members "who are classified as nonresidents for tuition purposes (i.e., the standing members in this case)." Dkt. 50 at 8. The summary judgment record has no evidence of any qualifying representative members.

Associational standing requires that the individual members of the group each have standing. *Tenth St. Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020). When an association has not identified its specific members who would be redressed by correcting the defendant's alleged conduct, the association has failed to establish associational standing. *N.A.A.C.P.*, 626 F.3d at 237.

YCT contends it has "many" members that Section 54.051(d) affects, but the summary judgment record evidences no members that would be redressed by the relief it seeks in this lawsuit. *See* Dkt. 5 (the "Dominguez Declaration"). In fact, the Dominguez Declaration attached to YCT's summary-judgment motion does not once state that Section 54.051(d) affects any one YCT member at UNT. *See id.* YCT must present evidence that its members independently meet

Article III's standing requirements to carry its burden of proof at this evidentiary stage of the litigation. Because it has not, UNT is entitled to a summary judgment dismissing YCT's lawsuit.

### 3.    *YCT has produced no evidence of injury-in-fact.*

As to YCT's alleged injury-in-fact, the first prong of its standing claim, there is no evidence in the record showing, at the time its operative complaint was filed, that more than one of its members were (1) non-residents of Texas, (2) students at UNT, (3) paying out-of-state tuition, and (4) are not receiving offsets of tuition. Without evidence that each of its members has experienced a concrete or imminent injury, YCT's allegations are abstract complaints that do not support associational standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring an injury in fact that is concrete and actual or imminent, not conjectural or hypothetical); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir.2006) (requiring that, for associational standing, the members must independently meet the Article III standing requirements). *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010). There is no evidence that YCT or its members have suffered an injury in fact, the first prong of associational standing.

This lawsuit requires YCT's members' individual participation—thus invalidating the third prong of associational standing—because YCT must inquire into each student's specific tuition circumstances to prove any of its members will be redressed by the relief requested. This third prong of associational standing is a prudential, "judicially self-imposed limit on the exercise of federal jurisdiction, not a constitutional mandate." *APFA Inc. v. UATP Mgmt., LLC*, 537 F. Supp. 3d 897, 907 (N.D. Tex. 2021). Individual participation is required when the relief sought requires a determination of individual member's divergent situations—even when the association seeks only injunctive and declaratory relief on behalf of its members. *Id*. at 908. Courts determine whether a party has satisfied this prong by evaluating whether a party has produced a representative

sampling of evidence proving its members have been injured, without a fact-intensive inquiry. *See Prison Justice League v. Bailey*, 697 Fed. Appx. 362, 363 (5th Cir. 2017) (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552)).

Here, an individual, fact-specific inquiry is required to determine whether any of YCT's members are economically harmed by the statute at issue. This inquiry includes determining each individual's specific tuition situation, at the time the operative complaint was filed, under a number of circumstances, including (1) each member's residency; (2) whether any non-resident member received a waiver of non-resident tuition; (3) whether any non-resident member receives offsets of tuition from grants or scholarships; (4) whether any member paying non-resident tuition is eligible to receive resident tuition; and (5) other special circumstances relating to members' tuition amount. Because an individual inquiry into each member's tuition situation must be made, this lawsuit requires the individual participation of YCT's members.

4. *YCT has produced no evidence of traceability or causation.*

YCT must also prove the second prong of standing, by submitting evidence of a causal relationship between its alleged injury and the challenged conduct that fairly can be traced to the challenged action of the defendant. *Ne. Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. at 663 (1993). Without proof of injury-in-fact, YCT can offer no proof of causation or traceability.[15]

5. *YCT has produced no evidence of redressability.*

Without proof of an injury in fact, YCT has no evidence of the second prong of standing, that its alleged injuries are redressable. Remedies ordinarily operate with respect to specific parties.

---

[15] UNT has thoroughly briefed this argument in Section V(C)(1-8), addressing the *Ex parte Young* issues in this case. UNT respectfully directs the Court to that Section for UNT's full analysis. *See City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (internal citations omitted) (Noting the Fifth Circuit "has acknowledged that [its] Article III standing analysis and *Ex parte Young* analysis significantly overlap.").

*California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461 1486 (2018) (Thomas, J., concurring). In the absence of an injury to any specific party, remedies do not operate on legal rules in the abstract. *Id.*

YCT has not presented any evidence that it has any members who have actually been injured, including any non-resident members who applied to UNT but chose not to attend because of the resident tuition amounts or any non-resident members who are attending UNT under financial hardship. Because YCT cannot demonstrate an injury-in-fact or a causal relationship between its alleged injury and the challenged governmental conduct, YCT has no prospect of obtaining relief from a favorable ruling.

