# EXHIBIT  1

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT
                  SHERMAN DIVISION

YOUNG CONSERVATIVES OF        )
TEXAS FOUNDATION              )
                             )
                             )
VS.                          )
                             )   CIVIL ACTION NO.
THE UNIVERSITY OF NORTH      )   4:20-CV-973
TEXAS, THE UNIVERSITY OF     )
NORTH TEXAS SYSTEM, NEAL     )   HONORABLE SEAN D. JORDAN
SMATRESK, PRESIDENT OF THE   )
UNIVERSITY OF NORTH TEXAS,   )
AND SHANNON GOODMAN, VICE    )
PRESIDENT FOR ENROLLMENT OF  )
THE UNIVERSITY OF NORTH      )
TEXAS                        )
```

**************************************************************

ORAL DEPOSITION

OF

DR. NEAL SMATRESK

TAKEN VIA ZOOM

NOVEMBER 22, 2021

**************************************************************

ORAL DEPOSITION OF DR. NEAL SMATRESK, taken

remotely via the Zoom platform, produced as a Witness at

the instance of the Plaintiff, and duly sworn, was taken

in the above-styled and numbered cause on the 22nd day of

November, 2021, from 1:31 p.m. to 2:29 p.m., before JUDY

A. COUGHENOUR JOHNSON, Certified Shorthand Reporter No.

```
 1   1198, in and for the State of Texas, reported by machine

 2   shorthand at THE UNIVERSITY OF NORTH TEXAS, DENTON, TEXAS,

 3   the location of the Witness, pursuant to the Federal Rules

 4   of Civil Procedure and the provisions stated on the record

 5   or attached herein.

 6                       * * * * * * *

 7                        APPEARANCES

 8   For Plaintiff:

 9         TEXAS PUBLIC POLICY FOUNDATION
           BY:  CHRISTIAN TOWNSEND
10              - AND -
                CHANCE WELDON
11         901 Congress Avenue
           Austin, TX  78701
12         PH:  (512) 472-2700
           e-mail:  Ctownsend@texaspolicy.com
13
     For Defendants:
14
           HUSCH BLACKWELL
15         BY:  SANDY HELLUMS-GOMEZ
           600 Travis Street
16         Suite 2350
           Houston, TX  77002
17         PH:  (713) 647-6800
           e-mail:  Sandy.gomez@huschblackwell.com
18
           - AND -
19
           HUSCH BLACKWELL
20         BY:  PAIGE DUGGINS-CLAY
           111 Congress Avenue
21         Suite 1400
           Austin, TX  78701
22         PH:  (512) 472-5456
           e-mail:  Paige.duggins-clay@huschblackwell.com
23
     Also Present:
24
           DOLLY GARCIA
25         RENALDO STOWERS
```

```
 1                    APPEARANCES (CONTINUED)

 2    Reported By:

 3            JUDY A. COUGHENOUR & ASSOCIATES
              BY:  JUDY A. COUGHENOUR JOHNSON
 4            8109 Asmara Drive
              Austin, TX  78750
 5            PH:  (512) 346-4707
              e-mail:  Jude@prodigy.net
 6

 7                     * * * * * * *

 8                      STIPULATIONS

 9            The attorneys for all parties present stipulate and

10    agree to the following items:

11            THAT the deposition of DR. NEAL SMATRESK is taken

12    pursuant to Notice;

13            THAT by agreement of Counsel and all parties

14    present, the Reporter was allowed to swear in the Witness

15    remotely;

16            THAT all objections will be made pursuant to the

17    Federal Rules of Civil Procedure;

18            AND THAT the original transcript will be submitted

19    for signature to the Witness' attorney, SANDY

20    HELLUMS-GOMEZ, and that the Witness or the Witness'

21    attorney will return the signed transcript to JUDY A.

22    COUGHENOUR & ASSOCIATES within thirty days of the date the

23    transcript is provided to the Witness' attorney.  If not

24    returned, the Witness may be deemed to have waived the

25    right to make the changes, and an unsigned copy may be
```

```
 1  used as though signed.

 2                      * * * * * * *

 3                           INDEX

 4  Appearances..........................................   2

 5  Stipulations.........................................   3

 6  Exhibits.............................................   4

 7  DR. NEAL SMATRESK

 8     Examination by Mr. Townsend.......................   6

 9  Witness Changes and Corrections......................  51

10  Witness Signature....................................  52

11  Court Reporter Certificate...........................  53

12                      * * * * * * *

13                          EXHIBITS
```

| EXHIBIT NUMBER | DESCRIPTION | PAGE MARKED | PAGE REF'D |
|---|---|---|---|
| 1 | Being an Office of the President 2021-2022 Organizational Chart | 50 | 11 |
| 2 | Being a document entitled 8 U.S. Code 1623 - Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits | 50 | 13 |
| 3 | Being a document entitled 8 U.S. Code 1101 - Definitions | 50 | 14 |
| 4 | Being a University of North Texas Dreamers' Resource Guide | 50 | 16 |
| 5 | Being Tweets | 50 | 25 |

```
 1                    EXHIBITS (CONTINUED)

 2   EXHIBIT                                  PAGE      PAGE
     NUMBER    DESCRIPTION                    MARKED    REF'D
 3   ─────────────────────────────────────────────────────────

 4    6    Being an article entitled
           Democrats Declare War on
 5         Conservatives at University of
           North Texas, dated July 9, 2020    50        31
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Judy A. Coughenour & Associates

```
 1               THE REPORTER:  My name is Judy Coughenour
 2  Johnson, Judy A. Coughenour & Associates, 8109 Asmara
 3  Drive, Austin, Texas.
 4               Today's date is November 22, 2021.  The
 5  time is 1:31 p.m.
 6               This is the oral deposition of Dr. Neal
 7  Smatresk, and it is being conducted remotely, by agreement
 8  of Counsel, with the Witness located at the University of
 9  North Texas, Denton, Texas.
10               Will the Witness please raise your right
11  hand and be sworn?
12                         *  *  *  *
13
14                    DR. NEAL SMATRESK
15  the Witness herein, having been first duly administered an
16  oath or affirmation, via Zoom, pursuant to the agreement
17  of Counsel, testified as follows:
18
19                       EXAMINATION
20  QUESTIONS BY MR. TOWNSEND:
21               THE REPORTER:  Thank you so much.
22               I have administered the oath, the Witness
23  having been identified to me by attestation of Counsel.
24               Would Counsel, and all other persons
25  present in the rooms, please identify yourselves, and your
```

```
1   locations, for the record?
2                   RENALDO STOWERS:  My name is Renaldo
3   Stowers.  I'm Senior Associate, General Counsel, for the
4   University of North Texas System.
5                   DOLLY GARCIA:  I am --
6                   MR. TOWNSEND:  My name is --
7                   DOLLY GARCIA:  Dolly Garcia --
8                   MR. TOWNSEND:  Oops.
9                   (The Reporter indicated Ms. Garcia
10                   could continue.)
11                   DOLLY GARCIA:  I am Dolly Garcia, Associate
12   General Counsel with the University of North Texas System.
13                   MR. TOWNSEND:  My name is Christian
14   Townsend.  I represent Young Conservatives of Texas
15   Foundation.  I'm in Austin, Texas.
16                   In the room with me is Chance Weldon.  He
17   also represents YCT, and he's also in Austin, Texas.
18                   MS. HELLUMS-GOMEZ:  I am Sandy
19   Hellums-Gomez.  I'm a partner at Husch Blackwell, an
20   outside Counsel for the Defendants, and I am in Houston,
21   Texas.
22                   MS. DUGGINS-CLAY:  Good afternoon,
23   everyone.
24                   Paige Duggins-Clay, Associate at Husch
25   Blackwell, outside Counsel for the UNT, Defendants, and I
```

1   am in McKinney, Texas today.

