**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **YOUNG CONSERVATIVES OF TEXAS FOUNDATION** | § § § | |
| *Plaintiff,* | § § | |
| | § | **CIVIL ACTION NO. 4:20-cv-00973** |
| **v.** | § § | |
| **THE UNIVERSITY OF NORTH TEXAS, THE UNIVERSITY OF NORTH TEXAS SYSTEM, NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS and SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS,** | § § § § § § § § § | |
| *Defendants.* | § | |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY-JUDGMENT AND
SUR-REPLY TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants file this reply in support of their Cross-Motion for Summary Judgment and sur-reply to Plaintiff's Motion for Summary Judgment, and respectfully request the Court grant the Cross-Motion for Summary Judgment.

**A.   YCT overstates the scope of the Court's ruling on Defendants' Motion to Dismiss.**

YCT's reliance on "findings" from the Court's previous ruling on Defendants' Motion to Dismiss at best overstate, and at worst misrepresent, what the Court actually found. For example, YCT states that the Court has already "largely rejected" UNT's sovereign immunity argument. Dkt. 53, at 24. This contention is wrong. Defendants' sovereign immunity was not before the Court on Defendants' Motion to Dismiss. The Court's ruling concerned only the sufficiency of YCT's pleadings in alleging facts stating a cause of action—not the merits of any defense available to UNT. *See* Fed. R. Civ. P. 12(b)(6); Dkt. 34, at 11 (finding that YCT stated an *Ex parte Young* claim "based on the well-pleaded allegations in the complaint."). Likewise, the Court's ruling on UNT's argument that *Armstrong* precludes relief was appropriately limited to consideration of YCT's pleading. But at this stage of the litigation, YCT has failed to meet its burden on summary judgment. Fed. R. Civ. P. 56.

**B.   YCT's evidence fails to carry its burden to show standing.**

**1.   YCT misrepresents the contents of the Dominguez Declaration.**

YCT claims that in his declaration, Mr. Dominguez "swears that he 'oversees' the UNT chapter and knows its roster." Dkt. 53, at 32.  YCT further claims that the Dominguez Declaration includes testimony "that YCT has members at UNT that have paid nonresident tuition." *Id.* As YCT says, "this is refuted by simply reading the Declaration." *Id.* In relevant part, the Dominguez Declaration includes the following statements:

- "In my role as State Chairman, I oversee all YCT chapters at colleges and universities across the state of Texas."

- "YCT has established and currently maintains a chapter at the University of North Texas ("UNT") in Denton County, Texas."

- "YCT's members include United States citizens that do not qualify as Texas residents and are not otherwise exempt from the requirement to pay nonresident tuition."

- "YCT's members include individuals that are currently enrolled as undergraduate students at UNT."

*Id.* at Ex. 2. Not once does Mr. Dominguez's testimony state he is familiar with YCT's UNT roster, nor does his testimony include a statement that YCT has members at UNT who have paid nonresident tuition. YCT's attempt to establish standing by representing to this Court that it has provided evidence that is not in the record does not meet its summary-judgment burden.

**2.   The new affidavits upon which YCT seeks to rely do not establish standing.**

YCT further attempts to prove it has standing by providing two declarations in its summary-judgment reply. Neither of these declarations, however, meet YCT's burden.

First, both affidavits fail to establish whether either student paid nonresident tuition at the time this lawsuit was filed and whether they received tuition offsets for that semester. Dkt 53, Exs. 3-4.  As Justice Scalia explained, the facts as they existed at the time the complaint is filed determine federal jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569–71 (1992). Neither affidavit includes any information regarding whether the two proffered students were enrolled in the fall semester of 2020 when YCT filed this lawsuit.  Dkt. 2.  Further, neither affidavit provides any information as to whether either student received scholarships, grants, or other tuition offsets for that semester.

