IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION §<br>§<br>*Plaintiff*, §<br>§<br>v. §<br>§<br>THE UNIVERSITY OF NORTH TEXAS, THE §<br>UNIVERSITY OF NORTH TEXAS SYSTEM, §<br>NEAL SMATRESK, PRESIDENT OF THE §<br>UNIVERSITY OF NORTH TEXAS and §<br>SHANNON GOODMAN, VICE PRESIDENT §<br>FOR ENROLLMENT OF THE UNIVERSITY §<br>OF NORTH TEXAS; §<br>*Defendants*. § | CIVIL ACTION NO. 4:20-CV-973<br>JUDGE SEAN D. JORDAN |

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE SEAN D. JORDAN:

Plaintiff, the Young Conservatives of Texas Foundation ("YCT") files this Sur-reply in opposition to Defendants' (hereafter "UNT") Cross-Motion for Summary Judgment.

**INTRODUCTION**

After over a year of litigation and multiple rounds of briefing, the relevant facts and law are clear: (1) Section 54.051(d) is preempted by federal law and thus unconstitutional; (2) the defendants apply Section 54.051(d) at UNT in direct violation of federal law; and (3) YCT's members are directly injured by these unlawful actions. Injunctive relief is therefore proper, and this Court should grant summary judgment in favor of YCT.

UNT does not present any evidence that would create a question of fact on these issues. Indeed, UNT does not present any evidence at all. Instead, it tries to create ambiguity by unnaturally parsing words in declarations, ignoring inconvenient evidence, and raising

unsupported hypothetical situations not present anywhere in the record. To the extent it makes legal arguments, its claims are directly refuted by binding Supreme Court precedent. Summary judgment for YCT is therefore proper.

## ARGUMENT

**I.     YCT HAS STANDING TO BRING THESE CLAIMS**

As explained in Dkt #53 at p. 19–23, YCT has standing to bring this lawsuit because, among other things, it has members at UNT injured by Section 54.051(d). This is supported by the uncontested declarations of YCT's chairman and two YCT members at UNT who were forced to pay out-of-state tuition. Dkt #53-2; Dkt #53-3; Dkt #53-4; Dkt #53-6. UNT's reply brief argues that these uncontested declarations are not sufficient for summary judgment. These arguments fail.

**A.     UNT's attempt to create ambiguity in the Dominguez declaration fails**

YCT's chairman, Will Dominguez, testified over a year ago that he oversees the UNT chapter of YCT and that YCT has members at UNT who were injured by Section 54.051(d). Dkt #52-2 at p. 2–3. UNT objects to this characterization of Mr. Dominguez's testimony, but the Declaration speaks for itself. *See, id.*

UNT seeks to create ambiguity by noting that Mr. Dominguez's testimony regarding the application of nonresident tuition to YCT's members at UNT was broken down into two sentences: (1) "YCT's members" pay nonresident tuition, and (2) "YCT's members" are enrolled at UNT. *Id*. According to UNT, this two-sentence approach must mean that the "YCT members" that paid nonresident tuition are not the same "YCT members" that are enrolled at UNT. *Id*.

First, assuming, arguendo, that this hairsplitting makes sense, it would not change the outcome of this case. As explained below, YCT has produced declarations from two student

2

members at UNT who paid out of state tuition. Those declarations alone are sufficient to establish standing.

Second, and more importantly, UNT's attempt to manufacture ambiguity in Mr. Dominguez's declaration fails. The two sentences at issue follow one immediately after the other and use the same term: "YCT's members." Dkt #52-2 at p. 2–3. Typically, when a term is used in the same document it should be given the same meaning in both instances. *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J. concurring). The rule is not absolute, but a court should not give a word varied meanings in the same document "unless the context force that construction on us." *Cherokee Nation v. Georgia*, 30 U.S. 1, 19-20 (1831); *see also United States v. Bittner*, No. 20-40597, 2021 U.S. App. LEXIS 35341, at *20 (5th Cir. Nov. 30, 2021) (the presumption of consistent usage should only yield when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the Act with different intent.")

