UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| YOUNG CONSERVATIVES OF | § | |
| TEXAS FOUNDATION | § | |
| | § | |
| v. | § | CIVIL NO. 4:20-CV-973-SDJ |
| | § | |
| THE UNIVERSITY OF NORTH | § | |
| TEXAS, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

A Texas statute provides that United States citizens who do not meet state residency requirements must pay a higher rate of college tuition than aliens not lawfully present in the country who satisfy such state residency requirements. The question before the Court is whether the Texas statute is preempted by federal law mandating that, if a university provides an educational benefit based on residence to an alien who lacks lawful immigration status, then that university must provide the same benefit to a United States citizen regardless of the citizen's residency. The answer is yes, the Texas statute is preempted.

Plaintiff Young Conservatives of Texas Foundation ("Young Conservatives") seeks declaratory and injunctive relief, claiming that the application of a certain provision of the Texas Education Code violates federal law. The suit is against the University of North Texas; the University of North Texas System; Neal Smatresk, in his official capacity as the University's president; and Shannon Goodman, in his official capacity as the University's Vice President for Enrollment (collectively, "UNT"). Both sides have moved for summary judgment.

1

The federal law at issue sets forth a straightforward rule: an alien unlawfully present in this country shall not be eligible based on residence within a State for any postsecondary education benefit unless a citizen of this country is eligible for that benefit regardless of whether the citizen is such a resident. 8 U.S.C. § 1623(a). Meanwhile, Texas law makes unlawfully present aliens who meet certain residency requirements eligible for in-state tuition while denying that benefit to United States citizens who do not meet those residency requirements and requiring such citizens to pay higher tuition rates. TEX. EDUC. CODE §§ 54.051(c), 54.051(d), 54.052. Because Texas's nonresident tuition scheme directly conflicts with Congress's express prohibition on providing eligibility for postsecondary education benefits, it is preempted and therefore unconstitutional under the Supremacy Clause.

For that reason, and those that follow, Young Conservatives is entitled to summary judgment on its preemption claim against Smatresk and Goodman, the university officials. But due to the nature of the cause of action that Young Conservatives relies on—the equitable *Ex parte Young* action—its preemption claim against the University of North Texas and the University of North Texas System fails as a matter of law. Accordingly, Young Conservatives' summary-judgment motion, (Dkt. #6), is **GRANTED in part** and **DENIED in part**, and UNT's cross-motion for summary judgment, (Dkt. #52), is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

The material facts, as opposed to the legal conclusions to draw from those facts, are undisputed. Taken together, Sections 54.051 and 54.052 of the Texas Education

Code permit persons who meet certain residency requirements and are enrolled in a state-operated institution of higher education to qualify as Texas "residents" for the purpose of receiving in-state tuition rates. TEX. EDUC. CODE §§ 54.051(c), 54.052. Anyone who fails to meet those residency requirements is not entitled to receive in-state tuition—regardless of whether that person is a United States citizen—and must pay higher tuition rates. *Id.* §§ 54.051(d), 54.052. This statutory scheme makes aliens who are unlawfully in the country eligible for in-state tuition rates while some United States citizens from States other than Texas are not.

Enter Section 1623(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), a federal statute. Section 1623(a) provides that

> an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).

Asserting that these state and federal statutes conflict with one another, Young Conservatives sued UNT on behalf of certain of its members, each of whom is a United States citizen from a state other than Texas and is, or was, a student at the University. Young Conservatives has moved for summary judgment, (Dkt. #6), asserting that it has established as a matter of law that Section 1623(a) of IIRIRA preempts Section 54.051(d) of the Texas Education Code. For a remedy, Young Conservatives seeks a permanent injunction prohibiting the UNT officials from applying the tuition rates set forth in Section 54.051(d) at the University.

3

UNT has responded and filed a cross-motion for summary judgment. (Dkt. #52). It argues that Young Conservatives has failed to establish standing to pursue its claim on behalf of its members and has not sued the proper parties under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). UNT also contends that the Court should not read IIRIRA to preempt the challenged state law and that Young Conservatives has failed to show that a permanent injunction is warranted. On these grounds, UNT urges the Court to grant summary judgment in its favor and deny Young Conservatives' claims.

## II. Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under

the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 476 (citing *Anderson*, 477 U.S. at 248).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### III. DISCUSSION

Young Conservatives argues that Section 54.051(d) of the Texas Education Code is preempted by Section 1623(a) of IIRIRA and is therefore unenforceable under the Constitution. To remedy the asserted violation, Young Conservatives' summary-judgment motion requests that the Court enter a permanent injunction prohibiting the application of Section 54.051(d) to United States citizens who attend UNT.

A party seeking a permanent injunction must establish "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury;

(3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). But in an express preemption case, a finding of success on the merits "carries with it a determination that the other three requirements have been satisfied." *Id.* (quotation omitted). Because the plain text of the relevant statutes confirms that IIRIRA preempts Section 54.051(d), and because the other requirements for injunctive relief have been met, the Court will grant injunctive relief.

## A. Standing

At the outset, UNT contends that Young Conservatives has not established standing to support its summary-judgment motion.[1] This argument fails.

---

[1] UNT argues that some of Young Conservatives' summary-judgment evidence is not properly before the Court. First, UNT objects to the admissibility of paragraphs 8–12 of the declaration of William Dominguez, which describe Young Conservatives' core purpose of advancing conservative values and give examples of the organization's stances on issues of higher education. (Dkt. #6-1 ¶¶ 8–12). According to UNT, this testimony is inadmissible under Federal Rule of Evidence 602 because the record contains insufficient evidence to support the basis for Dominguez's personal knowledge of these matters. But "[e]vidence to prove personal knowledge may consist of the witness's own testimony." FED. R. EVID. 602. And here, UNT's objection to paragraphs 8–12 of the Dominguez declaration is refuted by the declaration itself. Dominguez attests that he is the state chairman of Young Conservatives and, in that role, oversees all the organization's chapters at universities across Texas. (Dkt. #6-1 ¶¶ 2–3). Because no basis exists in the record to doubt that the state chairman of Young Conservatives has personal knowledge of the organization's mission and advocacy, this objection is overruled.

UNT also objects to paragraphs 5 and 6, as well as exhibits A–L, of the Dominguez declaration. The Court need not address these objections. Young Conservatives has produced a declaration from one of its student members at UNT who, at the time this lawsuit was filed, paid nonresident tuition and anticipated paying nonresident tuition during future semesters. (Dkt. #53-3). This declaration, standing alone, is sufficient to establish that at least one of Young Conservatives' members has standing to challenge Section 54.051(d) as preempted. So the Court need not—and has not—considered paragraph 5, paragraph 6, or exhibits A–L of the Dominguez declaration in rendering its summary-judgment decision.

