**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **YOUNG CONSERVATIVES OF TEXAS FOUNDATION,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § § | **CIVIL ACTION NO. 4:20-cv-00973** |
| **THE UNIVERSITY OF NORTH TEXAS, THE UNIVERSITY OF NORTH TEXAS SYSTEM, NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS, AND SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS,** | § § § § § § § § § § § | |
| *Defendants.* | § § | |

---

## MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL

Defendants Neal Smatresk, President of the University of North Texas, and Shannon Goodman, Vice President for Enrollment of the University of North Texas ("the UNT Officials"), seek a stay of the Court's Permanent Injunction (Dkt. 65), pending final resolution of their appeal. *See* FED. R. CIV. P. 62(d) (authorizing suspension of a permanent injunction pending appeal); Dkt. 66 (Notice of Appeal). As established below, the UNT Officials are likely to succeed in their appeal, the balancing of the equities strongly favor a stay, and a stay would serve the public interest.

### BACKGROUND

Young Conservatives of Texas Foundation ("YCT") sued UNT Officials, the University of North Texas, and the University of North Texas System (collectively, "the UNT Defendants") on

1

behalf of members who are United States citizens from states other than Texas.  Dkt. 1.  They

asserted that Section 1623(a) of the Illegal Immigration Reform and Immigrant Responsibility Act

of 1996, 8 U.S.C. § 1623 (a), preempts Section 54.051(d) of the Texas Education Code, which

establishes nonresident tuition rates for state colleges and universities.

     This Court issued a final judgment permanently enjoining the UNT Officials from

"applying the tuition rates prescribed by Section 54.051(d) of the Texas Education Code to United

States citizens at the University of North Texas."  Dkt. 65 at 2.

STANDARD FOR STAY OF PERMANENT INJUNCTION PENDING APPEAL

     In deciding whether to stay a permanent injunction pending an appeal, a court must

consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed
> on the merits; (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested
> in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009); *Planned Parenthood of Greater Tex. Surgical Health

Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013).

ARGUMENT

     Each requirement for a stay is satisfied here: (1) the UNT Officials are likely to succeed on

the merits of their appeal; (2) UNT will suffer irreparable harm in the absence of a stay; (3) YCT

will not be harmed by a stay; and (4) the public interest favors a stay.  *See Nken*, 556 U.S. at 426.

## I.    The UNT Officials are likely to succeed in their appeal.

     The appeal presents several serious legal questions, including whether YCT has standing

to challenge nonresident tuition rates under Section 54.051(d).  A related question is whether the

injunction was properly structured.

2

In this suit, nonresident students challenge a Texas statute that makes certain undocumented students eligible for in-state tuition.  The remedy they seek, however, is not to invalidate the allegedly improper benefit to undocumented students, but rather to compel in-state tuition for themselves. Because nonresident students have no constitutional or statutory entitlement to in-state tuition, YCT cannot twist its suit to obtain such relief.  By accepting YCT's flawed theory, the Court erred in its standing conclusion and the injunctive relief awarded.

**A.      YCT lacked standing to challenge nonresident tuition rates.**

**1.      YCT and the Court misread Section 1623.**

Section 1623 provides:

> [n]otwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623. This Court reduced the statute to "a simple rule":

> If a university provides an educational benefit based on residence to an alien who lacks lawful immigration status, then that university must provide the same benefit to a United States citizen regardless of the citizen's residency.

Dkt. 34 at 18.  The Court's interpretation is incorrect.  Section 1623 does not *pre*scribe a benefit for U.S. citizens. Rather, it *pro*scribes a benefit for aliens not lawfully present in the United States, *unless* the same benefit is given to U.S. citizens. By misinterpreting the statute as a *pre*scription rather than a *pro*scription, YCT and the Court have rewritten the statute's plain text and given it an entirely different meaning.  This fundamental error fatally undermines the Court's analysis of standing, its merits decision on preemption, and the scope of its injunction.

