UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| YOUNG CONSERVATIVES OF TEXAS FOUNDATION § § § | |
| v. § | CIVIL NO. 4:20-CV-973-SDJ |
| § | |
| THE UNIVERSITY OF NORTH TEXAS, ET AL. § § | |

## MEMORANDUM OPINION AND ORDER

Defendants Neal Smatresk and Shannon Goodman (collectively, "UNT Officials") are appealing this Court's decision to grant summary judgment and a permanent injunction in favor of Plaintiff Young Conservatives of Texas Foundation ("Young Conservatives"). They now seek a stay of the injunction pending appeal. (Dkt. #69). For the following reasons, the UNT Officials' motion to stay is **DENIED**.

### I. BACKGROUND

This Court previously concluded that Section 54.051(d) of the Texas Education Code, as applied to United States citizens at the University of North Texas, is preempted by Section 1623(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and is therefore unconstitutional under the Supremacy Clause. *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, — F.Supp.3d—, No. 4:20-CV-973-SDJ, 2022 WL 1063876, at *16 (E.D. Tex. Apr. 8, 2022). In reaching its decision, the Court first explained why Young Conservatives had standing to sue on behalf of its members. Next, the Court considered whether Young Conservatives had sued a proper defendant under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court answered this question in the

1

affirmative as to the UNT Officials. But due to the limited nature of an equitable *Ex parte Young* action, Young Conservatives' preemption claim against the University of North Texas and the University of North Texas System failed as a matter of law.

With the threshold issues resolved, the Court turned to preemption. Considering the federal and state statutes in tandem, the Court determined that Texas's tuition scheme directly conflicts with Congress's express prohibition on making unlawfully present aliens eligible for postsecondary education benefits based on residency when United States citizens are not eligible for such benefits based on residency. Accordingly, the Court concluded that Texas's nonresident tuition scheme is unconstitutional under the Supremacy Clause and granted summary judgment to Young Conservatives on its official-capacity equitable claim against the UNT Officials. To prevent ongoing violations of federal law, the Court permanently enjoined the UNT Officials from allowing unlawfully present aliens to pay resident tuition while denying that benefit to United States citizens based on residency. (Dkt. #65).

More than a month later, the UNT Officials moved the Court to stay the permanent injunction against them until the Fifth Circuit decides their appeal.[1] (Dkt. #69). They argue that each of the requirements for a stay is satisfied and that

---

[1] On June 17, 2022, the UNT Officials filed a notice indicating that they would seek a stay from the Fifth Circuit on June 24, 2022, if this Court had not issued a decision in their favor by that date. (Dkt. #76). In this notice, the UNT Officials assert that expedited relief is warranted because a "very significant budget planning and adoption deadline is approaching." (Dkt. #76 at 2). Curiously, though, the UNT Officials waited over a month to seek a stay in this Court and then requested a forty-day extension of time to file their opening brief in the Fifth Circuit. (Dkt. #75, #75-1).

2

the balance of equities tilts in their favor. Young Conservatives disagrees, contending that the UNT Officials' arguments are meritless and that staying the injunction pending appeal would substantially harm their members.

## II. LEGAL STANDARD

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961, 129 S.Ct. 2275, 173 L.Ed.2d 1285 (2009) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 433, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). It is instead an "intrusion into the ordinary processes of administration and judicial review," and the propriety of issuing a stay depends on the circumstances of the particular case. *Nken*, 556 U.S. at 427, 433 (quotation omitted). The decision to grant or deny a stay pending appeal is committed to the sound discretion of the district court. *Id.* at 433.

When considering whether to grant a stay pending appeal, a court must consider four factors: (1) "whether the stay applicants have made a strong showing that they are likely to succeed on the merits"; (2) "whether the applicants will be irreparably harmed absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties"; and (4) "where the public interest lies." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349–50 (5th Cir. 2022) (citing *Nken*, 556 U.S. at 426). Under this standard, the first two factors "are the most critical." *Nken*, 556 U.S. at 434. The applicant for a stay "bears the burden of showing its need." *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020).

### III. DISCUSSION

Considering the applicable factors, the UNT Officials have not met their burden to show that a stay of the permanent injunction pending appeal is warranted.

