# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2023

Lyle W. Cayce
Clerk

—————————

No. 22-40225

—————————

Young Conservatives of Texas Foundation,

*Plaintiff—Appellee*,

*versus*

Neal Smatresk, *President of the University of North Texas*; Shannon Goodman, *Vice President for Enrollment of the University of North Texas*,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:20-CV-973

———————————————————————

Before Smith, Clement, and Wilson, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

States often charge their residents one price for public college and charge those who live elsewhere much more. Texas allows illegal aliens who satisfy residency requirements to pay that in-state, lower tuition. A Texas university student group of out-of-state students sued officials at the University of North Texas, arguing that Texas' tuition scheme violated federal law. The district court agreed and barred the university from charging out-of-state tuition. We now REVERSE the judgment and VACATE the injunction.

No. 22-40225

# I

The facts here are undisputed. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act. *See* Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996). That act, among other things, restricts states' authority to grant certain postsecondary education benefits to illegal aliens unless other conditions are met. It directs that "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a).

Meanwhile, Texas charges students who satisfy certain residency requirements lower tuition than it charges to nonresident students. *See* TEX. EDUC. CODE §§ 54.051(c)–(d), 54.052. So long as they satisfy the statute's residency requirements, illegal aliens are eligible for Texas resident tuition. Out-of-state, nonresident American citizens are not. Currently, Texas resident tuition is pegged at $50 per semester credit hour. *See* TEX. EDUC. CODE § 54.051(c). Nonresident tuition instead totals $458 per semester credit hour.

Enter this lawsuit. The Young Conservatives of Texas Foundation (YCT) is a student group at the University of North Texas (UNT) comprising many nonresident members. YCT's "core organizational purpose is to advance conservative values" through a variety of actions. It has also "repeatedly opposed the disparate treatment of aliens who are not lawfully present in the United States and United States citizens from other states with regard to tuition."

That latter goal collided with UNT's tuition scheme. UNT, through its President, Neal Smatresk, and its Vice President for Enrollment, Shannon

2

No. 22-40225

Goodman, (the appellants here), charge illegal aliens who satisfied Texas' residency requirements resident tuition, and charge U.S. citizens who failed to meet those requirements nonresident tuition. YCT, believing this disparity unlawful and harmful to its members, sued in state court for injunctive and declaratory relief. Though it expressly *disclaimed* any challenge to what UNT charges to illegal aliens, it argued that the UNT officials improperly charged its members out-of-state tuition per § 54.051(d), which YCT believed was preempted by 8 U.S.C. § 1623(a).

Sometime after removal, the parties cross-motioned for summary judgment and the district court sided with YCT. It found that YCT had associational standing to challenge § 54.051(d); that though UNT itself was not a proper defendant under *Ex parte Young*, Smatresk and Goodman were[1]; that § 54.051(d) is both expressly and impliedly preempted by § 1623(a); and that YCT was entitled to a permanent injunction barring the UNT officials from enforcing § 54.051(d). The court then declared § 54.051(d) preempted and thus violative of the Constitution. It enjoined the UNT officials from enforcing "the tuition rates prescribed by Section 54.051(d) of the Texas Education Code against United States citizens at the University of North Texas." The UNT officials now appeal.

## II

We review a grant (or denial) of summary judgment de novo. *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018). A "court should grant summary judgment when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)). "We also review de novo the district court's ruling on standing[.]" *See Students for Fair Admissions, Inc. v.*

_____

[1] The UNT officials do not challenge this conclusion.

No. 22-40225

*Univ. of Tex. at Austin*, 37 F.4th 1078, 1083 (5th Cir. 2022). And finally, we review a grant of a permanent injunction for abuse of discretion. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam).

**A**

First, we must decide whether YCT has standing to challenge § 54.051(d). We conclude they do.

To establish standing, YCT must demonstrate (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) is fairly traceable to the defendant's actions; and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). But even if YCT has suffered no injury, it "may have standing to assert the claims of its members[.]" *Tex. Ent. Ass'n. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (citation omitted). To have associational standing, YCT must demonstrate that its members would have standing to sue in their own right, that the interests it seeks to protect are germane to its purpose, and that neither the claim nor the requested relief requires its members to participate in the lawsuit. *Id.* (citation omitted). It need only show that just one of its members would have standing. *See Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).

The court below found that YCT's out-of-state members would have standing; that the suit was germane to YCT's interests of education reform and the treatment of illegal aliens; and that the suit did not require the involvement of YCT's members. As for YCT's members themselves, the court found that they were injured by paying nine times more than in-state residents; that their injury was traceable to the UNT officials' enforcing § 54.051(d); and that an injunction stopping such enforcement would redress

4

the injury. On appeal, the UNT officials question only whether YCT's members have standing.[2]

First, the UNT officials argue that YCT's members are not injured. YCT and the district court's theory of injury here is straightforward: in-state residents pay an amount for college; enforcement of § 54.051(d) improperly charges out-of-state citizens a far higher amount; and that far-higher amount is an economic injury sufficient for standing.