###    E.    Federal law does not preempt Texas Education Code Section 54.051(d).

YCT seeks a declaration that Section 54.051(d), as applied to U.S. citizens, is preempted by 8 U.S.C. § 1623(a). *See* Dkt. 5 at 1, 3, 6, et. seq. Higher education is an area of traditional state concern and not one subject to federal regulation thus creating a presumption of no preemption. In examining the two statutes in question there is no express or implied preemption.

The Supremacy Clause states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding. U.S. CONST., Art. VI, cl. 2.

Under the Supremacy Clause, Congress may preempt a state law through federal legislation, either through express language in statute or implicitly through field preemption or conflict preemption.[16]

U.S. CONST., Art. VI, cl. 2.; *Oneok, Inc. v. Learjet, Inc.* 575 U.S. 373, 376 (2015).

---

[16] Plaintiff expressly waives a preemption argument on the basis of field preemption in Dkt. 5 at n. 1 "The category of field preemption is inapplicable to the instant case. Therefore, this Motion addresses only express preemption and the two distinct tests for conflict preemption."

In the absence of express congressional command, state law is preempted if that law actually conflicts with federal law, or if federal law so thoroughly occupies legislative field as to make reasonable the inference that Congress left no room for states to supplement it. U.S. CONST., Art. VI, cl. 2. "Conflict preemption" exists where (1) compliance with both state and federal law is impossible, or (2) where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See id.; Oneok, Inc*., 575 U.S. at 377. As the clause itself makes clear, federal law is supreme only when those laws are made pursuant to the Constitution and under the authority of the U.S. U.S. CONST., Art. VI, cl. 2.

A Supremacy Clause analysis begins with the "assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc*. 505 U.S. 504, 516 (1992) (citing *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). Pre-emption analysis begins with the text, but also requires the Court to identify the domain expressly pre-empted by the statute. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484 (1996) (finding no federal preemption because health and safety historically matter of local concern). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. *Lohr*, 518 U.S. at 485.  Thus, when the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Altria Group, Inc. v. Good*, 555 U.S.70 (2008) (finding no preemption of state-law).

Plaintiff attempts to characterize the statutory scheme as one of immigration. The Texas statute in question, however, is not an immigration statute, but rather one regarding education and in-state tuition. It is well-settled that education is an area of traditional state concern. Indeed, "[h]igher education is an area of quintessential state concern and a traditional state governmental

function." *Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 265 (4th Cir. 2005); *see United States v. Lopez*, 514 U.S. 549, 564 (1995) ("[E]ducation [is an area] where States historically have been sovereign."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (calling education one of the most important services performed by a state); *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ("Today, education is perhaps the most important function of state and local governments."); *In re Alien Child. Ed. Litig.*, 501 F. Supp. 544, 562 (S.D. Tex. 1980), *subsequently aff'd sub nom. Plyler v. Doe*, 457 U.S. 202 (1982) (holding that "in Texas, the provision of education is a state function.").

In areas such as education, state law should not be displaced unless it is the clear and manifest purpose of Congress. *Florida Lime*, 373 U.S. at 146; *see Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 432 (2002) (holding that the Supreme Court "would hesitate before interpreting [a] statute to effect such a substantial change in the balance of federalism" and refusing to adopt an interpretation that "would effect a drastic alteration of the existing allocation of responsibilities between States and the National Government in the operation of the Nation's schools."). Here, Congress did not intend to displace state law regarding state postsecondary benefits. To the contrary, it granted great latitude to the states in providing such benefits—latitude which Texas complied with when it drafted the Texas Education Code.

1. *There is no express preemption of Texas Education Code § 54.051(d).*

a. <u>Section 1623's plain language provides no preemption exists.</u>

Any question of preemption must begin with the ***plain language*** of the statute that YCT has challenged. As previously stated, YCT asks this Court to find that Texas Education Code Section 54.041(d) is preempted by 8 U.S.C. § 1623. Although both statutory schemes are outlined

more fully above, it is important to reiterate the actual text of the laws in that are being challenged by YCT.

| 8 U.S.C 1623(a) *Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits* | Texas Education Code § 54.051(d) *TUITION RATES* |
|---|---|
| (a)In general notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.<br><br>(b)       Effective date<br><br>This section shall apply to benefits provided on or after July 1, 1998. | Unless a different rate is specified by this section, tuition for a nonresident student at a general academic teaching institution or medical and dental unit is an amount per semester credit hour equal to the average of the nonresident undergraduate tuition charge to a resident of this state at a public state university in each of the five most populous states other than this state, as computed by the coordinating board under this subsection. The coordinating board shall set the tuition rate provided by this subsection for each academic year and report that rate to each appropriate institution not later than January 1 of the calendar year in which the academic year begins, or as soon after that January 1 as practicable. In computing the tuition rate, the coordinating board shall use the nonresident tuition for the other states in effect for the academic year in progress when the board makes the computation. |