2                    THE REPORTER:  And are there any

3   stipulations regarding this deposition or the transcript?

4                    MS. HELLUMS-GOMEZ:  Yes.  As we stated

5   before, we would like a copy of the transcript for review

6   and signature.

7                    (The Reporter indicated Mr. Townsend

8                     could begin at any time.)

9                    MR. TOWNSEND:  Thank you.

10       Q    (Mr. Townsend)  All right.  Good afternoon.

11                   My name is Christian Townsend.  I'm with

12   the Texas Public Policy Foundation, and I represent the

13   Young Conservatives of Texas Foundation in this case.

14                   Could you please state your name for the

15   record?

16       A    (The Witness)  Neal Smatresk.

17       Q    Have you ever given a deposition before?

18       A    Yes.

19       Q    All right.  Well, as I'm sure you're well aware,

20   the way things will go today, I'll ask you some questions,

21   and you must answer them truthfully, unless your attorney

22   tells you clearly and directly not to answer.  Does that

23   sound clear?

24       A    Yep.

25       Q    If you don't understand any of my questions,

```
 1  please feel free to ask so, and I'll rephrase it.  But if

 2  you do answer a question, I'll assume that you understood

 3  it.  Do you understand this?

 4       A   Yes.

 5       Q   Awesome.

 6               So just two basic requirements before we

 7  begin.

 8               First, so we can keep - keep a clear record

 9  for the case, or for the Reporter, will you agree to wait

10  until I finish asking a question before you give an

11  answer?

12       A   Yes.

13       Q   And in return, I'll offer you the same courtesy.

14  I'll wait until you finish an answer before I ask another

15  question.  Does that sound good?

16       A   Yes.

17       Q   Awesome.

18               If at any point you need a break, just let

19  me know, and we'll take a break.  I just ask that you

20  answer any question that's on the table at the time.  Is

21  that fair?

22       A   Yes.

23       Q   Are you currently on any medication that would

24  inhibit your ability to answer truthfully today?

25       A   No.
```

Judy A. Coughenour & Associates

1      Q    And do you have any medical conditions that

2    would prevent you from answering truthfully here today?

3      A    No.

4      Q    Awesome.

5                So you're currently employed by The

6    University of Texas.  Is that true?  Or University of

7    North Texas.  Is that true?

8      A    Yes.

9      Q    What's the title of your position there?

10     A    President.

11     Q    And you're testifying here today in your

12   official capacity as President of the University of North

13   Texas.

14     A    Yes.

15     Q    And how long have you been in that role?

16     A    Not quite eight years.

17     Q    Awesome.

18               And can you tell me a little bit about what

19   the role of President at UNT is?

20     A    It's the CEO position for the University.

21     Q    And so CEO position, so does that mean you

22   oversee aspects of the campus?

23     A    I supervise an array of employees.

24     Q    Awesome.

25               All right.  I'm going to start sharing my

```
1   screen in order to introduce the first exhibit.  Is that
2   all right?
3        A   Yes.
4        Q   All right.  Can you see my screen?
5        A   I can.
6        Q   Awesome.
7                Do you recognize this chart?
8        A   Yes.
9        Q   All right.  Can you describe what is this chart?
10       A   It's my org chart.
11       Q   And does this accurately reflect the way your
12   office is organized?
13       A   Yes.
14       Q   So the way it looks, is like it - you oversee
15   the people beneath you on the chart.  Is that correct?
16       A   Correct.
17       Q   All right.  Do you see Shannon Goodman on this
18   chart?
19       A   I do.
20       Q   And Mr. Goodman reports to you.  Correct?
21       A   Yes.
22       Q   What's Mr. Goodman's role at UNT?
23       A   He's the VP for Enrollment.
24       Q   And you'd be responsible if Mr. Goodman were to
25   mess up or violate University policy.  Correct?
```

```
 1        A    I guess it depends, but I am the ultimate - I'm

 2   ultimately accountable for what happens at the University,

 3   in most cases.

 4        Q    Awesome.

 5             So if Mr. Goodman were violating State law,

 6   you could do something about it?

 7        A    I suppose.

 8        Q    Do you see Clay Simmons on this chart?

 9        A    I do.

10        Q    And Clay Simmons is beneath you on this chart.

11   Correct?

12        A    Correct.

13        Q    What is Mr. Simmons' role at UNT?

14        A    He's our Chief Compliance Officer.

15        Q    And he makes sure that UNT complies with State

16   law?

17        A    He makes sure that we comply with all applicable

18   laws and Board of Regents' policies.

19        Q    Awesome.

20             And does UNT comply with State law?

21        A    I believe so.

22        Q    Do you see Elizabeth With on this chart?

23        A    I do.

24        Q    And Elizabeth With is beneath you on this chart?

25        A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | And she reports to you?  Correct? |
| 2 | A | Correct. |
| 3 | Q | What's Miss With's role at UNT? |
| 4 | A | She is our Senior - she's Senior Vice-President |

5   for Student Affairs.

| 6 | Q | And does Student Affairs include freshmen |
|---|---|---|

7   recruitment?

| 8 | A | No. |
|---|---|---|
| 9 | Q | Now where is freshman recruitment? |
| 10 | A | Under Shannon Goodman. |
| 11 | Q | Awesome. |
| 12 | | And she -- |
| 13 | A | She - she does participate in freshman |

14   orientation.

| 15 | Q | Okay.  Perfect.  Thank you. |
|---|---|---|
| 16 | | All right.  I'm going to stop sharing for a |

17   second and introduce the second exhibit.

| 18 | | (The Reporter asked whether Exhibit 1 |
|---|---|---|
| 19 | |  had been introduced.) |
| 20 | | MR. TOWNSEND:  Yes.  That was Exhibit 1. |
| 21 | Q | (Mr. Townsend)  All right.  I'm going to |

22   introduce what will be Exhibit 2.  Can you all see my

23   screen?

| 24 | A | (The Witness)  Yes. |
|---|---|---|
| 25 | Q | Okay.  Great. |

1              Do you recognize this Statute?

2        A    No.

3        Q    Would you take a minute to familiarize yourself

4    with this Statute, particularly Section (a)?

5        A    Yep.

6        Q    Awesome.

7              So there's a term in that Statute.  It's

8    not very polite, nowadays, in - in common parlance.  But

9    it says, "An alien who is not lawfully present in the

10   United States".  Do you know what that means?

11             MS. HELLUMS-GOMEZ:  Objection.  Calls for a

12   legal conclusion.

13       A    (The Witness)  Probably not in a political or a

14   legal sense.

15       Q    (Mr. Townsend)  What about in a normal sense?

16       A    Someone who is present in the United States

17   without any form of documentation.

18       Q    Would we typically call that somebody - that

19   person unauthorized or undocumented immigrant?

20             MS. HELLUMS-GOMEZ:  Objection.  Calls for a

21   legal conclusion.

22       A    (The Witness)  I don't know.

23       Q    (Mr. Townsend)  Okay.  I'm going to introduce

24   what will be Exhibit 3.  Can you see this?

25       A    Yes.