Second, YCT acknowledges that Exhibit 4's unnamed affiant is no longer enrolled at UNT. Dkt. 53, at 21. Not only must a claim be live at the time of the complaint; it must remain so throughout the litigation.  *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990); U.S. Const. art. III, §

2, cl. 1. Here, Exhibit 4's unnamed affiant no longer retains a personal stake in this lawsuit and will not be redressed by a favorable ruling because they are no longer a UNT student. *Id.*

Finally, YCT has failed to produce any evidence that the UNT Chapter consented to or endorsed this litigation purportedly on its members' behalf.  Notably absent from the Dominguez affidavit are averments that the organization engaged in any process to authorize or even notify the student members of YCT's UNT chapter of this suit.  Under YCT's theory, any organization can bring the State into court with a single affidavit by an organizational leader far removed from interactions with and the experiences of its members under the guise of representational standing. Allowing YCT to proceed on this record—and after denying Defendants the opportunity to engage in meaningful discovery regarding the identities and backgrounds of YCT's members—would dramatically expand the doctrine of representational standing. Because YCT has failed to produce competent summary-judgment evidence, it has not established its burden on standing and for that reason alone UNT's cross-motion should be granted.

### C.  Defendants are immune.

#### 1.  The Texas Declaratory Judgment Act does not include an express waiver of the sovereign immunity of UNT and the UNT System.

YCT wrongly argues that the State of Texas has waived immunity for UNT and the UNT System under the Texas Uniform Declaratory Judgment Act (UDJA). Resp. at 31. The UDJA does not grant a broad waiver of sovereign immunity. Instead, it includes a limited number of "express waivers" of sovereign immunity that do not apply to the facts of this case. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 n.3 (Tex. 2011) (holding that Texas Department of Transportation was immune because there was no "express provision" of the UDJA that waived its immunity).

YCT relies on language from a 2015 Texas Supreme Court decision that does not apply to the facts of this case. *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69 (Tex. 2015).

The *Patel* decision involved a challenge to Texas statutes and regulations requiring eyebrow threaders to obtain a state license. Several eyebrow threaders brought suit against the Texas Department of Licensing and Regulation (TDLR), the state agency charged with enforcing the license requirements. They sought a declaratory judgment that the TDLR's requirements violated the privileges and immunities and due course guarantees of Article I, § 19 of the Texas Constitution. *Id*. at 74. It was undisputed that the TDLR was the state agency charged with enforcing the relevant statutes and regulations.

Rejecting TDLR's sovereign immunity argument, the Court cited *City of El Paso v. Heinrich*. *Id*. at 76 (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009)). In *Heinrich*, Chief Justice Jefferson explained that the immunity of the City of El Paso was expressly waived by the UDJA:

> For claims challenging the validity of ordinances or statutes, however, the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity. TEX. CIV. PRAC. & REM. CODE § 37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard."). ….

*Id*.

YCT's response does not cite section 37.006(b) of the UDJA, however, for the obvious reason that its express waiver of sovereign immunity does not apply here.[1] This is not a proceeding involving the validity of a municipal ordinance or franchise, and neither UNT nor the UNT System is a "municipality."

---

[1] YCT's response does not cite *Heinrich* either, because that decision highlights the proper focus of section 37.006(b) is a municipality, not a university.

Furthermore, neither UNT nor the UNT System are subject to section 37.006(b) because they are not the relevant governmental entities charged with the enforcement of the challenged law. While *Patel* holds that "the relevant governmental entities" may be made parties under the UDJA, 469 S.W.3d at 76, it patently does *not* hold that entities that do not have enforcement powers over the challenged law are proper parties. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (holding that immunity bars suit unless state actor has "some connection with the enforcement of the challenged act"). Neither UNT nor the UNT System have authority to enforce the challenged law, for the same reasons that the individual officials YCT has sued have no authority to grant relief.

YCT fails to cite any express provision of the UDJA that purports to waive the UNT defendants' sovereign immunity, because there is none. In the absence of an express waiver, YCT's suit is barred by sovereign immunity. *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d at 622 n.3

### 2.   Smatresk and Goodman do not enforce the challenged law.

YCT does not contest that UNT and the UNT System are entitled to immunity. The only question is whether Smatresk and Goodman are proper *Ex parte Young* defendants.[2] They are not.

YCT claims that Smatresk and Goodman enforce Section 54.051(d)—and are therefore not immune—by collecting tuition under Section 54.051(b). But Section 54.051(b) provides only that UNT "shall cause" tuition to be collected "at the rates prescribed in this section"—*i.e.*, at the rate

---

[2] YCT implies, without reaching a firm conclusion, that the argument that Smatresk and Goodman do not have a connection to Section 54.051(d) has "likely been waived." There is no basis to find waiver here. A waiver of sovereign immunity "must be clearly stated and will not be easily implied." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). And raising an affirmative defense for the first time at summary judgment—or even later—does not result in waiver. *See Motion Med. Techs., LLC v. Thermotek, Inc.*, 875 F.3d 765, 772 (5th Cir. 2017) (citing cases). UNT pled Eleventh Amendment immunity as an affirmative defense in its state-court Answer at the very beginning of this case. !