Here, both text and context squarely favor reading the term, "YCT's members" to refer to the same students in both sentences. The sentences at issue are not merely in the same document, one sentence literally follows the other. Moreover, there is no dispute that Mr. Dominguez's declaration was drafted for the purpose of establishing that YCT has members at UNT injured by the challenged law. Given this context, it would be unreasonable to read the declaration in the unnatural way that UNT suggests.

However, to the extent that inartful drafting created any ambiguity as to whether the "YCT members" Mr. Dominguez referred to were at UNT, that ambiguity is resolved by several of Mr. Dominguez's sworn responses to UNT's discovery. For example, in response to an interrogatory asking that he "explain the basis for calculating any and all economic injuries allegedly suffered

*by YCT members*," Mr. Dominguez swore that the "cost of attendance for resident students *at UNT* is lower than that for non-resident students [and] *YCT has members* that are united states citizens forced to pay non-resident tuition." Dkt #52-1 at p. 5 (emphasis added). In response to a similar interrogatory about how *YCT's members* were injured by UNT's application of Section 54.051(d), he responded that "requiring *YCT's members* to pay nonresident tuition under Section 54.051(d) is unconstitutional." *Id*. at p. 5–6. And in response to an interrogatory asking how an injunction "*against the UNT Defendants* would redress the alleged harm caused by application of Texas Education Code § 54.051(d) to *YCT's members,"* he swore that it would do so by "prevent[ing] *UNT* from unlawfully assessing tuition and fees against *YCT's members* in violation of the Constitution." *Id*. at p.6 (emphasis added). None of those statements make any sense unless the *YCT members* he is referring to are *at UNT*. UNT's attempt to create ambiguity in the Dominguez declaration therefore fails.

### B. YCT's production of two student declarations is sufficient to establish standing

Assuming *arguendo* that Mr. Dominguez's declaration and sworn interrogatory responses are not sufficient to establish that YCT members at UNT paid nonresident tuition, YCT has provided additional declarations from not one, *but two*, YCT members at UNT. UNT raises three arguments that these declarations are insufficient for standing purposes, but each of those arguments fail.

First, UNT objects that "[n]either affidavit includes any information regarding whether the two proffered students were enrolled in the fall semester of 2020 when YCT filed this lawsuit." Dkt #58, p. 3. But this is false. The first student declaration was signed and notarized on November 6, 2020—five days before YCT filed this lawsuit. Dkt #53-3, p. 4.

4



That declaration confirms that the student "paid nonresident tuition for [his] most recent semester…[and] anticipate[d] paying nonresident tuition during future semesters." *Id*. at p. 3. That is enough to establish standing at the time the lawsuit was filed.

Second, UNT objects that "neither affidavit provides any information as to whether either student received scholarships, grants, or other tuition offsets for that semester." Dkt #58, p. 3. But that gets the burden on summary judgment precisely backwards. YCT produced sworn declarations that each student: (1) was not "legally exempt from the requirement to pay nonresident tuition"; (2) "paid nonresident tuition"; and (3) that the payment of nonresident tuition "harm[ed] [them] financially." Dkt #53-3; 53-4. If UNT contends that YCT's members were instead secretly eligible for some benefit that fully resolved their injuries—they were not—then the burden is on UNT to produce concrete evidence to that effect. A litigant opposing summary judgment "may not rest upon conclusory allegations or denials" but instead "must present affirmative evidence" contradicting the movant's theory of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986).

Third, UNT objects that one of YCT's student declarants is no longer a student at UNT because she was dropped from classes after this semester began because she was unable to make the installment payments on her unconstitutionally high tuition. Dkt #58, p. 3. UNT claims that

5

this significant injury to a YCT member somehow eliminates, rather than bolsters standing. *Id*. at p. 3-4. But being dropped from classes because you cannot pay unconstitutionally high tuition is just as much of an injury as paying the tuition itself. *See Tatro v. Texas*, 625 F.2d 557, 564 (5th Cir. 1980) ("exclusion of plaintiff from the University's programs" constituted irreparable harm for which a TRO was granted); *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) (exclusion from school was irreparable harm). Moreover, it is undisputed that the thing preventing her from being a student at UNT right now is UNT's unlawfully high tuition. Dkt #57 (noting that but for the unlawfully high tuition she would have been able to afford tuition). A ruling from this Court removing that obstacle would provide redress for those injuries.