Constitutional standing, which is a plaintiff's personal stake in the outcome of the case, is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (quotation omitted). For a litigant to have standing, it usually must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (cleaned up). When these requirements are met, the plaintiff may sue on its own behalf. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1992).

An association, like Young Conservatives, may also "have standing to assert the claims of its members even where it has suffered no injury from the challenged activity." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (cleaned up). To establish associational standing, the association must show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

As to the first element, an association may have standing even when only one of its members would have standing. *See Hunt*, 432 U.S. at 342–43 (explaining that

associational standing exists if an association's "members, *or any one of them*, are suffering immediate or threatened injury" (emphasis added)); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–588 & n.5 (5th Cir. 2006) (concluding that the plaintiff had associational standing on behalf of one of its members under *Hunt* and thus declining to address whether the plaintiff could sue on behalf of its other members); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) ("Associational standing may exist even when just one of the association's members would have standing."); *Am. Libr. Ass'n. v. F.C.C.*, 406 F.3d 689, 697 (D.C. Cir. 2005) ("Because only one member of a petitioning organization must have standing in order for the court to have jurisdiction over a petition for review, it is unnecessary for us to consider any of the other grounds offered by petitioners to demonstrate their standing." (citation omitted)). But the association "must set forth by affidavit or other evidence specific facts" of its member's injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation omitted).

Young Conservatives has met that burden. In support of its summary-judgment motion, Young Conservatives submitted a declaration from one of its members who currently is a student at UNT. The member attests that he is "neither a Texas resident nor legally exempt [from] the requirement to pay nonresident tuition." (Dkt. #53-3 ¶ 4); (Dkt. #63 ¶ 4). The declaration also confirms that this member "paid nonresident tuition for [his] most recent semester at UNT and anticipate[d] paying nonresident tuition during future semesters[,]" and that the payment of nonresident tuition "harms [him] financially." (Dkt. #53-3 ¶¶ 4–6);

(Dkt. #63 ¶¶ 4–6). This economic harm is a sufficiently concrete and particularized injury for purposes of establishing standing. *See El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("Economic injury is a quintessential injury upon which to base standing." (cleaned up)).

UNT responds with two arguments, neither of which is persuasive. First, UNT contends that this declaration is insufficient for purposes of standing because it does not establish that the student paid nonresident tuition at the time Young Conservatives filed this lawsuit. Not so. The declaration was signed and notarized on November 6, 2020, (Dkt. #53-3 at 4); (Dkt. #63 at 4), ten days before Young Conservatives filed this lawsuit, (Dkt. #1-4 at 1).

Second, UNT argues that the declaration does not provide any information as to whether this student member "received scholarships, grants, or other tuition offsets for that semester." (Dkt. #58 at 2). But it is not Young Conservatives' burden to provide evidence contradicting its theory of the case. According to the declaration, the requirement that Young Conservatives' member "pay tuition in excess of the rate set for resident students harms [him] financially." (Dkt. #53-3 ¶ 6); (Dkt. #63 ¶ 6). This harm satisfies Article III's injury-in-fact requirement. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (explaining that "the injury in fact requirement under Article III is qualitative, not quantitative, in nature" and that the injury "need not be substantial" or "measure more than an identifiable trifle" (quotation omitted)). Young Conservatives has therefore met its burden to show that

at least one of its members has been injured by Section 54.051(d) and would have standing to bring this suit.[2]

As to the second associational-standing prong, Young Conservatives' state chairman, William Dominguez, testified that the organization's core purpose "is to advance conservative values by educating students and the public, advocating for conservative policies, engaging in campus activism, and publishing ratings of the Texas Legislature." (Dkt. #6-1 ¶ 7). Dominguez also testified that Young Conservatives "has repeatedly taken stands on issues of higher education" and not only advocates for higher education reform statewide but also focuses on "campus specific policies, including those at UNT." (Dkt. #6-1 ¶ 8). And according to Dominguez, Young Conservatives "has repeatedly opposed the disparate treatment of aliens who are not lawfully present in the United States and United States citizens from other states with regard to tuition." (Dkt. #6-1 ¶ 12). This uncontroverted evidence confirms that the interests Young Conservatives seeks to protect through this lawsuit are "germane to the organization's purpose." *See Ass'n of Am. Physicians*, 627 F.3d at 550 (quoting *Hunt*, 432 U.S. at 343). UNT does not argue otherwise. Thus, Young Conservatives has met the second requirement for associational standing.

UNT does, however, contest the third associational-standing prong. To satisfy the third prong, an association must show that "the nature of the case does not

---

[2] UNT asserts that, "without proof of an injury in fact," Young Conservatives has failed to meet the causation and redressability requirements for standing under Article III. *See* (Dkt. #52 at 35–36). Because these arguments rest on the faulty premise that Young Conservatives has not established that Section 54.051(d) has injured any of its members, they are meritless.

require the participation of the individual affected members as plaintiffs to resolve the claims or prayers for relief at issue." *Friends for Am. Free Enter. Ass'n v. Walmart Stores*, 284 F.3d 575, 577–78 (5th Cir. 2002) (quotation omitted). When assessing this prong, which is a prudential—not constitutional—limit on the exercise of federal jurisdiction, courts examine "both the relief requested and the claims asserted." *Ass'n of Am. Physicians*, 627 F.3d at 551.

A party satisfies the third prong if its "claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry." *Id.* at 552. In general, "an association's action for damages running solely to its members would be barred for want of the association's standing to sue." *Id.* at 551 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)). Conversely, requests for declaratory or injunctive relief rarely require individual determinations. *Hunt*, 432 U.S. at 343 (explaining that requests for "a declaration, injunction, or some other form of prospective relief" generally do not require individual determinations because "the remedy, if granted, will inure to the benefit of those members of the association actually injured" (quoting *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

Here, neither Young Conservatives' claim nor its requested relief requires an individualized, fact-intensive inquiry. The preemption question is, at bottom, "one of statutory intent" that turns on "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the

legislative purpose." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed. 2d157 (1992) (quotation omitted). And Young Conservatives seeks only declaratory and injunctive relief. To these ends, Young Conservatives has provided sufficient evidence that enforcement of Section 54.051(d)'s nonresident tuition rate at UNT has injured at least one of its members. *See Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." (quotation omitted)). Thus, further member participation is not necessary. *Hegar*, 10 F.4th at 505.