> **2.     YCT's alleged injury is not traceable to the statute providing in-state tuition to aliens unlawfully present in the U.S. nor redressable by its invalidation.**

YCT lacks standing. As the Tenth Circuit held in an analogous suit, nonresident students' claims lack both traceability and redressability because "[n]one of these Plaintiffs would be eligible to pay resident tuition … even if [the state law] favoring illegal aliens were stricken." *Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007). The same is true here: non-Texas residents have neither a statutory nor a constitutional entitlement to in-state tuition. YCT complains about disparate treatment of nonresident U.S. citizens vis-a-vis aliens unlawfully present in the United States, but Section 1623 does not provide the relief they seek—cheaper tuition for themselves. The fundamental disconnect between YCT's claim and the remedy they seek confirms their lack of standing to prosecute this suit.

Even assuming that YCT can rely on associational standing, Article III standing requires an association member to present "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision," as the Court recognized. Dkt. 34 at 5-6 (quotation and citation omitted). The Court's misreading of Section 1623 caused it to incorrectly conclude that Plaintiff's purported injury (an obligation to pay nonresident tuition) is traceable to their preemption claim and redressable if the claim succeeds. Dkt. 34 at 7-8. The UNT Officials are likely to succeed on appeal on this point because YCT members' preference to pay in-state tuition rates is neither a statutory nor constitutional entitlement, and their obligation to pay nonresident rates is independent of the challenged state statutory provisions extending undocumented students resident tuition rates.

By wrongly concluding that the YCT members were injured *because of* Section 1623's preemptive effect, the Court is at odds with Article III's core requirement that a litigant must suffer

a personal and concrete injury *as a result of* the challenged conduct.  *See, e.g., Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993).

Without the requisite concrete injury caused by the Texas statutory provisions that are displaced by Section 1623(a), YCT members present only a generalized grievance.  The Supreme Court has repeatedly held that a "generalized grievance," no matter how earnest, is insufficient to confer standing.  *See, e.g., Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree."); *Allen v. Wright*, 468 U.S. 737, 754 (1984) ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court[.]").

Moreover, an ideological interest has never satisfied standing requirements, yet that appears to be the basis on which the Court allowed the suit to proceed.  *See, e.g., Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) ("Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests.  No matter how deeply committed petitioners may be to upholding Proposition 8 or how zealous their advocacy, that is not a "particularized" interest sufficient to create a case or controversy under Article III.") (quotations, brackets, and citations omitted); *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) ("[A] a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected or aggrieved…") (quotations omitted). Accordingly, the UNT Officials are likely to prevail on standing on appeal.

### B.      The injunction is overbroad.

Federal Rule of Civil Procedure 65 bars an overbroad injunction.  Broadness refers to "the range of proscribed activity" and is "a matter of substantive law."  *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.19 (5th Cir. 1975) (quotation and citation omitted).  An

injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order" as determined by the substantive law. *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004*); accord Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013). An injunction cannot prohibit conduct beyond the claim's legal basis, that is, relief cannot exceed the underlying cause of action. *Veneman*, 380 F.3d at 819.

Here, the Court's misreading of Section 1623 as *pre*scribing a benefit for United States citizens, rather than *pro*scribing a benefit for aliens unlawfully in the United States, led the Court to issue an impermissibly broad injunction. Instead of tailoring the injunctive relief to the allegedly preempted conduct, the Court rewrote the state statutes to give in-state tuition rates to all students at UNT without regard to residency. The Court lacked a basis to command UNT officials to create a wholly new benefit for out-of-state students by mandating in-state rates for nonresident students.

An injunction cannot be so broad that it bars admittedly lawful activities. *See, e.g., M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 271-72, 272-88 (5th Cir. 2018) (explaining that injunctions aimed at remedying constitutional violations must be narrowly tailored to remedying the unconstitutional conduct, vacating injunction for overbreadth, and remanding for modification); *Diageo N. Am., Inc. v. Mexcor, Inc.*, 661 F.App'x 806, 814 (5th Cir. 2016) (per curiam) (injunction was overbroad when it prohibited packaging a product in a way that did not infringe trademark at issue). Nonresident students have no entitlement to in-state tuition. *See, e.g., Day*, 500 F.3d at 1135-36. Therefore, by preventing the UNT Officials from charging nonresident rates to nonresident U.S. citizens, the Court has improperly enjoined lawful conduct.