**A. Success on the Merits**

The Court first considers whether the UNT Officials have made a strong showing that they are likely to succeed on the merits. As to this factor, the thrust of the UNT Officials' argument is that "Section 1623 does not extend [Young Conservatives'] members a right to resident tuition." (Dkt. #73 at 2). "Without an affirmative right to resident tuition," the UNT Officials say, Young Conservatives does not have standing, "its preemption claim fails, and the injunction is impermissibly broad." (Dkt. #73 at 2).

The requirements for Article III standing are familiar. To establish standing, a litigant must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (cleaned up). An association, like Young Conservatives, may establish standing by showing, among other things, that at least one of its members would have standing to sue in their own right. *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021).

The UNT Officials present several arguments challenging Young Conservatives' standing, none of which has merit. First, the UNT Officials contend that Young Conservatives' members fail to meet the injury-in-fact requirement because they have no affirmative right to any particular tuition rate under Section

4

1623 and thus no "legally protected interest" in resident tuition. (Dkt. #73 at 2 (quoting *Ne. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993))). This argument misunderstands the injury-in-fact inquiry and conflates standing with the distinct question of whether Young Conservatives has a cause of action for its preemption challenge.

The UNT Officials' argument might have had some merit during the first half of the twentieth century. At that time, a plaintiff could sue only for the violation of a legal right—"one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137, 59 S.Ct. 366, 83 L.Ed. 543 (1939). But all this changed with the Supreme Court's 1970 decision in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). After *Data Processing*, a plaintiff need not have suffered an invasion of a legal *right*—one protected by statute or some other positive law—only an "injury in *fact*, economic or otherwise." *Id.* at 152 (emphasis added); *see also id.* at 153 (criticizing the lower court's search for a "legal interest" to establish standing as improper because "[t]he 'legal interest' test goes to the merits" and "[t]he question of standing is different"); *Jud. Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 363 (D.C. Cir. 2005) (Williams, J., concurring) (explaining that, in *Data Processing*, the Supreme Court "rejected the 'legal interest' standard, proclaiming the separation of standing from merits issues").

5

True, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court introduced the phrase "legally protected interest" as part of the injury-in-fact test. *Id.* at 560 (explaining that, to show an "injury in fact," a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" (cleaned up)). But the Supreme Court did not define the phrase or indicate that it does any independent work in the standing analysis. *See Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 163–64 (3d Cir. 2017); *Jud. Watch,* 432 F.3d at 363 (Williams, J., concurring).[2] To the contrary, the Court in *Lujan* summarily concluded that the plaintiffs had a "cognizable interest" in using or observing an animal species without asking whether they had a legally protected *right* to do so. 504 U.S. at 562–63. And nowhere did the *Lujan* Court suggest that it was turning the standing clock back to the old "legal right" theory it had rejected more than twenty years earlier in *Data Processing. Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (Silberman, J.), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); *see also* 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.4 (3d ed. updated 2022) (explaining the phrase "legally protected interest" has not returned standing doctrine to "the conceptualism that lingered into the 1960s" but has provided "ample

---

[2] As courts have also recognized, the term "legally protected interest" has not appeared with regularity in post-*Lujan* Supreme Court opinions addressing standing. Indeed, a "host of the Court's standing opinions have omitted the term altogether, and it has rarely been applied." *Cottrell*, 874 F.3d at 163; *see also Jud. Watch*, 432 F.3d at 363 (observing that the modifier "legally protected" has appeared only "episodically" in post-*Lujan* Court opinions).

6

opportunity for mischief should a court be bent on denying the reality of a sufficient injury-in-fact").

But even if the phrase "legally protected interest" does some work in the injury-in-fact analysis, the UNT Officials' laser focus on whether Young Conservatives' members have a legal right to resident tuition under Section 1623 is still too narrow. Some of Young Conservatives' members have undoubtedly suffered—and without the Court's injunction likely would suffer again—an injury *in fact*: economic harm in the form of higher tuition rates enforced against them at UNT. For more than half a century—both before and after *Lujan*—the Supreme Court has repeatedly recognized that financial or economic interests are "legally protected interests" for purposes of standing. *See, e.g.*, *Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 772–77, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); *Clinton v. City of New York*, 524 U.S. 417, 432, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); *Sierra Club v. Morton*, 405 U.S. 727, 733–34, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The Fifth Circuit has likewise held, and often assumed without discussion, that economic harm satisfies the injury-in-fact requirement so long as the harm is concrete and particularized and actual or imminent. *See, e.g.*, *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491 n.15 (5th Cir. 2022) ("Allegations of economic harm are enough to establish injury in fact."); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("[I]t is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered."); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a

quintessential injury upon which to base standing."); *Hosein v. Gonzales*, 452 F.3d 401, 404 (5th Cir. 2006) (per curiam) ("Standing clearly exists when a plaintiff alleges direct economic harm."). And so has its sister circuits. *See, e.g.*, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."); *Cottrell*, 874 F.3d at 163 (explaining that "financial harm is a classic and paradigmatic form of injury in fact "(cleaned up)); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury."); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 951 (9th Cir. 2013) ("[E]conomic injury is generally a legally protected interest." (quotation omitted)).