In analyzing standing, we assume that YCT is correct on the merits such that § 54.051(d) is preempted by § 1623(a). *See, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("We assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim that the Guidance was promulgated in violation of the APA."). It's also the case that an economic injury is the "quintessential injury upon which to base standing." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). And to confer standing, such injury "need not measure more than an identifiable trifle." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations and citation omitted).

UNT argues first that any "injury" the students sustained was of their own making: out of all possible postsecondary options across the country, the students chose to buy—at an open, disclosed price—an out-of-state education where they are asked to pay more. In the UNT officials' framing, the university offered a bargain—out-of-state tuition in exchange for a college education—which students accepted and got the benefit of.

---

[2] Though the UNT officials do not challenge the other components of standing, we must nevertheless satisfy ourselves that they have been met. *See Cleartrac, LLC v. Lanrick Contractors, LLC*, 53 F.4th 361, 364 (5th Cir. 2022). We conclude they have. Whether U.S. citizens (or illegal aliens) are eligible for benefits is clearly germane to YCT's mission, and YCT's members need not be involved in the pure legal question presented here.

Indeed, "standing cannot be conferred by a self-inflicted injury." *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (citation omitted); *see also Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III."). But, at base, the students are handing over money that, in the absence of Texas' presumed-unlawful statute, they would happily retain. *Cf. Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) ("[P]laintiffs spent money that, absent defendants' actions, they would not have spent. . . . This is a quintessential injury-in-fact."). Just because they agreed to do so does not mean they are not, *in fact*, harmed by the 900% higher price UNT supposedly lacks power to impose. *See also* 13A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3531.5 (3d ed. 2008 & Supp. 2022) ("Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is *so completely due* to the plaintiff's own fault as to break the causal chain." (emphasis added)); *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 373, 377 n.14 (1978) (standing to challenge nonresident pricing for hunting licenses).

"Causation and redressability then flow naturally from th[at] injury." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015); *see also Lujan*, 504 U.S. at 561–62 (explaining that when the plaintiff "is himself an object of the action . . . at issue," "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it"). The harm is directly traceable to the UNT officials' wrongfully enforcing § 54.051(d). That section sets out-of-state tuition for these students (making them the statute's indirect object), which is then implemented and enforced by the UNT officials here. *See* TEX.

EDUC. CODE § 54.051(d). That enforcement causes the students' harm and will continue to do so as more payments are collected. That's enough to establish traceability. *Lujan*, 504 U.S. at 560 ("[T]he injury has to be fairly traceable to the challenged action of the defendant." (cleaned up)).

The UNT officials offer thin arguments in response. They insist that any duty to pay out-of-state tuition does not lie in a failure to properly apply § 1623(a), but instead comes from Texas' legislative choice to charge that tuition. They're right in that, but the argument misunderstands YCT's claim. YCT agrees that it's Texas' legislative choice to charge their members out-of-state tuition that caused their harm—but the entire point is that that legislative choice is preempted by § 1623(a) and is thus void. That must be assumed as true at this stage, and so we disagree with the UNT officials' arguments to the contrary.

The future harm is also redressable by favorable action here. If the UNT officials may no longer enforce § 54.051(d), then they may no longer calculate and charge out-of-state tuition. That erases the students' future harm. The UNT officials' responses again miss the mark. They claim that an order enjoining § 54.051(d) cannot make these students suddenly eligible for in-state tuition, which the officials believe to be the injury. But that misunderstands YCT's injury and, in turn, its desired remedy. YCT is not asking us to make its members categorically eligible for in-state tuition. Rather, YCT is asking us to stop UNT officials from charging an improper or unlawful price. The officials muddy the two.

In response, the officials insist that they only charge rates set by statute and the district court lacks any power to force Texas to change its statutes. But as YCT notes, that misunderstands redressability. While it's true that no "provision in the Constitution permits a court to dictate to legislative bodies . . . what laws . . . they must promulgate," *Mi Familia Vota*

*v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020), we need not do so here. As the officials themselves explain, "[u]nder state law, a public university cannot assess a charge unless authorized by law, giving UNT no choice but to assess to out-of-state U.S. citizens the only tuition rate that was not enjoined: *the in-state tuition rate*." That's exactly the fix that would—and so far, did—redress the students' injury. Preventing application of the unlawful rate imposed by § 54.051(d) is sufficient redress to establish standing.

Thus, YCT's members have an injury in fact, traceable to the complained-of acts of the defendants, which is likely redressable by favorable action by this court. They therefore have standing. Because those members' participation here is not needed, and because this suit is germane to YCT's purpose, YCT also has standing to challenge § 54.051(d).