YCT references other provisions of the Texas Education Code to support its argument that Section 54.051(d) is preempted by Section 1623. However, it is not seeking relief or an injunction on any other portion of the education statute other than Section 54.051(d). YCT's summary-judgment motion states: "[P]laintiff seeks a declaration that Section 54.051(d) of the Texas Education Code, as applied to United States citizens, is preempted by 8 U.S.C. § 1623(a)" and "requests that this Court enter an order permanently enjoining Defendants, . . . from applying Section 54.051(d) of the Texas Education Code to United States citizens." *See* Dkt. 5 at 1.

Nothing in 8 U.S.C. § 1623 expressly deals with the provisions of Section 54.051(d). Section 54.051(d) does not speak to or confer any eligibility or exemption requirements of any kind related to the establishment or conferral of an economic benefit. The Texas Education Code provision challenged by YCT establishes the method for calculating nonresident tuition based on the average of the five other most populous states' nonresident tuition and the deadline by which this rate is provided to institutions of higher education. TEX. EDUC. CODE § 54.051(d). The Texas law does not reference "alien who is not lawfully present," "postsecondary education benefit," any differentiation benefits to a "citizen or national of the United States," or establish any eligibility requirements.

YCT does not include or attempt to argue that the plain text of the actual state statute which it is seeking to have enjoined, is preempted by federal law. Instead, YCT points to other provisions of the Texas Education Code to support its express preemption claim. However, even when considering those additional provisions, 8 U.S.C. § 1623 does not expressly preempt Texas law.

> b.  <u>Section 1623 does not contain any express preemption provisions.</u>

YCT points to no language in Section 1623 that expressly preempts Texas Education Code § 54.051(d) or any other state statute. To the contrary, Section 1623's plain text allows for states to provide benefits, which is consistent with Section 1621(d) that *expressly allows* states to adopt laws that provide for public benefits; no express prohibition exists in Section 1623's language. While the Court is tasked with reviewing the text of the statute in question, frequently recognized phrases demonstrating federal preemption are not present in Section 1623.

Express preemption analysis should "begin with the language employed by Congress on the assumption that the ordinary meaning of the language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.* 504 U.S. 374, 383 (1992) (citations omitted).

Congress knows how to draft express superseding language and has done so on numerous occasions, but none exists in the IIRIRA statute. For example, in the Employee Retirement Income Security Program ("ERISA"), Congress provided "the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter related to any employee benefit plan. . . ." 29 U.S.C. § 1144(a). Similar language is found in other federal statutes and reflects Congress' ability to utilize express preemption language. *See e.g.*, Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ("Preemption.—Except as provided in tis subsection, a State … may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.").

The plain language of 8 U.S.C. § 1623 does not include any express preemption language. To the contrary, 8 U.S.C. § 1623 expressly allows the states to adopt laws relating to benefits for non-qualified aliens. Specifically, it allows the states to take multiple actions with regards to the providing of state and local benefits to non-qualified aliens. IIRIRA allows states to:

- Enact a law allowing otherwise ineligible aliens to receive State or local public benefits (8 U.S.C. § 1621(d));
- Determine eligibility for any State public benefits for qualifying aliens (8 U.S.C. § 1622(a));
- Provide postsecondary education benefits (8 U.S.C. § 1623);
- Limit or restrict eligibility of aliens for certain programs (8 U.S.C. § 1624(a)); and
- Require proof of eligibility of an applicant for public benefits (8 U.S.C. § 1625).

The express language of the statute demonstrates that Congress did not intend to make a blanket federal prohibition against any state or local government providing benefits to nonqualifying aliens. To the contrary, the statutory scheme grants the states wide authority to adopt laws and regulations related to providing such public benefits. If Congress had intended to preempt a state from establishing tuition for a non-resident student, it could have done so. Instead, it

provided multiple mechanisms *to allow* States and local governments to provide benefits rather than restricting them.