```
 1        Q    All right.  This - if - if I told you that this
 2   is the definition section for that previous Statute, would
 3   you have any reason to doubt that?
 4        A    I wouldn't doubt it or know it.
 5        Q    All right.  So here, it's - defines some of the
 6   terms.  Do you see Section (a),  Subsection (3) here?
 7        A    Yes.
 8        Q    Would you take a second to familiarize yourself
 9   with this?
10        A    Okay.
11        Q    All right.  So it says that "The term alien
12   refers - means any person who's not a citizen or national
13   of the United States."
14        A    Okay.
15        Q    Do you understand what that means?
16        A    I read the sentence.
17             MS. HELLUMS-GOMEZ:  Objection.  Calls for a
18   legal conclusion.
19        A    (The Witness)  I read the sentence.  I can
20   understand the sentence.
21        Q    (Mr. Townsend)  And can you describe what that
22   means, in common parlance?
23             MS. HELLUMS-GOMEZ:  Objection.  Calls for a
24   legal conclusion.
25        A    (The Witness)  I'm not sure I know what it
```

```
 1  means, in common parlance or in legal parlance.
 2       Q   (Mr. Townsend)  All right.
 3             All right.  I'm going to stop sharing my
 4  screen for a second.
 5             All right.  So do you - do you know what an
 6  undocumented immigrant is?
 7             MS. HELLUMS-GOMEZ:  Objection.  Calls for a
 8  legal conclusion.
 9       A   (The Witness)  I've heard of such, but I
10  wouldn't - couldn't tell you the legal particulars.
11       Q   (Mr. Townsend)  Okay.  So you've heard of that
12  term?
13       A   Yes.
14       Q   Have you ever used it, yourself?
15       A   No.
16       Q   No?
17             Have you ever used the term unauthorized
18  immigrant?
19       A   No.
20       Q   Have you ever seen that term on UNT documents?
21       A   Not that I recall.
22       Q   All right.  I'd like to introduce - this will be
23  Exhibit 4.
24             Have you seen this before?
25       A   I may have.
```

```
 1        Q    Do you know where this would come from?

 2        A    No.

 3        Q    I'm going to scroll down here.  This is Page 2.

 4             All right.  Do you see down here where it's

 5   signed from Rebecca Perfecto?

 6        A    Yes.

 7        Q    Do you know Rebecca Perfecto?

 8        A    No.

 9        Q    Do you know the Office of Freshman Recruitment?

10        A    Actually I don't know that office.  I know

11   there's an Admissions Office and a Recruitment Office.

12        Q    All right.  So there's a Recruitment Office at

13   UNT?

14        A    Yes.

15        Q    So if I told you that this came from your Web

16   site, you wouldn't have any reason to believe that it

17   didn't?

18        A    No.

19        Q    I'm going to scroll to Page 4 of this document.

20   Can you familiarize yourself with that first paragraph

21   there?

22        A    Okay.

23        Q    Do you know what - when that paragraph uses the

24   term unauthorized immigrants, what they're referring to?

25                  MS. HELLUMS-GOMEZ:  Objection.  Calls for
```

Judy A. Coughenour & Associates

```
 1  speculation.
 2              MR. TOWNSEND:  I'm sorry.  One second, if I
 3  can interrupt real quick.
 4              Sandy, just so you know, under the local
 5  rules, Section CV-30, in the Eastern District of Texas,
 6  you can only make two different objections.  One is
 7  objective (sic.), leading, and the other is objection,
 8  form.
 9              So if you could just kind of stick to those
10  objections --
11              MS. HELLUMS-GOMEZ:  Well --
12              MR. TOWNSEND:  -- you can make your
13  substantive arguments later.
14              MS. HELLUMS-GOMEZ:  Actually, we didn't
15  make that stipulation for this deposition.
16              But if you're fine with stipulating that I
17  can say, "Objection.  Form," and preserve my objections to
18  the evidence and the questions later, we can make that
19  stipulation, if that's what you want.
20              MR. TOWNSEND:  That - that's the way - that
21  would be great, because that's the local rules that we're
22  operating under.
23              MS. HELLUMS-GOMEZ:  Okay.  Federal Rules --
24              MR. TOWNSEND:  Awesome.
25              MS. HELLUMS-GOMEZ:  -- are - tend to like
```

Judy A. Coughenour & Associates

```
 1  specificity, but if you agree, I'm - I'm fine with,

 2  "Objection.  Form."

 3                  MR. TOWNSEND:  Perfect.

 4                  MS. HELLUMS-GOMEZ:  Objection.  Form.

 5                  And on that same basis, I'll object to this

 6  exhibit, as it has - we have no basis for what this is, or

 7  where it's from, or who produced it, or when they produced

 8  it.

 9                  So I'll put an, "Objection.  Form," to this

10  exhibit on the record, as well.

11                  MR. TOWNSEND:  Yeah.  Of course.

12      Q   (Mr. Townsend)  Would you like for me to restate

13  my question, Mr. Smatresk?

14      A   (The Witness)  Yes.

15      Q   Awesome.

16                  When - you said you'd familiarized yourself

17  with this paragraph.  Correct?

18      A   Correct.

19      Q   Do you know, when the paragraph used the term

20  unauthorized immigrants, what that term means?

21      A   I couldn't define it for you.

22      Q   But in common parlance, would you understand

23  what they were getting at?