5

set by the Texas Higher Education Coordinating Board using a formula devised by the Texas Legislature, as provided in Section 54.051(d). It is this formula that, as YCT acknowledges, "makes nonresident tuition more expensive than resident tuition." Dkt. 53 at 6. YCT's challenge is to the constitutionality of how tuition is calculated using this formula—a task that is expressly assigned to the Texas Higher Education Coordinating Board. *See* Tex. Educ. Code § 54.051(d) ("The **coordinating board** shall set the tuition rate provided by this subsection for each academic year."); *see also Bergin v. Texas*, No. 4:20-CV-017-SDJ, 2021 WL 1090743, at *3 (E.D. Tex. Mar. 22, 2021) (a state's express delegation of enforcement responsibility to a specific government official, while "not necessary," may "make [the enforcement] duty clearer") (citations omitted).

Smatresk and Goodman undisputedly have no enforcement role in connection with Section 54.051(d)—the provision YCT actually challenges. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (the defendant must have a connection "to the enforcement of *the particular statutory provision*" that is the subject of the litigation) (emphasis added). Even if YCT sought relief under Section 54.051(b), Smatresk and Goodman would still not be proper defendants simply because they collect tuition at the rates prescribed in Section 54.051(d), which are calculated by a state agency using a formula set by the Texas Legislature. YCT cites no case in which a party in a similar position to Smatresk and Goodman was deprived of immunity, because none exists.

In the absence of any specific enforcement authority, YCT falls back to arguing that Smatresk and Goodman's are "ultimately accountable" or have the "authority to oversee" the University's compliance with state law. But this is simply not enough. This is the language of a "general duty" that the Fifth Circuit has consistently found insufficient to constitute "enforcement" authority. *See Bergin*, 2021 WL 1090743, at *4 (dismissing plaintiff's contention that the Attorney

General was a proper party based on his general obligation to "defend[] the State's interests in all proceedings where the constitutionality of a State law is at issue.").

Section 54.051(b) only provides that Defendants "shall cause" tuition to be collected at the rates set by the State. In performing this essentially ministerial task, Smatresk and Goodman cannot change the rate of tuition to bring it in line with what YCT believes the Constitution requires. Their lack of enforcement power, then, differentiates them from an attorney general who had the authority to take (or not take) action to prosecute a state law violation, and had in fact threatened a suit (*Ex parte Young*, 209 U.S. 123 (1908)); a state medical board that enjoyed discretion to differentiate between allowable and non-allowable claims (*K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)); and a state agency which itself had rate-setting authority, set rates, and arbitrated fee disputes relating to those rates (*Air Evac. EMS, Inc. v. Tex. Mut. Ins. Co.*, 851 F.3d 507, 519 (5th Cir. 2017)).[3] The Texas Higher Education Coordinating Board—not any defendant in this case—sets the tuition rate of which YCT complains, and alone has the authority to change that rate.

YCT claims it has identified a statutory silver bullet authorizing Smatresk and Goodman to change the rate of tuition, by pointing to Tex. Educ. Code § 54.0513 as authority permitting the University to "set new rates that comply with federal law." But YCT omits critical language in its misreading of that statute. Section 54.0513 concerns tuition that may, at a university's discretion, be charged "in addition to amounts" that may be charged elsewhere under Chapter 54—including Section 54.051(d). *See* Tex. Educ. Code § 54.0513(a). In other words, this section permits UNT,

---

[3] Plaintiff's citation to *Edgewood Indep. Sch. Dist. v. Kirby* underscores, rather than contradicts, UNT's position. 777 S.W.2d 391, 399 (Tex. 1989). In that case (which unlike this case involved no federal question), the plaintiff school district sued the Texas Commissioner of Education, William N. Kirby, as well as the Texas State Board of Education. In a case involving the State of Texas's higher education policy decisions, Smatresk and Goodman are not proper defendants.

in its discretion, to charge *more* for tuition, but does not give UNT authority to charge *less*. It is plainly not an avenue for UNT to set a tuition rate for non-residents that is *lower* than the non-resident rate set by the Texas Higher Education Coordinating Board pursuant to Section 54.051(d).