### C. YCT's members support this lawsuit

Finally, UNT argues that YCT lacks standing because it has failed to produce sufficient "evidence that the UNT Chapter consented to or endorsed this litigation purportedly on its members' behalf." Dkt #58, p. 4. But there is no dispute that YCT's leadership has chosen to pursue this litigation and that multiple YCT members at UNT have chosen to participate. YCT is not required to show that *every member* of its UNT chapter approves of this litigation in order to establish associational standing. *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996). Indeed, the support "of only a few members" is sufficient, even if other members are opposed. *Id*. Having met that burden, no further showing is necessary.

Moreover, UNT does not present evidence that *a single YCT member* opposes this litigation. Indeed, it does not even claim that such a member exists. If YCT's "members felt their interests were not being served by this suit, they could vote to end the Association's involvement." *Playboy Enters. v. Pub. Serv. Comm'n*, 906 F.2d 25, 35 (1st Cir. 1990). In the absence of such

6

action, UNT has no basis to claim that YCT's membership is not on board. *Id*. UNT's hypothetical what-ifs are not sufficient to defeat a summary judgment. *Anderson*, 477 U.S. at 257.

## II. DEFENDANTS ARE NOT ENTITLED TO SOVEREIGN IMMUNITY

UNT next wrongly claims that both the Entity Defendants (UNT and the UNT System) and the Named Defendants (Smatresk and Goodman) are protected from this lawsuit by sovereign immunity. These arguments fail.

### A. The UDJA waives immunity for the Entity Defendants

"[F]or claims challenging the validity of statutes, the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity." *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 76 (Tex. 2015) (cleaned up). Here, YCT challenged the validity of a statute, Section 54.051(d). UNT admits that the Entity Defendants are specifically tasked by law to collect the tuition mandated by Section 54.051(d). Dkt #52 at p. 38 (admitting that the law tasks UNT with collection). The Entity Defendants are therefore "relevant government entities" and the UDJA waives sovereign immunity. *Patel*, 469 S.W.3d at 76.

UNT's sole objection is that the UDJA's waiver of immunity only applies to municipalities. Dkt #58, p. 6. But the Texas Supreme Court considered and rejected that exact argument. *Tex. Lottery Comm'n v. First State Bank of Dequeen*, 325 S.W.3d 628, 634 (Tex. 2010) ("we disagree that the [U]DJA only waives the immunity of municipalities."). Subsequent cases have been in accord. *See, e.g.*, *Patel*, 469 S.W.3d at 76 (relying on *Tex. Lottery Comm'n* to hold that the UDJA waived sovereign immunity for challenges to statutes). UNT's claim that the immunity waiver of the UDJA is limited to municipalities or municipal ordinances is therefore precluded by binding precedent.

7

### B. Smatresk and Goodman are proper defendants under *Ex parte Young*

As explained in prior briefing, defendants Smatresk and Goodman are not immune because they are proper parties for injunctive relief under *Ex parte Young*, 209 U.S. 123, 157 (1908). In *Ex parte Young*, the Supreme Court held that a state official may be joined as a defendant to a suit to restrain the application of an allegedly unconstitutional statute if that official "by virtue of his office has *some connection* with the enforcement of the act." *Id.* (emphasis added). Here, YCT challenges the constitutional validity of applying the higher tuition rates mandated under Section 54.051(d) to YCT members at UNT. Accordingly, the only question under *Ex parte Young* is whether the named defendants have "some connection" to the application of the unlawful tuition rates mandated by Section 54.051(d). They do.