In sum, Young Conservatives has associational standing to challenge Section 54.051(d) as preempted.

## B. Proper Defendants Under *Ex parte Young*

Having confirmed that Young Conservatives has standing to challenge the constitutionality of Texas Education Code § 54.051(d), the Court next considers UNT's assertion of sovereign immunity. UNT argues that sovereign immunity bars this suit because Young Conservatives has not sued a proper defendant under *Ex parte Young*. Again, UNT is wrong.

### i. The University Officials: Goodman and Smatresk

The equitable cause of action recognized in *Ex parte Young* allows federal courts to grant prospective injunctive relief "against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575

U.S. 320, 326, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015). This longstanding doctrine relies on the legal "fiction" that a court does not violate state sovereignty when it orders a state official to do nothing more than uphold federal law under the Supremacy Clause. *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011). The inquiry does not require an analysis of the merits of the claim. *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 646, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Instead, a court need only ask whether the plaintiff requests relief prospectively requiring state officials to refrain from taking future actions to enforce an unlawful state law. *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 472 (5th Cir. 2020) (en banc).

Here, it is undisputed that Goodman and Smatresk, sued in their official capacities, are state officers for purposes of *Ex parte Young. Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 320–22 (5th Cir. 2008) (concluding that the plaintiff's claim against a public university administrator could proceed under *Ex parte Young*). It is also undisputed that Young Conservatives seeks injunctive relief properly characterized as prospective: a permanent injunction that would prevent UNT officials from enforcing a state law that allegedly runs counter to federal law. *See Armstrong*, 575 U.S. at 326 (explaining that when "an individual claims federal law immunizes him from state regulation," *Ex parte Young* allows a court to "issue an injunction upon finding the state regulatory actions preempted"). The question remaining, then, is whether Goodman and Smatresk have a sufficient connection to the enforcement of the challenged law.

Under *Ex parte Young*, the state official, "by virtue of his office," must have "some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." 209 U.S. at 157. The text of the challenged law need not actually state the official's duty to enforce it, but such a statement may make that duty clearer. *Id.* "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant," the *Young* analysis ends. *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019). But where no state official or agency is named in the statute in question, the Court must consider whether the state official actually has the authority to enforce the challenged law. *Id.*

Because "the precise scope of the requirement for a connection" between the challenged conduct and the defendant state officer "has not been defined," a "case-by-case approach" is appropriate. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). But the Fifth Circuit has provided some guiding principles. For one, the plaintiff at least must show that the defendant has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). Enforcement usually means "compulsion or constraint." *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). And a "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" will do. *Id.* (quoting *City of Austin*, 943 F.3d at 1002).

In this case, both Goodman and Smatresk have a sufficient connection to the enforcement of challenged tuition rates prescribed under Section 54.051(d). It is true,

as UNT points out, that neither official calculates the annual nonresident tuition rate applied on its campus. That duty belongs to the Texas Higher Education Coordinating Board (the "Coordinating Board"). TEX. EDUC. CODE § 54.051(d). But the formula for calculating the nonresident rate is set by statute, and the Texas Legislature charges UNT's "governing board" with the application and enforcement of the challenged rates prescribed in Section 54.051(d). Specifically, Section 54.051(b) mandates that the "governing board of each institution of higher education . . . shall cause to be collected from students registering at the institution tuition or registration fees at the rates prescribed in this section." TEX. EDUC. CODE § 54.051(b). And as the undisputed evidence shows, UNT's governing board has delegated its statutory duty to charge and collect nonresident tuition to Smatresk and Goodman.[3]

Goodman is the Vice President for Enrollment of the University of North Texas. (Dkt. #53-5 at 8). In that role, he oversees all departments that handle matters relating to the charging and payment of student tuition at UNT. (Dkt. #53-5 at 9–10, 15–17). The officials Goodman oversees at UNT comply with state law, including Section 54.051(d), when assessing, charging, and collecting tuition. (Dkt. #53-5 at 16–

---

[3] The "governing board," as that term is used in Section 54.051, is defined as "the body charged with policy direction of any public technical institute, public junior college, public senior college or university[.]" TEX. EDUC. CODE § 61.003(9); *accord id.* § 54.001(2). At UNT, authority for policy making "vests in the Board of Regents, chancellor, and the president." *Shared Governance and the Role of Advisory Committees and the Academic Administration*, UNIV. N. TEX. POLICY OFFICE, https://policy.unt.edu/policy/06-047 (last visited Apr. 7, 2022). The "president [i.e., Smatresk] may delegate authority to other members of the university administration as allowed by state law and Regents Rules; however, authority rests only with individuals - who are directly accountable for the decisions they make - and may not rest with a committee." *Id.* Smatresk admits that he is "ultimately accountable for what happens at the University, in most cases." (Dkt. #53-1 at 12). And UNT has delegated authority over tuition matters to Goodman. (Dkt. #53-5 at 9–10).

17, 19–20). If those UNT officials did not comply with state law, including Section 54.051(d)'s requirement of charging a different rate of tuition for resident and nonresident students, Goodman would have authority to take action to correct them. (Dkt. #53-5 at 13, 16–17). And if a student wishes to change their residency determination for purposes of tuition, a committee in one of the departments Goodman oversees would handle that process. (Dkt. #53-5 at 28–29). Thus, Goodman has a "sufficiently close" connection to the challenged enforcement of Section 54.051(d) such that the Court can meaningfully redress Young Conservatives' asserted injuries with an injunction against him. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021).

Smatresk also is a proper defendant under *Ex parte Young*. In his role as the President of the University of North Texas, Smatresk is "ultimately accountable for what happens at the University, in most cases." (Dkt. #53-1 at 12). Smatresk directly oversees Goodman and his departments, which cover all issues relating to the charging and payment of student tuition at UNT. (Dkt. #53-1 at 11). And if Goodman did not comply with state law, including Section 54.051(d), while performing his duties at UNT, Smatresk has authority to take corrective action. (Dkt. #53-1 at 11–12). Smatresk also oversees Clay Simmons, UNT's Chief Compliance Officer, who ensures that the University complies with all applicable state laws. (Dkt. #53-1 at 12). So like Goodman, Smatresk has a "sufficiently close" connection to the challenged enforcement of Section 54.051(d) such that the Court can meaningfully redress Young

Conservatives' asserted injuries with an injunction against him. *See Mack*, 4 F.4th at 312.