On appeal, the UNT Officials will ask the court of appeals to enforce the rule that injunctions must be "narrowly tailor[ed]" to "remedy the specific action which gives rise to the order." *Veneman*, 380 F.3d 807 at 818. The UNT Officials have a strong chance of success on

the merits of this argument.  When crafting an injunction, district courts must abide by the Supreme Court's instruction that "the scope of injunctive relief is dictated by the extent of the violation established."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  This Court granted much broader relief than appropriate, even assuming its preceding conclusions leading up to the injunction are correct.  Instead of ensuring compliance with federal law, the Court rewrote the Texas tuition scheme to grant nonresident U.S. students a new entitlement to in-state tuition.  Under long-established principles for permanent injunctions, the Court exceeded its authority.  The UNT Officials will likely prevail on appeal on this issue.

## II.    The permanent injunction will cause UNT and its students irreparable harm.

Absent a stay, UNT and its students will suffer irreparable injuries.

### A.    Disallowing a state from enforcing its law imposes an irreparable harm.

The Court's injunction will cause the UNT Officials irreparable harm by preventing them from enforcing the State's tuition statutes.  *See Planned Parenthood of Greater Tex.*, 734 F.3d at 419 ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *see also, e.g., New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

### B.    The injunction imposes heavy financial losses on UNT.

The injunction will have substantial financial impacts on UNT; such impacts should not be foisted on the university without final appellate disposition of the issues.

**Tuition monies.**  Based on the injunction, out-of-state U.S. citizens will now pay a $50 statutory tuition rate per semester credit hour versus the $458 non-resident credit hour rate set by the Texas Higher Education Coordinating Board.  *Compare* TEX. EDUC. CODE § 54.051(d), *with*

7

*id.* § 54.051(c); *see also* Christopher W. Foster Decl. ¶¶ 3-4 (May 11, 2022).  UNT currently enrolls more than 6,000 students (including nonresident U.S. students and foreign students) who pay nonresident tuition. *See* James Garrison Decl. at ¶ 10 (Jan. 18, 2022).[1]  Based on the Court's permanent injunction, UNT has calculated that prohibiting UNT from charging nonresident U.S. students at the non-resident tuition rate will result in a loss of approximately $5.7 million in the next academic year. Clayton Gibson Decl. ¶ 4 (May 11, 2022). A $5.7 million reduction in nonresident tuition revenue would take UNT from a $2.9 million surplus to a $2.8 million deficit, a hefty loss to UNT's operating budget.  *Id*. ¶ 6. The injunction adversely impacts UNT's annual revenue, which will require the University to make adjustments in order to function and deliver its educational services under a suddenly altered budget. Possible changes include reducing institutional aid awards, freezing salaries and eliminating inflation adjustments, increasing class size, and reducing employee incentives. UNT also must be prepared to address a drop in employee morale, as well as increased employee turnover and resulting training costs. *Id*. ¶ 7.

The financial injuries to UNT have already begun.  In compliance with the injunction, UNT billed U.S. nonresident students at resident tuition rates when it recently sent out tuition bills for the summer semester.  *See* Foster Decl. ¶ 4 (explaining that tuition and fees bills transmitted the week of May 5, 2022 assessed nonresident tuition rates for all U.S. students).

These financial harms are not merely to an inanimate entity, but specifically fall on UNT students and personnel. UNT comprises 42,372 students,[2] 1,274 professors and research

---

[1] The initial $25 million loss was based on a potential ruling that invalidated section 54.051(d) and prohibited application to all nonresident students (including foreign students).  The actual losses have been recalculated based on the scope of the injunction and using projected enrollment numbers in Fall 2022 and Spring 2023 enrollment.  The projected loss would increase with a higher enrollment of U.S. nonresident students, which might result from the court's injunction.

[2]   https://news.unt.edu/news-releases/its-3-peat-unt-grows-again-enrolls-42372-defy-national-trend.  This number is as UNT reported to the Texas Higher Education Coordinating Board on the

professionals, 103 administrators, and 9,226 other university staff (including student employees). *See* Katherine McDaniel Decl. ¶ 3 (May 11, 2022).  This injunction impacts an entire community who depends on UNT for educational services they chose to receive at UNT and for their livelihoods, all of which depend on UNT's financial wherewithal.