The UNT Officials' reliance on the Tenth Circuit's nonbinding decision in *Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007), only serves to underscore the flaws in their argument. In *Day*, the plaintiffs solely challenged a provision of Kansas law granting resident tuition to unlawfully present aliens (KAN. STAT. ANN. § 76-731a) and "disclaimed on appeal any injury other than an invasion of the legal right that they assert § 1623 has vested in them and any remedy other than the presumptive annulment of § 76–731a." *Id.* at 1136. Because the plaintiffs' only asserted form of injury was "the invasion of a putative statutory right conferred on them by § 1623," the court determined that their standing turned on whether they possessed a private, individualized right under the statute. *Id.* The Court answered this question in the negative, concluding that the plaintiffs lacked standing to bring their preemption

8

claim because Section 1623 does not create a private right of action. *Id.* at 1138–39. In other words, because the plaintiffs had no cause of action, the court reasoned that they had no injury in fact and thus no standing to sue. *Id.* at 1139–40.

The UNT Officials' reliance on *Day* is misplaced. To begin, *Day*'s blending of standing with the cause-of-action inquiry improperly "flips the standing inquiry inside out, morphing it into a test of the legal validity of the plaintiff's claims of unlawful conduct." *Cottrell*, 874 F.3d at 166. Such an approach cannot be reconciled with the Supreme Court's repeated admonition that "a valid claim for relief is *not* a prerequisite for standing." *Id.* (citation omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that "the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal" and highlighting the "fundamental distinction between arguing" that plaintiffs have no cause of action and arguing that they do not have Article III standing); *Bond v. United States*, 564 U.S. 211, 218–19, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011) (same). As this Court has previously explained, "constitutional standing is a matter distinct from and anterior to the question of whether a plaintiff has a cause of action under a statute." *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, —F.Supp.3d—, No. 4:20-CV-973-SDJ, 2021 WL 5003274, at *4 n.2 (E.D. Tex. Oct. 28, 2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4, 134 S.Ct. 1377, 188 L.Ed. 2d 392 (2014)).

But even taking *Day* on its own terms, the case is readily distinguishable. Unlike the plaintiffs in *Day*, Young Conservatives did not challenge or seek to enjoin

9

the provisions of Texas law that make unlawfully present aliens eligible for resident tuition. Rather, Young Conservatives challenged the statutory provision that is enforced against its members in violation of federal law and causes economic harm to them in the form of higher tuition. As the Tenth Circuit recognized in *Day* when it denied en banc review—and as more than five decades of binding precedent make clear—such a "sufficiently particularized economic injury" supports standing for a preemption claim. *Day v. Bond*, 511 F.3d 1030, 1033–34 (10th Cir. 2007). Thus, to the extent *Day* has any persuasive value here, it refutes rather than supports the UNT Officials' position.

The UNT Officials also assert that "[t]raceability and redressability are . . . absent because no injury can be traced to the UNT Officials" and Young Conservatives' members "cannot obtain resident tuition through a claim based on § 1623." (Dkt. #73 at 2); *see also* (Dkt. #69 at 4–5). This argument has no support in law or fact. It is undisputed that Section 54.051(d) sets the tuition rates for nonresident students and, when applied, requires them to pay more to attend UNT than students who qualify as Texas residents. It is also undisputed that, prior to the entry of the injunction at issue, the UNT Officials were charging some of Young Conservatives' citizen members nonresident tuition based on residency while allowing some aliens unlawfully present in the country to pay in-state tuition rates based on residency. The asserted economic injuries to Young Conservatives' members are therefore "fairly traceable" to the UNT Officials' enforcement of Section 54.051(d)'s tuition rates, and it is "likely" that those injuries are judicially

10

redressable by an injunction that prevents the application of those rates at UNT. *See Lujan*, 504 U.S. at 560–61.