**B**

Next, we must decide whether the *specific provision* that YCT has chosen to challenge is preempted by federal law. We conclude it is not, even if other, unchallenged provisions in Texas' scheme may be.

Thanks to the Constitution's Supremacy Clause, state laws that conflict with federal law are without effect. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Federal law can preempt state law when (1) Congress expressly commands it so; (2) the state law and federal law actually conflict; or (3) Congress "so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (quotations and citations omitted). "In determining whether a state law or regulation is preempted, Congress's intent is the ultimate touchstone." *Union Pac. R.R. Co. v. City of Palestine*, 41 F.4th 696, 704 (5th Cir. 2022) (quotations and citation omitted). Finding Congress's intent requires "examin[ing] the explicit statutory language and the structure

and purpose of the statute." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).

The district court first found that § 1623(a) expressly preempted § 54.051(d). Then, in the alternative, the district court found that § 1623(a) and § 54.051(d) conflicted to such a degree that following them both was impossible. The UNT officials disagree on both fronts.

**1**

A federal statute expressly preempts a state law when Congress "adopts express language defining the existence and scope of pre-emption." *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500, 504 (5th Cir. 2022) (citation omitted). And when the statute contains an express preemption clause, the court does not indulge "any presumption against pre-emption but instead focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quotations and citation omitted). "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue, and in the first instance we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492 (5th Cir. 2017) (alterations adopted) (quotations and citation omitted).

Section 1623(a) contains an express preemption clause. It directs that "[n]otwithstanding any other provision of law," an illegal alien "shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a). To reach its conclusion, the district court framed the statute a different way. In § 1623(a) the district court found a "simple rule: If a State makes an unlawfully present alien eligible for a

postsecondary education benefit on the basis of state residency, it must make a United States citizen eligible for the same benefit regardless of whether the citizen is such a resident." Thus, said the court, Congress meant to "invalidate state laws that deny United States citizens eligibility for a postsecondary education benefit . . . based on residency if unlawfully present aliens are eligible for that benefit based on residence within the State." Because § 54.051(d) does exactly that (by charging nonresident tuition), it was found expressly preempted.

The UNT officials balk at the court's rewording. Rather than merely make the statute easier to read, they say, the court instead "converted Section 1623's 'unless' clause—a condition precedent to granting a benefit to aliens—into an affirmative obligation to give citizens benefits granted to aliens." This led the court to *require* states to grant benefits to citizens if they grant those benefits to illegal aliens. Per the UNT officials, this improperly rewrites Congress's prohibitory statute and falsely implicates § 54.051(d).

We agree. Start with the text. Section 1623(a) commands that an illegal alien "shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a) (emphasis added). A preliminary question is what is meant by the chameleon "shall." *See Words of Authority*, Bryan Garner, Garner's Dictionary of Legal Usage (3d ed. 2011) (explaining that "shall can bear five to eight senses even in a single document"). Typically, shall is meant to impose a duty (e.g., you shall file your taxes by April 15). But when followed by not, shall often instead means may (i.e., you shall not means you may not). *See id.* ("The word shall gives permission (as opposed to a duty), and shall not denies permission (i.e., it means 'may not')"—Garner laments the "pervasive problem" of shall/may misuse); *see also Shall*, Black's Law

Dictionary (11th ed. 2019) (explaining that shall can mean may, especially when paired with a negative word like not or no).

That latter reading of "shall not" is the better understanding here: it denies permission. Otherwise, § 1623 would impose a duty on *illegal aliens* to not be eligible for benefits if citizens are not. That outcome wouldn't make sense. Instead—with "shall not" given proper effect—the statute simply requires that all U.S. citizens be eligible for a benefit, without regard to residency, before any alien be able to receive the same benefit (based on residency). Hence the title, "Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits." In doing so, it merely targets offending *laws*.

That brings us to the district court's rewrite. The district court's new "rule" says, in essence, "that if a state says illegal aliens are eligible, it shall say that U.S. citizens are eligible." This is wrong in several ways. First, unlike the statute, the district court imposes a duty—*i.e.*, it uses the wrong definition of shall. Unlike the statute as written, which is entirely prohibitory and *limits* what can properly be done, the court's rule demands action. Second, it moves shall to the wrong side of the sentence. Rather than using the statute's proper "if A, then B" form ("if immigrants shall be eligible, U.S. citizens are"), the court has it backwards ("if immigrants are eligible, U.S. citizens shall be"). Third, it changes the object of the statute's regulation. Now, rather than declaring a limitation on illegal alien eligibility itself, the court's rule regulates states directly. In short, the district court applied an entirely different rule than the one Congress passed.