### 2. There is no implied preemption of Texas Education Code § 54.051(d).

In the absence of express preemption language, the issue turns to whether preemption is implied in the statute at issue. In deciding conflict preemption, the Court primarily considers Congress' intent. Congress' intent is discerned from the language of the statute and the statutory framework surrounding it. *Lohr*, 518 U.S. at 486. There are two general types of implied preemption: field and conflict. In this instance, YCT expressly concedes that no field preemption applies and does not argue that position.[17]

Conflict preemption applies when compliance with both federal and state regulation is a physical impossibility or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) (*citing Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Impossibility preemption requires that there is a physical impossibility of complying with both the state and federal law in question. *Florida Lime & Avocado Growers*, 373 U.S. 132, 142–43 (1963). Obstacle preemption requires a showing that the state law under the circumstances of the particular case "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Zadeh*, 820 F.3d at 751 (quoting *Hines*, 312 U.S. at 67).

### a. The plain language of the statute shows an implied inference of no preemption.

As discussed more fully above, Congress *expressly* provided that states may give public benefits to non-qualified immigrants, thus precluding any possibility of implied preemption.

---

[17] Dkt. 5 at n. 1 ("The category of field preemption is inapplicable to the instant case. Therefore, this Motion addresses only express preemption and the two distinct tests for conflict preemption.").

Section 1621 and Section 1623 both contain language granting states powers over providing state and local benefits. 8 U.S.C. § 1621, 1623. Such an express definition of the reach of the statute and reserved powers of the states creates an implied inference that Congress did not intend to preempt the power of the State of Texas to adopt higher education policies regarding tuition. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 290 (1995). A limited statement is considered "*inclusio unius est exclusion alterius*"—as an indication that Congress did not aim to broadly limit state power. *Campo v. Allstate Ins. Co*., 562 F.3d 751, 757–58 (5th Cir. 2009) (finding that federal agency (FEMA) knows how to explicitly preempt state law, but chose plain language limiting that preemption).

> b.      No impossibility preemption exists in this case.

YCT attempts to argue that it is impossible for "a governing board" and "United States citizens" to comply with both Section 54.051(d) and Section 1623. Specifically, it claims "it is impossible for the same student to comply with both his state-law duty to pay nonresident tuition and his federal-law entitlement to only pay resident tuition" and "members of a 'governing board of each institution of higher education' both 'cause to be collected from students registering at the institution or registration fees at the rates prescribed' by state law . . . and also extend the 'postsecondary education benefit' of resident tuition to all United States citizens." Dkt. 5.

Impossibility pre-emption is a demanding defense. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). To find impossibility preemption, the court must find federal exclusion of state law is inescapable. It is not enough that the two laws overlap—it must be impossible to comply with both. *Freightliner Corp*., 514 U.S. at 287. The question for "impossibility" is whether the private party could independently do under federal law what state law requires of it. *Wyeth*, 555 U.S. at 573 (finding no preemption where the private party could unilaterally do what state law requires).

YCT makes its impossibility argument without any reference to the actual text of either provision and generally misrepresents what both the state and federal laws plainly state. The only textual analysis YCT provides is in a footnote where it acknowledges no conflict exists: "That this Section does not specifically refer to 'an alien who is not lawfully present in the United States,' or some equivalent term, is of no consequence for the purposes of conflict preemption." Dkt. 5 at n. 3. YCT expressly admits the absence of any express language in Section 54.052(a)(3) that conflicts with § 1623 in footnote 3 of its Motion and summarily dismisses this glaring disparity. YCT makes no mention of the actual text of Section 54.051(d), which is actually the statute that it is asking this Court to strike down as preempted.

### 1. *Section 54.051(d) does not conflict with Section 1623.*

YCT contends that Texas law cannot require United States citizens to pay nonresident tuition as calculated by Texas Education Code § 54.051(d) because another Texas law allows an alien who is not lawfully present in the U.S. to pay resident tuition if they qualify under Texas Education Code § 54.052(a)(3). YCT seeks not to have Section 54.052(a)(3) or its related regulatory scheme enjoined, but rather asks the Court to find that the entire nonresident tuition rate provision—54.051(d)—be found unconstitutional and preempted by federal law and to prohibit the application of a nonresident tuition rate to *any* United States citizen.

Despite this broad request for relief, YCT does not even attempt to argue how Section 54.051(d) is impossible to follow while also following federal law. The reason for this failure is simple: the statutory provision at issue has no relationship with the federal law here. Section 54.051(d) establishes the method by which the Coordinating Board is to determine the *rate of nonresident tuition*. It also establishes the deadlines for which this determination must be made by the Coordinating Board and reported to appropriate institutions. This section does not establish the

criteria or supporting requirements for determining resident status. The method by which the State of Texas calculates a tuition rate, on its face, does not conflict with any federal law.