24      A   I would have to say a best guess, which is

25  someone who is in the country without documentation.
```

1    Q    Absolutely.

2              So this paragraph says that some

3  unauthorized immigrants are eligible to enroll at UNT?

4              MS. HELLUMS-GOMEZ:  Objection.  Form.

5    A    (The Witness)  Yeah.  I - I - I couldn't - I

6  couldn't hazard a guess on that, based off what you've

7  just showed me.

8    Q    (Mr. Townsend)  No.  I'm just saying what this

9  paragraph says.

10    A    The words --

11    Q    That's what --

12    A    -- in the --

13    Q    -- this paragraph --

14    A    -- paragraph --

15    Q    -- says?

16    A    -- the words in the paragraph say these students

17  may be eligible for State grants.

18    Q    But - yes.  Sorry.  I'm - let me just read this,

19  just so we're on the same terms.

20              This first sentence says, "Certain

21  unauthorized immigrants are eligible to enroll in Texas

22  public colleges and pay in-state tuition."  Is that

23  correct?

24    A    The words are eligible - you - you just repeated

25  the words of the sentence.

Judy A. Coughenour & Associates

1    Q    Yes.

2    A    I --.

3    Q    Did - did I do that correctly?

4    A    I believe you read them well.

5    Q    Thank you.

6              Would you agree that UNT allows

7    unauthorized immigrants to enroll, or are they eligible to

8    enroll at UNT?

9              MS. HELLUMS-GOMEZ:  Objection.  Form.

10   A    (The Witness)  Again, I - you're asking me to

11   judge something that I didn't write and haven't seen

12   before, so am I supposed to draw conclusion from something

13   I don't know where it came from?

14   Q    (Mr. Townsend)  No, sir.

15             You - you're the President of UNT, so I'm

16   asking you, in your official capacity as President of UNT,

17   whether or not unauthorized immigrants are eligible to

18   enroll at UNT.

19   A    I guess it depends on the definition of

20   unauthorized immigrants.

21             So from my perspective, I believe we could,

22   based off this, but I don't - this doesn't look like a

23   legal document, to me, and so I can't really guess at what

24   point what immigrants would be allowed.

25   Q    How would you --

```
 1        A    Or unauthorized --

 2        Q    -- define --

 3        A    -- immigrants.

 4        Q    Oh.  Sorry.

 5                  (The Reporter asked the Witness to

 6                   repeat the end of his answer which she

 7                   could not hear clearly.)

 8        A    (The Witness)  I said I couldn't guess what

 9   unauthorized immigrants would or wouldn't be allowed,

10   based off this paragraph.

11        Q    (Mr. Townsend)  How would - hmmm.

12                  But some unauthorized immigrants may be

13   eligible, or are - are eligible?

14                  MS. HELLUMS-GOMEZ:  Objection.  Form.

15        A    (The Witness)  You're asking me to interpret

16   words in a paragraph that I'm not familiar with, and I'm

17   not familiar with the legal veracity of it.

18                  This certainly doesn't look like a Senate

19   Bill, to me, so --

20        Q    (Mr. Townsend)  So --

21        A    -- I - I feel unable to answer, based off what

22   you've presented.

23        Q    No, sir.

24                  And - and this might be where some of the

25   confusion is coming in.
```

1            This was just to introduce this exhibit and

2    to let you know that there is material from your

3    University that does say this.

4            This now question, what I'm asking, is as

5    President of the University, in your official capacity,

6    whether or not you know whether or not unauthorized

7    immigrants are eligible to enroll at UNT.

8        A    I believe that some categories are.

9        Q    All right.  And are some categories eligible to

10   pay in-state tuition?

11       A    I believe some categories are.

12       Q    And those are categories unauthorized - of

13   unauthorized immigrants?

14       A    Correct.

15       Q    Great.

16            The last things on this point.

17            In-state tuition.  That's different than

18   out-of-state tuition.  Correct?

19       A    Correct.

20       Q    And currently in-state tuition is cheaper than

21   out-of-state tuition?

22       A    That's actually a technically difficult

23   statement, but generally yes.

24       Q    Generally yes.

25            So generally it would benefit students to

```
 1  receive in-state tuition?
 2                MS. HELLUMS-GOMEZ:  Objection.  Form.
 3       A   (The Witness)  Yes.
 4       Q   (Mr. Townsend)  I'm going to stop sharing my
 5  screen real quick.
 6                Do you have a Twitter account?
 7       A   Yes.
 8       Q   What's the name of your Twitter account?
 9       A   Well, it's actually the University runs it for
10  me, but I can Tweet on it.  It's @UNTPrez.
11       Q   UNTPrez?
12                So you do Tweet from that account?
13       A   On occasion.
14       Q   Do other people Tweet from that account, as
15  well?
16       A   Yes.  They do.
17       Q   All right.  Do you review Tweets, either before
18  or after they Tweeted?
19       A   Not generally.
20       Q   Do you have the authority to review Tweets --
21       A   I do.
22       Q   -- that go out on that account?
23       A   I do.
24       Q   Do you have the authority to remove Tweets from
25  that account?
```

```
 1        A   I don't think I've ever asked to do that, except
 2   for when I misspell something and delete a Tweet.
 3        Q   Absolutely.
 4                 But - and you can.  Correct?
 5        A   Yes.
 6        Q   All right.  This will be - I'd like to introduce
 7   Exhibit 5.  I'm going to start sharing my screen.  Can you
 8   see this?
 9        A   Yep.
10        Q   And this is your Twitter account.  Correct?
11        A   It is.
12        Q   And it's the official Twitter of the University
13   of North Texas President?
14        A   Correct.
15        Q   And that's your name at the top?
16        A   Yes.
17        Q   So a student who sees these Tweets would assume
18   that they come from you?
19        A   Yes.
20        Q   I'm going to scroll down to Page 2 of the
21   exhibit.
22                 All right.  Is this from - this reply from
23   your Twitter account?
24        A   Yep.
25        Q   Can you tell me what you meant by this reply?
```

1    A    That a student, who said they didn't feel good,

2  Tweeted, and I said, "We're looking in to it."

3              I probably forwarded the Tweet to Student

4  Affairs.

5    Q    All right.  And did UNT investigate this?

6    A    I can't recall.

7    Q    Do you know if there's ever been an

8  investigation against YCT?

9    A    An investigation?

10   Q    Um hum.

11   A    I don't - I'm not sure if you mean it in the

12 sense of EEOAA.  I don't know.

13   Q    Have there ever been official steps to look in

14 to the conduct of either the organization or members of

15 that organization?

16   A    Not by me.

17   Q    Okay.

18   A    And I don't - I - I - I'm actually not sure if

19 anyone else has, but I don't think so.

20   Q    So you - you're testifying that you're not aware

21 of any investigations in to YCT?

22   A    Not official investigations.

23   Q    What's the difference between official and

24 unofficial investigations?

25   A    When you say, "We're looking in to it," and it

```
 1  goes to Student Affairs, many different things can happen.
 2       Q    What are those?  Can you describe some of those
 3  things?
 4       A    It can go to the Dean of Students, who then
 5  looks in to it.
 6                 We get complaints all the time, on social
 7  media, and so I generally refer them to Student Affairs.
 8  Sometimes I refer them to University Branding and
 9  Marketing.
10       Q    Do you often --
11                 (The Reporter asked for a repeat of the
12                  last part of the Witness' answer.)
13       A    (The Witness)  University Branding and
14  Marketing.
15       Q    (Mr. Townsend)  Do you often reply to Tweets,
16  telling informed people that they are - well, you - you
17  are looking in to this?
18       A    Not a lot.
19       Q    Have you ever?
20       A    Oh.
21       Q    Besides this instance?
22       A    Probably.
23       Q    Can you recall a time --
24       A    I can't --
25       Q    -- that you --
```

```
 1        A    -- recall.