In short: YCT complains of a statutory scheme permitting some to pay different rates than others. But Smatresk and Goodman have nothing to do with what those rates are, how those rates are calculated, or to whom those rates apply. Their only statutory function is to "cause to be collected" tuition "at the rates prescribed in this section." Because they lack the authority to "constrain" or "compel" the rate to be something other than what the Texas Higher Education Coordinating Board determines, they have no enforcement role under Section 54.051(d), and are entitled to immunity.

### D.  There is no preemption in this case.

YCT contends that this case "begins and ends with the text of the relevant statutes," but then proceeds to argue express preemption even when there is no "explicit preemption clause." Dkt. 53 at 11.  YCT then effectively abandons its implied preemption argument providing no response to UNT's refutation of this argument. Rather, YCT merely points this Court to its prior arguments concerning implied preemption via a footnote.  Dkt. 53 at n. 4.  In support of its express preemption argument, YCT acknowledges the absence of an express clause and the lack of contradictory language between the two statutes. Finally, it attempts to contradict the meaning and interpretation of several statutory words and phrases—thus actually demonstrating that there is no express preemption between the state and federal statute. To the contrary, Congress has provided the states and local governments with broad latitude for providing aid to undocumented persons and has not preempted states' rights to adopt higher education tuition policies:

> The power to supplant state law is 'an extraordinary power in a federalist system.' Preemption radically alters the balance of state and federal authority, so the

8

> Supreme Court has historically refused to impose that alteration interstitially.  The Court has expressed this principle as a presumption against preemption of state law. Supremacy Clause analysis is classic 'tie goes to the state' jurisprudence, and the existence of an express preemption provision does not always plainly demarcate what the federal law expressly preempts.

*White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 370 (5th Cir. 2005)(citations omitted).  In *White Buffalo*, a commercial marketer challenged the University of Texas's anti-solicitation policy as preempted by the CAN-SPAM Act. The CAN-SPAM Act had an express preemption clause more definitive than Section 1623. It expressly stated, "[t]his chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." *Id*. at 371. The Fifth Circuit found that there were two competing interpretations of the federal statute, both rooted in the text of the law, concerning the amount of authority state actors had in this area.  *Id*. at 372.  In denying the express preemption claim, the court stated: "The textual ambiguity triggers the strong presumption against a [a preemption] finding, and we cannot be sure whether [the State's] regulations fall within the ambit of the express preemption clause." *Id*.

Congressional power is capable of offsetting the delicate balance between federal and state powers and, therefore, Congress does not exercise this power lightly.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The United States Supreme Court has long recognized a presumption against preemption and has required that Congress exercise its legislative authority precisely.  "Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States." *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd*., 330 U.S. 767, 780 (1947).

9

Given this, YCT's contention that Section 1623 preempts Texas tuition law is untenable. The numerous ambiguities and interpretations of the federal statute demonstrate a lack of preemptive language or intent. If Congress had intended to preempt state laws regulating tuition for unlawfully present aliens, it could have expressly done so without exception. Congress has adopted clear and unambiguous preemptive language in numerous other statutes that did not leave the possibility of multiple interpretations.

Section 1623 has several terms that are undefined and subject to multiple interpretations—as is evidenced by the briefing in this case and others, and courts across the country have debated the meaning and application of terms within the statute including "postsecondary education benefit," "residence," "unless," "eligible," "payments or assistance," "appropriated funds," "similar," and "preferential." *See* Dkt 52 at 36-52. The then-Texas Attorney General Greg Abbott advised as much in 2009 when asked by Texas Representative Rob Eissler whether the State of Texas may permit unauthorized aliens to receive the benefit of in-state tuition at Texas state colleges and universities. *See* Tex. Op. Att'y Gen. GA-0732 (2009). Attorney General Abbott had the opportunity to conclude that Section 54.052 was an impermissible granting of in-state tuition preempted by Section 1623. However, after examining the statutory language, Abbott concluded that his office could not predict with certainty whether a federal or state court in Texas would make such a finding. *Id*.