UNT concedes that state law specifically tasks defendants Smatresk and Goodman with collecting tuition in accord with Section 54.051(d). Dkt #58, p. 6, 8, 9. And UNT does not dispute that both Smatresk and Goodman require that their subordinates comply with Section 54.051(d) while collecting tuition and that both Smatresk and Goodman can take action against those subordinates if they fail to do so. Dkt #53-5 at p. 6, 7–8. In other words, UNT admits that the named defendants and their subordinates are effectively the boots on the ground causing direct injury to YCT members by charging and collecting unlawful tuition at the rates mandated by Section 54.051(d). Those concessions, standing alone, are sufficient to make Smatresk and Goodman proper parties for injunctive relief under *Ex parte Young*. *See Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) (officials were proper defendants under *Ex parte Young* where the performance of their duties applying a law "were the immediate causes" of the plaintiff's injuries.)

UNT's sole objection in its reply is that neither UNT, Smatresk, or Goodman *calculate* the rate under Section 54.051(d). Dkt #58 at p. 7. That responsibility belongs to the state coordinating

board. *Id*. But as explained in Dkt #53 at p. 36–37, the same was true in *Ex parte Young*. The rate challenged in that case was set by "Railroad and Warehouse Commission." *Ex parte Young*, 209 U.S. at 142. Nonetheless, the attorney general was an appropriate party for injunctive relief because, like the defendants here, he had authority to ensure that the rates were followed. *Id*. at 160, 161.

UNT argues that *Ex parte Young* is different because the attorney general in that case had enforcement discretion, whereas here the defendants have a clear statutory duty to enforce the law. Dkt #58 at p. 8. But that distinction cuts precisely the opposite way. The fact that the attorney general had discretion was part of what made *Ex parte Young* a difficult case. It is a general rule that federal courts *may not* enjoin actions within "the exercise of the discretion of an officer." *Ex parte Young*, 209 U.S. at 158. *Ex parte Young* created an exception to that rule in constitutional cases because, as the court explained, state officials do not have discretion to violate the Constitution. *Id.*

By contrast, "[C]ourts often have allowed suits to enjoin the performance of ministerial duties in connection with allegedly unconstitutional laws." *Finberg*, 634 F.2d at 54 (citing *Powell v. McCormack*, 395 U.S. 486, 494 (1969)). Indeed, as early as 1824, the Court noted that any argument that the mandatory nature of an allegedly unconstitutional state law granted officers enforcing it immunity from injunctions was too outrageous to be considered: "The counsel for the appellants are too intelligent, and have too much self respect, to pretend, that a void act can afford any protection to the officers who execute it." *Osborn v. President, Dirs. & Co. of Bank*, 22 U.S. (9 Wheat.) 738, 868 (1824); *see also*, *Poindexter v. Greenhow*, 114 U.S. 270, 288 (1885) (state official enforcing mandatory law was not immune from suit merely because the state law did not grant him discretion).

This makes sense. Courts enjoin people, not laws. If the mandatory nature of a challenged law granted the officials tasked with its enforcement immunity from injunctions, injunctive relief would be impossible in most cases, as there would be no one to enjoin. Indeed, the problem is particularly acute here. Under UNT's view, the mandatory nature of Section 54.051(d) would render it unchallengeable—not just in a suit against UNT, but against anyone. Even the state coordinating board—who UNT repeatedly implies is the proper defendant in this case—would be wholly immune because it too lacks discretion to depart from the formula mandated by Section 54.051(d).

Thankfully, this is not the law. UNT's application of the rate mandated by Section 54.051(d) is what injures YCT's members. Enjoining UNT's officials from applying that rate to YCT members will therefore redress YCT's injuries. That makes UNT's officials proper defendants under *Ex parte Young*. *Finberg*, 634 F.2d at 54.