UNT's contrary arguments do not hold water. It doggedly insists that Goodman and Smatresk have no role in enforcing the challenged law because they do not calculate the challenged tuition rate. But the same was true in *Ex parte Young* itself, where the plaintiffs challenged the constitutionality of state mandated rates for transporting goods by railroad. 209 U.S. at 129–30. There, like here, the statute at issue tasked a state-created body—the railroad and warehouse commission—with setting the challenged rates. *Id.* at 127. And there, like here, the railroad and warehouse commission fixed the rates, but the statute left the application and enforcement of those rates to others. *Id.* at 127–28. Shareholders of a railroad subject to the challenged rates sued the state attorney general to stop him from enforcing the rates. *Id.* at 129–30. The attorney general neither calculated the rates nor could adjust them, and the rate-setting law contained no special provision making it his duty to enforce it. *Id.* at 154, 160–61. Yet the Supreme Court held that the attorney general was a proper party for injunctive relief because he had authority to ensure compliance with the rate laws and had shown a willingness to exercise that authority through filing an enforcement action. *Id.* at 160–61.

Similarly, Goodman and Smatresk do not calculate the base rate that must be applied for nonresident tuition at UNT. But they do have a statutory duty, acting on UNT's behalf, to ensure compliance with the challenged law by charging and collecting tuition at the rate prescribed in Section 54.051(d). More so than in *Ex parte*

*Young*, then, Goodman and Smatresk have a sufficiently close connection to the enforcement of the challenged law. Indeed, Goodman and Smatresk not only have a particular duty to enforce the challenged law but also have discretion to charge more for nonresident tuition than the base rate set by the Coordinating Board. *See* TEX. EDUC. CODE § 54.0513(a) (providing that, "[i]n addition to amounts" that may be charged under Chapter 54, a university's "governing board, under the terms [it] considers appropriate, may charge any student an amount designated as tuition that [it] considers necessary for the effective operation of the institution").

There also is uncontroverted evidence that Goodman and Smatresk have a demonstrated willingness to exercise their duty to enforce the challenged rates at UNT. As noted above, both officials testified that they require their subordinates to charge and collect tuition at the rates mandated under Section 54.051(d). But there is more. Young Conservatives submitted a declaration from one of its student members whom UNT dropped from her classes earlier this year because she could not afford nonresident tuition.[4] (Dkt. #53-4, #53-6). Had this student not been charged nonresident tuition, she "would have been able to afford tuition" and remained in attendance at UNT. (Dkt. #53-6). Thus, on this record, it strains credulity to suggest that Goodman's and Smatresk's role in charging nonresident tuition to students at UNT lacks the compulsive or constraining quality of enforcement.

---

[4] To be clear, the Court has only considered the former UNT student's declarations, (Dkt. #53-4, #53-6), as evidence of Goodman's and Smatresk's enforcement of Section 54.051(d)'s nonresident tuition rates. The Court has not considered this student's injuries in determining that Young Conservatives' has standing to bring this suit on behalf of its members. As explained above, *see supra* Part III(A), Young Conservatives has established standing on independent grounds.

18

At bottom, Smatresk and Goodman have a particular duty related to 54.051(d) and a willingness to carry out that duty: they charge nonresident tuition in accordance with statutory rates prescribed by Section 54.051(d) and disenroll students who fail to pay tuition at those rates. In other words, Smatresk and Goodman are the boots on the ground at UNT ensuring compliance with Section 54.051(d)'s mandate "by applying its prohibitions." *See K.P.*, 627 F.3d at 125. Because their actions "would, if the rate law was unconstitutional, constitute an actionable wrong" to those students who are required to pay higher tuition under Section 54.051(d), they are proper defendants to this suit under *Ex parte Young*. *See Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) (citing *Young*, 209 U.S. at 153–56).

### ii. The Entity Defendants: The University of North Texas and the University of North Texas System

The entity defendants—the University of North Texas and the University of North Texas System—are a different story. When the entity defendants (and the individual defendants) removed this case, they "voluntarily invoked the jurisdiction of the federal courts and waived [their] immunity from suit in federal court." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005). Thus, UNT's argument that sovereign immunity bars this suit fails.[5]

---

[5] To be sure, "the Constitution permits and protects a state's right to relinquish its immunity from suit while retaining its immunity from liability." *Meyers*, 410 F.3d at 255. So a "state may waive its immunity from suit through removal and simultaneously retain its immunity from liability." *Zeng v. Tex. Tech Univ. Health Sci. Ctr. at El Paso*, 836 F.App'x 203, 207 (5th Cir. 2020) (per curiam). But immunity from suit and immunity from liability are two distinct principles. The former "bars an action against the state unless the state expressly consents to the suit," whereas the latter "protects the state from judgment even if the Legislature has expressly consented to the suit." *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam). Immunity from suit implicates the court's jurisdiction, and

But that doesn't mean the University of North Texas and the University of North Texas System are proper defendants for an equitable *Ex parte Young* action. They are not. One of the "essential ingredients of the *Ex parte Young* doctrine [is] that a suit must be brought against individual persons in their official capacities as agents of the state[.]" *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992); *see also Mack*, 4 F.4th at 312 (explaining that a "claim is cognizable under *Ex parte Young* only if, *inter alia*, (1) the defendant is a state officer . . ."). Because the University of North Texas and the University of North Texas System are entities— not state officials—Young Conservatives cannot rely on the equitable cause of action recognized in *Ex parte Young* for its preemption claim against them. *See Mack*, 4 F.4th at 311 n.3 (noting that *Ex parte Young*'s second holding is relevant to whether a party "has an equitable cause of action" to enjoin unlawful state action). And because Young Conservatives has not identified any other viable cause of action for its preemption claim against these entities,[6] the University of North Texas and the University of North Texas System are entitled to judgment as a matter of law.

waiver of such immunity is a question of federal law. *Meyers*, 410 F.3d at 246–47. By contrast, immunity from liability is not jurisdictional, and state law governs whether it has been waived. *Meyers*, 410 F.3d at 253. Here, UNT has only argued that it is immune from suit, not from liability. *See* (Dkt. #52 at 19, 30); (Dkt. #58 at 5 n.2). In any event, the Court need not decide whether the University of North Texas and the University of North Texas System have immunity from liability in this case because Young Conservatives does not have a cause of action to bring its preemption claim against these entities.