Because the UNT Officials charged, and will charge, the only tuition rates lawful under the injunction at the time of billing, they cannot retroactively charge nonresident tuition rates to U.S. out-of-state students if the Fifth Circuit decides that U.S. nonresident students should not have been charged in-state rates. *See* TEX. EDUC. CODE §54.009 (State law prohibiting any increase in tuition rate charged to a student after the student registers for classes.).  The difference in the total tuition charged to U.S. nonresident students[3] for Summer 2022 billing and what UNT would have charged before the injunction is approximately $746,346.  *See* Foster Decl. ¶ 5.

This type of financial injury is the irreparable harm contemplated when considering a stay pending appeal.  *See, e.g., United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 40 (5th Cir. 1983) (per curiam) (granting stay until HHS's investigatory power was resolved on appeal when Baylor challenged HHS's authority to investigate its facilities on basis of a "single complaint" and faced loss of all Medicare and Medicaid funds unless it submitted to HHS's authority).

Moreover, in the event that the UNT Officials prevail on appeal, monetary losses incurred in complying with the injunction will not be recoverable through, for example, a claim for damages or reimbursement.  Monetary injuries are irreparable when they arise in "[t]he absence of an

---

census date for Fall 2021.  *See* TEX. EDUC. CODE § 54.0501(1) ("'Census date' means the date in an academic term on which an institution of higher education is required to certify a student's enrollment to the coordinating board for purposes of determining formula funding for the institution.").

[3] Based on total number of U.S. nonresident students enrolled as of May 10, 2022.

available remedy by which the movant can later recover monetary damages." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985).   In such circumstances, financial damage is an irreparable harm.  *See, e.g., Texas v. U.S. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016) (finding irreparable injury and granting stay where "[t]he tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies" and "[n]o mechanism here exists for the power companies to recover the compliance costs they will incur if the Final Rule is invalidated on the merits"); *see also, e.g., Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment) (noting that "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs"); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (finding irreparable injury, even though "[e]conomic harm is not normally considered irreparable" because states would incur costs from affirmative conduct taken to comply with new administrative rules); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425-26 (8th Cir. 1996) (granting stay of FCC's local competition pricing rules after explaining that "threat of unrecoverable economic loss…qualif[ies] as irreparable harm").  The injunction's costs to UNT are immense and irreversible.  They cannot be ignored.

This Court has dismissed the financial impacts to UNT, remarking that "[b]udgetary constraints do not absolve constitutional violations" and implying that the Texas Legislature must take responsibility.  Dkt. 64 at 38.[4]  The Court's refusal to consider UNT's irreversible financial

---

[4] There is overlap between the factors assessed in considering permanent injunction as relief for a successful claim and the factors involved in deciding whether to stay an issued permanent injunction pending appeal.  After a plaintiff succeeds on the merits,

> a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

injuries seems to have circumvented applicable precedent holding that the financial costs here are the type of irreparable harm that *must* be part of the injunction and stay calculus.

Moreover, the Court's failure to give UNT time to plan to achieve compliance disregarded the amount of administrative work and budgetary revisions the injunction necessitated.  The Court overlooked the irreparable financial harm to UNT with a quotation from the Supreme Court's decision awarding a stay of the OSHA vaccine mandate.  Dkt. 64 at 38 ("As the Supreme Court recently reminded us, however, it is not the judiciary's 'role to weigh such tradeoffs.'") (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S.Ct. 661, 666 (2022)).  But the Supreme Court's comment reflected its concern that elected officials had no role in the vaccine mandate and was not a general disparagement of financial impacts as irrelevant.

**Time and Effort Losses.**  The Student Accounting Department's compliance with the injunction required modifying the billing infrastructure utilizing three full-time employees, who spent more than three weeks and 360 hours, capital and monetary expenses that were diverted from

---

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quotation and citation omitted).  Accordingly, the Court considered irreparable harm to YCT and the hardship to UNT that would be caused by the permanent injunction.  Dkt. 64 at 37-38.