The Court need not belabor the point: "If a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quotation omitted). By the UNT Officials' own admission, UNT is no longer charging United States citizens the higher tuition rate prescribed by Section 54.051(d) while simultaneously providing the benefit of cheaper resident tuition to unlawfully present aliens. (Dkt. #69 at 7–8). Thus, by prohibiting the UNT Officials from enforcing Section 54.051(d)'s tuition rates in violation of Section 1623, the Court has prevented violations of federal law that would have caused economic injuries to Young Conservatives' members. For these reasons, the UNT Officials' position as to traceability and redressability—like their injury-in-fact argument—is without merit.

In addition to their justiciability arguments, the UNT Officials challenge the scope of the injunction against them. They, once again, point to *Day* and argue that the injunction is overbroad because "[n]onresident students have no entitlement to in-state tuition." (Dkt. #69 at 6 (citing *Day*, 500 F.3d at 1135–36)). But in *Day*, the Tenth Circuit did not consider whether the plaintiffs had an equitable cause of action under *Ex parte Young* to enjoin the challenged state action. When "an individual claims federal law immunizes him from state regulation," the longstanding doctrine of *Ex parte Young* allows a court to "issue an injunction upon finding the state

11

regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015). Here, after full consideration of the merits, this Court concluded that Section 1623 preempted Texas's tuition scheme and enjoined the application of the specific state-law provision that would cause injuries to Young Conservatives' members. The propriety of such relief is well established. *See id.* (explaining that *Ex parte Young* allows federal courts to grant injunctive relief "against state officers who are violating, or planning to violate, federal law").

The last point deserves elaboration. The UNT Officials contend that injunctive relief "cannot exceed the underlying cause of action." (Dkt. #69 at 6 (citing *John Doe #1 v. Veneman*, 380 F.3d 807, 819 (5th Cir. 2004))). Yet, when arguing that they are likely to succeed on the merits of their appeal, they say not a single word about *Ex parte Young*. That silence speaks volumes.

At day's end, the UNT Officials have not offered new arguments or any authority indicating a likelihood of success on the merits—let alone a strong case at that. This factor therefore weighs heavily against granting a stay.

### B. Irreparable Injury to UNT

Turning to the second stay factor, the UNT Officials argue that the injunction will cause irreparable harm by preventing them from enforcing Texas law. The Fifth Circuit has said that "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). But at the same time, the Fifth Circuit has also held that a

12

governmental entity is not harmed by an order enjoining enforcement of an "unlawful (and likely unconstitutional)" law because any interest in enforcing such a law is "illegitimate." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021).

Here, the Court determined that Texas's tuition scheme directly conflicts with Congress's express directive in Section 1623 and is therefore unconstitutional under the Supremacy Clause. As explained above, the UNT Officials have not made any showing—let alone a strong showing—that this conclusion is wrong. Accordingly, even if the UNT Officials' interest in enforcing the challenged state law is legitimate, that interest carries less weight in the stay analysis. *Cf. Planned Parenthood*, 734 F.3d at 416, 419 (staying injunction where the State's interest in enforcing its laws was coupled with its strong showing of likely success on the merits).

The UNT Officials also contend that complying with the injunction pending appeal will result in unrecoverable revenue losses of approximately $5.7 million during the next academic year. To be sure, $5.7 million is a significant amount of money, and such a loss of revenue unquestionably would require UNT to make certain budgetary and administrative decisions. But as Young Conservatives points out, these losses also would account for only 0.68% of UNT's total budgeted revenue for the upcoming year. (Dkt. #72 at 8); *see also* (Dkt. #69-1 at 17). What's more, despite this economic harm, UNT still plans to spend $91,595,585 more in 2022 than it did in 2021. (Dkt. #69-1 at 17). These numbers cast doubt on the parade of horribles that the UNT Officials say will occur if the injunction remains in force pending appeal.

At bottom, the UNT Officials have shown that the injunction would cause some harm to UNT's interests. But for the reasons given above, any injury to UNT is "outweighed by [Young Conservatives'] strong likelihood of success on the merits." *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (collecting cases).

### C. Substantial Injury to Young Conservatives' Members

On the other side of the ledger, a stay pending appeal would substantially injure Young Conservatives' members. The UNT Officials disagree. They argue that a stay would not cause irreparable harm to Young Conservatives' members because their constitutional rights have not been violated and they have an avenue under Texas law to recover tuition overpayments.[3] That may be true, but the salient question here is "whether issuance of the stay will *substantially* injure" Young Conservatives' members, not whether the stay will cause them *irreparable* harm. *See Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (emphasis added).