So, going instead with the proper reading of § 1623(a), the statute expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same. No matter what a state says, if a state did not make U.S. citizens eligible, illegal aliens cannot be eligible. But, to be

clear, § 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens. *Cf. Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007) ("Section 1623 does not provide that 'No nonresident citizen shall be denied a benefit' afforded to an illegal alien, but rather imposes a limit on the authority of postsecondary educational institutions."). Its sole focus is on improper benefits for illegal aliens.

Section 54.051(d)—the one and only section challenged here—does not grant those benefits. It does nothing more than set the tuition price for nonresident students, citizens or not. It takes no stance on whether illegal aliens are eligible for a cheaper price.[3] Section 1623(a) has nothing to say about a rule like that. Therefore, § 54.051(d) is not expressly preempted by § 1623(a).

**2**

The district court, relying again on its erroneous reading, also found that § 54.051(d) conflicted with § 1623(a) to such degree that it was impliedly preempted. It is not.

Unlike express preemption, conflict preemption begins with the presumption "that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citation omitted). Such preemption exists when "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotations and citation omitted).

Per the district court, it's impossible to both (1) to charge out-of-state U.S. citizens the nonresident tuition rate (as § 54.051(d) requires of

---

[3] Which we here assume is a postsecondary benefit.

universities) and also (1) to charge out-of-state U.S. citizens the resident price (as, thought the court, was required by § 1623(a) since illegal aliens could earn resident tuition). Unsurprisingly, then, the district court found § 54.051(d) preempted.

But again, § 1623(a) does not require what the district court insists it does. The court and YCT have it backwards: the problem with Texas' system relevant to § 1623(a) is that it grants illegal aliens in-state benefits, not that it denies those benefits to U.S. citizens. Section 1623(a) does not restrict the latter, and burdens Texas with no duty related to U.S. citizens. That § 54.051(d) calculates and imposes a nonresident tuition rate (for U.S. citizens, foreign nationals, and immigrants alike) has nothing to do with § 1623(a)'s mandate that illegal aliens are ineligible for in-state benefits unless U.S. citizens are. Thus, even though a different, *unchallenged* portion of Texas' scheme seems to conflict with § 1623(a), it is entirely possible to follow both § 1623(a) and § 54.051(d) at the same time.

YCT's arguments generally track the district court's reasoning and are wrong for the same reasons. But one warrants addressing. YCT contends that § 1623(a) requires that universities either make illegal aliens eligible for in-state tuition, or they can charge U.S. citizens out-of-state tuition. They cannot do both. And, says YCT, § 1623(a) is "wholly agnostic on how universities choose to comply with its terms." *Id.* That is not correct. While it's true that § 1623(a) disallows alien eligibility if paired with citizen ineligibility, the statute makes clear that if a state tries both, the former must give. The statute does not grant a choice—illegal aliens simply are not eligible if citizens aren't.

Further still, though the district court didn't address the question, § 54.051(d) does not hamper Congress's § 1623(a) objectives. To start, declaring a statute enough of an obstacle for implied preemption is "a matter

of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). As luck would have it, Congress made explicit its aims for the Illegal Immigration Reform and Immigrant Responsibility Act. *See* 8 U.S.C. § 1601. They include promoting immigrant self-sufficiency, reducing immigrant reliance on public assistance, and ensuring that public benefits aren't incentives to enter illegally. *Id.* The strictures of § 54.051(d) are silent on those objectives. Section 54.051(d) only imposes nonresident tuition for those who do not qualify for Texas residency (alien or citizen alike). It does not offer a public benefit to illegal aliens, and thus cannot affect that class's self-sufficiency, their reliance on public services, or their incentives to come to America. Unlike Texas' rule allowing illegal aliens to qualify for resident tuition (which implicates *every* IIRIRA objective, often in the negative), § 54.051(d) speaks only to the price that nonresidents pay. Congress's objectives are not thwarted by that higher price.

Since § 54.051(d) neither conflicts with, nor harms the objectives of, § 1623(a), the latter does not impliedly preempt it. The district court was wrong to find otherwise.

## C

With that conclusion in mind, we turn next to whether the district court abused its discretion in permanently enjoining the university officials from enforcing § 54.051(d). We conclude it did.

The court reviews a grant of a permanent injunction for abuse of discretion. *Scott*, 826 F.3d at 211. A district court "abuses its discretion if (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the

No. 22-40225

factual or legal conclusions when fashioning its injunctive relief." *Peaches Ent. Corp. v. Ent. Repertoire Assocs.*, 62 F.3d 690, 693 (5th Cir. 1995).

Because the district court awarded a permanent injunction by relying on its erroneous preemption analysis, it abused its discretion.

## III

There may be valid preemption challenges to Texas' scheme here. But this is not one of them. The district court's judgment is REVERSED, and its permanent injunction is VACATED.