> 2.  *The broader Texas tuition scheme does not conflict with Section 1623.*

Despite the fact that YCT seeks relief under the general tuition statute of Section 54.051(d), YCT points to other sections of Chapter 54 to argue that it is impossible to follow the existing state laws regarding tuition and federal law. No blanket prohibition on providing benefits to unlawfully present aliens exists, however, and states are specifically allowed to provide such benefits under IIRIRA. Texas has adopted legislation that is compliant on its face and in its application, thus negating any impossibility argument.

Further, YCT presents no evidence that Chapter 54 and Section 1623 cannot both be complied with. To the contrary, the evidence supports that any person, including U.S. citizens, may qualify for resident tuition in the same manner as anyone else. Exhibit C at 7.

> i.  <u>Aliens not lawfully present do not receive preferential treatment.</u>

Section 1623 provides that states are allowed to provide postsecondary education benefits so long as aliens not lawfully present are treated the same as out-of-state U.S. citizens. The section title itself indicates that it is meant as a "limitation on eligibility for *preferential treatment* of aliens." 8 U.S.C. § 1623. YCT attempts to characterize this federal statute as creating a complete prohibition against providing benefits to unlawfully present aliens, while also misrepresenting the application of Texas Education Code 54.053(3)(B). To the contrary, the federal law expressly allows postsecondary education benefits to be given to undocumented immigrants. Congress utilized "unless" to condition the allowable state action—not prohibit it.

No provision of Texas Education Code Chapter 54 provides any means of establishing resident tuition that are preferential to unlawfully present aliens. To the contrary, Section 54.052

"Determination of Resident Status" makes no distinction with regards to unlawfully present aliens *at all*. *Id*. at § 54.052(a–b). The only provision relating to a citizen or permanent resident of the United States places an *additional* requirement on those students which is not required of a U.S. citizen. Namely, a non-student or permanent resident, in addition to establishing the other statutory requirements, must also submit an affidavit stating they will apply to become a permanent resident. *Id*. At 54.053(3)(B).

A non-resident can qualify for 54.041(d) resident tuition in the identical manner that any other person can. YCT admits that "*any person*, *including an alien not lawfully present in the United States*" can obtain in-state tuition if he/she satisfies the requirements of Texas Education Code § 54.052(a)(3). *See* Dkt. 5 at 9. The Dominguez Declaration (attached to YCT's summary-judgment motion) further admits that YCT members can qualify for resident tuition: "YCT's members include United States citizens that do not qualify as a Texas resident and are not otherwise exempt from the requirement to pay nonresident tuition." Dkt. 5. YCT presents no evidence that U.S. citizens generally, or YCT members specifically, are prevented from receiving a resident tuition designation in the same manner as every other UNT student.

YCT argues that Section 1623 serves to "ensur[e] that [private citizens of the United States] may qualify for post-secondary benefits that are at least equivalent to those enjoyed by aliens not lawfully present in the United States." *See* Dkt. 5 at 19. There is nothing in Texas Education Code § 54.052(a)(3) that precludes a U.S. citizen from obtaining the same tuition classification as an unlawfully present alien. The same requirements are equally applicable to him/her as they are to an undocumented alien. The only difference is the non-citizen has the additional burden of signing an affidavit averring that he or she is also seeking permanent residence status, something other

students are not required to do. Thus, it is completely possible to comply with both of these provisions.

## ii.  Tuition is not a postsecondary education benefit.

The granting of in-state tuition is not a "postsecondary education benefit" and thus does not conflict with the federal statute as it does not fall within the definition of prohibited benefits. State or local public benefit includes the term "postsecondary education benefit," but does not define that term to include in-state tuition.

Section 1623 requires that the benefit be of "no less an amount, duration, and scope." 8 U.S.C. § 1623. Further, Section 1621 modifies the term "benefit" as being that "for which payments or assistance are provided to an individual . . . or by appropriated funds of a State or local government." 8 U.S.C. § 1621. A residency determination does not result in a payment or assistance of any appropriated funds by the State or its agency and is not a monetary amount. To the contrary, the state statute merely confers a consideration for qualification for in-state tuition. It is not direct cash or in-kind benefit that requires expenditure of funds by the state.

Both § 1621 and § 1623 limit public benefits to payments or direct services of which resident tuition is neither. Courts have held various non-monetary state programs fall outside the public benefit definition. *See Equal Access Educ. v. Merten*, 305 F.Supp.2d 585, 605 (E.D. Virginia, Alexandria Division, Feb. 24, 2004) ("In the area of post-secondary education, PRWORA address only monetary assistance paid to students or their households, not admissions to college or university."); *City Plan Dev., Inc. v. Office of Labor Comm'r*, 117 P.3d 182, 190 (Nev. 2005) (finding payment of prevailing wages under a public works contract to undocumented aliens did not constitute a public benefit); *Rajeh v. Steel City Corp.*, 813 N.E.2d 697, 707 (Ohio Ct. of Appeals, 7th Dist., 2004) (finding workers' compensation was not a public benefit as

Congress intended only to address benefits that are meant to assist with economic hardship or as an earned benefit such as retirement).