 2        Q    -- did?

 3        A    I can't recall the last time I did it.

 4        Q    All right.  Do you think it's reasonable for a

 5   YCT student to see this Tweet, and to think that YCT

 6   members are being investigated?

 7                    MS. HELLUMS-GOMEZ:   Objection.   Form.

 8        A    (The Witness)  No.

 9        Q    (Mr. Townsend)  Why not?

10        A    When you say you're looking in to something, it

11   doesn't imply a full investigation.

12        Q    But you described that there were official and

13   unofficial investigations.   Correct?

14        A    I - I said I referred it to Student Affairs, in

15   most likelihood.  And I actually couldn't recall.

16                    If someone says something that I believe is

17   illegal, or hate speech, or something like that, I might

18   refer it to EEOAA, or even to the police.

19                    But in this case, I doubt that I did either

20   of those things.

21        Q    Do you know what you did do in this case?

22        A    No.  I told you I'm not sure.  I probably

23   referred it to Student Affairs.

24        Q    And just to clarify, when you referred something

25   to Student Affairs, what happens?  Or what steps can
```

Judy A. Coughenour & Associates

```
 1  happen?
 2       A    They look in to the situation, as best they can.
 3       Q    Can you describe how?
 4       A    No.
 5       Q    No?
 6       A    No.  I --
 7       Q    You don't --
 8       A    -- don't know how.
 9       Q    -- know how?
10       A    I don't know how.
11            If it's something egregious, it would go to
12  EEOAA, or a Title IX investigation.
13       Q    And when you say you refer something to Student
14  Affairs, that's Elizabeth With oversees that?
15       A    Yes.
16       Q    And you testified earlier that you oversee
17  Elizabeth With.  Correct?
18       A    That's correct.
19       Q    But you don't know what happens when you refer
20  someone to Student Affairs?
21            MS. HELLUMS-GOMEZ:  Objection.  Form.
22       A    (The Witness)  Different things happen.
23  Sometimes I get an answer, sometimes I don't.
24       Q    (Mr. Townsend)  Can you describe some of those
25  different things for us?
```

```
 1        A    If a student - and - and I'm speculating now, so
 2   I don't really see the value of this.
 3        Q    Well, I'm just asking what are different
 4   measures that Student Affairs can take, once they get a
 5   referral from yourself?
 6        A    They can refer it to the Dean of Students for
 7   followup, or they can refer it to EEOAA, or they can refer
 8   it to the police.
 9        Q    So just to clarify, there are three --
10        A    They --
11        Q    -- actual --
12        A    -- or they could decide to do nothing.
13        Q    All right.  So just to clarify, there are four
14   actions that Student Affairs can do - take, when they
15   receive a - a referral from you?
16        A    Well, I would - I would say there's two.  They
17   can act on it or not.
18        Q    All right.  And if they do choose to act on it,
19   the things that they can do are --?
20        A    Refer to the police, refer to EEOAA, or refer to
21   the Dean of Students' office.
22        Q    And if they are referred to the Dean of
23   Students' office, could students get in trouble for that?
24             MS. HELLUMS-GOMEZ:  Objection.  Form.
25        A    (The Witness)  I don't know.
```

```
 1       Q    (Mr. Townsend)   Could a student be expelled?

 2       A    Again, I don't know.

 3       Q    Could a student be interviewed?

 4       A    Probably.

 5       Q    All right.  So what is the point of you stating

 6  that you're looking in to this and were referring it to

 7  Student Affairs?

 8                  MS. HELLUMS-GOMEZ:  Objection.  Form.

 9       A    (The Witness)  To let a student, who says they

10  feel unsafe and harassed, know that someone will review

11  this.

12       Q    (Mr. Townsend)  But not you, yourself?

13       A    Nope.

14       Q    But you did testify earlier that you oversee the

15  person who does review it?

16       A    One of them.

17       Q    All right.  I'm going to introduce - this will

18  be --

19                  MR. TOWNSEND:  Is this Exhibit 6 we're on?

20                  (The Reporter indicated that it would be.)

21       Q    (Mr. Townsend)  Yes.  I'd like to introduce

22  Exhibit 6.

23                  Have you seen this article before?

24       A    (The Witness)  No.

25       Q    Okay.
```

Judy A. Coughenour & Associates

```
 1        A    Not that I recall.

 2        Q    All right.  I'm just going to walk through a

 3   couple of things in this article.

 4                  First it says it's from July 9th, 2020.

 5   Correct?

 6        A    Yep.

 7        Q    All right.  I'm going to scroll down to Page 2.

 8                  Can you familiarize yourself with this

 9   paragraph, starting with, "The UNT chapter"?

10        A    I read it.

11        Q    Great.

12                  And that paragraph says that Kelly Neidert

13   was last - the previous year's chapter's chairman.

14        A    That's what the sentence says.

15        Q    Great.

16                  So that would have been 2019.  Correct?

17        A    Well, I don't know the date.  I think --

18        Q    But it would have been the year before this

19   article was published?

20        A    I don't know.

21                  MS. HELLUMS-GOMEZ:  Objection.  Form.

22        A    (The Witness)  I don't know.

23        Q    (Mr. Townsend)  Do you know if Kelly Neidert was

24   the chapter's chairman at UNT?  Or YCT at UNT?

25        A    I assume from this she was, but I don't know.
```

```
 1       Q    All right.  Great.
 2                 All right.  I'm going to scroll down.  Do
 3  you see this Tweet that's up there?
 4       A    Yes.
 5       Q    Have you seen this Tweet before?
 6       A    Maybe, but I - there's so many around this young
 7  woman that I couldn't recall any specific.
 8       Q    What do you mean by that?
 9       A    I know she was very active on Twitter.
10       Q    All right.  Which person are you referring to?
11       A    Kelly Neidert.
12       Q    So what activity are you aware of?  On her
13  Twitter?
14       A    That she posted a lot of stuff.
15       Q    Can you define what "stuff" you're referring to?
16       A    No.
17       Q    No, that you don't know?
18       A    That's correct.  I mean, I've seen some of her
19  posts, but - I've seen that she is active on Twitter.  I
20  have lots of people I follow, so I don't try to pick out
21  anybody, and this is just noise, as far as I'm concerned.
22                 (The Reporter asked for a repeat of the
23                  last part of the Witness' answer.)
24       A    (The Witness)  I have - I said I got a lot - I -
25  I have a lot of Tweets from people I'm following, with
```