While the lack of precise Congressional language shows no express preemption, Chapter 54 does not run afoul of any potentially implied preemption, but rather constitutes a proper State action providing eligibility for in-state tuition to ***all*** qualifying students. In 2005, the Texas Legislature amended Chapter 54 to extend the 36-month pathway to all U.S. citizens. The Texas Legislative history makes it clear that this amendment was to provide equal opportunity to qualify

for in-state tuition for all students.  "The bill would give U.S. citizens and permanent residents the same opportunity to base residency on three years residence and high school graduation as is now allowed for international students."  *See* H. Research Org., *Bill Analysis*, S.B. 1528, 79 Leg., Reg. Sess., at 3 (Tex. 2005). According to the Higher Education Coordinating Board, Texas law provides equal opportunity for U.S. citizens to qualify for in-state tuition under this provision.

> For example, students born and raised in Texas but whose parents moved out of state before they had enrolled in college were previously classified as nonresidents unless they had enrolled in college prior to their parents' departure.  Additionally, students raised by grandparents or other family members who had never gone to court to acquire legal custody were considered residents of the state in which their parents lived. Current statutes allow students in both cases, and other similar circumstances, to qualify for Texas resident status.

*See* THECB, "Overview: Eligibility for In-State Tuition and State Financial Programs" *available at*   https://reportcenter.highered.texas.gov/reports/data/overview-eligibility-for-in-state-tuition-and-state-financial-programs/.

Section 1623 does not contain language supporting a finding that it preempts Texas higher education law. The states maintain the primary authority and control over their police powers, and education has long been held to be an area belonging to the states.  Congress has not expressly preempted the power of the Texas Legislature to establish the method of determining residency and tuition rates. To do so would be a gross overstep of federal power, and to find such a preemption, the statutory language must be clear and unambiguous.  Further, Texas has adopted a fully compliant tuition scheme that U.S. citizens can qualify for in an equal manner as non-U.S. citizens.  If the Texas Legislature or the Higher Education Coordinating Board wished to change that policy, it has had ample time and opportunity to do so.

**E.  YCT's requested relief asks the Court to take the role of the Texas Legislature.**

YCT argues that UNT's position is "judicial activism" although its position seeks to maintain the status quo and follow well established theories of immunity and federalism.  In contrast, YCT seeks to circumvent the legislative process, disregarding basic principles of federalism and foundational procedural requirements to achieve its policy goals. To provide the relief YCT seeks, the Court must find that a validly enacted Texas law—in existence for more than two decades and never challenged by the federal government—is unconstitutional as it applies to a single YCT member still enrolled at UNT.  Such a finding would be an expansion of judicial power across multiple legal doctrines.

First, it is this Court's obligation to "ensure that the doctrine of sovereign immunity remains meaningful," in addition to maintaining fidelity to Article III's case-or-controversy limitations. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997). Here, YCT targets Smatresk and Goodman for an injunction seeking to change how tuition is calculated in the State of Texas, under state law. But the challenged law gives Smatresk and Goodman no authority to enforce how tuition is calculated—they have no role in calculating tuition at all. "It is not hyperbole to say that a court's well-intended effort to 'help' the Legislature or 'do justice' by rewriting a statute in a given case threatens the very foundation on which our liberty rests." *City of San Antonio v. Tenorio*, 543 S.W.3d 772, 787 (Tex. 2018) (Boyd, J. dissenting). Thus, "[t]o interpret Young to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Idaho*, 521 U.S. at 270. "Application of the *Young* exception must reflect a proper understanding of its role in our federal

system and respect for state courts instead of a reflexive reliance on an obvious fiction." *Id.* (citing *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 114 n.25 (1984) (explaining that the limitation in *Edelman v. Jordan*, 415 U.S. 651 (1974), of *Young* to prospective relief represented a refusal to apply the fiction in every conceivable circumstance)). YCT's pivot to *Ex parte Young* after failing to plead the doctrine and failing to argue the doctrine in its motion for summary judgment shows the "reflexive reliance on an obvious fiction" of which this court should be aware. *Idaho*, 521 U.S. at 270.

Second, expanding the *Ex parte Young* cause of action—which the Supreme Court has made clear is an extraordinary remedy only to be applied in extreme circumstances—to include any state official that merely collects a fee as a result of a state statute would mark a significant expansion of the doctrine. As the Court observed in *Young*:

> That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

*Young*, 209 U.S. at 157 (quotations omitted).