### III.  SECTION 1623 PREEMPTS TEXAS'S OUT-OF-STATE TUITION SCHEME

As explained in prior briefing, the preemption issue in this case is straightforward. Section 1623 forbids states from simultaneously: (1) allowing unlawfully present aliens to pay in-state tuition; while (2) denying in-state tuition to United States citizens on the basis of residence. In direct contradiction to this command, Texas law simultaneously: (1) makes unlawfully present aliens eligible for in-state tuition; and (2) denies in-state tuition to United States citizens on the basis of residence. That means that Texas law is preempted. Whether this Court determines that this is "express preemption" (because it is clearly mandated by the text), or "implied preemption" (because it's impossible to comply with both laws at the same time), does not affect the result. *See*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ("[T]he categories of preemption are not rigidly distinct.") (cleaned up); Dkt #5 at p. 5–6 (noting that any theory would apply); Dkt

#53 at p. 19 n. 4 (noting that many of the arguments regarding implied preemption are subsumed in the arguments involving express preemption).

In an attempt to avoid this outcome, UNT now claims that basically every word in Section 1623 is ambiguous. Dkt #58 at p. 11. According to UNT "postsecondary education benefit," "residence," "unless," "eligible," "payments or assistance," "appropriated funds," "similar," and "preferential" are all hopelessly indeterminate terms. *Id.* But half of these terms are found nowhere in Section 1623. And even if they were, "simply calling something ambiguous does not make it so." *Duncan v. Muzyn*, 885 F.3d 422 (6th Cir. 2018).

As this Court recognized, Section 1623 "sets forth a simple rule: If a university provides an educational benefit based on residence to an alien who lacks lawful immigration status, then that university must provide the same benefit to a United States citizen regardless of the citizen's residency." Dkt #34 at p.18. Every court to look at the issue has had no difficulty concluding that this simple rule applies to eligibility for in-state tuition. *Equal Access Educ. v. Merten*., 305 F. Supp. 2d 585, 606 (E.D. Va. Feb. 24, 2004) ("[A]liens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit."); *State ex rel. Brnovich v. Maricopa Cty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 541 (Ariz. 2018) ("Federal law generally bars granting in-state tuition to students based on state residency when they are not lawfully present in the United States *See* 8 U.S.C. § 1623(a)."); *Martinez v. Regents of University of California*, 241 P.3d 855, 862–63 (CA 2010) (referring to in-state tuition as a postsecondary education benefit under Section 1623). The statute is not ambiguous.

Despite this significant case law to contrary, UNT claims that a 2009 Texas Attorney General opinion confirms the ambiguity of Section 1623. Dkt #58 at p. 11. But the AG's opinion did not claim that Section 1623 was ambiguous. To the contrary, it made a fairly strong argument

that Section 1623 preempted Texas law, noted that a federal court could reach that conclusion, and presented no argument whatsoever for any other outcome. Tex. Op. Att'y Gen. GA-0732, at p. 2-4 (2009). The attorney general merely concluded that "due to the paucity of judicial precedent, we cannot predict *with certainty* that a court would so find." *Id*. at 4 (emphasis added) That is hardly a ringing endorsement for hopeless ambiguity.

At the end of the day, UNT is left to contend that merely because the parties' proffer competing interpretations of Section 1623, the text is ambiguous by definition. Dkt #58 at p. 11. But the only competing interpretation of Section 1623 that UNT offers fails a plain-text reading of the statute. UNT argues that Section 1623 only requires "that U.S. citizens can qualify for [in-state tuition] in an equal manner as non-U.S. citizens." But as YCT has previously explained, in circumstances where an unlawfully present alien is eligible for benefits on the basis of residency, Section 1623 plainly requires *preferential treatment* for United States citizens—namely, that United States citizens be granted the same benefit given to the unlawfully present alien on the basis of residency, "without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623 (emphasis added). That UNT has offered a plainly invalid reading of Section 1623 as an alleged alternative does not render the statute ambiguous. Indeed, "[i]f that is all it takes to make something ambiguous, everything is ambiguous." *King v. Burwell*, 576 U.S. 473, 510 (2015) (Scalia, J., dissenting).