[6] Young Conservatives does not argue that the Supremacy Clause provides a cause of action. (Dkt. #53 at 23). And rightfully so: "the Supremacy Clause . . . certainly does not create a cause of action" either expressly or impliedly. *Armstrong*, 575 U.S. at 324–25. Nor does Young Conservatives attempt to identify a federal statute that supplies a cause of action for its preemption claim. *See* (Dkt. #53 at 23). Instead, Young Conservatives "brings its claim pursuant to *Ex parte Young*[.]" (Dkt. #53 at 23). So at this stage, *Ex parte Young* "is the whole ballgame." *See Green Valley*, 969 F.3d at 471; *see also Young Conservatives of Tex. Found. v.*

## C. Preemption

With the threshold issues resolved,[7] the Court now turns to the heart of this dispute: whether Section 1623(a) of IIRIRA preempts Section 54.051(d) of the Texas Education Code.

The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Accordingly, a state law that conflicts with federal law is without effect. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). A federal law may preempt a state law in three ways: (1) express preemption; (2) conflict preemption; and (3) field preemption. *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500, 504 (5th Cir. 2022). At bottom, preemption is a question of "statutory intent" that turns on "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *See Morales*, 504 U.S. at 383 (quotation omitted).

---

*Univ. of N. Tex.*, 551 F.Supp.3d 717, 721–22 & n.1 (E.D. Tex. 2021) (explaining that neither the Texas Declaratory Judgment Act nor the federal Declaratory Judgment Act supplies a cause of action for Young Conservatives' preemption claim)).

[7] UNT also argues that the complexity of IIRIRA precludes Young Conservatives' *Ex parte Young* action. But unlike the claim at issue in *Armstrong*, Young Conservatives' preemption challenge to Section 54.051(d) does not require application of a "judicially unadministrable" standard. *See* 575 U.S. at 328. Section 1623(a)'s mandate is not "judgment-laden," "broad," or "[un]specific." *See id.* In short, this argument fails for the reasons provided in the Court's prior order denying UNT's motion to dismiss. *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2021 WL 5003274, at *7–9 (E.D. Tex. Oct. 28, 2021).

No one here is arguing about field preemption. Rather, Young Conservatives argues that Section 54.051(d) is expressly preempted by Section 1623(a) and, alternatively, preempted based on the principles of conflict preemption. The Court addresses each theory of preemption in turn.

### i. Express Preemption

Congress has the power to employ "express language" to preempt, "i.e., invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). State law is expressly preempted when Congress "adopts express language defining the existence and scope of pre-emption." *Est. of Miranda*, 23 F.4th at 504 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring)). When the language of a statutory provision expressly preempts state law, a court need not go beyond the language of the statute itself. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125, 136 S.Ct. 1938, 195 L.Ed.2d 298 (2016). In such cases, a court does not "invoke any presumption against pre-emption" but instead focuses on the plain wording of the statute, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011)).

Here, the Court's analysis of express preemption begins and ends with the plain text of the relevant statutes. Congress spoke clearly when it enacted Section 1623(a):

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States *shall* not be eligible on the basis of

> residence within a State . . . for any postsecondary education benefit *unless* a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a) (emphases added). Giving this language a plain and commonsense meaning, the statute sets forth a simple rule: If a State makes an unlawfully present alien eligible for a postsecondary education benefit on the basis of state residency, it must make a United States citizen eligible for the same benefit regardless of whether the citizen is such a resident. It is difficult to imagine a clearer indication of statutory intent to invalidate state laws that deny United States citizens eligibility for a postsecondary education benefit—such as in-state tuition—based on residency if unlawfully present aliens are eligible for that benefit based on residence within the State.

Any doubt that this is what Congress intended vanishes when the language of Section 1623(a) is read with a view to its place in the context of the overall statutory scheme. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) ("To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute."). Under IIRIRA, the general rule is that "an alien" who does not fall within one of three named categories[8] "is not eligible for any State or local public benefit," 8 U.S.C. § 1621(a), including any "postsecondary education" benefit, 8 U.S.C. § 1621(c)(1)(B). But one of the statute's

---

[8] IIRIRA's general rule that "an alien" is ineligible "for any State or local public benefit" does not apply to "(1) a qualified alien (as defined in section 1641 of this title), (2) a nonimmigrant under the Immigration and Nationality Act," or "(3) an alien who is paroled into the United States under section 212(d)(5) of such Act" for less than one year. 8 U.S.C. § 1621(a). None of these categories are at play in this case.

two exceptions is that "[a] State may provide that an alien who is not lawfully present in the United States is eligible" for such benefits, but "only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d).

Now re-enter Section 1623(a), which imposes an additional condition on state laws enacted after August 22, 1996, that provide eligibility for any postsecondary education benefit. *See* 8 U.S.C. § 1623(a). Section 1623(a) does not foreclose States from enacting laws that permit unlawfully present aliens to obtain a postsecondary education benefit, such as in-state tuition, but it does restrict how a State can do so. If a State wishes to extend eligibility for such a benefit to unlawfully present aliens on the basis of residence within the State, its only option is to make United States citizens eligible for such a benefit regardless of whether such citizens are residents of the State. When read in the context of the overall statutory scheme, the scope of Congress's prohibition is clear: Section 1623(a) expressly forbids States from denying United States citizens eligibility for a postsecondary education benefit based on nonresident status if unlawfully present aliens are eligible for that benefit based on residence within the State. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (explaining that the scope of a statute's preemptive effect "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." (quotation omitted)).

For its part, Texas's statutory scheme provides three paths to resident tuition. A student can obtain eligibility by showing that: (1) they established "domicile" in

Texas "not later than one year before the census date of the academic term in which the person is enrolled"; (2) if the student is a dependent, that their parent established "domicile" in Texas "not later than one year before the census date of the academic term in which the person is enrolled"; or (3) if the student graduated from a Texas high school, that they "maintained a residence" in Texas for the "three years preceding the date of graduation" and "the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education." TEX. EDUC. CODE § 54.052(a). Because the statute defines "domicile" as a "permanent residence," all three methods for establishing resident tuition turn on residency within the State. Tex. Educ. Code § 54.0501. Any student who fails to meet these residency requirements is not eligible for in-state tuition—regardless of whether that student is a United States citizen—and must pay higher tuition rates. *Id.* §§ 54.051(d), 54.051(m), 54.052.

When the federal and state statutory regimes are considered in tandem, the preemptive effect of Section 1623(a) on Section 54.051(d) of the Texas Education Code, as applied to United States citizens at UNT who do not qualify for in-state tuition, is apparent. It is undisputed that, under the Texas Education Code, aliens who are not lawfully present in the United States are eligible on the basis of residence in Texas to receive the benefit of in-state tuition. TEX. EDUC. CODE § 54.052(a)(3); (Dkt. #53-1 at 23). At the same time, United States citizens who do not meet those residency requirements are denied eligibility for that benefit and must pay nonresident tuition at the higher rates prescribed by 54.051(d). TEX. EDUC. CODE §§

54.051(d), 54.052; *see also id.* § 54.0501(4) (defining nonresident tuition as "tuition paid by a person who is not a resident of this state and who is not entitled or permitted to pay resident tuition under this subchapter"). When viewed in the context of Chapter 54's overall tuition scheme, Section 54.051(d) falls within the scope of Congress's express displacement of state law under Section 1623(a) and is therefore preempted.