The Court initially asserted that its determination that Section 54.051(d) is expressly preempted by Section 1623(a) means that the latter requirements for a permanent injunction were automatically satisfied.  Dkt. 64 at 36.  But in the decision cited by the Court, the supporting statement was *dicta* because the court of appeals concluded that federal law did not preempt the city ordinance and affirmed the denial of a permanent injunction.  *See VRC LLC v. City of Dall.*, 460 F.3d 607, 615-16 (5th Cir. 2006).  And in the Fifth Circuit decision cited by *VRC* for this proposition, the court was careful to point out that its conclusion was "[u]nder the facts of this case," and tied to Congress's decision to expressly preempt the entire "area of regulation" of airline rates, routes, and services.  *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783-84 (5th Cir. 1990).  In addition, in *Trans World*, the court did examine all the factors required for an injunction and ensured they were satisfied.

11

other UNT needs.  Foster Decl. ¶ 6.  This new billing system will require an additional forty hours a week of employee time to maintain and track revenue for state budget reporting processes.  *Id*.

Similarly, UNT's Financial Aid Department must add personnel to implement the changes necessary to be in compliance with the injunction, including the creation of a new cost of attendance table for nonresident U.S. citizens, which will require approximately 1,000 hours of work.  Beth Tolan Decl. at ¶ 3 (May 13, 2022).

### C. The injunction creates confusion for student planning and skews normal considerations for current and incoming UNT students.

The injunction has other impacts on UNT students, interjecting large disparities among tuition rates across state educational institutions and causing confusion for students and families. The injunction creates uncertainty and anxiety for students about future financial burdens if the judgment is reversed or the injunction vacated or modified.

Students might make decisions about attending UNT and establishing residency based on the lower costs and elimination of residency status mandated by the injunction, only to have the Fifth Circuit's decision upend those savings and residency parameters.  The Court should avoid inviting reliance on a new tuition structure and a lack of residency requirement when the injunction, as UNT reasonably predicts, will be vacated or modified on appeal.  Nonresident U.S. citizens' plans to obtain a cost-savings degree at UNT may not be realized depending on the appeal's outcome.

### III. A stay would not cause YCT or its members substantial injury.

A stay would not substantially injure YCT or its members.  *See Nken*, 556 U.S. at 426 (2009). When considering the irreparable harm factor, the Court concluded that (1) at least one YCT member would suffer financial harm without the injunction, and (2) that injury would be

irreparable because the *Ex parte Young* theory on which the Court relied does not permit monetary recovery for tuition overpayments.  Dkt. 64 at 37.[5]

The stated injury is not substantial and therefore does not preclude a stay.  First, it overlooks the fact that the only two YCT members who currently pay nonresident tuition already have an avenue under Texas law to recover tuition overpayments.  *See Dall. Cnty. Comty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 879 (Tex. 2005) (holding that the refund mechanisms in chapter 403 of the Texas Government Code apply to state universities); *see also* TEX. GOV'T CODE §403.202 *et seq*. Second, the costs identified by the Court are temporary in nature, assuming that YCT prevails. When the appeal is resolved, the two YCT members' proper tuition rate will be resolved, and UNT's billings will either remain as they were pre-suit or altered in accordance with the Fifth Circuit's mandate.  There has been no showing that two students' obligation to pay out-of-state tuition rates while the appeal proceeds—an obligation they assumed when they accepted UNT's offer of admission—is a substantial injury.

In holding that these two students face irremediable, irreparable harm, the Court invoked "the loss of constitutional freedoms" and "constitutional right[s]." Dkt. 64 at 37.  This would make sense if YCT had alleged an impairment of constitutional rights.  Yet, conspicuously, YCT has not invoked its, or its members, constitutional rights.  No nonresident YCT members' constitutional rights have been violated, even under the Court's preemption analysis. The absence of substantial injury to YCT or its members from a stay of the injunction supports the issuance of a stay.

---

[5] In other words, although the YCT members' alleged injury is monetary, which would normally foreclose an injunction because an adequate remedy of compensation is available for economic injuries, *see, e.g., Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004), no adequate remedy is available here because of *Ex parte Young*'s constraints.  *See* Dkt. 64 at 37.