In contrast to UNT's 0.68% decrease in annual revenue if a stay is denied, staying the injunction would force some of Young Conservatives' members (and many other United States citizens) to pay tuition rates nine times greater than those

---

[3] For the first time in their motion to stay, the UNT Officials contend that Young Conservatives' members have an avenue under Chapter 403 of the Texas Government Code to recover unlawfully collected tuition. *See* (Dkt. #69 (citing TEX. GOV'T CODE § 403.202 *et seq.*)). The Court recognizes that the refund mechanisms in Section 403.202 apply to "[f]ees paid to state universities" in violation of state law, but it is unclear whether tuition charged in violation of federal law falls under this protest statute. *See Dallas Cnty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 879 (Tex. 2005) (addressing student-services fees allegedly imposed in violation of Chapter 54 of the Texas Education Code). The UNT Officials do not elaborate on this point in their motion or their reply. *See* (Dkt. #69 at 13); (Dkt. #73 at 5).

14

allowed by federal law and the Constitution. (Dkt. #69-1 at 3, 15); *see also Tuition Plan Options for Undergraduate Students*, UNIV. OF N. TEX., https://sfs.unt.edu/tuition-and-fees (last visited Apr. 28, 2022). The UNT Officials brush aside this financial harm by characterizing nonresident tuition as an obligation these students assumed when they decided to attend UNT. But it is impossible to deny that the UNT Officials' violations of federal law, if allowed to resume, would have a significant impact on these students' financial condition. As the Court noted at the summary-judgment stage, UNT dropped one of Young Conservatives' members from her classes during the prior academic year because she could not afford to pay nonresident tuition. *Young Conservatives of Tex. Found.*, 2022 WL 1063876, at *9; *see also* (Dkt. #53-4, #53-6). In short, the substantial injury to Young Conservatives' members weighs against a stay.

**D. The Public Interest**

Finally, the Court considers whether staying the injunction would serve or disserve the public interest. When "the State is the appealing party, its interest and harm merge with that of the public." *Planned Parenthood*, 734 F.3d at 419 (citing *Nken*, 556 U.S. at 435); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (same). *But see U.S. Navy Seals*, 27 F.4th at 353 (quoting *Nken* and reasoning that the harm to the government and the public interest do *not* merge when the government is seeking a stay).

It is true that, as a general matter, the UNT Officials have an interest in seeing Texas's statutory tuition scheme enforced. *See Planned Parenthood*, 734 F.3d at 419.

15

And, as the UNT Officials point out, granting their request for a stay would return the legal landscape to the pre-injunction status quo, which "is an important equitable consideration" in the decision. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (quotation omitted). But because the Court determined Texas's tuition scheme offends the Constitution—and because the UNT Officials have not shown that the merits of the injunction will likely be disturbed on appeal—these considerations weigh weakly in favor of a stay. *See supra* Part III(A) and (B). After all, the public interest is served not only in protecting individual rights but also in maintaining principles of federalism and upholding our constitutional structure of government. *See BST Holdings*, 17 F.4th at 618–19. Under these circumstances, the Court concludes that the public-interest factor, at most, tilts slightly in favor of issuing a stay.

\* \* \*

In sum, the UNT Officials have not presented a substantial case on the merits. Their arguments for their likely success on appeal are contradicted by controlling Supreme Court and circuit precedent, rely on distinguishable, out-of-circuit authority, and disregard uncontroverted evidence in the record. At the same time, staying the Court's injunction pending appeal would substantially injure Young Conservatives' members. But even if the balance of the equities and the public interest both weighed in favor of a stay, those factors fail to overcome the conclusion "that the merits of the injunction will not likely be disturbed on appeal." *See Becerra*, 20 F.4th at 263 ("The other three factors for a stay—injury to the movant, injury to

16

the opponent, and the public interest—are important but, regardless of the outcome of analyzing them, they will not overcome our holding that the merits of the injunction will not likely be disturbed on appeal.").

## IV. Conclusion

For the foregoing reasons, Defendants Neal Smatresk and Shannon Goodman's Motion to Stay Permanent Injunction Pending Appeal, (Dkt. #69), is **DENIED**.

**So ORDERED and SIGNED this 28th day of June, 2022.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

17