### iii.   Tuition is not based solely on residency.

If it is determined that resident tuition is a postsecondary education benefit, it is still possible to comply with both the state and federal law as the Texas statute is not based solely on residency. Section 1623 limits a State's granting benefits "on the basis of residence." 8 U.S.C. § 1623(a). Among the many other methods of obtaining resident tuition provided in Texas law and discussed more fully above, Section 54.052(a)(3) provides a qualification for resident tuition based on attendance and graduation from a Texas high school.

Any student, Texan or otherwise, can qualify based on the statutory criteria of (1) graduating from a Texas high school and (2) maintaining a residence in the state for three years preceding graduation and the year preceding enrollment in an institution of higher education. TEX. EDUC. CODE § 54.052(a)(3). The statute is based on possessing a Texas high school diploma and having attended such school for three years—not mere residency. There are multiple ways that a student could qualify under this statute. For example, a non-Texan, U.S. citizen might qualify who has attended boarding school in Texas, or a student that graduated from a Texas high school and then moved away, losing status, and then returned for a period. By the same token, an unlawfully present alien would not qualify simply by living in Texas or moving here right before high school graduation or college. All students would be required to attend and graduate from a Texas high school as a requirement for further consideration. Such a statute is not based on residency but on other criteria thus, precluding conflict with federal law. *See Martinez v. Regents of Univ. of California*, 241 P.3d 855, 369 (Cal. 2010).

### c.   Section 54.0541(d) creates no obstacle to immigration policy.

Plaintiff asks this Court to find that Texas' long-standing statutory and regulatory scheme for establishing higher education tuition is an obstacle to federal immigration policy merely because it touches tangentially on non-U.S. citizens.  YCT goes so far as to argue that pursuant to its "broad authority over immigration, Congress [is] undoubtedly empowered to prohibit any postsecondary education benefit from being extended to any alien not lawfully present in the country under any circumstances."  *See* Dkt. 5 at 18.  Interpreting federal law as creating an absolute barrier such that any state or local action involving immigrants is an obstacle to Congressional power is an overly broad and unsupported interpretation of the law.  In making such a finding, this Court would create a substantial federal overreach into powers traditionally reserved to the states.

Obstacle preemption applies when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67, (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects ...." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Implied preemption analysis does not justify a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives;" such an endeavor "would undercut the principle that it is Congress rather than the courts that pre-empts state law."  *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (finding provisions of Arizona labor law targeting employers who hired unauthorized aliens was not preempted by IRCA or IIRIRA). Further, the Supreme Court has refused to extend obstacle preemption focusing instead on the actual text of the federal statute. *See Wyeth v. Levine*, 555 U.S.555 (2009) (expressing increasing skepticism "of this Court's 'purposes and objectives' preemption jurisprudence.  Under this approach, the Court routinely invalidates state laws based

on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law." J. Thomas, concurring).

YCT does not identify how Texas Education Code § 54.051(d) or 54.052(3) interferes with the federal immigration scheme other than stating that there is an interest "to remove the incentive for illegal immigration provided by the availability of public benefits."  There is no evidence proffered to support its claim that this Texas statute conflicts with broad federal policy objective of disincentivizing immigration. To the contrary, YCT acknowledges that legislative text shows Congress intended to allow the states to provide public education benefits and doing so would not obstruct its purpose.

YCT attempts to characterize the federal law as purely one of immigration—an area it argues is exclusive to the federal government.  Immigration, however, is not the policy concern underlying PWORWA and IIRIRA.  Section 1601 states that the policy concerns welfare and immigration and provides that States must choose the manner for providing benefits to qualified aliens and outlines the provision of benefits to unlawful aliens.  *See* 8 U.S.C. 1611-13.  Plaintiff acknowledges this and states Congress "elected to balance the federal interest in disincentivizing illegal immigration, the States' interests in maintaining flexibility in the administration of their public universities, and private citizens' interest in access to postsecondary education benefits that are at least equal to those available to aliens not lawfully present in the country" and "States retain the flexibility to make both aliens not lawfully present in the country and all United States citizens eligible for these benefits." Dkt. 5 at 24.