```
 1  others, and that I don't go out of my way to follow any of
 2  them, specifically, unless I see something that looks
 3  particularly egregious, and I note that I am not
 4  referenced in this Tweet, so I couldn't say whether I saw
 5  it or not.
 6        Q   (Mr. Townsend)  And do you follow Kelly Neidert?
 7        A   I - I don't think so, but you never know.
 8            I don't follow - you know, sometimes people
 9  follow for me, so I doubt I would - would want to.
10        Q   Can you describe the context that you would have
11  seen some of her Tweets?
12        A   People often put my hash tag in, or my - my
13  address, my Twitter handle in.
14            So when they put my Twitter handle in to a
15  Tweet, then I generally see it.
16        Q   And can you describe the context of some of
17  those Tweets that you would have seen?
18        A   Which ones?
19        Q   Referring to Kelly Neidert.  Any of them.
20        A   Yes.  There was a dispute between her and some
21  of the other students on campus that seemed heated.
22        Q   Can --
23        A   Oh.
24        Q   -- you describe it?
25        A   Both contributing in - in - in ways to the
```

```
 1   conversation, which, at some point, just looked like two
 2   people shouting at each other.
 3        Q   Can you describe the context of that Twitter
 4   spat?
 5             MS. HELLUMS-GOMEZ:  Objection.  Form.
 6        A   (The Witness)  No.  I can't.
 7        Q   (Mr. Townsend)  You don't remember anything from
 8   that?
 9        A   Not really.
10        Q   Just that it occurred?
11        A   Yeah.  There was a lot of activity around it for
12   awhile.  Then it stopped.
13        Q   When you say activity, what do you mean?
14        A   Tweets back and forth.
15        Q   And when was this?
16        A   I feel - I - I couldn't tell you, for sure.  I
17   feel like it was right around - it was preCOVID, but I - I
18   can't say, for sure.
19        Q   So just - just so I'm clear, you remember that
20   there were Tweets, you remember Kelly Neidert as an
21   account, but you don't recall any of the subject matter of
22   those Tweets?
23        A   Not really.  I mean, people shouting at each
24   other doesn't constitute something I would look at deeply.
25        Q   Do you know what they were shouting at each
```

```
 1  other?
 2        A    No.
 3        Q    You just remember that they were shouting at
 4  each other?
 5        A    Yeah.
 6        Q    Was it political?
 7        A    I don't know.
 8        Q    All right.  I'd like to refer back to this
 9  Tweet.  You said you were familiar with - you familiarized
10  yourself with it?
11        A    This one?
12        Q    Yes.  The --
13        A    Yes.
14        Q    -- on the screen?
15        A    I read it.
16        Q    All right.  What - can you tell me what this
17  Tweet says?
18        A    "Don't come back to campus if you value your
19  safety."
20        Q    And who is this Tweet directed at?
21        A    The - at YCT, UNT, and at Kelly Neidert.
22        Q    Do you know if UNT has investigated threats
23  against YCT or Kelly Neidert?
24        A    I don't know.
25        Q    If you had seen this Tweet, would you have
```

```
 1  forwarded it to Student Affairs for investigation?
 2        A   It's --
 3              MS. HELLUMS-GOMEZ:  Objection.
 4        A   (The Witness)  -- possible.
 5              MS. HELLUMS-GOMEZ:  Form.
 6        Q   (Mr. Townsend)  Okay.
 7        A   (The Witness)  Okay.  It's possible.
 8        Q   But you didn't.
 9        A   No.  It doesn't - it didn't reference me, but I
10  would - and, again, at some point, when groups are just
11  Tweeting unmercifully, I ignore them.
12        Q   And I'm going to scroll up here.
13              Do you see this paragraph that starts, "In
14  addition to this Petition"?
15        A   Yes.
16        Q   Can you familiarize yourself with that
17  paragraph?
18        A   I have.
19        Q   Great.
20              This paragraph says that, "YCT and UNT - at
21  UNT and Neidert have had threats of violence leveled
22  against them, and they claim their account was recently
23  hacked."
24              Is it - did I read that correctly?
25        A   Yeah.  Good job reading.
```

1     Q    Yo.

2              Are you aware of these allegations?

3     A    No.  And I've never heard of this hacking thing.

4              I - I knew there was an argument that was

5  escalating around both of them.  Both students on one side

6  and students on the other.

7     Q    So you've - hadn't heard of the hacking.  Have

8  you - you heard of the threats of violence?

9     A    I haven't heard threats of violence,

10  specifically.

11     Q    What have you heard?

12     A    I thought I explained that.

13              There was a heated discussion, on Twitter,

14  between some of our students and some of the - and Kelly

15  Neidert.

16     Q    So that's the only time that you've heard about

17  those - that situation?

18     A    Yeah.  There was a spate of them, and then it

19  kind of went away.

20     Q    There's a what?  I'm sorry?

21     A    A spate of them.

22     Q    I - I'd like to direct to the next paragraph.

23  Can you familiarize yourself with this paragraph that

24  starts with "Neidert has been"?

25     A    Okay.  I read it.

```
 1        Q    Great.

 2                  So it says that, "Neidert has been the

 3   target of doxxing."

 4        A    I have - I have no idea what that is.

 5        Q    It defines it later.  "Attempts to publish her

 6   private and" --

 7        A    Oh.

 8        Q    -- "identifying" --

 9        A    Someone else wrote that.  I don't know.  It's -

10   I mean, you know --

11        Q    You --

12        A    -- this person has obviously got an opinion, and

13   so they've been writing stuff.  I don't know.

14                  If you want me to verify it, I have no clue

15   whether it's right or wrong.

16        Q    On - sorry.  We're getting - backing up just a

17   second.

18                  We're going to start with the definition of

19   doxxing.  Do you know what the - that phrase means?

20        A    No.  I do not.

21                  And I don't know if I accept whatever

22   definition is put in parentheses by someone I don't know.

23        Q    All right.  Do you know what attempts to publish

24   her private and identifying information on the Internet

25   means?
```

```
 1          A    I've never heard of that.
 2          Q    You've never heard of someone publishing private
 3    information on the Internet?
 4          A    Oh.   That I've heard of.
 5          Q    Yeah.
 6               So if - so if we replace, "Neidert has been
 7    the target of doxxing," with "Neidert has been the target
 8    of attempts to publish her private and identifying
 9    information on the Internet," are you aware of that --
10               MS. HELLUMS-GOMEZ:   Objection.
11          Q    (Mr. Townsend)  -- allegation?
12               MS. HELLUMS-GOMEZ:   Form.
13          A    (The Witness)  No.
14          Q    (Mr. Townsend)  No?
15               Are you aware of any attempts to publish
16    private information from YCT students?
17          A    No.
18          Q    Of YCT students?
19          A    No.
20          Q    No?
21               Real quick, I just want to scroll down to
22    5, 6, 7.
23               I know you said that this was just one
24    article, so I want to direct you to this Tweet from UNT
25    Democrats.  Can - do you see this?
```