Finally, the public-school finance cases on which YCT relies undercut, rather than support, its point. In those cases, the plaintiffs named the correct defendants—state agencies and the directors of those state agencies who could be enjoined from enforcing unconstitutional policies statewide—not administrators at local schools. YCT's request for an injunction against UNT officials is simply "not *Ex parte Young*'s style," as Justice Barrett recently put it,[4] because even if there is a putative plaintiff with requisite standing to sue, the injunction would run only against

---

[4] *Whole Woman's Health v. Jackson*, No. 21-463 Oral Argument (Nov. 1, 2021) at 87-88 *available at* https://s3.documentcloud.org/documents/21096621/whole-womans-health-v-jackson.pdf

one Defendant—UNT. There are numerous university systems and public and private institutions of higher education in Texas, not to mention community and junior colleges. Under YCT's proposed approach, lawsuits would have to be filed against each and every institution of higher education in Texas, in different and dramatically varying jurisdictional personalities, likely resulting in disparate outcomes in each case, based on the individual facts presented by YCT or a similarly situated organization. This approach would result in a patchwork of tuition rates across the state, upending the state's higher education finance regime. Such an outcome is inconsistent with the stated goals of *Young* and the principles of comity within our system of government.

For all of the reasons stated throughout the course of this litigation, this court is not the appropriate venue for Plaintiff's advocacy—advocacy which includes failed attempts to lobby the Texas Legislature to repeal the offending provisions for nearly a decade. While YCT might be understandably "disappointed" in these stalled efforts, their appropriate remedy continues to lie "in the Legislature and thus in the privilege and duty that all Texans have to elect the legislators who will implement the policy choices they desire.'" *Morath v. The Texas Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 895 (Tex. 2016) (Boyd, J. concurring). But honoring the federalism and separation-of-powers principles undergirding our constitutional democracy does not leave YCT without a federal remedy; as the Supreme Court noted in *Armstrong*: "Their relief must be sought initially through the Secretary rather than through the courts. . . . We doubt that the Secretary's notice to a State that its compensation scheme is inadequate will be ignored." *Armstrong*, 575 U.S. 320, 331 (2015).

**F. Conclusion.**

YCT cannot simply hand-wave aside foundational requirements of standing, immunity, and pleading a cause of action by insisting that a constitutional violation exists, and therefore, the

Court must act. *That*—not UNT's insistence on compliance with the Federal Rules or urging that YCT prove standing and a waiver of immunity—is a call for judicial activism.  The Texas higher education tuition scheme, as adopted by the Texas Legislature and implemented by the Higher Education Coordinating Board, provides equal opportunity for all students to qualify for in-state tuition in the same manner, and nothing in federal law preempts this valid exercise of Texas' power to oversee its educational system.  To find otherwise would create a system where federal judges are dictating policy to the states without a constitutional basis.

Date: February 15, 2022

Respectfully submitted,

By: */s/ Andy Taylor*
Andy Taylor
**ANDY TAYLOR & ASSOCIATES, P.C.**
Designated Lead Counsel
State Bar No. 19727600
ataylor@andytaylorlaw.com
2628 Highway 36 South #288
Brenham, Texas 77833
(713) 222-1817 – telephone
(713) 222-1855 – facsimile

-and-

**HUSCH BLACKWELL LLP**

By: */s/ Sandy Hellums-Gomez*
Sandy Hellums-Gomez
State Bar No. 2403670
Sandy.Gomez@HuschBlackwell.com
Jeff Nobles
State Bar No. 15053050
Jeff.Nobles@HuschBlackwell.com
600 Travis Street, Suite 2350

Houston, Texas 77002
(713) 647-6800 – main telephone
(713) 647-6884 – general facsimile

-and-

Scott Schneider
State Bar No. 24054023
Scott.Schneider@HuschBlackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 – main telephone
(512) 479-1101 – general facsimile

**ATTORNEYS FOR THE DEFENDANTS UNIVERSITY OF NORTH TEXAS, THE UNIVERSITY OF NORTH TEXAS SYSTEM, NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS, AND SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS**

## CERTIFICATE OF SERVICE

I certify that a copy of this motion has been served upon the following on this the 15th day of February 2022:

Robert Henneke
rhenneke@texaspolicy.com
Chance Weldon
cweldon@texaspolicy.com
Joseph Aaron Barnes, Sr.
abarnes@texaspolicy.com
Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701

*Attorneys for Plaintiff*

By: */s/ Sandy Hellums-Gomez*
Sandy Hellums-Gomez