Faced with this, UNT points to *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366 (5th Cir. 2005) for the proposition that close cases should go to the state. But that case is inapposite. *White Buffalo* involved a unique scenario where the University in question was covered by two conflicting federal provisions within the CAN-SPAM Act, 15 U.S.C. §§ 7701–7713. Section 7707(c) permitted internet service providers (which included the University) to use

12

protection measures to block email spam. Another provision, section 7707(b)(1), prevented state entities (which included the University) from blocking emails that were not false or fraudulent. Faced with this unique scenario, the court deferred to the state. That is not remotely the case here. UNT does not argue that a competing federal law mandates that it do something different than what Section 1623 commands. Instead, UNT is clearly covered by Section 1623 and is clearly acting contrary to the plain language of the statute. *White Buffalo* is irrelevant.

**IV.  APPLYING THE LAW IN THIS CASE DOES NOT ENLARGE THE SCOPE OF JUDICIAL POWER OR DIMINISH THE IMPORTANCE OF FEDERALISM**

Finally, UNT accuses YCT of asking this Court to weaken sovereign immunity, expand the judicial role, undercut the principles of Federalism, and improperly create a patchwork of tuition laws across the state. Dkt #58, p. 13-16. But YCT seeks only to enjoin state officials from applying an unlawful statute to its members. Courts have been doing that for hundreds of years.

In seeking the narrow relief requested, YCT is not asking that this Court weaken sovereign immunity. It is asking that this Court apply binding precedent regarding *Ex parte Young* and the UDJA. It is not seeking to expand the judicial role. It is merely asking that this Court exercise its well-established duty when two laws conflict to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). It is not seeking to undercut federalism. Rather, this lawsuit seeks to apply federalism, rightly understood, by enforcing the Supremacy Clause on an issue of federal concern. *Arizona v. United States*, 567 U.S. 387, 398-99 (2012).

Finally, YCT is not seeking to create a patchwork of tuition laws. It seeks an injunction against the limited set of state officials that are currently injuring its members at UNT. The fact that other officials at other universities could *technically* ignore this Court's ruling, potentially prompting other lawsuits by other parties, is immaterial.

In *Wooley v. Maynard*, 430 U.S. 705 (1977), the plaintiff sought to enjoin the application of a state law that forbid him from covering the "Live Free or Die" motto on his license plate. Tellingly, he did not sue the state as a whole, the governor, or the legislative body that passed the statute. Instead, he properly sued his local chief of police who had previously applied the statute to him and had authority to do so in the future. The Court granted declaratory and injunctive relief against the police chief because it found the state law unconstitutional.

In the technical sense that UNT proposes, such a ruling created a "patchwork" of license plate laws. The injunction itself ran only against a single chief of police in one town. Thus, according to UNT's theory, other individuals seeking to cover their license plates would have to file their own lawsuits to get the same relief, thus potentially resulting in "disparate outcomes in each case, based on the individual facts presented." Dkt #58, p. 15. But that was not a reason for the Court not to grant injunctive relief against a party properly before it. It is merely the natural consequence of a proper application of Article III.

Article III often limits this Court's relief to the parties in the case. Thus, as in nearly every case, the injunction will technically only run against UNT because UNT was the proper defendant in this case. To be sure, that means that officials at the University of Texas, or Texas A&M could (technically, if not wisely) choose to ignore this Court's order, prompting more lawsuits. But that is true in every case. As noted above, Courts enjoin people, not laws. And YCT was bound to sue only the people that injured its members—in this case, the officials at UNT.

## CONCLUSION

For the forgoing reasons, UNT's cross motion for summary judgment should be denied in full, and YCT's motion for summary judgment should be granted.

Respectfully submitted,

*/s/Chance Weldon*
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHRISTIAN TOWNSEND
Texas Bar No. 24127538
ctownsend@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:   (512) 472-2700
Facsimile:   (512) 472-2728

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document was electronically filed on February 22, 2022, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                                       */s/Chance Weldon*
                                       CHANCE WELDON