Attempting to head off this conclusion, UNT argues that express preemption cannot exist here because Congress did not explicitly label Section 1623(a) as a preemption provision or include certain language commonly used in express preemption clauses. It is true that most statutes creating express preemption contain an explicit statement to that effect. *See e.g.*, 29 U.S.C. § 1144(a) (providing, in the Employee Retirement Income Security Act, that "the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"); 49 U.S.C. § 41713(b)(1) ("Preemption.—Except as provided in this subsection, a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."). But that is not always the case. *See, e.g., Franklin Cal. Tax-Free Tr.*, 579 U.S. at 123 (characterizing 11 U.S.C. § 903(1), entitled "Reservation of State power to control municipalities," as an "express pre-emption provision").

Congress is not required "to employ a particular linguistic formulation when preempting state law." *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S.Ct. 1190,

26

1199, 197 L.Ed.2d 572 (2017). Nor has the Supreme Court ever "required any particular magic words" in express preemption cases. *Gade*, 505 U.S. at 112 (Kennedy, J., concurring). Rather, courts must determine statutory intent from the language and structure of the statute as a whole. *Ingersoll-Rand Co.*, 498 U.S. at 138. Because UNT's argument "elevates semantics over substance," it fails. *See Nevils*, 137 S.Ct. at 1199. For these reasons, the Court concludes that Section 54.051(d) of the Texas Education Code is expressly preempted by Section 1623(a) of IIRIRA.

### ii. Conflict Preemption

Even if Section 1623(a) did not expressly preempt Section 54.051(d), the state law would still be unconstitutional based on principles of conflict preemption.

Implied preemption analysis begins with the presumption that "Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Conflict preemption exists where "compliance with both state and federal law is impossible" or where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In either scenario, federal law prevails.

Here, an irreconcilable conflict exists between the relevant federal and state laws. Federal law forbids States from simultaneously making unlawfully present aliens eligible on the basis of residence within the State for a postsecondary education benefit while denying that benefit to United States citizens on the basis of residence.

8 U.S.C. § 1623(a). In direct violation of this command, Texas law makes unlawfully present aliens who meet certain residency requirements eligible for in-state tuition (i.e., a postsecondary education benefit) while denying that benefit to United States citizens who are not Texas residents. TEX. EDUC. CODE §§ 54.051(c), 54.051(d), 54.052. For their part, Goodman and Smatresk cannot both "cause to be collected from students" at UNT nonresident tuition at the rates prescribed by 54.051(d), *see* TEX. EDUC. CODE § 54.051(b), and extend the "postsecondary education benefit" of in-state tuition to United States citizens regardless of whether they qualify as Texas residents, *see* 8 U.S.C. § 1623(a). Because it is impossible to harmonize these contradictory statutory provisions, the challenged "state law must give way" to its federal counterpart. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617–18, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011).

UNT raises several objections to this reading of the relevant statutes, none of which is well taken. First, UNT advances the notion that its nonresident tuition scheme does not conflict with Section 1623(a) because only state laws giving unlawfully present aliens preferential treatment over United States citizens are prohibited. This simply reads the words "without regard to whether the citizen or national is such a resident" out of the statute. *See* 8 U.S.C. § 1623(a). It is this Court's duty "to give effect, if possible, to every clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). Had Congress designed Section 1623(a) to preempt state law in such a limited fashion, the

28

statute would have required the States to treat unlawfully present aliens and United States citizens equally. But Section 1623(a) does not merely require equal treatment. Rather, when an unlawfully present alien is eligible for a postsecondary education benefit based on state residency, Section 1623(a) requires preferential treatment for a United States citizen—namely, that the citizen is eligible for the same benefit "*without regard* to whether the citizen . . . is such a resident." 8 U.S.C. § 1623 (emphasis added). For this Court, words mean what they say.

Given the plain text of Section 1623(a), it is hardly surprising that UNT's strained reading of the statute is based on a selective quotation of its title: "limitation on eligibility for *preferential treatment* of aliens." *See* (Dkt. #52 at 45 (quoting 8 U.S.C. § 1623)). Based on this selective quotation, UNT claims that Section 1623(a) merely requires States to make United States citizens eligible for postsecondary education benefits on the same terms as unlawfully present aliens eligible for such benefits based on residence. The problem with this argument is twofold.

First, even if Section 1623's title could reasonably be interpreted as an equal-treatment provision—a faulty premise—it "cannot limit the plain meaning of the text." *See Bhd. of R.R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). A title can aid in resolving an ambiguity in a statute's text, but it cannot create ambiguity where none exists. *Id.* And the text of Section 1623(a), as the Court just explained, contains no ambiguity.

Second, when read in full, the title of Section 1623 does not imply that the statute is an equal-treatment provision. Section 1623's title is not "[l]imitation on

preferential treatment of aliens," as UNT suggests. Rather, the full title is: "Limitation on *eligibility for preferential treatment* of aliens not lawfully present *on basis of residence* for higher education benefits." 8 U.S.C. § 1623 (emphases added). These additional words matter. *See Menasche*, 348 U.S. at 538–39.

It is undisputed that in-state tuition is "preferential treatment" for some students "on the basis of residence." Students at UNT who qualify as Texas residents, for instance, receive preferential treatment in the form of in-state tuition, which generally is cheaper than the tuition paid by their nonresident counterparts for the same education. (Dkt. #53-1 at 23). Accordingly, the reasonable inference to draw from Section 1623's title is that unlawfully present aliens' eligibility for that preferential treatment—in-state tuition—is limited, not that United States citizens and unlawfully present aliens must be treated equally for purposes of establishing residency for such a benefit. To the extent Section 1623's title is useful as an interpretative tool, then, it refutes rather than supports UNT's position.

Next, UNT contends that its nonresident tuition scheme is not preempted by federal law because in-state tuition is not a "postsecondary education benefit" within the meaning of Section 1623(a). The Court disagrees.