IV.     **A stay would serve the public interest.**

For the same reasons that the injunction is causing irreparable harm to UNT and its students, *see supra* Section II, the public interest strongly favors a stay.  Because the UNT Officials act for the State and a state agency in this case, the State's public policy is harmed by the injunction. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam); *see also Nken*, 556 U.S. at 436 (same); *Planned Parenthood of Greater Tex.*, 734 F.3d at 419 (same).

In addition, UNT and the public properly seek to prevent the sudden administrative disruption and substantial reductions to incoming tuition and UNT's operational budget, and they have a strong interest in the enforcement of tuition rates set by the Texas Legislature.  Indeed, state policy, embodied in the Texas Education Code's tuition provisions, "is in itself a declaration of public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937); *see also, e.g., Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 939 (Tex. 1996) (describing statutory provisions as a "declaration of policy").  Upending UNT's tuition funds when, as UNT contends, the Circuit will likely disagree with this Court's conclusions, militates strongly in favor of pausing the injunction while the Circuit considers the appeal.

And, as noted, the Court grounded its conclusion that an injunction would serve the public interest on the violation of constitutional rights, *see* Dkt. 64 at 39, even though YCT *disclaimed* reliance on the personal constitutional rights of its members. Instead, YCT has sought compliance with the Supremacy Clause under a *preemption* theory, urging enforcement of the constitutional relationship of the federal and state governments, and argued that Texas state law conflicts with federal law.  Thus, the Court misconstrued the proper public interest here.

Last, the public interest favors maintaining the status quo. *See, e.g., Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) ("preserving the status quo is an important equitable

consideration in the stay decision") (quotation and citation omitted); *Houchins v. KQED, Inc.*, 429 U.S. 1341, 1346 (1977) (Rehnquist, J., in chambers) (granting stay after noting that "preservation of that status quo is an important factor favoring a stay" and "preferable to forcing the applicant to develop new procedures which might be required only for a short period of time").  Charging out-of-state students at higher rates is a decades-long component of the higher education tuition system. Yet, now, UNT is the only state institution prohibited from charging nonresident tuition to any U.S. student under the injunction's mandated tuition schedule.  This financial upheaval is at odds with a long-established tuition structure devised by the Legislature and ignores proper consideration of the public interest in the status quo.

The public interest favors holding the injunction in abeyance while the UNT Officials' appeal is considered and resolved.

## CONCLUSION

For these reasons, the UNT Officials respectfully request that the Court stay its permanent injunction until the Fifth Circuit finally decides the appeal and issues its mandate.

Respectfully submitted,

*/s/ Wallace B. Jefferson*
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
Melanie D. Plowman
State Bar No. 24002777
mplowman@adjtlaw.com
**ALEXANDER DUBOSE & JEFFERSON LLP**
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

*/s/ Andy Taylor*
Andy Taylor
State Bar No. 19727600
ataylor@andytaylorlaw.com
**ANDY TAYLOR & ASSOCIATES, P.C.**
2628 Highway 36 South #288
Brenham, Texas 77833
(713) 222-1817 – telephone
(713) 222-1855 – facsimile

*/s/ Sandy Hellums Gomez*
Sandy Hellums-Gomez
State Bar No. 2403670
Sandy.Gomez@HuschBlackwell.com
Jeff Nobles
State Bar No. 15053050
Jeff.Nobles@HuschBlackwell.com
**HUSCH BLACKWELL LLP**
600 Travis Street, Suite 2350
Houston, Texas 77002
(713) 647-6800 – main telephone
(713) 647-6884 – general facsimile

16

Scott Schneider
State Bar No. 24054023
Scott.Schneider@HuschBlackwell.com
**HUSCH BLACKWELL LLP**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 – main telephone
(512) 479-1101 – general facsimile

**ATTORNEYS FOR DEFENDANTS NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS, AND SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS**

**CERTIFICATE OF CONFERENCE**

On May 13, 2022, I conferred with Chance Weldon, counsel for Plaintiff, via email regarding the relief sought by this motion. He stated that his client opposes the motion.

*/s/ Melanie D. Plowman*
Melanie D. Plowman

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2022, this motion was served on all counsel of record via the CM/ECF system of the Court.

*/s/ Wallace B. Jefferson*
Wallace B. Jefferson

18