Congress did not adopt an express preemption provision, but did provide for a savings clause allowing states to operate with regards to benefits for unlawful aliens.  Congress intended

to grant states authority to exercise discretion over providing state and local benefits to undocumented aliens by granting the states authority to adopt laws concerning the same. 8 U.S.C. § 1621(d). Multiple states, like Texas, have adopted such laws including in the area of higher education tuition.[18] Since IRRIRA's enactment in 1996 there has been no federal enforcement activity against any of these laws even though Congress provided an enforcement authority via the Secretary of Homeland Security. In addition, the Texas Legislature has had numerous opportunities to review Chapter 54 of the Education Code to address any conflict, but it has not done so. Both legislative bodies have had opportunities to address any obstacle presented by Texas law, but have failed to do. Silence on the issue, coupled with their certain awareness of the issue "is power evidence that Congress did not intend" the federal oversight to be the exclusive means of implementing federal goals. *See Wyeth*, 555 U.S. at 575.

### d.  All U.S. citizens are not entitled to receive resident tuition.

Finally, YCT seems to argue that the Texas tuition provision is preempted because *all* U.S. citizens are not given in-state tuition when even a single unlawful alien does. This is a grossly overbroad reading of the term "eligible" as utilized in Section 1623(a). IIRIRA did not create an entitlement for all U.S. citizens. Eligibility is a broader term than entitlement and describes a person who *may* qualify for a benefit, but has no legal right to it. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) ("[T]hose who can only show a well-founded fear of persecution are not entitled to anything, but are eligible for the discretionary relief of asylum"); *Jarecha v. Immigration and Naturalization Service*, 417 F.2d 220 (5th Cir. 1969) (finding "an applicant who meets the objective prerequisites is merely eligible for adjustment of status, he is in no way entitled

---

[18] Other states with similar laws include California, Connecticut, Illinois, Kansas, Maryland, Nebraska, New Mexico, New York, Rhode Island, Utah, and Washington.

to such relief"). Making eligibility equally available to U.S. and non-U.S. citizens is what Section 1623 requires. Further, YCT puts forth no evidence that any of its members—or any U.S. citizens at all—who were eligible for resident status under the Texas Education Code § 54.052(3) did not receive such status.

e.  Plaintiff's proposed interpretation of Section 1623 would exceed congressional authority to regulate the States.

Plaintiff is asking this Court to find that Congress has the authority to mandate how states determine resident and non-resident tuition as well as who can qualify for which. In order to find that Section 1623 preempts Texas Education Code § 54.051(d), this Court would have to determine that such a regulation was within the enumerated powers of Congress and did not exceed its authority. Congress understood the limitations of its powers when enacting IIRIRA, which is why it included Section 1621(d) allowing states to enact their own laws regarding providing state and local benefits.

F.  YCT has failed to plead or prove the elements of a permanent injunction.

On summary judgment, YCT seeks a "permanent injunction that prevents Defendants from applying the preempted state provision to citizens." Dkt. 6 at 20. To prevail, YCT must show "(1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest." *United Motorcoach Ass'n, Inc.*, 851 F.3d at 492–93.

As explained above, YCT cannot succeed on the merits of its preemption claim (even assuming it had a cause of action, satisfied the elements of associational standing, or selected a proper defendant). Its request for permanent injunctive relief therefore fails. But even if it could pass that initial hurdle, it fails to carry its burden on each of the other elements of permanent

injunctive relief as well. YCT's summary judgment seeking permanent injunctive relief must be denied.

### 1. No irreparable injury.

YCT has presented no evidence of injury. The summary judgment record is void of any indication that the claimed injury—"the application of nonresident rates of tuition to United States citizens"—actually occurs as to any specific member.

### 2. YCT's alleged injury does not outweigh damage to the University.

UNT currently enrolls more than 6,000 students that pay nonresident tuition. *See* Garrison Decl. at ¶ 10. An injunction (assuming, *contra* below, that YCT had presented the Court with a proper injunction under Rule 65) that for example prevented UNT from charging those students non-resident tuition would result in a loss of approximately $25,000,000 per semester. *Id.* This would significantly impact UNT's annual revenue.

YCT, on the other hand, has offered no evidence of injury to any particular student or students. On the summary judgment record before the Court, the balance of equities on this element undisputedly favors UNT.

### 3. An injunction would disserve the public interest.

Any order the Court could enter here to stop UNT from "applying" Texas law would have far-reaching and unforeseeable impacts. It has the potential to create a patchwork of tuition rates across the state, varying from university to university and potentially from student to student. The policy set forth in the Texas Education Code reflects a policy judgment of the Texas legislature that, consistent with the principles of federalism, should not be second-guessed by this Court. *See Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016).