```
 1        A    Yes.
 2        Q    And you see that it says, "You all heard them.
 3   Sign that Petition," referring to the Tweet below.   It
 4   says that, "College Democrats declare open war on
 5   conservatives"?
 6        A    I've just read it.
 7        Q    Would that appear to be an endorsement of
 8   declaring war on conservatives?
 9                  MS. HELLUMS-GOMEZ:   Objection.   Form.
10        A    (The Witness)  I don't know.
11        Q    (Mr. Townsend)  If the alleged threats above,
12   that we discussed, are true, would you find that
13   troubling?
14                  MS. HELLUMS-GOMEZ:   Objection.   Form.
15        A    (The Witness)  I'm not sure what you're asking.
16        Q    (Mr. Townsend)  If what we've discussed -
17   threats of violence, threats of hacking, threats of
18   public - private information being put on public
19   information - if that was true, would you find that
20   troubling on your University?
21                  MS. HELLUMS-GOMEZ:   Objection.   Form.
22        A    (The Witness)  Yes, but I think context is
23   relevant.
24        Q    (Mr. Townsend)  Can you discuss what context
25   would be relevant for that?
```

```
 1      A    If the threats were serious.  I can't judge
 2   that, however.
 3      Q    How is a threat - can you describe how a threat
 4   of violence would not be serious?
 5                   MS. HELLUMS-GOMEZ:  Objection.  Form.
 6      A    (The Witness)  I might answer by saying I've
 7   watched fights between my two year old and five year old
 8   grandson who threaten each other with violence on a
 9   regular basis, and I don't take them very seriously.
10      Q    (Mr. Townsend)  Do you think of your students as
11   two and five year olds?
12                   MS. HELLUMS-GOMEZ:  Objection.  Form.
13      A    (The Witness)  I think there's times when our
14   students don't behave as the adults they are.
15      Q    (Mr. Townsend)  All right.
16                   MR. TOWNSEND:  I'm going to take a five
17   minute break here, if that's all right, and then we'll
18   come back.
19                   Let's mute ourselves.
20                   THE REPORTER:  We're off the record at
21   2:12.
22                   (Recess from 2:12 p.m. to 2:21 p.m.)
23                   THE REPORTER:  We're back on the record at
24   2:21.
25      Q    (Mr. Townsend)  Awesome.
```

Judy A. Coughenour & Associates

```
 1              Just a couple more questions before we

 2   get - and sorry about the light kind of shining on my face

 3   like that.

 4              First, if I use the term undocumented

 5   immigrant, would you know what that means?

 6       A   (The Witness)  I couldn't define it legally.

 7       Q   Have you ever heard that term?

 8       A   I've heard the term.  (Witness nodded head up

 9   and down.)

10       Q   Where have you heard that term?

11       A   I don't know.  Newspaper.  Around.

12       Q   Do you know what it means if a newspaper were to

13   use it?

14       A   Someone who is in the country without

15   documentation.  (Witness shook head from side to side.)

16       Q   Have you ever used the term undocumented

17   immigrant?

18       A   I - I - I - I don't think so, but I wouldn't

19   swear to it.

20       Q   Have you ever heard the term illegal alien?

21       A   Yes, I have.

22       Q   Do you know what it means?

23              MS. HELLUMS-GOMEZ:  Objection.  Form.

24       A   (The Witness)  Actually, no.  I don't.

25       Q   (Mr. Townsend)  Where have you heard it?
```

```
 1        A    People use it all the time.  (Witness shook head
 2   from side to side.)
 3               I do not - I am not aware of the technical
 4   definition of the term.
 5        Q    But when people use it and you hear it, do you
 6   know what they're referring to?
 7        A    I would assume someone who came in to the
 8   country with no documentation.
 9        Q    And you heard the term unauthorized immigrant
10   before?
11        A    Again, the same thing.  I - I'm - I'm not sure
12   unauthorized.  I've read it in something you just had up
13   there, but I would assume it means the same thing.
14               But actually - but I really don't know.
15        Q    I'm sorry.  One quick - real quick.
16               MR. TOWNSEND:  Is that Renaldo who is in
17   the room?
18               If you could just slide in a little bit?
19               I can see his elbow.
20               I'm sorry.  Okay.  A little bit more.
21               RENALDO STOWERS:  Why do you need me to
22   slide in?  I am doing nothing but sitting in this
23   deposition.  I'm not doing anything.  You can - you can
24   see if I'm going to start saying - doing anything --
25               MR. TOWNSEND:  But --
```

Judy A. Coughenour & Associates

```
 1                    RENALDO STOWERS:  -- with President
 2    Smatresk.
 3                    MR. TOWNSEND:  It - it's common practice
 4    for any Counsel to be --
 5                    RENALDO STOWERS:  I've been --
 6                    MR. TOWNSEND:  -- on the --
 7                    RENALDO STOWERS:  -- I've been --
 8                    MR. TOWNSEND:  -- camera.
 9                    RENALDO STOWERS:  -- I've been an attorney
10    for an extremely long time, so you don't need to advise me
11    on what's common practice.
12                    If you do, I can advise --
13                    MR. TOWNSEND:  Well, just --
14                    RENALDO STOWERS:  -- you on what's common
15    practice with regard to taking a deposition.
16                    Is this good enough?
17                    MR. TOWNSEND:  Yes.  I can see the edge of
18    your face.  That's --
19                    RENALDO STOWERS:  Thank you.
20                    MR. TOWNSEND:  -- useful.  Thank you.
21                    RENALDO STOWERS:  Please continue.
22                    MR. TOWNSEND:  I will.
23                    RENALDO STOWERS:  Good.
24         Q   (Mr. Townsend)  You testified earlier,
25    Mr. Smatresk, that you oversee Mr. Goodman?
```

```
 1        A    (The Witness)  Yes.

 2        Q    And you testified that he oversees recruitment?

 3        A    Yes.

 4        Q    Great.

 5             And he would be responsible for things

 6   published from freshman recruitment - or from recruitment.

 7   Correct?

 8        A    Most likely.

 9        Q    And you, being responsible for Mr. Goodman,

10   would be responsible for things published through - by the

11   University.  Correct?

12        A    Yes.

13        Q    And you wouldn't publish something that's not

14   true.

15        A    If I --

16             MS. HELLUMS-GOMEZ:  Objection.  Form.

17        A    (The Witness)  To the extent that I knew it

18   wasn't true, I wouldn't.

19        Q    (Mr. Townsend)  And it would be improper for you

20   to tell students something that wasn't true.  Correct?

21             MS. HELLUMS-GOMEZ:  Objection.  Form.

22        A    (The Witness)  The same answer.

23        Q    (Mr. Townsend)  And can you repeat the answer,

24   then?