Neither Section 1623 nor any other provision in the statute defines postsecondary education benefit. So this term must be understood in its ordinary, everyday meaning unless the statutory context makes apparent that it bears a different meaning. *See Niz-Chavez v. Garland*, 141 S.Ct. 1474, 1480, 209 L.Ed.2d 433 (2021); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF

LEGAL TEXTS 69 (2012). As used in its ordinary sense, a "benefit" is "anything contributing to an improvement in condition; advantage; help," WEBSTER'S NEW WORLD COLLEGE DICTIONARY 129 (3d ed. 1997), or a "[p]ecuniary advantage, profit, gain," *Benefit*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/17694?rskey=rPncTk&result=1#eid (last visited Apr. 7, 2022); *see also Yates v. United States*, 574 U.S. 528, 535 (2015) (referring to ordinary or natural meaning as "its dictionary definition").

In-state tuition meets that definition. Eligibility to pay resident, as opposed to nonresident, tuition contributes to a student's financial condition and often is the quintessential pecuniary advantage of attending a public college or university. At UNT, for example, the difference in the average annual cost of attendance for a student who qualifies as a Texas resident and one who does not is approximately $12,240. *Tuition, Costs & Aid*, UNIV. OF N. TEX., https://admissions.unt.edu/tuition-costs-aid (last visited Apr. 7, 2022). To suggest that in-state tuition is not a benefit, as that word is commonly understood, in the context of higher education is to deny reality. *See Yates*, 574 U.S. at 537 (explaining that "plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole" (cleaned up)). Because UNT fails to offer a "sound reason in the statutory text or context" of the statute as a whole to depart from the ordinary meaning of postsecondary education benefit, the Court need not delve any further. *See FCC v. AT & T Inc.*, 562 U.S. 397, 407, 131 S.Ct. 1177, 179 L.Ed.2d 132 (2011).

UNT's contrary argument is unpersuasive. UNT contends that "postsecondary education benefit" in Section 1623 should have the same meaning as "State or local public benefit" in Section 1621. And Section 1621, UNT says, "modifies the term 'benefit' as being that 'for which payments or assistance are provided to an individual . . . or by appropriated funds of a State or local government.'" (Dkt. #52 at 47 (quoting 8 U.S.C. § 1621)). So, according to UNT, in-state tuition is not a benefit under Section 1623(a) because it is not a cash payment or a direct monetary service that requires expenditure of state funds. This reading is untenable for several reasons.

For one, Section 1621's definition of state or local public benefit is phrased disjunctively. Section 1621, in relevant part, defines "State or local public benefit" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, *or* any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government *or* by appropriated funds of a State or local government." 8 U.S.C. § 1621(c)(1)(B) (emphases added). Because there is an "or" between the phrases "postsecondary education" and "any other similar benefit for which payments or assistance are provided," 8 U.S.C. § 1621(c)(1)(B), it is inconsistent with English usage to read the latter as modifying the former. Rather, when viewed in context, "any other similar benefit for which payments or assistance are provided" is best understood as an alternative, catch-all phrase to the preceding list of enumerated benefits. *See* SCALIA & GARNER, *supra*, at 116 ("Under the conjunctive/disjunctive cannon, *and* combines items while *or* creates alternatives.").

But even if the phrase "payments or assistance" modified "postsecondary education," the statutory text still would not support UNT's interpretation. If Congress had prohibited only direct cash or in-kind payments, it simply would have said "payments." It did not. Instead, Congress prohibited "postsecondary education . . . payments *or* assistance." 8 U.S.C. §1621(c)(1)(B) (emphasis added). Thus, UNT urges the Court to read words ("or assistance") out of the statute. *See Rotkiske v. Klemm*, 140 S.Ct. 355, 360, 205 L.Ed.2d 291 (2019) (instructing courts to presume that Congress "says in a statute what it means and means in a statute what it says there" (citation omitted)). On the other hand, reading postsecondary education benefit to include aid not in the form of direct payments gives meaning to "or assistance," as those words are used in Section 1621(c), and is consistent with Section 1623(a). *See Menasche*, 348 U.S. at 538–39. And in the context of higher education, lower resident tuition rates are the paradigmatic form of such "assistance." Therefore, the statutory context does not provide a "sound reason" to disregard the common meaning of postsecondary education benefit in this case. *See FCC*, 562 U.S. at 407.

UNT's argument is not only inconsistent with the plain language of the statute but also out of step with relevant case law. Several courts have indicated that in-state tuition is a postsecondary education benefit within the meaning of Section 1623(a). *See, e.g.*, *Equal Access Educ. v. Merten*, 305 F.Supp.2d 585, 606 (E.D. Va. Feb. 24, 2004) ("The more persuasive inference to draw from § 1623 is that public post-secondary institutions need not admit illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this

benefit."); *Ariz. ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 416 P.3d 803, 804 (Ariz. 2018) ("Federal law generally bars granting in-state tuition to students based on state residency when they are not lawfully present in the United States." (citing 8 U.S.C. § 1623(a))); *Cf. Martinez v. Regents of Univ. of Cal.*, 241 P.3d 855, 865–66 (Cal. 2010) (referring to resident tuition as a benefit when analyzing Section 1623(a)). UNT does not address these cases. Nor does it otherwise provide any persuasive reason for this Court to conclude that in-state tuition is not a postsecondary education benefit under Section 1623(a).

Switching gears, UNT argues that it is possible to comply with both state and federal law because "resident tuition" under Chapter 54 of the Texas Education Code is not determined based on residency. But a student's eligibility for in-state tuition expressly turns on whether the student has established "resident status" and is "considered [a] resident[] of th[e] state." TEX. EDUC. CODE § 54.052 (requiring a showing of "domicile" or "residence" for each category); *Id.* § 54.0501(3) (defining "domicile" as "a person's principal, permanent residence"). UNT's argument, therefore, cannot be reconciled with the plain language of the relevant statutes.

UNT points to *Martinez*, a decision in which the California Supreme Court concluded that California's in-state tuition scheme was not preempted by Section 1623 because it did not turn on residence. 241 P.3d at 863–64. But the state law at issue there allowed a student to qualify for in-state tuition if they attended high school in California for at least three years and met other statutory requirements, none of which involved establishing residence in California. *Id.*; *accord* CAL. EDUC.

CODE § 68130.5. For example, "some students who live in an adjoining state or country are permitted to attend high school in California in some circumstances, even though they are not California residents." *Martinez*, 241 P.3d at 864. The "children of parents who live outside of California but who attend boarding schools in California might attend California high schools for three years, yet not be California residents." *Id.* And "those who attended high school in California for three years but then moved out of the state and lost their residency status would apparently be eligible for the exemption if they decided to attend a public college or university in California." *Id.*

By contrast, none of that is true for the Texas statute at issue here. Under Section 54.052, a student may establish resident status for purposes of tuition if she attended a Texas public high school "and . . . *maintained a residence* continuously in this state for the three years preceding the date of graduation . . . and the year preceding the census date of the academic term in which the person is enrolled in an institution." TEX. EDUC. CODE § 54.052(a)(3) (emphasis added). UNT's reliance on *Martinez* is therefore misplaced.