### G. YCT's proposed injunctive relief fails to comply with Rule 65.

YCT's motion should be denied for a final, independent reason. The motion's concluding prayer lacks any guideposts for the Court to refer to in fashioning meaningful and enforceable injunctive relief. *See* Fed. R. Civ. P. 65. Rule 65(d)(1) contains three requirements: an order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *Id.*

Rule 65's specificity provisions are "no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). An order that fails to comply with those requirements runs afoul of "basic fairness" to the enjoined party, and makes it difficult for an appellate court to conduct an "informed and intelligent" appellate review—leaving the reviewing court little choice but to vacate the injunction. *Id.* at 476–77. That is what happened in *Schmidt*, where an order entered judgment consistent with an opinion prohibiting "further enforcement of" a Wisconsin statute. *Id.* at 473–74.

Plaintiff's motion for summary judgment and proposed order asks the Court to enter the same kind of relief that the Supreme Court found insufficient in *Schmidt*. *See* Dkt. 6-14. An order restraining Defendants from "applying Section 54.051(d) of the Texas Education Code to United States citizens" is plainly non-compliant with Rule 65. For example, which provisions of the section are not to be applied (given that Defendants as explained above have no responsibilities and perform no function under that section)? How are Defendants to refrain from applying them? YCT does not answer these questions, falling back on a request for injunctive relief that the Supreme Court determined decades ago to violate basic fairness, not to mention Rule 65. Such "[b]road generalities" are inappropriate for an injunction and fatal to YCT's motion for summary judgment. *Scott*, 826 F.3d at 213 (5th Cir).

Rule 65's requirements are particularly important because it is not the district court's role to "act as an executive or legislative agent of the state, dictating with intricate precision the policies the state should adopt in order to fulfill its statutory obligations." *Scott*, 826 F.3d at 213. YCT places the Court in exactly that "difficult position" by putting the burden on the Court to occupy the Texas legislature's role and rewrite a duly enacted Texas law. *Id.* The Court should reject YCT's attempt to shift to the Court its obligation to plead and prove entitlement to "specific[]" injunctive relief that is described in "reasonable detail." *See* Fed. R. Civ. P. 65(d).

## CONCLUSION

The claims and relief sought by YCT in this matter are nothing short of extraordinary.  It seeks to have this Court determine that Congress and the Texas Legislature have been working in conflict with one another for almost twenty-five years and that the proper parties and forum for resolving this conflict are (1) unidentified members of a student club at the University of North Texas, (2) two administrators at one of the many Texas institutions of higher education, and (3) in this federal district court.  In order to grant this request, this Court will have to determine that all of those are proper and then conclude that the plain language of not one, but two statutory schemes is not clear and implies something other than what the plain text expressly provides.  Such a conclusion would strain the bounds of federalism and judicial restraint.  For all of the reasons as stated in this Response and Motion, summary judgment for Defendants must be granted and Plaintiff's claims denied.

Date: January 18, 2022

Respectfully submitted,

By: */s/ Andy Taylor*
Andy Taylor
**ANDY TAYLOR & ASSOCIATES, P.C.**
Designated Lead Counsel
State Bar No. 19727600
ataylor@andytaylorlaw.com
2628 Highway 36 South #288
Brenham, Texas 77833
(713) 222-1817 – telephone
(713) 222-1855 – facsimile

-and-

**HUSCH BLACKWELL LLP**

By: */s/ Sandy Hellums-Gomez*
Sandy Hellums-Gomez
State Bar No. 2403670
Sandy.Gomez@HuschBlackwell.com
Jeff Nobles
State Bar No. 15053050
Jeff.Nobles@HuschBlackwell.com
600 Travis Street, Suite 2350
Houston, Texas 77002
(713) 647-6800 – main telephone
(713) 647-6884 – general facsimile

-and-

Scott Schneider
State Bar No. 24054023
Scott.Schneider@HuschBlackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 – main telephone
(512) 479-1101 – general facsimile

**ATTORNEYS FOR THE DEFENDANTS**
**UNIVERSITY OF NORTH TEXAS, THE**
**UNIVERSITY OF NORTH TEXAS SYSTEM,**
**NEAL SMATRESK, PRESIDENT OF THE**
**UNIVERSITY OF NORTH TEXAS, AND**

SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS

## CERTIFICATE OF SERVICE

I certify that a copy of this motion has been served upon the following on this the 18th day of January 2022:

Robert Henneke
rhenneke@texaspolicy.com
Chance Weldon
cweldon@texaspolicy.com
Joseph Aaron Barnes, Sr.
abarnes@texaspolicy.com
Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701

***Attorneys for Plaintiff***

By: */s/ Sandy Hellums-Gomez*
Sandy Hellums-Gomez