25        A    I wouldn't knowingly tell a student something
```

1  untrue.

2      Q   And you wouldn't tell a student that they were

3  eligible for something if they weren't?

4      A   I guess it depends what eligible - what

5  eligibility you're discussing.

6              I don't know all the rules for eligibility,

7  so I wouldn't normally be in that position.

8      Q   No.  But if you did know that - if you did say

9  that somebody was eligible, it would be improper for you

10  to do that if it wasn't --

11      A   I have --

12      Q   -- true?

13      A   You mean if I had a perfect understanding of all

14  the rules that we have?

15      Q   Yes.

16      A   Then I would probably not knowingly tell them

17  something that - tell them they were eligible for

18  something, if I understood all the rules.

19              MS. HELLUMS-GOMEZ:  And I would object to

20  form on that question, Miss Johnson.

21      Q   (Mr. Townsend)  I'm going to pull back up

22  Exhibit 4.  Can you see this?

23      A   (The Witness)  Yes.

24      Q   And I'm scrolling to Page 4 on this.

25              And you would agree that this says that

1  unauthorized immigrants are eligible to enroll at UNT and
2  pay in-state tuition?
3           MS. HELLUMS-GOMEZ:  I'm going to object to
4  form, again, to this exhibit.
5      A   (The Witness)  I have already answered this
6  question.
7      Q   (Mr. Townsend)  And if you could just give an
8  answer, that would be awesome.
9      A   It reads, "Certain unauthorized immigrants are
10 eligible to enroll in Texas public colleges and pay
11 in-state tuition."
12     Q   And that appears to tell students that they -
13 that even if they're unauthorized immigrants, that they
14 might be in - eligible to enroll and pay in-state tuition.
15 Correct?
16          MS. HELLUMS-GOMEZ:  Objection.  Form.
17     A   (The Witness)  To the extent that I understand
18 the sentence I just read you.
19     Q   (Mr. Townsend)  And this appears to be on UNT
20 letterhead.  Or UNT document.
21          MS. HELLUMS-GOMEZ:  Objection.  Form.
22     A   (The Witness)  Did you ask a question?
23     Q   (Mr. Townsend)  Yes.
24          Does it appear that this comes from UNT?
25     A   It looks like it.

```
 1         Q    But you are testifying today that you don't know
 2    whether or not unauthorized immigrants are eligible to
 3    enroll at UNT?
 4         A    I told you before, I believe some are.
 5         Q    Great.
 6                    And this will be my final question.
 7                    And I'll stop sharing my screen real quick.
 8                    Do you think that college students might be
 9    intimidated if they saw their President Tweeting that they
10    are looking in to Tweets, and political conduct, and
11    political statements by the University President?
12                    MS. HELLUMS-GOMEZ:  Objection.  Form.
13         A    (The Witness)  No.
14         Q    (Mr. Townsend)  Okay.
15                    MR. TOWNSEND:  I have no further questions.
16                    (Witness passed at 2:29 p.m.)
17                    MR. TOWNSEND:  Would you like to Redirect?
18                    MS. HELLUMS-GOMEZ:  Not at this time.
19                    THE REPORTER:  Okay.  That concludes the
20    deposition at 2:29 p.m.
21                    Stipulations have been made that the
22    original transcript is going to be sent to Sandy
23    Hellums-Gomez for signature of the Witness, and thereafter
24    the signed transcript is to be returned to JUDY A.
25    COUGHENOUR & ASSOCIATES, 8109 Asmara Drive, Austin, Texas,
```

```
 1  within thirty days for filing with the attorney who asked

 2  the first question in the deposition.

 3                  And that does conclude the deposition.

 4                        * * * * * * *

 5                  (The Certified Shorthand Reporter JUDY A.

 6                   COUGHENOUR JOHNSON hereby states that

 7                   Exhibit Nos. 1 through 6 were marked at

 8                   the conclusion of the deposition, and the

 9                   originals are to be attached to the

10                   original transcript of the deposition.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Judy A. Coughenour & Associates

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:        DR. NEAL SMATRESK

 3   DATE TAKEN:          NOVEMBER 22, 2021

 4   PAGE   LINE          CHANGE          REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1 _____

2 _____

3 _____

4 _____

5        I, DR. NEAL SMATRESK, have read the foregoing

6 deposition and hereby affix my signature that the same is

7 true and correct, except as noted above.

8

9                          _____

10                         DR. NEAL SMATRESK

11 STATE OF _____

12 COUNTY OF _____

13        BEFORE ME, _____, on this

14 day personally appeared DR. NEAL SMATRESK, known to me or

15 proved to me, under oath, identity card, or other

16 document, to be the person whose name is subscribed to the

17 foregoing document and acknowledged to me that the same

18 was executed for the purposes and consideration therein

19 expressed.

20        GIVEN under my hand this _____ day of _____,

21 2021.

22                          _____

23                         NOTARY PUBLIC IN AND FOR THE
                           STATE OF _____
24                         MY COMMISSION EXPIRES ON:

25                          _____

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT
 2                      SHERMAN DIVISION

 3   YOUNG CONSERVATIVES OF        )
     TEXAS FOUNDATION              )
 4                                 )
                                   )
 5   VS.                           )
                                   )    CIVIL ACTION NO.
 6   THE UNIVERSITY OF NORTH       )    4:20-CV-973
     TEXAS, THE UNIVERSITY OF      )
 7   NORTH TEXAS SYSTEM, NEAL      )    HONORABLE SEAN D. JORDAN
     SMATRESK, PRESIDENT OF THE    )
 8   UNIVERSITY OF NORTH TEXAS,    )
     AND SHANNON GOODMAN, VICE     )
 9   PRESIDENT FOR ENROLLMENT OF   )
     THE UNIVERSITY OF NORTH       )
10   TEXAS                         )

11   ************************************************************

12                   REPORTER'S CERTIFICATION

13              DEPOSITION OF DR. NEAL SMATRESK

14                    NOVEMBER 22, 2021

15   ************************************************************

16        I, JUDY A. COUGHENOUR JOHNSON, a Certified

17   Shorthand Reporter in and for the State of Texas, do

18   hereby certify to the following:

19        THAT the Witness, DR. NEAL SMATRESK, was duly sworn

20   by the officer, and that the transcript of the oral

21   deposition is a true record of the testimony given by the

22   Witness;

23        THAT the deposition transcript was submitted on

24   December 1, 2021 to the attorney for Defendants for

25   examination, signature, and return to JUDY A. COUGHENOUR &
```

Judy A. Coughenour & Associates

1  ASSOCIATES, 8109 Asmara Drive, Austin, Texas, 78750, by

2  December 31, 2021.

3          THAT the amount of time used by each party at the

4  deposition is as follows:

5          CHRISTIAN TOWNSEND - (49 minutes)

6          SANDY HELLUM-GOMEZ - (00:00 minutes)

7          THAT $404.55 is the deposition officer's charges

8  for preparing the original deposition transcript and any

9  copies of exhibits, charged to Plaintiff.

10         I further certify that I am neither Counsel for,

11  related to, nor employed by any of the parties in the

12  action in which this proceeding was taken, and further,

13  that I am not financially or otherwise interested in the

14  outcome of the action.

15         SWORN TO by me this 1st day of December, 2021.

16

17  _____

18  JUDY A. COUGHENOUR JOHNSON
    TEXAS CSR NO. 1198
    EXPIRATION DATE:  06/30/23
19  8109 Asmara Drive
    Austin, Texas  78750
20  PH:  (512) 346-4707

21

22

23

24

25

Judy A. Coughenour & Associates