Last, UNT challenges the constitutionality of Section 1623(a). If Section 1623 preempts Section 54.051(d) of the Texas Education Code, UNT's argument goes, then Congress has exceeded its constitutional authority. UNT cites no authority to support this argument, and the Court is aware of none. To the contrary, it is beyond peradventure that the "regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law

of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Hines*, 312 U.S. at 66 (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). This argument is meritless.

The Court recognizes that education is an area of traditional state concern. *See United States v. Lopez*, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (noting that "education [is an area] where States historically have been sovereign"). But under the Supremacy Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade*, 505 U.S. at 108 (quotation omitted). Section 54.051(d) of the Texas Education Code, as applied to United States citizens at UNT, directly conflicts with, and is therefore preempted by, Section 1623(a) of IIRIRA. For this additional reason, Young Conservatives is entitled to summary judgment on its preemption claim.

## D. Entitlement to Permanent Injunction

At this point, the Court has concluded that Section 54.051(d) of the Texas Education Code is expressly preempted by Section 1623(a) of IIRIRA. This conclusion "carries with it a determination that the other three requirements [for a permanent injunction] have been satisfied." *VRC*, 460 F.3d at 611. For this reason alone, a permanent injunction is appropriate. But even examining the remaining permanent injunction factors—that a failure to grant the injunction will result in irreparable injury, that its injury outweighs any damage that the injunction will cause the opposing party, and that the injunction will not disserve the public interest—the Court concludes that the requested relief is warranted.

To begin, the Court will consider whether irreparable injury will occur without the requested injunction. For the same reasons presented in the standing portion of this memorandum opinion, *see supra* Part III(A), the Court disagrees with UNT's argument that none of Young Conservatives' members face injury if the injunction is denied. Young Conservatives has established that at least one of its members will continue to suffer harm if the requested injunction is not issued. Of course, the salient question is whether that injury is irreparable.

A harm typically is irreparable when "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Because *Ex parte Young* only provides for relief that is "declaratory or injunctive in nature and prospective in effect," *Saltz*, 976 F.2d at 968, Young Conservatives will not be able to remedy the asserted injuries at law, *see Edelman v. Jordan*, 415 U.S. 651, 668, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (limiting *Ex parte Young* to prospective, injunctive relief while affirming grant of a permanent injunction requiring compliance with federal time limits for paying disability benefits that were wrongfully withheld). Thus, for Young Conservatives' student members who are unlawfully required to pay nonresident tuition, "the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *See BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021) (cleaned up); *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (cleaned up)); 11A CHARLES ALAN

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. updated 2021) (same).

The balance of hardships also tilts in favor of granting injunctive relief. Any interest UNT may claim in enforcing an unconstitutional law is "illegitimate." *See BST Holdings*, 17 F.4th at 618. Indeed, enjoining enforcement of the preempted state law would not subject UNT to any undue hardship or penalty because the injunction would require only UNT's compliance with federal law under the Supremacy Clause. *See Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962) (explaining that a permanent injunction requiring compliance with federal law does not constitute a hardship because it only "requires the defendants to do what the Act requires anyway—to comply with the law").

But wait, says UNT, an injunction preventing it from unlawfully charging students nonresident tuition will force it to incur millions of dollars in lost revenue each semester. (Dkt. #52 at 53). As the Supreme Court recently reminded us, however, it is not the judiciary's "role to weigh such tradeoffs." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S.Ct. 661, 666, 211 L.Ed.2d 448 (2022) (per curiam). In our Republic, "that is the responsibility of those chosen by the people through democratic processes." *Id.* Having chosen to operate an institution of higher education and make unlawfully present aliens eligible for the benefit of nonresident tuition, UNT is obligated to comply with the dictates of federal law and the Constitution. Budgetary constraints do not absolve constitutional violations.

Finally, the requested injunction "would not disserve the public interest because it will prevent constitutional deprivations." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014); *see also Awad*, 670 F.3d at 1132 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("The Government does not have an interest in the enforcement of an unconstitutional law." (cleaned up)). The public interest will not be harmed by an injunction requiring Goodman and Smatresk to conform UNT's tuition system to the Constitution. To the contrary, the public has a profound and long-term interest in not only upholding an individual's constitutional rights but also maintaining our constitutional structure of government. *BST Holdings*, 17 F.4th at 618–19. An injunction prohibiting UNT officials from simultaneously allowing unlawfully present aliens to pay nonresident tuition while denying that benefit to United States citizens based on residency—in violation of federal law and the Supremacy Clause— serves both interests.

With all four of the applicable factors met, injunctive relief is appropriate here. Thus, the Court will grant Young Conservatives' request for a permanent injunction.[9]

---

[9] UNT argues that the Court should deny the request for a permanent injunction because Young Conservatives has not provided sufficient guideposts for crafting appropriate injunctive relief under Federal Rule of Civil Procedure 65. (Dkt. #52 at 53–54). This argument is meritless. For one, as to permanent injunctions, Rule 65(d) establishes a procedural rather than substantive framework; it does not set forth criteria for when an injunction is appropriate. *See* FED. R. CIV. P. 65 (addressing procedural issues such as notice to parties and the scope and duration of an injunction). But more importantly, this Court is aware of its obligations under Rule 65 and can fashion a narrowly tailored remedy that addresses the constitutional infirmities without exceeding the limits of its authority. *See M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 271–72 (5th Cir. 2018) (admonishing district courts to

## IV. CONCLUSION

For the foregoing reasons, Young Conservatives' summary-judgment motion, (Dkt. #6), is **GRANTED in part** and **DENIED in part**, and UNT's cross-motion for summary judgment, (Dkt. #52), is **GRANTED in part** and **DENIED in part**. To the extent Young Conservatives' motion seeks summary judgment against Defendants the University of North Texas and the University of North Texas System, its requested relief is **DENIED**. But to the extent Young Conservatives seeks summary judgment against Defendants Neal Smatresk and Shannon Goodman, its requested relief is **GRANTED**. The Court will enter a final judgment and a permanent injunction against Defendants Neal Smatresk and Shannon Goodman by separate order.

**So ORDERED and SIGNED this 8th day of April, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

---

avoid issuing sweeping injunctions "aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation" (quoting *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)).